**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| VI-JON, LLC,[1] | Case No. 26-11216 (___) |
| Debtor. | |

**DEBTOR'S MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE
DEBTOR TO CONTINUE OPERATING UNDER THE SHARED
SERVICES AGREEMENTS AND (II) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "Debtor") respectfully states the

following in support of this motion (the "Motion"):[2]

**RELIEF REQUESTED**

1.	The Debtor seeks entry of an interim order and a final order (respectively,

the "Interim Order" and "Final Order"), substantially in the forms attached hereto as **Exhibit A**

and **Exhibit B**, respectively, granting, among other things, the following relief:

a.	authorizing, but not directing, the Debtor to continue operating under:

    i.	that certain Administrative Services Agreement, dated December 3, 2023, by and among Vivos Holdings, LLC ("Vivos") and the Debtor (the "Vivos Administrative Services Agreement"), attached hereto as **Exhibit C**;

    ii.	that certain Administrative Services Agreement, dated December 3, 2023, by and among Vi-Jon Holding, Inc. (n/k/a Emprise Group, Inc. ("Emprise")) and the Debtor (the "Emprise Administrative Services Agreement" and together with the Vivos Administrative Services

---

[1] The Debtor in this chapter 11 case is Vi-Jon, LLC.  The last four digits of the Debtor's federal tax identification number are 8002.  The Debtor's service address is 8800 Page Ave., St. Louis, MO 63114.

[2] A detailed description of the Debtor, its business and the facts and circumstances supporting this Motion and the Debtor's chapter 11 case are set forth in greater detail in the *Declaration of Mackenzie Shea in Support of the Debtor's Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day Declaration.

Agreement, the "Administrative Services Agreements"), attached hereto as **Exhibit D**;

    iii.    that certain Co-Manufacturing and Supply Agreement by and among Consumer Product Partners, LLC (n/k/a Nice-Pak ("Nice-Pak")) and the Debtor (the "Co-Manufacturing Agreement" and, together with the Administrative Services Agreements, each as amended from time to time, collectively, the "Shared Services Agreements"), attached hereto as **Exhibit E**;

b.    authorizing, but not directing, the Debtor to pay amounts arising postpetition under the Shared Services Agreements in accordance with the reconciliation procedures outlined herein; *provided* that such amounts shall not exceed $2,000,000 during the first 30 days of this Chapter 11 Case (the "Interim Period" and such amount, the "Interim Cap"); and

c.    granting related relief, including scheduling a final hearing to consider approval of the Motion on a final basis.

## JURISDICTION AND VENUE

2.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtor confirms its consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.    The statutory and legal bases for the relief requested in this Motion are sections 105(a), 362, and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and rules 6003

and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 9013-1.

## BACKGROUND

5.    The Debtor is a provider of private-label dry bath products consisting of Epsom salts and body powders.  The Debtor's products are sold across retail and e-commerce channels in the United States to major retailers such as Amazon, Dollar General, Kroger, TopCo, and Walgreens.  The Debtor leverages shared-services and co-manufacturing agreements with its affiliates for sourcing, manufacturing, packaging, testing, quality control, and distribution of its products.

6.    On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court.  The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in this case, and no statutory committee has been appointed.

7.    Additional information regarding the Debtor's business, capital structure, and circumstances preceding the Petition Date may be found in the First Day Declaration.

## THE SHARED SERVICES AGREEMENTS

### I.    The 2023 Restructuring Transaction and the Shared Services Framework

8.    In 2023, the Vi-Jon enterprise effected a strategic internal reorganization (the "2023 Restructuring Transaction") to (a) better align its organizational structure with each of their product lines, which included (i) private-brand liquid fill household and personal care products, (ii) private-brand dry goods and personal care products, and (iii) branded products such as Germ-X, a leading brand of hand sanitizer and (b) begin to manage mounting talc-related liabilities.

3

9.      As part of the 2023 Restructuring Transaction, the parent company of the enterprise, Vi-Jon Holding, Inc., was renamed Emprise Group, Inc.   Vivos was formed in June 2023 and became the home of the liquid fill and branded product lines, while the Debtor retained its private-brand dry goods and personal care products lines of business.  At that time, the Debtor and its Non-Debtor Affiliates entered into the Shared Services Agreements so that the enterprise could continue working through common systems, vendor relationships, customer relationships, and shared administrative support without requiring each entity to duplicate those functions on a standalone basis.

