**<u>Exhibit E</u>**

**Co-Manufacturing Agreement**

**Execution Version**

### CO-MANUFACTURING AND SUPPLY AGREEMENT

THIS CO-MANUFACTURING AND SUPPLY AGREEMENT (this "Agreement"), is entered into as of December 3, 2023 (the "Effective Date"), by and between Vi-Jon, LLC, a Delaware limited liability company ("Company"), and Consumer Product Partners, LLC, a Delaware limited liability company ("Supplier").

### RECITALS

A.      Company is in the business of manufacturing and producing a broad range of private brand and Germ-X® brand health, beauty, and personal care products for sale to retail and institutional customers in North America.

B.      Vi-Jon Holding, Inc., a Delaware corporation and 100% employee-owned ESOP holding company headquartered in St. Louis, Missouri ("Holdings"), has developed a plan (the "Plan") to reorganize its business in order to create a more effective framework to accelerate innovation, drive greater efficiencies across existing manufacturing and distribution networks, increase growth and maximize the potential value for all of its employee-owners.

C.      In connection with the Plan, Holdings formed Vivos Holdings, LLC, a Delaware limited liability company ("Vivos"), on June 28, 2023 to serve as a consumer packaged goods holding company.

D.      Following the reorganization contemplated by the Plan, Vivos will directly or indirectly own Supplier, Company, and UpLift Brands, LLC, a Delaware limited liability company ("UpLift"). Each of Vivos, Supplier, Company, and UpLift is classified as an entity disregarded as separate from its direct or indirect owner, Holdings, within the meaning of Treasury Regulation Section 301.7701-3(b)(1)(ii) for federal and state income tax purposes.

E.      Following the reorganization contemplated by the Plan, Company wishes to purchase Products from Supplier, and Supplier wishes to manufacture and sell Products to Company, on the terms and conditions set forth in this Agreement.

F.      Following the reorganization contemplated by the Plan, Supplier will be a leading manufacturer of private brand household and personal care products for sale to retail and industrial customers and a provider of contract manufacturing services to other consumer products companies.

G.      Following the reorganization contemplated by the Plan, Company will offer a broad portfolio of private label dry goods products.

### Agreements

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises, covenants, representations, warranties, conditions and agreements hereinafter expressed, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Products and Specifications.

a. Manufacture. Supplier shall manufacture the products listed in Exhibit A, as such list may be amended from time to time by mutual agreement of the parties (collectively, the "Products"). In connection with the manufacture of Products hereunder, Supplier shall comply in all material respects with the specifications for such Products, as such specifications may be amended from time to time by mutual agreement of the parties (as to each Product, the "Specifications").

b. Product Inputs. Except as otherwise set forth herein, Supplier shall supply all Product raw materials, packaging, inputs and ingredients. If required by Company, Supplier shall purchase any proprietary ingredients from suppliers designated by Company subject to prior approval of Supplier's quality requirements.

c. Product Revisions. Any Product Revision shall be subject to mutual agreement of the parties. Prior to any implementation of a Product Revision, the parties shall mutually agree on the details thereof, including but not limited to any appropriate price adjustments to reflect changes in costs due to such Product Revision. Once a Product Revision has been mutually agreed upon, Supplier will use commercially reasonable efforts to manufacture and package Products in conformance with such Product Revision within a reasonable period of time (but no less than 60 days after such mutual agreement). A "Product Revision" shall mean any change to the specifications and/or formulation or, if applicable, pack size or configuration or package construction or design of a Product. Company will pay for any obsolete packaging or ingredients resulting from a Product Revision or any changes to the label or artwork used on a Product; provided, that in no event shall Company be required to pay for more than a 180-day supply of such packaging or ingredients unless Supplier and Company have otherwise agreed in writing.

d. Additional Product Development. From time to time Company may request Supplier to provide assistance in developing additional Products according to criteria, characteristics or other requirements specified by Company ("Additional Products"). The parties agree to cooperate and work together to develop such Additional Products in accordance with the terms of a separate development agreement.

2. Intellectual Property Rights

a. Definitions.

i. "IP Rights" means all patents, copyrights, trademarks, trade secrets, formulas, know-how and other proprietary or intellectual property rights, and all patents, registrations and applications therefore.

ii. "Background IP" means all IP Rights owned by a party as of the Effective Date of this Agreement, whether or not incorporated or embodied in a Product or developed by either party independently of this Agreement.

iii. "Developed IP" means all intellectual property made, invented, developed, created, conceived or reduced to practice after the Effective Date as a result of

2

work conducted pursuant to this Agreement, including all rights in any patents or patent applications, copyrights, trade secrets, and other intellectual property rights relating thereto, regardless of whether such intellectual property comprises or is embodied in a Product or Additional Products.

b.      Intellectual Property Ownership.  All Background IP and IP Rights in connection therewith owned by a party as of the Effective Date are and will remain the exclusive property of such owning party.  Each party shall own all Developed IP that is solely developed, created, conceived or reduced to practice by such party.  The parties further agree with respect to all other Developed IP as follows:

i.      Company shall be the sole owner of all right, title and interest in and to all modifications, enhancements or improvements to, adaptions of, or derivative works based upon Company's Background IP or Company Developed IP (the "Improvements"), including all modifications to the formulae for the Products but excluding any proprietary manufacturing process know how of Supplier, provided that such Improvements are non-material and made solely to optimize such Company Background IP or Company Developed IP (but not Supplier Background IP or Supplier Developed IP) for use by Supplier's supply chain.   In consideration for Company's ownership of such Improvements, Company agrees that it (or its designee) shall purchase from Supplier all of Company's requirements for Products incorporating such Improvements.

ii.     Company agrees that Supplier may distribute and sell all products containing Supplier Developed IP to any third party.  Company further agrees that it (or its designee) shall purchase exclusively from Supplier all products containing any Supplier Developed IP.