10.     Following the 2023 Restructuring Transaction, the Debtor has continued to operate its private brand dry goods business, with product offerings primarily focused on Epsom salts and body powders, although its broader product offerings include personal-care, bath, hygiene, and over-the-counter products.  The Debtor sells primarily to large retailers, and certain of the Debtor's customers also maintain commercial relationships with certain Non-Debtor Affiliates.

11.     Because of this structure, the Debtor relies on its Non-Debtor Affiliates through the Shared Services Agreements for procurement, raw materials, manufacturing, order administration, sales support, taxes, utilities, employee benefits, insurance, cash management, finance, accounting, information technology, legal, regulatory, risk-management, and other administrative services. The Debtor's business also operates within an enterprise-level cash management system with Emprise and other Non-Debtor Affiliates.

12.     The Debtor's operations rely on the Shared Services Agreements and an interruption to such agreements would impair the Debtor's ability to collect receipts, fund limited disbursements, maintain essential services, and continue operating during this chapter 11 case.

13. It is therefore essential that the Debtor continue to access the services provided by its Non-Debtor Affiliates under the Shared Services Agreements in order to maintain the stability of its business and maximize estate value.

**A. The Vivos Administrative Services Agreement**

14. Pursuant to the Vivos Administrative Services Agreement, Vivos provides or administers a variety of operational and administrative services key to the Debtor's operations, including:

a) Management Services: providing comprehensive managerial services, including, but not limited to, administrative supervision, business guidance, operational coordination, strategic planning support, and assistance with everyday business operations;

b) Human Resources: managing personnel-related matters, payroll administration and payroll processing management, ensuring compliance with employment laws and regulations;

c) Finance and Accounting: providing financial management and oversight, budget preparation and monitoring, comprehensive reporting, bookkeeping, payroll processing, and tax management services;

d) Order Processing: administering order processing functions, including preparing invoices for Debtor and Non-Debtor Affiliate products on a consolidated basis and collecting payments on behalf of such orders;

e) Information Technology: managing networks, hardware and support, software maintenance, data security and integrity measures, and other technical support as required;

f) Etzel Services: coordinating and paying for certain utilities and insurance at the Etzel Property (as defined below); and

g) Legal & Regulatory Compliance: assisting in analysis and compliance with applicable laws and regulatory standards.

15. In exchange for the services provided by Vivos, the Debtor and Vivos negotiated a fee of approximately $572,000 for Vivos' services in 2026, which fee is annually renegotiated by Vivos and the Debtor based on the expected costs of such services and the Debtor's relative proportion of expected net sales across the Debtor's and Non-Debtor Affiliates' product lines

(the "Vivos Administrative Fee").  The Vivos Administrative Fee is not subject to reconciliation based on the actual costs of such services.  As of the Petition Date, the Debtor estimates that approximately $286,000 is outstanding and payable pursuant to the Vivos Administrative Services Agreement, which is incorporated into the balance under the Intercompany Promissory Note.

16.     The Debtor also reimburses Vivos for any direct costs Vivos incurs on the Debtor's behalf including, but not limited to, insurance, taxes, utilities (including at the Etzel Property), employee health benefits, and vendor payments.  Historically, the Debtor and its Non-Debtor Affiliates, including Vivos, Nice-Pak, and Emprise, have reconciled intercompany transactions, including the Debtor's direct costs under the Shared Services Agreements, on a monthly basis for accounting purposes, and only cash settling such amounts pursuant to true-ups from time to time, with the last true-up having occurred in December 2025.  As further discussed herein, postpetition activity between the Debtor, Vivos, Emprise, and any other Non-Debtor Affiliates will be settled through weekly cash remittances rather than carried as a continuing intercompany balance.

17.     As the Debtor only has one employee, the Debtor does not have the internal personnel, systems, or infrastructure necessary to provide these services on its own.  Further, the Debtor does not have a practicable path to replace these services quickly during this chapter 11 case.  Creating a separate, standalone platform for the Debtor would require duplicating functions that Vivos already provides at the enterprise level, which would be costly, inefficient, and unnecessary.  The Vivos Administrative Services Agreement instead allows the Debtor to access existing enterprise resources and compensate Vivos for the services and direct costs attributable to the Debtor.  Accordingly, continued access to Vivos' services, including the ability to make payments on account of the postpetition obligations related thereto in the Debtor's discretion, is

6

essential to avoid disruption, preserve estate value, and allow the Debtor to administer this chapter 11 case efficiently.