A party will not acquire any rights in the other party's Background IP or Developed IP except for the limited rights specified in this Agreement or as otherwise set forth in a separate development agreement entered into by the parties.  Notwithstanding the foregoing, all goodwill, going concern value and other assets relating to the ongoing business operations of each party (including, without limitation, customer relationships, customer lists and the like) will remain the exclusive property of such party, and the other party will not be deemed to acquire any interest therein as a result of the performance of its obligations hereunder.

c.      Developed IP Ownership Disputes.  The parties shall use commercially reasonable efforts to address all issues concerning the inventorship or ownership of, or any rights to, Developed IP in a fair and equitable manner and in accordance with the requirements of U.S. patent law to achieve the goals of this Agreement.

d.      Enforcement of Developed IP.  Each party shall promptly notify the other party if it becomes aware of any actual or possible infringements, misappropriations or other violations of any Developed IP by any third party (an "Infringement").  The parties shall promptly consult with each other and use their best efforts to agree upon a course of action to be taken with respect to such Infringement.  Notwithstanding the foregoing, each party shall have the right, but not the obligation, to bring enforcement actions at its expense, against any Infringement of its solely-owned Developed IP.

3

3.	Orders, Scheduling and Delivery.

a.	Terms and Conditions.  Terms and conditions of production, delivery and shipping stated in this Agreement shall prevail over any conflicting terms and conditions on any purchase order or acknowledgment forms used by either the Company or Supplier.

b.	Risk of Loss.  Supplier shall maintain title to and bear the risk of loss or damage to any raw materials, ingredients and packaging materials under its control and to any finished Product until the same shall have been delivered to Company's designated distribution center(s).

c.	Shipment.  The parties acknowledge and agree that Products shall be delivered directly to Company's distribution center(s).  Unless otherwise mutually agreed between the parties, Products shall be shipped from the place of manufacture at Company's expense.  In the event Supplier arranges for any shipments at Company's expense, fuel surcharges shall only be added to the extent they are charged by the freight company.

d.	Order Placement.  Company shall place all orders for Products via the format agreed to separately by the parties.  Supplier's production shall be in accordance with Company's forecasted needs.  Except as otherwise agreed in writing, the parties agree that nothing in this Agreement commits Company to order a specific volume of Product from Supplier.

4.	Quality Assurance.

a.	Non-Conformity.  Company shall have the right to return any Products that fail to conform to Supplier's representations and warranties set forth in this Agreement, whether discovered as a result of an incoming inspection, recall, withdrawal or otherwise; provided that Company shall notify Supplier of any such non-conforming Product within seven days of receipt of the Products (or in the case of latent or non-observable non-conformities, within seven days of discovery of such non-conformity).  Such Products shall be returned to Supplier at Supplier's expense including all freight charges for shipment and return or, at Supplier's option, destroyed by Company.  All non-conforming Products so returned or destroyed shall either be replaced with conforming Products at Supplier's expense or the purchase price to be refunded to Company.  In all cases of alleged non-conforming Products, Supplier will be provided an opportunity to investigate Company's rejection of Products through a mutually agreeable procedure to confirm or contest any alleged violation or non-conformity, including inspection, at Supplier's cost.

b.	Records.  Supplier shall maintain and retain accurate records documenting quality assurance, production, shipments, losses, rejected materials and rejected finished Product. Supplier shall also retain all records required to be kept by applicable laws and regulations.  Such records shall be available to Company as needed and requested during Supplier's regular business hours and upon reasonable prior written notice.

5.	Prices; Price Adjustments; Payment Terms; Limited Audit Rights.

a.	Prices.  Company shall pay to Supplier the prices set forth on Exhibit A for the Products (the "Prices"), subject to adjustment as set forth below.

b.      <u>Invoicing</u>.  Supplier will account in good faith for the costs of providing the Products to the Company during each fiscal week or month, as agreed upon by the parties, based on (a) the actual Products provided by the Supplier to the Company and (b) the Supplier's costs prorated or properly allocable to providing such Products.  Supplier will invoice the Company for applicable Products in the manner agreed to by the parties.  Upon mutual agreement of the parties, the form and timing of invoices and orders may be changed at any time after the date hereof.

c.      <u>Payment Terms</u>.  Supplier and Company will record and track charges pursuant to this Agreement in U.S. dollars as Products are shipped to Company, or to Company's customers on behalf of Company.  Payments are due at the completion of each fiscal period or at a different time mutually agreed upon by the parties.

d.      <u>Charge Disputes</u>.  In the event of a bona fide dispute regarding an amount charged hereunder (a "<u>Disputed Charge</u>"), Supplier shall use its commercially reasonable efforts to provide Company with records relating to the disputed amount set forth in the Disputed Charge (to the extent such records have not already been provided to Company) so as to enable the parties to resolve the dispute.  The parties shall use commercially reasonable efforts to resolve any such dispute promptly.  Upon resolution of the dispute, the owing party shall pay the other party, at fiscal week or month end, as agreed upon by the parties, any amount owed hereunder.

e.      <u>Taxes</u>.  To the extent applicable, all sales, use and other taxes, levies and charges (other than taxes based on net income or net profits) imposed by applicable taxing authorities with respect to the purchase of the Products hereunder, if any, shall be borne by Company.  If Supplier is required to pay any amount of such taxes, levies or charges in connection with the purchase of the Products hereunder, Company shall promptly reimburse Supplier for such amount.  The Prices do not include any such taxes, levies or charges.  Company and Supplier agree to use commercially reasonable efforts to mitigate, reduce or eliminate any tax that could be imposed with respect to the transactions contemplated by this Agreement (including preparing and furnishing, or obtaining from any taxing authority, any certificate, form, or other document as may be necessary to mitigate, reduce or eliminate any such tax).