### 1. Property Insurance

18.     Pursuant to the Vivos Administrative Services Agreement, Vivos pays for property insurance for real property owned by the Debtor located at 6300 Etzel Avenue, St. Louis, Missouri (the "Etzel Property").  Property insurance across the business enterprise is paid on an aggregated basis across properties and constitutes (with respect to the Etzel property) part of the fixed overhead charge under the Co-Manufacturing Agreement but is maintained by Emprise and paid for by Vivos.  The Debtor estimates that the Etzel Property comprises approximately $5,000–5,500 of annual premiums.

19.     Although the Etzel Property is non-operational, it remains an estate asset whose cash proceeds will be Trust Assets contributed to the Talc Personal Injury Trust.  The property remains exposed to ordinary real-property risks, including casualty loss, fire, weather events, vandalism, theft, premises liability, and other damage.  Maintaining insurance coverage protects the estate from potentially significant uninsured losses.  Accordingly, it is imperative that the Debtor continue to perform under the Vivos Administrative Services Agreement, including the ongoing reconciliation of the costs associated with insuring the Etzel Property.

### 2. Taxes and Fees

20.     In the ordinary course of business, the Debtor may incur tax liabilities, including sales and use taxes, real and personal property taxes, and income taxes, as well as certain regulatory and filing fees (collectively, the "Taxes and Fees").  The Debtor does not directly pay any of its

Taxes and Fees.  Instead, Vivos pays or administers the Taxes and Fees on the Debtor's behalf to the relevant federal, state, and local taxing authorities (the "Taxing Authorities").

21.     As noted above, the Administrative Services Agreements distinguish between services covered by the Vivos Administrative Fee and direct costs paid on the Debtor's behalf. Tax-management, finance, and accounting support are administrative services covered by the applicable fixed annual fee.  The payment of actual Taxes and Fees to the Taxing Authorities on the Debtor's behalf is treated as a direct cost.  Sales and use taxes and real and personal property taxes are generally administered and paid by Vivos on the Debtor's behalf, while consolidated income, franchise, margin, or similar taxes are generally administered by Emprise, but ultimately paid by Vivos.  Because Emprise is ultimately owned by a trust pursuant to an employee stock ownership plan ("ESOP"), Emprise and its affiliates (including the Debtor) operate on a pass-through basis for federal income tax purposes and do not directly incur federal income taxes.

22.     Similar treatment is afforded under the vast majority of state income tax regimes, with minimal exceptions.  The Debtor incurs *de minimis* franchise, margin, excise taxes, and LLC fees at the state level in an annual amount of approximately $7,000, and such amounts are paid by Vivos and reconciled pursuant to the intercompany reconciliation process.  Property taxes on the Etzel Property in 2025 were $17,095.34 and the Company anticipates a similar annual cost for 2026.  The Company is charged approximately $1,500 per month by Vivos on account of the property taxes on the Etzel Property.

23.     The Debtor's failure to continue participating in the Administrative Services Agreements, including the reconciliation of its obligations to Vivos on account of the Taxes and Fees, could materially and adversely impact the Debtor's business operations in several ways. *First*, a failure to continue performing under the Administrative Services Agreements, including

the reconciliation of the Taxes and Fees, could lead Vivos and Emprise to suspend performance under the Administrative Services Agreements, which provide for a wide variety of services essential to the Debtor's continued operations. *Second*, a suspension of performance by Vivos or Emprise could lead to the Debtor being subject to unpaid Taxes and Fees—potentially causing the Debtor to lose the ability to conduct business in certain jurisdictions. *Third*, in connection with unpaid Taxes and Fees, the Taxing Authorities could initiate audits, suspend operations, impose liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtor's attention from this chapter 11 case. *Fourth*, unpaid Taxes and Fees could (i) result in penalties, the accrual of interest, or both, and (ii) subject certain of the Debtor's directors and/or officers, as applicable, to claims of personal liability—which likely would distract those key persons from their duties related to the Debtor's operations and this chapter 11 case, each of which could negatively impact the Debtor's business and estate value.

24.     Accordingly, the Debtor seeks authority, but not direction, to continue to perform under the Administrative Services Agreements, including with regard to intercompany reconciliation of the Taxes and Fees in the ordinary course of business consistent with historic practice as set forth more fully herein.

3.     *Utilities*

25.     The Etzel Property uses a limited number of utilities, including electricity, gas, water, security, and waste services. Vivos pays the various utility providers for these services, and such amounts, which total to approximately $18,000 per month, constitute direct costs under the Vivos Administrative Services Agreement and are subject to the intercompany reconciliation process.