6.      <u>Confidential Information</u>.  During the course of their business relationship, each party may disclose to the other party certain information which the disclosing party considers proprietary and confidential, including but not limited to the terms of this Agreement as well as information concerning manufacturing and processing methods, ingredients, inputs, business and technology plans, distribution strategies, sales, costs, pricing, marketing, customers, suppliers and research and development (collectively, "<u>Confidential Information</u>").  For purposes hereof, information that is already in the public domain or known by the receiving party at the time of disclosure by the disclosing party, or subsequently becomes available to the public or known by the receiving party without any breach of this Section, shall not be considered to be Confidential Information.  The parties each agree that all Confidential Information shall be used by the receiving party solely for the purposes contemplated by this Agreement, shall be kept strictly confidential and shall not, without the disclosing party's prior written consent, be disclosed by the receiving party in any manner whatsoever, except as required to comply with applicable laws or regulations, or with a court or administrative order, subpoena, civil investigative demand or other legal process.  The receiving party shall be liable for any failure of its employees, agents or representatives to comply with the confidentiality obligations set forth in this Section.  The confidentiality

obligations set forth in this Section shall expire five years following the expiration or termination of this Agreement.  Supplier expressly agrees that it shall not, and shall cause its affiliates, officers, directors, employees, agents and representatives not to make any attempt to reverse engineer any formula or product base of Company.

7.    Representations and Warranties.

a.    Supplier's Representations and Warranties.  Supplier represents and warrants that each delivery hereunder is guaranteed, as of the date of such delivery, to contain Product that is not adulterated.  Each Product delivered hereunder is further guaranteed to be an item which can be shipped and/or sold in U.S. interstate commerce and which conforms in all respects to the requirements hereof.

b.    Company's Representations and Warranties.  Company represents and warrants to Supplier that compliance with the Specifications and Company's formulae or use of any raw materials or other ingredients provided by Company will not cause any Product provided to Company pursuant to this Agreement (i) to be produced or packaged to be in violation of any applicable U.S. laws or (ii) be an article which may not be shipped and/or sold in U.S. interstate commerce.

c.    Additional Representations and Warranties.  Each party represents and warrants that (i) it has full power, authority and capacity to enter into this Agreement and to perform all its obligations hereunder, and (ii) it is not bound by any other agreement, arrangement, judgment or order which would be violated as a result of its entering into this Agreement or performing any of its obligations hereunder.

d.    Warranty Disclaimer.  EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS AGREEMENT, EACH PARTY DISCLAIMS ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, SAFETY, OR NON-INFRINGEMENT OF ANY INTELLECTUAL PROPERTY OR ARISING FROM COURSE OF DEALING OR TRADE USAGE.

8.    Indemnities.

a.    Supplier Indemnity.  Supplier shall defend, indemnify, and hold harmless Company and its parents, subsidiaries and affiliates, or any successor in interest to, or transferee of, Company and each of their respective equity holders, officers, directors, employees, and agents from and against any and all third party damages, losses, costs, and expenses (including, without limitation, reasonable attorneys' fees) (collectively, "Losses") to the extent caused by (i) Supplier's breach of this Agreement, (ii) the gross negligence or willful misconduct committed or omitted by Supplier in connection with this Agreement, (iii) personal injuries or death to any person or damage to any property caused by any Products produced for Company hereunder failing to conform to the representations or warranties set forth in this Agreement; or (iv) any contract, commitment, agreement or other liability entered into by Supplier in connection with the purchase of raw materials, supplies, labor or any other obligation, financial or otherwise, undertaken by Supplier.

6

Notwithstanding the foregoing, Supplier's aforementioned indemnification and hold harmless obligations will not apply for or to the extent such Losses were caused by a negligent or intentional act or omission of an agent or employee of Company or caused by any damage to or modification to the Products which occurred after title of such Products has passed to Company.

b.    Company Indemnity.  Company shall indemnify, defend and hold harmless Supplier and its parents, subsidiaries and affiliates, or any successor in interest to, or transferee of, Supplier and each of their respective equity holders, officers, directors, employees, and agents from and against any and all Losses, to the extent arising out of or relating to (i) Company's breach of this Agreement, (ii) the gross negligence or willful misconduct committed or omitted by Company in connection with this Agreement, (iii) the distribution, sale, advertisement, storage or transportation of Products after the time that title to such Products has passed to Company, or (iv) any third party allegation that the formulas or IP Rights in the Products infringe the intellectual property rights of any third party.