26.     Uninterrupted utility services are essential to preserve the value of the Etzel Property. Although the Etzel Property is non-operational, the Debtor requires the utility services

to preserve the property, protect against theft or damage, and avoid safety, insurance, or other issues that could diminish estate value.  Any disruption of such services, even for a brief period, could impair the Debtor's ability to preserve estate assets, protect the value of the Etzel Property, and impose unnecessary costs.  Accordingly, it is critical that such services continue on an uninterrupted basis throughout this chapter 11 case.

**B.      The Emprise Administrative Services Agreement**

27.      Pursuant to the Emprise Administrative Services Agreement, Emprise provides or administers a variety of key services that support the Debtor's operations, including:

a) <u>Corporate Governance and Secretarial Services</u>: providing services related to corporate governance, such as ensuring compliance with corporate laws and regulations, maintaining corporate records, arranging board meetings, and other secretarial tasks;

b) <u>Risk Management</u>: identifying potential risks, developing risk mitigation strategies, and managing, and binding the Debtor's insurance policies;

c) <u>Employee Benefits</u>: maintaining and administering the Debtor's employee benefits programs; and

d) <u>Tax Support</u>:  providing consolidated tax support, coordination of tax filings and related costs, and other enterprise-level support services.

28.      The Debtor is not charged an annual fee by Emprise for these services and, as of the Petition Date, the Debtor does not believe any amounts are outstanding and payable pursuant to the Emprise Administrative Services Agreement.  Instead, Vivos pays the amounts associated with these services, and such amounts are reconciled through the intercompany reconciliation process. The Insurance Program (as defined below) is charged to the Debtor at cost, while the Workers' Compensation Program (as defined below) and the employee benefit program, and their related administrative costs, are charged to the Debtor as a fee equal to 21% of the Employee's gross payroll.

29.     As is the case with the services provided by Vivos, the Debtor does not have the ability to provide these services on its own and does not have a practicable path to quickly replacing such services.  Accordingly, continued access to Emprise's services, including the ability to make payments (to Vivos) on account of obligations relating to such postpetition services in the Debtor's discretion, is essential to avoid disruption, preserve estate value, and allow the Debtor to administer this chapter 11 case efficiently.  Further detail regarding the services provided by Emprise and paid for by Vivos on account of the Debtor follows.

### 1.     Insurance Program

30.     Emprise maintains coverage under a group insurance program (the "Insurance Program" and the policies thereunder, the "Insurance Policies") that provides coverage for the Debtor and its Non-Debtor Affiliates (although the amounts due under the Insurance Program are paid by Vivos).  The Insurance Program includes coverage for, among other things, general liability, umbrella coverage, excess liability, product liability insurance and directors' and officers' liability.  The Insurance Policies vary in amounts and types of coverage in accordance with prudent business practices and state and local laws governing the Debtor's operations and various contracts.

31.     The Debtor does not pay for coverage under any of the Insurance Policies directly.  Instead, the Debtor reimburses Vivos via the intercompany reconciliation process.  Most of the Debtor-attributable portion of premiums, taxes, fees, audits, surcharges, and other insurance-related costs constitute a part of the fixed overhead charge under the Co-Manufacturing Agreement.

32.     The Insurance Policies are essential to preserve the value of the Debtor's business, property, and assets during this chapter 11 case.  Some of the Insurance Policies are required by applicable law, contract, or U.S. Trustee guidelines, and the failure to maintain appropriate

insurance could create risk to the estate. Moreover, the *Operating Guidelines for Chapter 11 Cases* of the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") require debtors to maintain insurance coverage throughout the pendency of chapter 11 cases.

### 2.    Workers' Compensation Program

33.    Emprise coordinates, manages, and pays for the Debtor's workers' compensation program (the "Workers' Compensation Program," and the Debtor's obligations thereunder, the "Workers' Compensation Obligations") for its employee, and maintains such program at the level required by law for claims arising from or related to his employment with the Debtor and to satisfy the Workers' Compensation Obligations. Emprise also maintains third-party insurance for the Workers' Compensation Program, including coverage for the Workers' Compensation Obligations. Similar to the Insurance Program, Vivos (not Emprise) pays the amounts due under the Workers' Compensation Program.

34.    To the extent the Debtor's employee asserts any claims arising under the Workers' Compensation Program, the Debtor requests that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the employee to proceed with his claims under the Workers' Compensation Program; *provided* that any recovery on account of such claims is limited solely to funds available under the Debtor's Workers' Compensation Program and not to other estate funds. This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

### 3.    Employee Benefits

35.    As discussed more fully in the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtor to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefit Programs and (II) Granting Related Relief*, filed contemporaneously herewith, the Debtor employs

12

one employee as of the Petition Date. The employee is eligible to participate in the various employee benefit programs administered by Emprise, including, but not limited to, medical and prescription drug coverage, dental coverage, short-term and long-term disability, 401(k), life insurance, and ESOP benefits.