c.    Indemnification Process.  In the event of any third-party claim, suit or action relating to any matter for which a party has agreed to provide indemnification under this Agreement (the "Indemnifying Party"), the party seeking indemnification hereunder (the "Indemnified Party") shall promptly provide notice of such claim, suit or action to the Indemnifying Party.  The Indemnifying Party shall then have the option to assume the defense or prosecution of such claim, suit or action, at its sole cost and expense, and the Indemnified Party shall reasonably cooperate in the conduct of such defense and/or settlement at the request and expense of the Indemnifying Party. The Indemnified Party may, if it wishes and at its expense, retain counsel to participate in the claim, suit or action, and in such event the Indemnifying Party and its counsel shall reasonably cooperate with the Indemnified Party and its counsel.  In no event, however, may there be a settlement of any claim, suit or action under which the Indemnified Party would be required to assume any liability, make any admissions or be subject to any equitable relief without the prior written consent of the Indemnified Party.

d.    Recalls.  In the event of a recall of any Product produced hereunder, the party whose acts or omissions are responsible for the recall shall indemnify and hold harmless the other party for all of its reasonable costs and expenses associated with such recall including, but not limited to, notices, freight, testing, storage, Product destruction, customer damages and claims, and reasonable attorneys' fees.

e.    Limitations of Liability.  EXCEPT FOR LIABILITY ARISING FROM SECTION 6 HEREOF OR ARISING FROM A THIRD PARTY CLAIM COVERED UNDER AN INDEMNIFYING PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER, IN NO EVENT WILL ANY PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS, LOSS OF GOODWILL OR LOST SALES) IN CONNECTION WITH LOSSES ARISING OUT OF THE CONDUCT OF SUCH PARTY PURSUANT TO THIS AGREEMENT REGARDLESS OF WHETHER THE NONPERFORMING PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR NOT.  THE AGGREGATE LIABILITY OF EACH PARTY FOR ANY LOSES INCURRED OR ARISING OUT OF THIS AGREEMENT SHALL IN NO EVENT EXCEED THE SUMS PAID OR PAYABLE TO SUPPLIER DURING THE INITIAL TERM.

9.      Force Majeure.  In the event a party is prevented from performing any of its obligations under this Agreement by circumstances beyond its reasonable control occurring after the date hereof, including without limitation, fire, explosion, flood, drought, blackout, closure of borders, riots, sabotage, embargo, terrorism, war or other hostilities, domestic or foreign governmental acts or changes in law, accident, equipment failure, inability in obtaining facilities or supplies, or labor dispute including a strike or lockout (each a "Force Majeure Event"), such party's obligations shall be temporarily suspended, without liability to the other party, to the extent of such inability to perform; provided, however that a party shall not be relieved of its obligation to make payments as and when due.  A party affected by a Force Majeure Event shall give written notice to the other party of the occurrence of such Force Majeure Event as soon as commercially practicable.

10.      Term.  The initial term of this Agreement shall commence on the Effective Date and continue for five years (the "Initial Term").  Following the Initial Term, this Agreement shall automatically renew for successive one-year renewal terms unless either party notifies the other party of its intention to terminate this Agreement at least 90 days prior to the end of the then current term.  The Initial Term and all extensions, if any, shall constitute the "Term" of this Agreement, subject to earlier termination as provided herein.

11.      Termination Rights.

a.      Termination Due To Breach.  Without prejudice and in addition to all other lawful rights and remedies, each party shall have the right to terminate this Agreement upon written notice to the other party if such other party materially breaches any of its representations, warranties, covenants or obligations set forth in this Agreement, and such failure has not been cured within 30 days of receiving written notice from the non-defaulting party reasonably describing such breach.

b.      Termination Due To Financial Condition.  Without prejudice and in addition to all other lawful rights and remedies, each party shall have the right to terminate this Agreement upon written notice to the other party in any of the following events, each of which constitutes good cause for termination: (i) such other party files a petition for bankruptcy or is otherwise adjudicated bankrupt, (ii) a petition for bankruptcy is filed against such other party and such petition is not dismissed within 90 days, and/or (iii) such other party becomes insolvent, discontinues its business or voluntarily submits to, or is ordered by any federal bankruptcy court to undergo, liquidation pursuant to any applicable bankruptcy laws.

c.      Termination By Mutual Written Consent.  Without prejudice and in addition to all other lawful rights and remedies, the parties hereto may terminate this Agreement at any time for any reason by mutual written consent.

d.      Effect of Termination.  The expiration, non-renewal or termination of this Agreement shall not terminate any purchase order delivered hereunder, and the terms of this Agreement shall remain effective as to any such purchase order, until that purchase order has been completed.  Company agrees that it shall remain responsible to Supplier for any raw materials, labels or components purchased by Supplier as of the date of termination in response to a forecast report solely for use in the Products.  The termination or expiration of this Agreement shall not

8

relieve either party of any obligations or liabilities accrued prior to such termination or expiration, or affect or impair the rights of either party arising under this Agreement prior to such termination or expiration, except as may be otherwise expressly provided herein.

12.  Independent Contractors.  Each party hereby acknowledges and agrees that it is an independent contractor and not an employee, agent or representative of the other party, and it is not authorized to assume or create any obligation or responsibility on behalf of the other party, including but not limited to obligations based on representations, warranties or guarantees.  Neither party, nor any of its employees, agents or representatives, shall misrepresent such status or authority.