36. Emprise provides or administers these employee benefit programs for the Debtor's employee under the Emprise Administrative Services Agreement, while Vivos pays certain benefit providers and plan administrators on the Debtor's behalf and charges the Debtor for benefit-related amounts and related administrative costs as provided under the Administrative Services Agreements. Maintaining the employee's access to these benefit programs is important to the Debtor's ability to retain its employee and avoid unnecessary disruption during this chapter 11 case.

37. Accordingly, it is critical that the Debtor continue to perform under the Emprise Administrative Services Agreement, including with regard to ongoing reconciliation of the costs on account of the Debtor's participation in Emprise's employee benefits program.

**C.      The Co-Manufacturing Agreement**

38. The Co-Manufacturing Agreement provides for the operational framework through which Nice-Pak supports the Debtor's dry goods business. Nice-Pak provides sourcing, production, manufacturing, packaging, warehousing, logistics, customer-service, and sales support for certain Epsom salt, personal care powder products, and other dry goods products. As detailed below, all charges accrued between the Debtor and Nice-Pak are settled through the intercompany reconciliation process.

39. Epsom Salt: The Debtor sells its Epsom products directly to its retail customers but relies on Nice-Pak to source or procure raw, bulk magnesium sulfate and related materials, convert those materials into finished Epsom salt goods, package the products, and move finished goods

13

through Nice-Pak's warehouse and distribution network.  Title transfers to the Debtor when the product reaches Nice-Pak's distribution center.  The Debtor then sells such products to its customers; however, Nice-Pak manages the shipments of product to the customer.

40.     Body Powder: The Debtor sells fully finished and packaged body powder products directly to its retail customers, but relies on Nice-Pak to source finished goods from third-party suppliers, coordinate receipt of those goods into Nice-Pak's distribution network, and coordinate outbound shipments of the product to the Debtor's customers.

41.     Under the Co-Manufacturing Agreement, Nice-Pak charges the Debtor (i) the SG&A Costs (as defined below), (ii) direct costs incurred during production, and (iii) a 12.5% manufacturing fee on Epsom salt products.

42.     SG&A Costs: Under the Co-Manufacturing Agreement, Nice-Pak charges the Debtor an annual fee of $400,000 for sales, customer service, sales support, research and development, and related services (the "SG&A Costs").  Similar to the Vivos Administrative Fee, this amount is renegotiated annually by the Debtor and Nice-Pak on an arm's-length basis.

43.     Nice-Pak also charges the Debtor for certain direct costs associated with sourcing, production and manufacturing, direct labor, and order processing, including, but not limited to procuring raw materials, pallets used for shipping, in-warehouse overhead costs, and the freight costs of shipping.  Included in these direct costs are certain variable, fixed overhead, and distribution costs charged based on a proportional number of units sold: (i) variable overhead equal to $0.115 per unit, (ii) fixed overhead equal to $0.082 per unit (applicable to Epsom salt products only), and (iii) distribution equal to $0.043 per unit.  A portion of the fixed overhead costs are attributable to certain of the policies included in the Insurance Program.

44. Finally, in addition to the SG&A Costs and the direct costs of production and distribution, the Debtor also pays a contract manufacturing fee of 12.5% of the product cost of Epsom salt products.

45. The Co-Manufacturing Agreement is the sole means by which the Debtor sources and sells products. Accordingly, the importance of this agreement to the Debtor cannot be overstated—absent the ability to continue under the Co-Manufacturing Agreement, the Debtor's estate will lose its only source of revenue. Accordingly, it is critical that the Debtor be permitted to continue operating under the Co-Manufacturing Agreement, including the ability to make payments on account of such postpetition services in the Debtor's discretion, in the ordinary course of business and consistent with historical practices.

## II. Intercompany Reconciliation

46. The Debtor and its Non-Debtor Affiliates use an intercompany payment, accounting, and reconciliation process to account for the integrated operations described above. The Intercompany Transactions include, among other things: customer receipts collected by Vivos or the Debtor; shared-services fees; direct costs paid or administered by Non-Debtor Affiliates; manufacturing and distribution charges; Taxes and Fees; utilities; insurance; employee benefits; payroll-related amounts; inventory movements; reimbursements; allocations; and any other amounts attributable to the Debtor or a Non-Debtor Affiliate under the Shared Services Agreements.