13.  Assignment.  This Agreement shall not be assigned, in whole or in part, by either party without the written consent of the other party; provided, however, that such consent shall not be unreasonably withheld.  Notwithstanding the foregoing, this Agreement may be assigned (i) by Supplier without limitation or consent to any direct or indirect subsidiary or affiliate of Supplier or to a successor to the business serviced by this Agreement; provided, that Supplier or its assignee continues to supply the Products under this Agreement; or (ii) by Company without limitation or consent to any direct or indirect subsidiary or affiliate of Company, or to an unaffiliated third party upon any sale, exchange or other transfer of all or substantially all of Company's assets, or a sale, exchange or other transfer by Company of all or substantially all of the business activities involved in this Agreement, including by merger, consolidation, or otherwise.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, legal representatives and permitted assigns.  Without limiting the provisions set forth above, if Company sells or otherwise transfers to a third party all or any portion of the business serviced by this Agreement, then at Supplier's option, Company shall require the purchaser or transferee to assume the obligations of Company under this Agreement with respect to the applicable business.

14.  Miscellaneous.

a.  Applicable Laws.  This Agreement, and all controversies, claims and disputes arising out of or relating to this Agreement or either party's performance under this Agreement, including claims for breach of contract and related causes of action, shall be governed by the laws of the State of Delaware, without reference to its choice of law principles.

b.  No Waiver; Remedies Cumulative.  No delay or omission by either party in exercising any right or power hereunder will impair such right or power or be construed to be a waiver thereof.  A waiver by either party of any provision hereof or of any breach hereunder must be in a writing signed by the waiving party and will not be construed to be a waiver of any prior or subsequent breach of such provision or of any other provisions herein contained.  Except as otherwise provided in this Agreement, all remedies provided for in this Agreement will be cumulative.

c.  Entire Agreement.  This Agreement, including the Exhibits hereto, constitutes the final agreement between the parties relating to the matters contained in this Agreement and is the complete and exclusive expression of the parties' agreement on such matters. All prior and contemporaneous negotiations and agreements between the parties on matters contained in this Agreement, whether oral or written, are expressly merged into and superseded by

9

this Agreement.  The provisions of this Agreement may not be explained, supplemented or qualified through evidence of trade usage or prior course of dealings, except to the extent, and solely to the extent, the Agreement expressly requires the parties to act and/or provide products or services in a manner consistent with the past practices of the parties.  In entering into this Agreement, neither party has relied upon any statement, representation, warranty or agreement of the other party except for those expressly contained in this Agreement.

d.      Amendments.  Except for any automatic amendments to Exhibit A as described herein, this Agreement may not be amended, supplemented or modified in any respect without further written agreement of both parties referencing this Agreement, signed by their respective authorized representatives.  If any operating standards, procedures or manuals or any other documents of either party (or if form language in either party's forms such as purchase orders, bills of lading and the like), regardless of whether signed by a representative of the other party, contain any provisions that purport to impose obligations on the other party not imposed by this Agreement, such provisions shall be null and void and have no force or effect.

e.      Severability.  In case any one or more of the provisions of this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, any other provision in this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.  Such invalid, illegal or unenforceable provisions shall be given effect to the maximum extent permitted by law.

f.      Counterparts; Signatures.  This Agreement may be executed in one or more counterparts for the convenience of the parties hereto, all of which together will constitute one and the same instrument.  A signature transmitted by facsimile or other electronic means shall have the same force and effect as an original signature.

g.      Headings; Construction.   The headings contained herein are for convenience of reference only and shall not be deemed to limit or affect the subject matter contained herein.  The parties have jointly prepared this Agreement and the terms hereof shall not be construed in favor or against any party on account of its participation in such preparation.  As used in this Agreement, the singular form shall include the plural, and vice versa, when the context so requires.

h.      Compliance With Laws.  Each party shall comply with all federal, state and local laws, rules and regulations of the U.S. that apply to its performance hereunder and/or to its handling, distribution, sale or resale of the Products purchased hereunder, including without limitation, possessing and maintaining all necessary permits and licenses.

*[Remainder of page intentionally left blank; signature page follows.]*

10

IN WITNESS WHEREOF, the parties hereto have caused this Co-Manufacturing and Supply Agreement to be executed by their duly authorized representatives as of the date first written above.

Consumer Product Partners, LLC

By:               
Name: Gregory Billhartz
Title: Vice President

Vi-Jon, LLC

By:               
Name: Gregory Billhartz
Title: President and Chief Strategy Officer

*[Signature Page to Co-Manufacturing and Supply Agreement]*

## <u>EXHIBIT A</u>
## PRODUCTS AND PRICING

### I. Product Categories
The products to be manufactured by the Supplier (collectively, the "<u>Products</u>") for the Company under this agreement will consist of the following categories:
1. Dry Goods Products: This includes any current or future Epsom salts products or personal care powder products, or any other dry goods products mutually agreed upon by the parties.
2. Future Products: This category encompasses any products developed and agreed upon in the future by both parties.

The specific Products to be manufactured at any given time, along with their corresponding Specifications, will be determined based on the Company's requirements and mutual agreement between the parties.

### II. Product Pricing
The pricing for the manufacture of the Products shall be determined on a case-by-case basis, according to the following principles:
1. <u>Base Price</u>: The base price of each Product will consist of the product cost, inclusive of a mutually agreed percentage markup, defined as the 'Base Price'.
2. <u>True-ups</u>: Adjustments to reconcile any discrepancies between actual and estimated costs will be conducted at year-end or periodically, as mutually agreed by the parties.