47. Historically following the 2023 Restructuring Transaction, the Debtor and its Non-Debtor Affiliates closed their books based on a 5-4-4 retail calendar, an accounting calendar commonly used by retailers that divides each fiscal quarter into three fiscal periods of five weeks, four weeks, and four weeks, respectively, resulting in 13-week quarters and generally a 52-week fiscal year. As part of that process, the Debtor and its Non-Debtor Affiliates would process,

15

identify, and reconcile customer receipts, shared-services charges, affiliate-paid costs, manufacturing costs, logistics costs, taxes, utilities, insurance, employee benefits, inventory movements, cash-management-related obligations, and other amounts attributable to the Debtor or the Non-Debtor Affiliates. The Debtor and the Non-Debtor Affiliates recorded activity, identified and corrected discrepancies, and maintained accurate intercompany balances, with cash settlement of those intercompany balances occurring from time to time pursuant to a true-up.

48.     After the 2023 Restructuring Transaction, many customers continued to purchase products from both the Debtor and the Non-Debtor Affiliates. As a result, those customers typically submit consolidated purchase orders that include products sold by the Debtor together with products sold by the Non-Debtor Affiliates. Other than the Debtor, only Vivos issues invoices that include the Debtor's products. Each invoice identifies the stock-keeping unit ("SKU") for each product sold, which allows the Debtor and the Non-Debtor Affiliates to determine which portion of the order and related customer payment is attributable to each entity. Vivos then collects the customer payment. The Debtor-attributable portion of those receipts is then identified and reconciled against amounts the Debtor owes to the Non-Debtor Affiliates under the Shared Services Agreements, including service fees, reimbursements, direct costs, and other amounts paid or incurred on the Debtor's behalf. This process allows the Debtor and its Non-Debtor Affiliates to track consolidated customer receipts, assign those receipts to the proper entity, identify and correct discrepancies, and maintain accurate intercompany balances.

49.     Additionally, certain customers purchase products directly from the Debtor and pay the Debtor directly for such products.

50.     Prior to the Petition Date, the Debtor and its advisors undertook an evaluation of all intercompany reconciliations occurring after the 2023 Restructuring Transaction, which

showed that the Debtor and its Non-Debtor Affiliates conducted intercompany reconciliation monthly and remitted cash payments from time to time to settle intercompany balances, with the last true-up having occurred in December 2025.

51.     Additionally, the Debtor and its advisors initiated a prepetition process to provide greater visibility into weekly postpetition cash flows, and to separate, track, and reconcile Debtor-attributable receipts and disbursements more frequently.  Going forward, postpetition activity will be reconciled and settled through weekly cash remittances rather than being subject to periodic true-ups.  At the close of each week, the Debtor and its Non-Debtor Affiliates will reconcile postpetition customer receipts, shared-services charges, affiliate-paid costs, direct costs, reimbursements, allocations, and other Intercompany Transactions.  The weekly reconciliation will be completed by the following Thursday, and the resulting net balance will be settled by cash remittance on the following Friday.  If the net balance is payable by the Debtor, the Debtor will remit payment to the applicable Non-Debtor Affiliate; if the net balance is receivable by the Debtor, the applicable Non-Debtor Affiliate will remit payment to the Debtor.  Following each month-end close, the Debtor and its Non-Debtor Affiliates will perform a final monthly reconciliation, and any discrepancies identified between the weekly reconciliations and the month-end close process will be settled at that time.  These procedures are intended to protect the Debtor's estate by ensuring that postpetition estate cash is transferred efficiently and expeditiously after the parties identify the Debtor-attributable activity, calculate the net amount payable or receivable, and maintain records sufficient to trace the Intercompany Transactions.

52.     The Debtor estimates, in reliance on its historical budgeting and after accounting for working capital fluctuations and expected increases in inventory purchases to support a recently awarded contract, that it will pay approximately $1.5 million, and in any case no more than

17

$2,000,000, pursuant to the Shared Services Agreements during the Interim Period. Accordingly, the Debtor requests authorization, but not direction, to make payments pursuant to the postpetition intercompany reconciliation process (i) during the Interim Period of no more than $2,000,000 and (ii) in its business judgment thereafter; *provided* that in no circumstance will amounts be paid on account of amounts accrued pre-petition, except as such amounts relate to the Workers' Compensation Program, payroll, or employee benefits.