### III. Cost Bill Backs
In addition to the Product Pricing, Supplier will charge Company for these additional services and shared costs.
1. <u>Overhead and Distribution Costs</u>: Proportional overhead and distribution costs attributable to Company, as mutually agreed upon by the parties.
2. <u>Selling, General & Administrative Expenses (SG&A) Chargebacks</u>: A fixed fee based on the specific services and level of support required by Company, calculated from Supplier's weekly or monthly, as agreed upon by the parties, SG&A cost assumptions as allocated to Company, or as otherwise mutually agreed upon by the parties. These costs will be subject to periodic review and potential adjustments between the Supplier and Company to account for inflation or other pertinent factors. The billing for these services will occur on a weekly basis, monthly basis, or as agreed upon by the parties, with payment processing schedules to be determined.
3. <u>True-ups</u>: Adjustments to reconcile any discrepancies between actual and estimated costs will be conducted at year-end or periodically, as mutually agreed by the parties.

### IV. Specifications
Each Product will be processed and manufactured in accordance with its Specifications, which will be determined mutually by the parties based on the Company's requirements. The Specifications for each Product will be subject to change over time by mutual agreement of the parties.

**<u>Supplier Facilities</u>**:

8515 Page Avenue
St. Louis, Missouri

1 Swan Drive
Smyrna, Tennessee

**FIRST AMENDMENT TO THE CO-MANUFACTURING AND SUPPLY AGREEMENT**

This First Amendment (this "Amendment"), dated as of December 28, 2023 (the "Effective Date"), to the Co-Manufacturing and Supply Agreement, dated December 3, 2023, by and between Consumer Product Partners, LLC, a Delaware limited liability company ("Supplier"), and Vi-Jon, LLC, a Delaware limited liability company (the "Company"). Capitalized terms used but not defined herein shall have the definition ascribed to such term in the Co-Manufacturing and Supply Agreement.

**Recitals**

A.      WHEREAS, Vi-Jon Holding, Inc., a Delaware corporation and a 100% employee-owned ESOP holding company headquartered in St. Louis, Missouri, has developed a plan to reorganize its business in order to create a more effective framework to accelerate innovation, drive greater efficiencies across existing manufacturing and distribution networks, increase growth and maximize the potential value for all of its employee-owners (the "Restructuring").

B.      WHEREAS, following the Restructuring, the Company wishes to purchase certain products from Supplier, and Supplier wishes to manufacture and sell such products to the Company, on the terms and conditions set forth in the Co-Manufacturing and Supply Agreement.

C.      WHEREAS, Supplier and the Company desire to amend the Co-Manufacturing and Supply Agreement in accordance with Section 14(d) of the Co-Manufacturing and Supply Agreement, as set forth below.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereby agree as follows, effective as of the Effective Date:

1.  Section 10 of the Co-Manufacturing and Supply Agreement is hereby amended and restated in its entirety as follows:

"Section 10      Term. The term of this Agreement shall commence as of the date of this Agreement and shall continue for a period of ten years (the "Initial Term"), unless sooner terminated pursuant to Section 11. Upon the expiration of the Initial Term, the Agreement shall automatically renew for subsequent one-year periods (each a "Renewal Term"), unless either party provides written notice to the other party of its intent not to renew. The terms and conditions of this Agreement during any Renewal Term shall be the same as those in effect at the time of renewal. The Initial Term and all Renewal Terms, if any, shall constitute the "Term" of this Agreement, subject to earlier termination as provided herein."

2.  Exhibit A of the Co-Manufacturing and Supply Agreement is hereby amended to include the following:

"**V. Product Cost and Contract Manufacturing Fee**

Supplier will be charging the Company for the cost of product (raw materials, components and direct labor) and freight.  A contract manufacturing fee of 12.5% of the product cost of Epsom Salt will also be charged.

**VI. Overhead and Distribution Costs**

Supplier will be charging the Company for variable overhead, fixed overhead and distribution expenses based upon a proportional number of units sold.  The amounts below will be used at the start the agreement and will be reviewed and updated periodically.

1. Variable Overhead:  $.133 per unit
2. Fixed Overhead:  $.092 per unit
3. Distribution:  $.045 per unit

**VII. Selling General and Administrative Costs (SG&A)**

Supplier will be charging the Company for various services including Sales, R&D, customer service, sales support and related services based upon proportional net sales.  The amount of $440,000 annually will be used at the start the agreement and will be reviewed and updated periodically."

3. Except as specifically amended in this Amendment, the Co-Manufacturing and Supply Agreement remains in effect without change. All references to the Co-Manufacturing and Supply Agreement set forth therein shall hereafter be deemed to refer to the Co-Manufacturing and Supply Agreement as amended by this Amendment.

[*Signature Page Follows*]

IN WITNESS WHEREOF, each of the parties has caused this Amendment to be executed in duplicate originals by its duly authorized representatives.

**SUPPLIER:**

**Consumer Product Partners, LLC**

By: _____

Name: Gregory Billhartz

Title: Vice President

**COMPANY:**

**Vi-Jon, LLC**

By: _____

Name: Gregory Billhartz

Title:  President and Chief Strategy Officer

[*Signature Page to First Amendment to the Co-Manufacturing and Supply Agreement*]

# MEMORANDUM

Date:                                    January 17, 2024
To:                                      File
Re:                                      Co-Manufacturing and Supply Agreements

Emprise Group, Inc. f/k/a Vi-Jon Holding, Inc., a Delaware corporation and 100% employee-owned ESOP holding company ("Emprise"), developed a plan to reorganize its business in order to create a more effective framework to accelerate innovation, drive greater efficiencies across existing manufacturing and distribution networks, increase growth and maximize the potential value for all of its employee-owners (the "Restructuring").