## BASIS FOR RELIEF REQUESTED

### I. The Court Should Authorize the Debtor to Continue Operating Under the Shared Services Agreements

53.     Section 363(c)(1) of the Bankruptcy Code provides that a debtor in possession may "enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." In determining whether a transaction falls within the ordinary course of a debtor's business, courts in the Third Circuit apply a two-part test containing both a horizontal and vertical inquiry. *See In re Roth Am., Inc.*, 975 F.2d 949, 952–53 (3d Cir. 1992) ("In prior cases, the courts have engaged in a two-step inquiry for determining whether a transaction is in 'the ordinary course of business': a 'horizontal dimension' test and a 'vertical dimension' test."); *see also In re Blitz U.S.A. Inc.*, 475 B.R. 209, 214–15 (Bankr. D. Del. 2012) (applying the horizontal and vertical prongs of the test). Under the vertical test, courts look at "whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit." *Roth Am.*, 975 F.2d at 953. Under the horizontal test, in general, courts look at whether "the transaction is of the sort commonly undertaken by companies in that industry." *Id.*

54.     The Debtor's continued operation under the Shared Services Agreements is an ordinary course action that satisfies both the horizontal and vertical tests. The Shared Services

18

Agreements are typical arrangements that exist among integrated companies with legal entities separated by product line or business function using shared infrastructure, thereby satisfying the horizontal test as operating under the Shared Services Agreements falls within the standard and ordinary practice of companies in the Debtor's industry.

55.     In looking to the vertical test, the Debtor has been operating under the Shared Services Agreements since the 2023 Restructuring Transaction and, accordingly, continuing to operate under such agreements is consistent with the Debtor's ordinary course prepetition practice. Moreover, given that the Debtor's business effectively will cease to function in the absence of the Shared Services Agreements, failure to continue the Shared Services Agreements drastically changes the economic circumstances of the Debtor and subverts the likely expectations of a creditor when it entered into business arrangements with the Debtor.  In light of the criticality of such agreements, it is common for debtors to seek, and for courts to grant, orders authorizing the relief sought herein.  *See, e.g.*, *In re Corvias Campus-Living - USG, LLC*, Case No. 25-11214 (LSS) (Bankr. D. Del. July 24, 2025) [Docket No. 125] (authorizing continued performance under shared services agreements); *In re Burgess BioPower, LLC*, Case No. 24-10235 (LSS) (Bankr. D. Del. Mar. 11, 2024) [Docket No. 240] (same); *In re Kidde-Fenwal, Inc.*, Case No. 23-10638 (LSS) (Bankr. D. Del. July 27, 2023) [Docket No. 316] (same); *In re Lincoln Power, L.L.C.*, Case No. 23-10382 (LSS) (Bankr. D. Del. Apr. 27, 2023) [Docket No. 112] (same); *In re TECT Aerospace Grp. Holdings, Inc.*, Case No. 21-10670 (KBO) (Bankr. D. Del. May 5, 2021) [Docket No. 129] (same); *In re Boy Scouts of Am. & Del. BSA, LLC*, Case No. 20-10343 (LSS) (Bankr. D. Del. Apr. 8, 2020) [Docket No. 369] (same).

56.     The relief requested is appropriate and in the best interests of the Debtor, its estate, and all parties in interest.  The Shared Services Agreements provide the framework that allows the

19

Debtor to generate revenue, access necessary administrative and operational services, maintain insurance and employee-benefit programs, preserve the Etzel Property, administer taxes and utilities, and reconcile Debtor-attributable receipts and disbursements.  Continuing to operate under the Shared Services Agreements is therefore consistent with the Debtor's ordinary course business practices and should be authorized under section 363(c)(1) of the Bankruptcy Code.

**II.    Continued Performance Under the Shared Services Agreements Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.**

57.    Even if continued performance under the Shared Services Agreements were not in the ordinary course of business, the Debtor submits that continued performance under the Shared Services Agreements is a sound exercise of the Debtor's business judgment and should be authorized under section 363(b) of the Bankruptcy Code.

58.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

20

59. The Shared Services Agreements are critical to the success of the Debtor's business and, particularly, to the Debtor's smooth transition into chapter 11. The Debtor has historically outsourced these functions and continuing to do so, with a service provider with whom the Debtor has an established relationship and systems already in place for the provision of such services, is in the best interest of the Debtor's estate and creditors. They provide economic and operational benefits by allowing the Debtor to use existing enterprise systems and affiliate expertise rather than duplicating procurement, manufacturing, logistics, customer-service, finance, accounting, tax, insurance, benefit, utility, and administrative infrastructure. Any disruption to the Debtor's arrangements under the Shared Services Agreements could severely disrupt the Debtor's operations and cause irreparable harm to the Debtor's business. Therefore, given the indispensable nature of the services provided under the Shared Services Agreements (including providing for payments and policies required under the Bankruptcy Code, such as the Taxes and Fees and appropriate insurance) and the Debtor's reliance on such agreements to generate revenue, continued performance under the Shared Services Agreements is a proper exercise of the Debtor's business judgment.