In connection with the Restructuring, Consumer Product Partners, LLC, a Delaware limited liability company and an indirect subsidiary of Emprise ("CPP"), entered into a Co-Manufacturing and Supply Agreement with each of Vi-Jon, LLC, a Delaware limited liability company and an indirect subsidiary of Emprise ("Vi-Jon"), and UpLift Brands, LLC, a Delaware limited liability company and an indirect subsidiary of Emprise ("UpLift"), on December 3, 2023. Each Co-Manufacturing and Supply Agreement was amended by that certain First Amendment to the Co-Manufacturing and Supply Agreement, each dated December 28, 2023 (as amended, collectively, the "Co-Manufacturing and Supply Agreements").

The parties to the Co-Manufacturing and Supply Agreements acknowledge and agree as follows:

1. The Co-Manufacturing and Supply Agreements state in the Recitals that Vivos Holdings, LLC, a Delaware limited liability company ("Vivos"), directly or indirectly owns each of CPP, UpLift and Vi-Jon.  However, Vi-Jon is not a direct or indirect subsidiary of Vivos, but rather an affiliate thereof.

2. The Co-Manufacturing and Supply Agreements state in the Recitals that Emprise formed Vivos. However, in connection with the Restructuring, Vivos was formed by Vi-Jon.

3. The foregoing inconsistencies were the result of scrivener's error and have no legal baring on the Co-Manufacturing and Supply Agreements.

**ACKNOWLEDGED AND AGREED:**

**Consumer Product Partners**

By: _____
Name: Gregory Billhartz
Title: Vice President

**UpLift Brands, LLC**

By: _____
Name: Gregory Billhartz
Title: Vice President

**Vi-Jon, LLC**

By: _____
Name: Gregory Billhartz
Title: ~~President and Chief Strategy Officer~~
        Vice President

**SECOND AMENDMENT TO THE CO-MANUFACTURING AND SUPPLY AGREEMENT**

This Second Amendment (this "Amendment"), dated as of August 13, 2025 (the "Effective Date"), to the Co-Manufacturing and Supply Agreement, dated December 3, 2023, as amended by that certain First Amendment dated December 28, 2023 (as amended, the "Co-Manufacturing and Supply Agreement"), by and between Consumer Product Partners, LLC, a Delaware limited liability company ("Supplier"), and Vi-Jon, LLC, a Delaware limited liability company (the "Company"). Capitalized terms used but not defined herein shall have the definition ascribed to such term in the Co-Manufacturing and Supply Agreement.

### R e c i t a l s

A.        WHEREAS, Supplier and the Company desire to amend the Co-Manufacturing and Supply Agreement in accordance with Section 14(d) of the Co-Manufacturing and Supply Agreement, as set forth below.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereby agree as follows, effective as of the Effective Date:

### A g r e e m e n t

1. **Exhibit A Update.** Sections V, VI, and VII of Exhibit A of the Co-Manufacturing and Supply Agreement are hereby amended and restated in their entirety as follows:

   **"V. Product Cost and Contract Manufacturing Fee**

   Supplier will be charging the Company for the cost of product (raw materials, components and direct labor) and freight. A contract manufacturing fee of 12.5% of the product cost of Epsom Salt will also be charged.

   **VI. Overhead and Distribution Costs**

   Supplier will be charging the Company for variable overhead, fixed overhead and distribution expenses based upon a proportional number of units sold. The amounts below will be used at the start the agreement and will be reviewed and updated periodically.

   1. Variable Overhead: $.115 per unit

   2. Fixed Overhead: $.082 per unit (Salt only)

   3. Distribution: $.043 per unit

   **VII. Selling General and Administrative Costs (SG&A)**

   Supplier will be charging the Company for various services including Sales, R&D, customer service, sales support and related services based upon proportional net sales. The amount of $548,000 annually is currently in effect under this Agreement. Effective October 1, 2025, this amount shall be reduced to $476,000 annually. These amounts will be reviewed and updated periodically."

2. **Continued Effect.** Except as specifically amended in this Amendment, the Co-Manufacturing and Supply Agreement remains in effect without change. All references to the Co-Manufacturing and Supply Agreement set forth therein shall hereafter be deemed to refer to the Co-Manufacturing and Supply Agreement as amended by this Amendment.

3. **Counterparts.** This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Amendment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Amendment.

IN WITNESS WHEREOF, each of the parties has caused this Amendment to be executed in duplicate originals by its duly authorized representatives.

**SUPPLIER:**

**Consumer Product Partners, LLC**

By: _____
Name: Gregory Billhartz
Title: Vice President

**COMPANY:**

**Vi-Jon, LLC**

By: _____
Name: Gregory Billhartz
Title: President and Chief Strategy Officer

**THIRD AMENDMENT TO THE CO-MANUFACTURING AND SUPPLY AGREEMENT**

This Third Amendment to the Co-Manufacturing and Supply Agreement (this "Amendment") is dated as of [_____], 2026, but effective as of January 1, 2026 (the "Effective Date") and amends that certain Co-Manufacturing and Supply Agreement dated as of December 3, 2023 (the "Original Agreement"), as amended by that certain First Amendment to the Co-Manufacturing and Supply Agreement dated as of December 28, 2023 (the "First Amendment"), and that certain Second Amendment to the Co-Manufacturing and Supply Agreement dated as of August 13, 2025 (the "Second Amendment"), originally by and between Consumer Product Partners, LLC, a Delaware limited liability company ("CP2"), as supplier, and Vi-Jon, LLC, a Delaware limited liability company (the "Company"). The Original Agreement, as amended by the First Amendment and the Second Amendment, is referred to herein as the "Agreement". Nice-Pak Products, LLC, a Delaware limited liability company and successor by merger to CP2 ("Supplier"), is entering into this Amendment in such successor capacity. Capitalized terms used but not defined herein have the meanings given to them in the Agreement.