60. Accordingly, the Debtor hereby requests the authority, but not direction, to continue performing under the Shared Services Agreements on a postpetition basis consistent with the terms described herein, including by paying or remitting postpetition fees, direct costs, reimbursements, and reconciliation amounts as they become due in the ordinary course.

**III.    The Automatic Stay Should Be Modified for Workers' Compensation Obligations**

61. Section 362(a) of the Bankruptcy Code operates to stay:

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title,

or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a). Section 362(d), however, permits a debtor or other party in interest to request a modification or termination of the automatic stay for "cause."

62.     To the extent the Debtor's employee holds claims under the Workers' Compensation Program, the Debtor seeks authority under section 362(d) of the Bankruptcy Code to permit its employee to proceed with the claims related to the Workers' Compensation Program, in the appropriate judicial or administrative forum, and to receive any payments to which he is entitled under the Workers' Compensation Program.   Modification of the automatic stay as requested is consistent with the continuation of the Workers' Compensation Program and necessary for the covered employee to pursue his claims (should any be asserted) under the Workers' Compensation Program.   Accordingly, the Court should (a) modify the automatic stay as it relates to claims under the Workers' Compensation Program to allow any such claims to proceed to resolution and (b) waive corresponding notice requirements under Bankruptcy Rule 4001.   The Court should also authorize the Debtor, to the extent required by law or under the Workers' Compensation Program, to pay all or part of a claim related thereto directly to its employee, any of his medical providers, or any of his heirs or legal representatives, as set forth in the applicable law or policy.

**THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED**

63.     The Debtor asserts that immediate relief is necessary to avoid immediate and irreparable harm.  Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  For the reasons discussed above, entry of the proposed Interim Order is integral to the Debtor's ability to successfully transition into chapter 11 and effectuate a

22

successful reorganization.    Specifically, the relief requested is necessary to avoid a severe disruption of the Debtor's operations and negotiations with key stakeholders at this critical juncture and, in turn, to preserve and maximize the value of the Debtor's estate for the benefit of all stakeholders.  Accordingly, the Debtor submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully requests that the Court approve the relief requested in this Motion.

## REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

64.    The Debtor requests a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).   As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtor's ongoing operations and value-maximization process.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## RESERVATION OF RIGHTS

65.    Nothing contained herein or any action taken pursuant to the relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Debtor or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim or other obligation; (d) a waiver of the Debtor or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's

23

estate. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtor or any party in interest's rights to subsequently dispute such claim.

**NOTICE**

66. Notice of this Motion has been provided by email, facsimile, or first-class mail to: (a) the Office of the United States Trustee for the District of Delaware; (b) the United States Attorney's Office for the District of Delaware; (c) the firms listed on the Debtor's list of the top twenty (20) law firms with the most significant representations of Represented Litigation Claimants; (d) counsel to the prepetition representative for future talc and asbestos claims; (e) counsel to the Non-Debtor Affiliates, including the counterparties to the Shared Services Agreements; (f) the Internal Revenue Service; (g) the attorneys general of the states in which the Debtor does business; and (h) all parties entitled to notice pursuant to Local Rules 2002-1(b) and 9013-1(m). Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtor respectfully requests entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and granting such other relief as is just and proper.

Dated: August 2, 2026
Wilmington, Delaware

/s/ Jason S. Levin
_____

**MORRIS JAMES LLP**
Eric J. Monzo (DE Bar No. 5214)
Jason S. Levin (DE Bar No. 6434)
Samantha L. Rodriguez (DE Bar No. 7524)
3205 Avenue North Boulevard, Suite 100
Wilmington, Delaware 19803
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
       jlevin@morrisjames.com
       srodriguez@morrisjames.com


*Proposed Co-Counsel to the Debtor and*
*Debtor in Possession*

**SIDLEY AUSTIN LLP**
Thomas R. Califano (*pro hac vice* pending)
William E. Curtin (*pro hac vice* pending)
Anne G. Wallice (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: tom.califano@sidley.com
       wcurtin@sidley.com
       anne.wallice@sidley.com


*Proposed Co-Counsel to the Debtor and Debtor*
*in Possession*