**RECITALS**

**A.** CP2 and the Company are parties to the Agreement, pursuant to which the Company purchases certain Products from Supplier, and Supplier manufactures and sells such Products to the Company.

**B.** Effective as of January 1, 2026, Consumer Product Partners, LLC and Surefil, LLC merged with and into Nice-Pak Products, LLC, a Delaware limited liability company formerly known as Nice-Pak Products, Inc., with Nice-Pak Products, LLC as the surviving entity.

**C.** As a result of the merger described above, Nice-Pak Products, LLC succeeded to all rights, duties and obligations of CP2 under the Agreement by operation of law and is the Supplier under the Agreement from and after the Effective Date.

**D.** Supplier and the Company desire to amend the Agreement in accordance with Section 14(d) of the Agreement to reflect the updated 2026 manufacturing, overhead, distribution and SG&A allocations between Supplier and the Company.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

**AGREEMENT**

**1. Succession; Supplier Name.** The parties acknowledge and agree that, effective as of the Effective Date, Nice-Pak Products, LLC is the successor by merger to CP2 under the Agreement and has assumed, and shall be entitled to the benefit of, all rights, duties and obligations of CP2 as Supplier under the Agreement. From and after the Effective Date, all references in the Agreement to "Consumer Product Partners, LLC," "CP2" or "Supplier" shall be deemed to refer to Nice-Pak Products, LLC, as successor by merger to Consumer Product Partners, LLC, unless the context otherwise requires.

**2. Exhibit A Update.** Sections V, VI, and VII of Exhibit A of the Agreement are hereby amended and restated in their entirety as follows:

"V. Product Cost and Contract Manufacturing Fee

Supplier will charge the Company for the cost of product (raw materials, components and direct labor) and freight. A contract manufacturing fee of 12.5% of the product cost of Epsom Salt will also be charged.

VI. Overhead and Distribution Costs

Supplier will charge the Company for variable overhead, fixed overhead and distribution expenses based upon a proportional number of units sold. The amounts below will be used as of the Effective Date and will be reviewed and updated periodically.

    1. Variable Overhead: $.108 per unit (all Products)
    2. Fixed Overhead: $.084 per unit (Epsom Salt only)
    3. Distribution: $.043 per unit (all Products)

VII. Selling General and Administrative Costs (SG&A)

Supplier will charge the Company for various services including Sales, R&D, customer service, sales support and related services based upon proportional net sales. Effective as of the Effective Date, the amount of $400,000 annually will be used under the Agreement and will be reviewed and updated periodically."

**3. Continued Effect.** Except as specifically amended in this Amendment, the Agreement remains in full force and effect. All references to the Agreement will be deemed to refer to the Agreement as amended by this Amendment.

**4. Counterparts; Electronic Signatures.** This Amendment may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. A signed copy of this Amendment delivered by facsimile, e-mail, DocuSign or other means of electronic transmission will be deemed to have the same legal effect as delivery of an original signed copy of this Amendment.

IN WITNESS WHEREOF, each of the parties has caused this Amendment to be executed by its duly authorized representative as of the date first written above.

**SUPPLIER:**

Nice-Pak Products, LLC

By: _Matthew Giljum_
Matthew Giljum (Jun 9, 2026 15:23:36 CDT)
_____
Name: Matthew Giljum
Title: Vice President


**COMPANY:**

Vi-Jon, LLC

By: _Mackenzie Shea_____
Name: Mackenzie Shea
Title: Chief Restructuring Officer

# Third Amendment - Co-Manufacturing and Supply Agreement - Nice-Pak to Vi-Jon 20260609

Final Audit Report                                      2026-06-09

| | |
|---|---|
| Created: | 2026-06-09 |
| By: | Emily Miller (emiller1@vivosholdings.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAJz3iQOZNj3Wxd64ICE4BJXCPHVahodif |

## "Third Amendment - Co-Manufacturing and Supply Agreement - Nice-Pak to Vi-Jon 20260609" History

📄 Document created by Emily Miller (emiller1@vivosholdings.com)
2026-06-09 - 8:20:44 PM GMT

✉ Document emailed to Matthew Giljum (mgiljum@emprisegroup.com) for signature
2026-06-09 - 8:20:49 PM GMT

✉ Document emailed to Mackenzie Shea (mshea@thinkbrg.com) for signature
2026-06-09 - 8:20:49 PM GMT

📄 Email viewed by Mackenzie Shea (mshea@thinkbrg.com)
2026-06-09 - 8:21:02 PM GMT

📄 Email viewed by Matthew Giljum (mgiljum@emprisegroup.com)
2026-06-09 - 8:23:20 PM GMT

✍ Document e-signed by Matthew Giljum (mgiljum@emprisegroup.com)
Signature Date: 2026-06-09 - 8:23:36 PM GMT - Time Source: server - Signature Appearance Selected: TYPE

✍ Document e-signed by Mackenzie Shea (mshea@thinkbrg.com)
Signature Date: 2026-06-09 - 9:19:21 PM GMT - Time Source: server - Signature Appearance Selected: IMAGE

✅ Agreement completed.
2026-06-09 - 9:19:21 PM GMT



Powered by
**Adobe**
**Acrobat Sign**