**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| VI-JON, LLC,[1] | Case No. 26-11216 (MFW) |
| Debtor. | |

**DEBTOR'S MOTION**
**FOR ENTRY OF INTERIM**
**AND FINAL ORDERS (I) AUTHORIZING THE**
**DEBTOR TO (A) CONTINUE USE OF ITS EXISTING**
**CASH MANAGEMENT SYSTEM, BANK ACCOUNTS, AND**
**BUSINESS FORMS AND (B) PAY CERTAIN OBLIGATIONS**
**RELATED THERETO, (II) AUTHORIZING POSTPETITION**
**INTERCOMPANY TRANSACTIONS, (III) APPROVING THE AMENDED**
**KEEPWELL AGREEMENT, (IV) EXTENDING THE TIME PERIOD**
**TO COMPLY OR WAIVING CERTAIN REQUIREMENTS OF SECTION 345(b)**
**OF THE BANKRUPTCY CODE, AND (V) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "Debtor") respectfully states the following in support of this motion (the "Motion"):[2]

**RELIEF REQUESTED**

1.      The Debtor seeks entry of an interim order and a final order (respectively, the "Interim Order" and "Final Order"), substantially in the forms attached hereto as **Exhibit A** and

---

[1] The Debtor in this chapter 11 case is Vi-Jon, LLC.  The last four digits of the Debtor's federal tax identification number are 8002.  The Debtor's service address is 8800 Page Ave., St. Louis, MO 63114.

[2] A detailed description of the Debtor, its business, and the facts and circumstances supporting this Motion and the Debtor's chapter 11 case are set forth in greater detail in the *Declaration of Mackenzie Shea in Support of the Debtor's Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day Declaration.

**Exhibit B**, respectively, granting, among other things, the following relief:[3]

    a. authorizing, but not directing, the Debtor to:

        i.    continue use of its existing cash management system, bank accounts, and business forms;

        ii.    continue postpetition Intercompany Transactions (as defined herein) in the ordinary course of business; and

        iii.    pay obligations related thereto;

    b. approving the Amended Keepwell Agreement and authorizing, but not directing, the Debtor to perform thereunder, including by making capital calls and receiving funding, and using such funding in accordance with the Budget;[4]

    c. extending the time period to comply or waiving certain requirements under section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines; and

    d. granting related relief, including scheduling a final hearing to consider approval of the Motion on a final basis.

## JURISDICTION AND VENUE

2.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtor confirms its consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

[3] The Debtor's authority to continue operating under the Shared Services Agreements (as defined herein) is addressed in the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Continue Operating Under the Shared Services Agreements and (II) Granting Related Relief* (the "Shared Services Motion"), filed contemporaneously herewith. The relief requested in this Motion is intended to complement the Shared Services Motion.

[4] The "Budget" means the budget attached hereto as **Exhibit E** which shows projected cash receipts and cash disbursements on a weekly basis, and any subsequent budget that is modified or extended from time to time with the consent of Emprise and Emprise HPC, and otherwise in accordance with the Restructuring Support Agreement.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal bases for the relief requested in this Motion are sections 105, 345, 363, and 503 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 2015-1, and 9013-1.

## BACKGROUND

5.      The Debtor is a provider of private-label dry bath products consisting of Epsom salts and body powders.  The Debtor's products are sold across retail and e-commerce channels in the United States to major retailers such as Amazon, Dollar General, Kroger, TopCo, and Walgreens.  The Debtor leverages shared-services and co-manufacturing agreements with its affiliates for sourcing, manufacturing, packaging, testing, quality control, and distribution of its products.

6.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court.  The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in this case, and no statutory committee has been appointed.

7.      Additional information regarding the Debtor's business, capital structure, and circumstances preceding the Petition Date may be found in the First Day Declaration.

## THE CASH MANAGEMENT SYSTEM

### I.      Overview

8.      In the ordinary course of business, the Debtor uses a cash management system (the "Cash Management System") to facilitate the collection, management, reconciliation, and disbursement of funds used in the Debtor's business.  The Cash Management System is not

maintained solely by the Debtor. Rather, it is integrated with the broader enterprise cash management system maintained by Emprise Group, Inc. ("Emprise") and certain of its non-Debtor subsidiaries that are parties to the Shared Services Agreements, including Vivos Holdings, LLC ("Vivos"), Nice-Pak Products, LLC ("Nice-Pak"), UpLift Brands, LLC ("UpLift"), as well as the Debtor's immediate parent, Emprise HPC, LLC (f/k/a Intermediary HoldCo, LLC) ("Emprise HPC," and together with Emprise, Vivos, Nice-Pak, and UpLift, the "Non-Debtor Affiliates"). As part of the 2023 Restructuring Transaction, the Debtor retained the private-label dry bath and personal care products businesses, while Vivos became the home of the liquid and branded product lines. The Debtor and certain of its Non-Debtor Affiliates entered into the Shared Services Agreements to allocate and consolidate many of the back-office functions, including procurement, manufacturing, shipping, taxes, utilities, employee benefits, insurance, treasury, finance, accounting, information technology, legal, regulatory, risk-management, and administrative functions.

9. Specifically, the Shared Services Agreements consist of (a) the Administrative Services Agreement, dated December 3, 2023, by and among Vivos and the Debtor (as amended, the "Vivos Administrative Services Agreement"), (b) the Administrative Services Agreement, dated December 3, 2023, by and among Emprise and the Debtor (as amended, the "Emprise Administrative Services Agreement" and, together with the Vivos Administrative Services Agreement, the "Administrative Services Agreements"), and (c) the Co-Manufacturing and Supply Agreement by and among Nice-Pak and the Debtor (as amended, the "Co-Manufacturing Agreement," and together with the Administrative Services Agreements, collectively, the "Shared Services Agreements").

4

10.     Each Shared Services Agreement impacts the Cash Management System by specifying the services provided and the fees, direct costs, reimbursements, and other payment amounts or categories of amounts payable under the applicable agreement.  In the ordinary course of its business, the Debtor receives certain payments consisting solely of amounts on account of the Debtor's products.  Additionally, certain customer receipts for joint customers or consolidated invoices are collected into Vivos's accounts, and the Debtor-attributable portion is identified through stock-keeping unit ("SKU") level and profit-center information and reconciled through the intercompany reconciliation process that occurs from time to time, including through netting against amounts the Debtor owes to the applicable Non-Debtor Affiliates and, to the extent the reconciliation results in a net amount receivable by the Debtor, cash remittance to the Debtor. Under the Vivos Administrative Services Agreement, Vivos provides management, finance, accounting, human resources, information technology, legal, regulatory, tax-management, utility, and other administrative services and pays certain direct costs on the Debtor's behalf.  Under the Emprise Administrative Services Agreement, Emprise provides risk-management, insurance, employee-benefit, consolidated-tax, and related services.   Under the Co-Manufacturing Agreement, Nice-Pak sources raw materials, manufactures, packages, warehouses, coordinates shipments, supports customer service and sales activity, and charges the Debtor for annual fees, direct costs, overhead, distribution, freight, labor, raw materials, and applicable manufacturing fees.

11.     The Debtor maintains oversight over the Cash Management System and related cash flows through Non-Debtor Affiliate bank accounts through its books and records, enterprise resource planning system, and reconciliation procedures.  These controls allow the Debtor and the Non-Debtor Affiliates to monitor and enforce the contractually specified obligations under the

Shared Services Agreements, identify Debtor-attributable receipts and disbursements, track amounts paid or collected by Non-Debtor Affiliates on the Debtor's behalf, and calculate net amounts payable to or from the Debtor.

12.     Because the Debtor's operations and cash flows depend on this integrated structure, any disruption to the Cash Management System, the Shared Services Agreements, or the related reconciliation process would impair the Debtor's ability to collect receipts, fund limited disbursements, maintain essential services, and continue operating during this chapter 11 case. Accordingly, the Debtor requests authority to continue using the Cash Management System during the pendency of this chapter 11 case, subject to the terms described herein.

## II.     The Bank Accounts

13.     As of the Petition Date, the Debtor maintains four (4) bank accounts (each, a "Bank Account," and, collectively, the "Bank Accounts") at Bank of America, N.A. ("BoA") and East West Bank ("East West," and each, a "Cash Management Bank" and, collectively, the "Cash Management Banks").  A schedule of the Bank Accounts is attached hereto as **Exhibit C**.

14.     The Bank Accounts and Cash Management System are further described in the following table:

| Active Debtor Bank Accounts | Account Description |
|---|---|
| **BoA Operating Account**<br><br>BoA ending –1998 | The Debtor maintains an operating account at BoA (the "BoA Operating Account"), which is used to make limited disbursements, including payroll to the Debtor's employee and independent contractor, settlement broker fees, and legal and consulting fees.  The BoA Operating Account receives funds from three primary sources: (i) funds from Vivos for amounts payable to the Debtor through the intercompany reconciliation process, (ii) amounts funded pursuant to the Original Keepwell Agreement and Amended Keepwell Agreement, and (iii) amounts swept from the Receivables Account (as defined below).  The amounts deposited into the BoA Operating Account may be manually transferred to the East West Operating Account as needed. |

| East West Operating Account

East West ending –8218 | The Debtor maintains an operating account at the Texas branch of East West (the "East West Operating Account" and, together with the BoA Operating Account, the "Operating Accounts").  The East West Operating Account receives funds from two primary sources (i) transfers from the BoA Operating Account and (ii) amounts funded under the Amended Keepwell Agreement.  The Debtor uses the East West Operating Account to disburse payments to professionals, pay Bank Fees (as defined below), and pay other operational costs. |
|---|---|
| Receivables Account

BoA ending –2586 | The Debtor maintains a receivables account (the "Receivables Account"), which receives limited direct customer receipts solely on account of the Debtor's products.  The funds deposited into the Receivables Account are swept into the BoA Operating Account daily. |
| **Inactive Account** | **Account Description** |
| Inactive Account

BoA ending –2599 | The Debtor maintains one inactive account (the "Inactive Account").  The Inactive Account has a $0 balance. |

15.     The Debtor estimates that, as of the Petition Date, it has approximately $1,650,000 in cash on hand.

16.     Additionally, Omni Agent Solutions, Inc. ("Omni"), the Debtor's claims and noticing agent, maintains two segregated accounts at East West Bank ending in 7868 and 8211 that are not part of the Cash Management System (the "Carve-Out Accounts").  Pursuant to the Amended Keepwell Agreement and the Budget, the Carve-Out Accounts will receive certain amounts (upon entry of the Interim Order and on a weekly basis thereafter, the "Carve-Out Amounts") that are earmarked and set aside for the benefit of the professionals retained by the Debtor, the official committee of unsecured creditors (the "UCC"), and the legal representative for the purpose of protecting the rights of persons that might assert talc-related demands (as defined in the Bankruptcy Code) against the Company or the Non-Debtor Affiliates (the "FCR"; and the Debtor's, UCC's, and FCR's professionals, collectively, the "Retained Professionals"), as well as

for fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) (the "U.S. Trustee Statutory Fees").  Once set aside, the Carve-Out Amounts will not be deposited into or commingled with any other Bank Accounts.   The Carve-Out Amounts will be held and disbursed solely to Retained Professionals in accordance with the Interim Order, the Final Order, and any interim compensation order or fee order entered in the Chapter 11 Case, as well as on account of the U.S. Trustee Statutory Fees.

### III.    Bank Fees

17.    The Debtor incurs periodic service charges and other fees related to the Cash Management System (collectively, the "Bank Fees").  The Debtor pays the Cash Management Banks an aggregate of approximately $2,100 per month in Bank Fees, including approximately $1,500 to BoA and approximately $600 to East West, which are generally due and payable monthly.

18.    As of the Petition Date, the Debtor estimates that it does not owe any prepetition, unpaid Bank Fees, but estimates that approximately $2,250 in aggregate Bank Fees will become due and payable within thirty (30) days of the Petition Date.[5]  The Debtor requests authority, but not direction, to continue paying Bank Fees, including any prepetition Bank Fees, in the ordinary course on a postpetition basis.

### IV.    Intercompany Transactions

19.    The Debtor's Intercompany Transactions are an integral part of the Cash Management System, and each such transaction arises under either the Shared Services Agreements or the Amended Keepwell Agreement, as applicable.  The Intercompany Transactions include, among other things: (a) customer receipts collected by Vivos that include amounts

---

[5] This amount includes a one-time $150 account-opening fee payable to East West in addition to the monthly fees payable to the Cash Management Banks.

attributable to the Debtor's goods; (b) shared-services fees, direct costs, service fees, taxes, utilities, insurance, employee benefits, manufacturing costs, logistics costs, freight costs, raw-materials, overhead, and other expenses paid or administered by Non-Debtor Affiliates and reimbursed by the Debtor; and (c) reimbursements and settlement payments among the Debtor and the Non-Debtor Affiliates (collectively, the "Intercompany Transactions").

### A.      Sources of Cash and Flow of Funds

20.      As reflected in the cash management schematic attached hereto as **Exhibit D**, Debtor-attributable cash reaches the Debtor in three principal ways.  First, limited customer payments solely on account of the Debtor's products made directly to the Debtor are deposited into the Receivables Account and swept into the BoA Operating Account; those funds may thereafter be transferred to the East West Operating Account as needed.  Second, certain customer receipts for joint customers or consolidated invoices are collected into Vivos's accounts, and the Debtor-attributable portion is identified through SKU-level and profit-center information and reconciled through the intercompany reconciliation process that occurs from time to time, including through netting against amounts the Debtor owes to the applicable Non-Debtor Affiliates and, to the extent the reconciliation results in a net amount receivable by the Debtor, cash remittance to the Debtor.  Lastly, and as more fully described in Section V below, Emprise HPC historically has provided, and will continue to provide, funding under the Amended Keepwell Agreement.

21.      In the ordinary course of its business, the Debtor receives limited customer payments solely on account of the Debtor's products.  In addition, pursuant to the Vivos Administrative Services Agreement and related ordinary-course practices described in the Shared Services Motion, Vivos invoices and collects from customers where a consolidated invoice includes both Debtor and Non-Debtor Affiliate products.  Customer payments on these invoices

9

are generally received into bank accounts maintained by Vivos.  The Debtor, along with Vivos, identifies the portion of such receipts attributable to the Debtor using SKU-level and profit-center accounting information, and the Debtor-attributable amounts are recorded through the intercompany accounting process and settled through the weekly cash-remittance process, which, as described in Section IV.B below, will be in effect after the Petition Date.

22.    With respect to disbursements, the Shared Services Agreements specify the fees, direct costs, reimbursements, and related charges payable by the Debtor in connection with the services and arrangements described therein.  Those contractually specified amounts include, among other things: manufacturing and logistics costs payable to Nice-Pak under the Co-Manufacturing Agreement; management, finance, accounting, human resources, information technology, legal, regulatory, tax, utility, and other administrative costs payable to or administered by Vivos under the Vivos Administrative Services Agreement; and insurance, employee-benefit, risk-management, workers' compensation, consolidated-tax, and related costs administered by Emprise under the Emprise Administrative Services Agreement.  Vivos is then either reimbursed by the Debtor or applies the Debtor-attributable costs against Debtor-attributable receipts through the intercompany reconciliation process described in Section IV.B below.

**B.    Intercompany Reconciliation Process**

23.    The Intercompany Transactions are subject to the Debtor's ordinary-course reconciliation process.  The Debtor maintains records of Intercompany Transactions and can ascertain, trace, and account for such transactions through its general ledger and related books and records.

24.    Historically, the Debtor and its Non-Debtor Affiliates closed their books based on a 5-4-4 retail calendar, an accounting calendar commonly used by retailers that divides each fiscal quarter into three fiscal periods of five weeks, four weeks, and four weeks, respectively, resulting

in 13-week quarters and generally a 52-week fiscal year.  As part of that process, the Debtor and its Non-Debtor Affiliates would process, identify, and reconcile customer receipts, shared-services charges, affiliate-paid costs, manufacturing costs, logistics costs, taxes, utilities, insurance, employee benefits, inventory movements, cash-management-related obligations, and other amounts attributable to the Debtor or the Non-Debtor Affiliates.  While this reconciliation allowed the Debtor and the Non-Debtor Affiliates to record activity, identify and correct discrepancies, and maintain accurate intercompany balances, cash settlement generally occurred only in connection with true-ups, which occurred from time to time, with the most recent true-up occurring in December 2025.

25.     Prior to the Petition Date, the Debtor and its advisors undertook an evaluation of all intercompany reconciliations occurring after the 2023 Restructuring Transaction, which showed that the Debtor and its Non-Debtor Affiliates conducted intercompany reconciliation monthly and remitted cash payments from time to time to settle intercompany balances.  As of the Petition Date, the Debtor implemented an updated intercompany reconciliation process.  Under the updated process, postpetition activity will be reconciled and settled more frequently through weekly cash remittances rather than carried as a continuing intercompany balance until year-end. At the close of each week, the Debtor and its Non-Debtor Affiliates will reconcile postpetition customer receipts, shared-services charges, affiliate-paid costs, direct costs, reimbursements, and other Intercompany Transactions.  The weekly reconciliation will be completed by the following Thursday, and the resulting net balance will be settled by cash remittance on the following Friday. If the net balance is payable by the Debtor, the Debtor will remit payment to the applicable Non-Debtor Affiliate.  If the net balance is a Debtor receivable, the applicable Non-Debtor Affiliate will remit payment to the Debtor.  Following each month-end close, the Debtor and its Non-Debtor

Affiliates will perform a final monthly reconciliation, and any discrepancies identified between the weekly reconciliations and the month-end close process will be settled at that time.  These procedures are intended to protect the Debtor's estate by ensuring that postpetition estate cash is transferred efficiently and expeditiously after the parties identify the Debtor-attributable activity, calculate the net amount payable or receivable, and maintain records sufficient to trace each Intercompany Transaction.  Any intercompany balance outstanding as of the Petition Date, including those outstanding under the Intercompany Promissory Note and the Intercompany Advance Agreement, will be frozen and excluded from the postpetition reconciliation and settlement process.

26.     Accordingly, the Debtor seeks authority to continue the Intercompany Transactions in the ordinary course of business through these postpetition reconciliation and settlement procedures.

**V.      Amended Keepwell Agreement**

27.     As part of the 2023 Restructuring Transaction, on December 3, 2023, the Debtor and Vivos entered into a Contribution Agreement (the "Contribution Agreement"), pursuant to which the Debtor transferred to Vivos its assets and liabilities not related to its dry goods business. Because the Contribution Agreement provided that the Debtor was to retain all liabilities related to the dry goods business, including talc-related liabilities, on December 28, 2023, Emprise HPC and the Debtor entered into a Limited Contribution Agreement (the "Original Keepwell Agreement").  Pursuant to the Original Keepwell Agreement, Emprise HPC agreed, subject to certain conditions being met, to make equity contributions to the Debtor upon receipt of a qualifying capital call, in an amount determined by projected liquidity shortfalls, up to $25 million (the "Keepwell Obligations").  The Original Keepwell Agreement was intended to provide a source of funding for the Debtor's anticipated talc-related liabilities as it continued to operate the

dry goods business and was sized based upon liability forecasts prepared by NERA Economic Consulting with respect to the Debtor's talc-related liabilities, as described in the First Day Declaration.

28.      On July 30, 2026, following receipt of the required lender consent, Emprise HPC and the Debtor entered into an Amended and Restated Limited Contribution Agreement, dated as of July 30, 2026, attached to the proposed Interim Order as **Exhibit 1** (the "Amended Keepwell Agreement").  The Amended Keepwell Agreement amends and restates the Original Keepwell Agreement, and removes certain limitations related to the availability of the remaining Keepwell Obligations.  The Keepwell Obligations were in effect under the Original Keepwell Agreement before the Amended Keepwell Agreement and continue under the Amended Keepwell Agreement. For example, under the Original Keepwell Agreement, if the amount of a Capital Call exceeded $2 million, then Emprise HPC was not obligated to fund such amounts until 45 Business Days' notice had been provided.  Although Emprise HPC's obligation to fund remains subject to the $25 million aggregate cap, as an accommodation to the Debtor, Emprise HPC agreed to the Amended Keepwell Agreement, which removes certain funding conditions so that,  upon approval of the Amended Keepwell Agreement, the Debtor may request the remaining available Keepwell Obligations.  Following the Debtor's request, the capital call shall be satisfied within six (6) business days and the proceeds are permitted to be used in accordance with the Budget.  Emprise HPC shall not receive or be entitled to assert any administrative expense or other postpetition claim against the Debtor on account of amounts funded pursuant to any capital call under the Amended Keepwell Agreement.

29.      Accordingly, the Debtor seeks approval of the Amended Keepwell Agreement and authority, but not direction, to perform thereunder, including by making capital calls and receiving

13

funding, subject to the $25 million aggregate cap and the terms of the Amended Keepwell Agreement, including use of funds in accordance with the Budget.

## VI.   Business Forms and Books & Records

30.     As part of the Cash Management System, the Debtor utilizes a number of preprinted business forms (the "Business Forms"), including letterheads and other ancillary forms.  The Debtor also maintains books and records to document its financial results and a wide array of operating information (the "Books & Records").

31.     To avoid significant disruption to its business operations and to minimize administrative expenses to its estate, the Debtor requests authorization to continue using all of the Business Forms and the Books & Records in a manner consistent with prepetition practice, without reference to the Debtor's status as a chapter 11 debtor in possession, and, upon exhaustion of the Debtor's existing supply of checks, to reorder (or with respect to checks the Debtor or its agents print themselves) or reprint checks that include the "Debtor in Possession" designation and corresponding bankruptcy case number.

## VII.   Compliance With the Bankruptcy Code and U.S. Trustee Guidelines

32.     Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money that "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. § 345(a).  To comply with section 345 of the Bankruptcy Code, the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines") for the United States Trustee for the District of Delaware (the "U.S. Trustee") generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with certain requirements set by the U.S. Trustee.  For deposits or investments that are not "insured or guaranteed by the United States or by a department,

agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires debtors to obtain, from the entity with which the money is deposited, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, or "the deposit of securities of the kind specified in section 9303 of title 31," unless the court "for cause" orders otherwise.  11 U.S.C. § 345(a)–(b).

33.     As of the Petition Date, all the Bank Accounts are maintained at financial institutions that have executed a uniform depository agreement with and are designated as authorized depositories (each, an "Authorized Depository") by the U.S. Trustee pursuant to the U.S. Trustee Guidelines.  *See* USTP Region 3 Authorized Depository Institutions, Feb. 1, 2026 (available at https://www.justice.gov/ust/ust-regions-r03/page/file/1582216/dl) at 2, 4 (listing Bank of America and East West Bank).  Each Cash Management Bank at which the Bank Accounts are held is a highly rated, FDIC-insured bank that is subject to supervision by the applicable federal and state regulators.

34.     Although the Bank Accounts are maintained at institutions that are Authorized Depositories and, therefore, the Debtor believes that the existing Cash Management System complies with the requirements of section 345(b) of the Bankruptcy Code, the Debtor requests, out of an abundance of caution, that the Court waive the requirements of section 345(b) of the Bankruptcy Code on an interim basis and permit it to maintain its deposits in the Bank Accounts in accordance with the Debtor's existing deposit practices.

## BASIS FOR RELIEF REQUESTED

**I.      The Court Should Authorize the Debtor to Continue to Use the Cash Management System.**

35.     The U.S. Trustee Guidelines require debtors in possession to, among other things: (a) close all existing bank accounts and open new debtor-in-possession accounts at an authorized

depository; (b) establish one debtor-in-possession bank account for all estate monies required for the payment of taxes, including payroll taxes; (c) physically set aside monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the chapter 11 case; (e) use new business forms indicating the debtor in possession status of the chapter 11 debtor, including checks that bear the designation of "debtor in possession" and reference the bankruptcy case number and type of account on such check; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement. *See* U.S. Trustee Guidelines.

36.     These requirements are intended to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims. Here, however, requiring the Debtor to replace or materially reconfigure the Cash Management System at the outset of this chapter 11 case would create a substantial risk of disruption to the Debtor's operations. Among other things, such requirements could impair or prevent the Debtor from timely receiving its share of proceeds from shared invoices processed through Vivos, or other Non-Debtor Affiliates, and could disrupt direct receipts into the Debtor's Bank Accounts, funding under the Amended Keepwell Agreement agreed to by Emprise HPC as an accommodation to the Debtor, ordinary-course disbursements, account sweeps, Intercompany Transactions, and the related weekly reconciliation and cash-remittance process. Any effort to separate, replace, or materially modify these integrated processes would require significant time and expense, impose undue administrative burdens on the Debtor at a critical juncture, and, given the shared nature of certain invoicing, payment, and reconciliation functions, may not be practicable without jeopardizing the Debtor's ability to identify, collect, and account for Debtor-attributable amounts in the ordinary course.

37.     Accordingly, the Debtor requests that this Court allow the Debtor to continue to use, designate, maintain, and close any or all Bank Accounts that comprise the Cash Management System, as each was maintained in the ordinary course of business before the Petition Date.

38.     Maintaining the Cash Management System is permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of this section is to provide a debtor with the flexibility to engage in the ordinary course transactions required to operate its business without unnecessary oversight by its creditors or the court. *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets.") (citations omitted); *In re Vision Metals, Inc.*, 325 B.R. 138, 145 (Bankr. D. Del. 2005) (same). Included within the purview of section 363(c) of the Bankruptcy Code is a debtor's ability to continue "routine transactions" necessitated by a debtor's cash management system. *See, e.g.*, *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007) (noting that courts have shown a reluctance to interfere in a debtor's routine, day-to-day business decisions) (citations omitted); *Vision Metals*, 325 B.R. at 142 ("[W]hen a chapter 11 debtor in possession continues to operate its business, as permitted by section 1108, no court authorization is necessary for the debtor to enter transactions that fall within the ordinary course of its business.").

39.     Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter[.]" *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). In granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes

17

the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in relevant part*, 997 F.2d 1039, 1061 (3d Cir. 1993). The requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Id.*

40. Additionally, the Court may rely on its equitable powers to grant the relief requested herein. Specifically, section 105(a) of the Bankruptcy Code authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code and the doctrine of necessity, the Court may exercise its broad grant of equitable powers to approve this Motion, including the payment of prepetition obligations when such payment is essential to the continued operation of a debtor's business. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of prepetition claims when such payment is necessary for the debtor's survival during chapter 11"). Therefore, it is within the Court's equitable powers under section 105(a) of the Bankruptcy Code to approve the continued use of the Cash Management System.

41. The Cash Management System constitutes an important business practice that provides operational resilience and flexibility to the Debtor. Accordingly, the continued use of the Cash Management System without interruption is vital to the Debtor's ongoing business operations and the success of this chapter 11 case.

42. Requiring the Debtor to adopt a new, segmented cash management system during this chapter 11 case would be expensive, burdensome, and unnecessarily disruptive. The Cash

Management System allows the Debtor and its Non-Debtor Affiliates to track and report the location and amount of funds, identify receipts and expenses processed through affiliate accounts, ensure cash availability, and reduce administrative costs through a coordinated method of collection and moving, reconciling, and settling funds.  Disrupting the Cash Management System could negatively affect the Debtor's efforts during this chapter 11 case, the costs of which ultimately would be borne by the Debtor's creditors and other stakeholders.  By contrast, maintaining the current Cash Management System will facilitate the Debtor's transition into chapter 11 and enable the Debtor to maximize value of its estate by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.

43.     Parties in interest will not be harmed by the Debtor's maintenance of the Cash Management System, including maintenance of the Bank Accounts and the Intercompany Transactions, because the Debtor has implemented appropriate mechanisms to ensure that there will not be unauthorized payments on account of prepetition obligations, including implementing procedures to mark prepetition and postpetition payables, splitting invoices that cover both the prepetition and postpetition periods, and stopping automatic payments on prepetition obligations. The Debtor will continue to work closely with its advisors and the Cash Management Banks to ensure that appropriate procedures are in place to prevent checks that were issued prepetition from being honored without the Court's approval.  In light of such protective measures, maintaining the Cash Management System is in the best interests of the Debtor's estate, creditors, and all parties in interest.

44.     In addition, the Debtor respectfully requests that the Court authorize the Debtor to continue to pay the Bank Fees, including any prepetition Bank Fees.  In light of the material benefit of maintaining the Cash Management System in order to avoid unnecessary disruption and costly

delay, especially as compared to the relatively modest amount of the Bank Fees, such relief is warranted under the circumstances.

45.      Accordingly, the Debtor requests authority, but not direction, to continue using the Cash Management System, including maintaining, servicing, and administering the Bank Accounts as accounts of the Debtor as a debtor in possession, without interruption and in the ordinary course of business.  Notwithstanding the foregoing, any check, draft, or other notification that the Debtor advises any Cash Management Bank to have drawn, issued, or otherwise presented before the Petition Date may be honored by such Cash Management Bank only to the extent authorized by order of the Court.  If the Debtor's ability to conduct transactions by these methods is impaired, the Debtor may be unable to collect receipts, make ordinary-course disbursements, and perform under certain contracts necessary to preserve the value of the Debtor's business, which would jeopardize the Debtor's restructuring and result in unnecessary disruption to its business operations and additional costs to its estate.

## II.      The Court Should Approve the Amended Keepwell Agreement.

46.      The Debtor seeks approval of the Amended Keepwell Agreement pursuant to section 363(b) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts have approved transactions under section 363(b) where the debtor demonstrates that the transaction is supported by a sound business justification.  *See In re Martin*, 91 F.3d 389, 395 & n.2 (3d Cir. 1996) (noting that, under normal circumstances, courts defer to the trustee's judgment where there is a legitimate business justification); *In re Mallinckrodt PLC*, 2022 WL 906458, at *5–7 (D. Del. Mar. 28, 2022) (applying the business judgment standard to affirm order entered under sections 363(b) and 365(a) authorizing debtors to assume and/or enter into reimbursement agreements with certain RSA-party

professionals); *Chamberlain v. Stanziale (In re Culp)*, 545 B.R. 827, 844 (D. Del. 2016) (stating that section 363 transactions must be based upon sound business judgment).

47.   In determining whether to approve a transaction under section 363(b), courts generally defer to the debtor's business judgment where the debtor articulates a reasonable basis for the transaction. *See In re Global Home Prods., LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) (internal citation omitted); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153–55 (D. Del. 1999) (holding that courts require a debtor to show a sound business purpose for the use of estate property outside the ordinary course and that the analysis is essentially a business judgment test).

48.   The Debtor submits that approval of the Amended Keepwell Agreement is a sound exercise of the Debtor's business judgment and is justified under section 363(b) of the Bankruptcy Code.  The Debtor and Emprise HPC entered into the Amended Keepwell Agreement before the Petition Date following receipt of the required lender consent, to preserve and enhance the Debtor's access to that funding during the initial stages of this chapter 11 case.  Under the Amended Keepwell Agreement, Emprise HPC's obligation to fund capital contributions to the Debtor remains subject to the $25 million aggregate cap, but the agreement has been amended to remove the other conditions to funding so that the Debtor may request the remaining available Keepwell funding upon approval of the Amended Keepwell Agreement from this Court and subject to use of the proceeds thereof in accordance with the Budget.

49.   Emprise HPC agreed to the Amended Keepwell Agreement as an accommodation to the Debtor, and approval of the Amended Keepwell Agreement will provide significant value to the Debtor and its estate by improving the Debtor's access to liquidity needed to fund this chapter 11 case, maintain ordinary-course operations, and preserve value for stakeholders. Without approval of the Amended Keepwell Agreement, the Debtor may be unable to access the

remaining Keepwell funding on the timing and terms needed to support its postpetition budget and ongoing operations. Accordingly, the Debtor requests that the Court approve the Amended Keepwell Agreement and authorize the Debtor to perform thereunder, including by making capital calls and receiving funding in accordance with its terms including use of proceeds in accordance with the Budget.

**III.   The Carve-Out Amounts Should be Disbursed Solely to Retained Professionals.**

50.     Pursuant to the Amended Keepwell Agreement and the Budget, the Carve-Out Accounts will receive the Carve-Out Amounts, which are funded by Emprise HPC as capital contributions and are earmarked and set aside for the benefit of the Retained Professionals and on account of the U.S. Trustee Statutory Fees. After entry of the Interim Order, $3,000,000 will be transferred directly into the Carve-Out Accounts. The Debtor will also transfer budgeted amounts for Retained Professionals and U.S. Trustee Fees on a weekly basis to the Carve-Out Accounts. The Debtor requests that the Court enter the Interim and Final Order providing that Carve-Out Amounts shall be held and disbursed solely to Retained Professionals in accordance with the Interim Order, the Final Order, and any interim compensation order or fee order entered in this Chapter 11 Case, as well as for the U.S. Trustee Statutory Fees.

51.     The Carve-Out Amounts that are funded directly by Emprise HPC to the Carve-Out Accounts were disbursed directly to the Carve-Out Accounts (which are not part of the Debtor's Cash Management System) specifically for the purpose of paying the Retained Professionals. Funds over which a debtor "never had actual control . . . never became part of the bankrupt's estate available for distribution to the creditors of the estate." *In re AmeriServe Food Distribution, Inc.*, 315 B.R. 24, 30 (Bankr. D. Del. 2004).

52.     Further, the budgeted amounts that the Debtor will transfer to the Carve-Out Accounts for Retained Professionals and U.S. Trustee Fees on a weekly basis are also earmarked

for that purpose under the Budget, which the Debtor must comply with under the Limited Keepwell Agreement. Where (i) an agreement between the funding party and the debtor provides that new funds will be used to pay a specified obligation, (ii) that agreement is performed according to its terms, and (iii) the transaction viewed as a whole does not diminish the debtor's estate, the funds are "earmarked" for the specified recipient and do not become property available to other creditors. *See Schubert v. Lucent Techs. Inc.* (*In re Winstar Commc'ns, Inc.*), 554 F.3d 382, 400 (3d Cir. 2009); *Masiz v. Burtch* (*In re Vaso Active Pharms., Inc.*), 537 B.R. 182, 187–88 (D. Del. 2015) (the "central inquiry" is "whether the debtor had the right to disburse the funds to whomever it wished" (quoting *AmeriServe*, 315 B.R. at 30)).

53. Each element is satisfied here. *First*, the Amended Keepwell Agreement between Emprise HPC and the Debtor provides that the Carve-Out Amounts shall be used solely tin accordance with the Budget (including Carve-Out Amounts for Retained Professionals and U.S. Trustee Statutory Fees). *Second*, once the Carve-Out Amounts are funded into the segregated Carve-Out Accounts maintained by Omni, they will not be commingled with any estate funds, and will be disbursed only in accordance with orders of this Court and to satisfy the Debtor's statutory obligations for the U.S. Trustee Statutory Fees. *Third*, the arrangement does not diminish the Debtor's estate: Emprise HPC is contributing the Carve-Out Amounts as equity (not a loan) and earmarking such funds for the Retained Professionals and U.S. Trustee Statutory Fees pursuant to the Budget; the Debtor's estate would never have received the Carve-Out Amounts unless they were being used in accordance with the Budget and being sent to the Carve-Out Accounts.

54. In fact, the arrangement benefits the estate, because the Retained Professionals are not able to rely on their exclusive access to the Carve-Out Amounts, the Debtor's estate may be deprived of possible rights and powers because the services for which professionals may be paid

23

in this case are restricted. *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Courts have accordingly refused to redistribute court-approved professional-fee set-asides to other administrative claimants. *See In re US Flow Corp.*, 332 B.R. 792, 797 (Bankr. W.D. Mich. 2005) (property "earmarked and conveyed for the benefit of the court-appointed professionals" under a court-approved carve-out was "not subject to disgorgement" for *pro rata* distribution among administrative claimants).

55.     Accordingly, the Court should enter the Interim and Final Order providing that the Carve-Out Amounts in the Carve-Out Accounts shall be held and disbursed solely to Retained Professionals and on account of U.S. Trustee Statutory Fees.

**IV.     The Court Should Authorize the Debtor to Continue to Use Its Existing Business Forms and Books & Records.**

56.     To avoid disrupting the Cash Management System and incurring unnecessary expenses, the Debtor requests authority, but not direction, to continue to use the Business Forms substantially in the form existing immediately before the Petition Date, without reference to its status as a debtor in possession.  Parties in interest will not be prejudiced by this relief and will undoubtedly be aware of the Debtor's status as a debtor in possession.  Thus, changing the Business Forms is unnecessary and would be unduly burdensome.  In accordance with Local Rule 2015-1, once the Debtor has exhausted its existing stock of Business Forms, the Debtor will ensure that any new Business Forms are clearly labeled "Debtor in Possession" as soon as it is reasonably practicable to do so.

57.     The Debtor also requests authority, but not direction, to maintain and continue using its existing Books & Records in the ordinary course of business.  Continued use of the

Debtor's existing Books & Records will preserve continuity, reduce administrative burden, and assist the Debtor and its advisors in tracking receipts, disbursements, and other transactions during this chapter 11 case.

**V.     The Court Should Authorize the Debtor to Continue Using Check, Wire, ACH, and Other Payment Methods.**

58.     The Debtor requests relief from the U.S. Trustee Guidelines to the extent such guidelines require the Debtor to make all disbursements by check.  Implementing the U.S. Trustee Guidelines would needlessly impair the Debtor's efforts to preserve the value of its estate.  Thus, the Debtor requests authority, but not direction, to continue using the Cash Management System, including receiving, processing, honoring, and paying any and all checks, wire transfers, ACH transfers, electronic funds transfers, and other payment instructions or drafts payable through, drawn on, or directed to the Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto.

59.     Notwithstanding the foregoing, any check, draft, wire transfer, ACH transfer, electronic funds transfer, or other payment item that the Debtor advises any Cash Management Bank to have been drawn, issued, or otherwise presented before the Petition Date may be honored by such Cash Management Bank only to the extent authorized by order of the Court.

60.     The Debtor also requests that the Court authorize and direct each Cash Management Bank to receive, process, honor, and pay any and all checks, wire transfers, ACH transfers, electronic funds transfers, and other payment instructions or drafts payable through, drawn on, or directed to the Bank Accounts maintained at such bank after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto, irrespective of whether such checks, drafts, transfers, or instructions are dated prior or subsequent to the Petition Date; *provided* that any prepetition payment item may be honored only to the extent authorized by order of the

Court.

61.     The Debtor further requests that, to the extent a Cash Management Bank honors a prepetition check or other payment item drawn on any Bank Account either (a) at the direction of the Debtor or (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored, such Cash Management Bank will not be deemed liable to the Debtor or its estate on account of such prepetition check or other item being honored postpetition.  This relief is reasonable and appropriate because a Cash Management Bank is not in a position to independently verify or audit whether a particular payment item may be paid in accordance with a Court order or otherwise.

62.     Moreover, the Debtor requests authority, but not direction, to authorize each Cash Management Bank to (a) continue to charge the Debtor the Bank Fees, as applicable, and (b) charge back returned items to the Bank Accounts maintained at such bank, whether such items are dated before, on, or after the Petition Date, in the ordinary course of business and only to the extent consistent with historical practices.

**VI.     The Court Should Authorize the Debtor to Continue Postpetition Intercompany Transactions.**

63.     Allowing the Debtor to engage in postpetition Intercompany Transactions is in the best interests of the Debtor's estate and its creditors, and the Debtor seeks authority to enter into such Intercompany Transactions in the ordinary course of business.  If the Intercompany Transactions were to be discontinued, the Cash Management System and Shared Services Agreements would be disrupted, impairing the Debtor's ability to collect customer receipts, receive shared services, reimburse affiliate-paid costs, access funding, and make limited disbursements.  The Debtor will continue to maintain records of such Intercompany Transactions and will settle postpetition activity through the weekly cash-remittance process described herein.

64. Because the Debtor engages in Intercompany Transactions on a regular basis as part of its existing cash management practices, the Debtor believes the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, therefore, do not require the Court's approval. In particular, these transactions are embedded in the Debtor's day-to-day operations and support, among other things, the identification of receipts and expenses, funding arrangements, ordinary-course payments, and reconciliation of amounts paid or received through Non-Debtor Affiliates. Disrupting or suspending these transactions at the outset of this chapter 11 case would risk impairing the Debtor's ability to operate its business, administer its estate, and preserve value for stakeholders. Accordingly, out of an abundance of caution, the Debtor is seeking express authority to engage in Intercompany Transactions on a postpetition basis.

65. If the Intercompany Transactions were to be discontinued, the Debtor could not operate, and the Cash Management System and related administrative controls would be disrupted to the detriment of the Debtor and its estate. Accordingly, the continued performance of the Intercompany Transactions is necessary and in the best interest of the Debtor's estate and its creditors and, therefore, the Debtor should be permitted to continue such performance.

66. Because certain of the Intercompany Transactions might represent extensions of intercompany credit that are an important component of the Cash Management System, the Debtor requests authority, but not direction, to continue conducting Intercompany Transactions postpetition in the ordinary course of business, settle these Intercompany Transactions through weekly cash remittances, complete a final monthly true-up after month-end close, and accrue intercompany balances to the extent such amounts have not yet been settled through those procedures, in each case, without further Court order and subject to this Court's approval of the

relief requested in the Shared Services Motion.  The Debtor further requests that, pursuant to sections 503(b) and 364(b) of the Bankruptcy Code, all postpetition payments on account of postpetition Intercompany Transactions between or among the Debtor and its Non-Debtor Affiliates that give rise to a claim be accorded administrative expense status, which would result in an administrative expense claim.[6]  This relief will ensure that each entity receiving payments from the Debtor will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions would jeopardize the recoveries available to the Debtor's creditors.

## VII.    Extension of Time to Comply or Waiver of the Requirements of Section 345(b) of the Bankruptcy Code Is Warranted.

67.    As explained above, the Debtor believes that the existing Cash Management System complies with the requirements of section 345 of the Bankruptcy Code and the U.S. Trustee Guidelines.  However, out of an abundance of caution, to the extent the Cash Management System does not strictly comply with section 345 of the Bankruptcy Code or the U.S. Trustee Guidelines, the Debtor seeks a waiver of such requirements, or an extension of time to comply with such requirements, as set forth herein.

68.    Section 345 of the Bankruptcy Code governs a debtor's deposit and investment of estate money, such as cash, during a chapter 11 case and authorizes deposits or investments of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. § 345(a).  For deposits that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States

---

[6] Notwithstanding the administrative expense status requested for postpetition intercompany balances, the Debtor reserves the right to dispute any Intercompany Transaction, intercompany balance, or payment made on account thereof on any ground, including the methodology for calculation of such transaction, balance, or payment, and to claw back or avoid such transaction or payment.

or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate surety, "unless the court for cause orders otherwise."  11 U.S.C. § 345(b).  In addition, under the U.S. Trustee Guidelines, debtors in possession must, among other things, close prepetition bank accounts and open new "debtor in possession" operating, payroll, and tax accounts at an authorized depository that agrees to comply with the U.S. Trustee's requirements.  *See* U.S. Trustee Guidelines.

69.    Courts may waive compliance with section 345 of the Bankruptcy Code "for cause."  11 U.S.C. § 345(b); *In re Reliz Tech. Grp. Holdings Inc.*, Case No. 26-10371 (TMH) (Bankr. D. Del. Apr. 14, 2026) [Docket No. 175] (waiving compliance with section 345(b)). Congress added the "for cause" language to section 345(b) in the Bankruptcy Reform Act of 1994 to permit courts to approve alternatives to strict compliance where appropriate, including where strict compliance could "needlessly handcuff larger, more sophisticated debtors."  *See* H.R. Rep. No. 103-835, 103rd Cong., 2d Sess. 210 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4, 1994); *In re Ditech Holding Corp.*, 605 B.R. 10, 17–18 & n.11 (Bankr. S.D.N.Y. 2019).  Courts and commentators have recognized that the 1994 amendment had the effect of overruling the Third Circuit's pre-amendment decision in *United States Trustee v. Columbia Gas System, Inc. (In re Columbia Gas System, Inc.)*, 33 F.3d 294 (3d Cir. 1994), by giving bankruptcy courts express authority to modify or waive section 345(b)'s requirements for cause.  *See In re King Mt. Tobacco Co.*, 623 B.R. 323, 331 & n.27 (Bankr. E.D. Wash. 2020); 3 Collier on Bankruptcy ¶ 345.04 (16th ed. 2026).

70.    Since the 1994 amendment, courts in other circuits evaluating cause have considered, among other things, the amount of funds involved, the ratings of the financial

institutions where funds are held, the safeguards in place to ensure the safety of the funds, the benefit to the debtor, the harm to the debtor and its estate, and the reasonableness of the requested relief in light of the circumstances of the case. *See In re King Mt. Tobacco Co.*, 623 B.R. at 332 (describing the "cause" inquiry as a "holistic, context-driven analysis" and adopting a fact- and context-specific totality-of-the-circumstances approach); *In re Ditech Holding Corp.*, 605 B.R. at 18 (applying a totality-of-the-circumstances test). Here, cause exists to grant the requested interim relief because the Bank Accounts are maintained at Bank of America, N.A. and East West Bank, each of which is an Authorized Depository, and requiring the Debtor to alter its existing deposit practices at the outset of this chapter 11 case could impose unnecessary administrative burden and disrupt ordinary-course collections and disbursements.

71.    Accordingly, the Court should authorize the Debtor to continue to deposit funds in the Bank Accounts and, to the extent that the requirements of section 345 of the Bankruptcy Code are inconsistent with these practices, the Debtor requests a thirty (30) day period following entry of the Interim Order to: (a) come into compliance with its obligations under section 345(b) of the Bankruptcy Code; (b) otherwise reach agreement with the U.S. Trustee, without prejudice to the Debtor's right to seek an extension of such period; or (c) return to the Court to argue that cause exists to waive the requirements of section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines to the extent such requirements remain inconsistent with the Debtor's cash management practices.

## VIII. The Debtor's Cash Management Banks Should Be Authorized to Honor Checks and Electronic Funds Transfers.

72.    Upon entry of the Interim Order, the Debtor will be authorized to perform under the Amended Keepwell Agreement, which, following receipt of the required lender consent, removes certain funding conditions applicable under the Original Keepwell Agreement and

permits the Debtor to request the remaining available Keepwell Obligations in accordance with its terms. Accordingly, the Debtor will have sufficient funds to pay the amounts described in this Motion, including by virtue of cash on hand and funding available under the Amended Keepwell Agreement. In addition, under the Debtor's existing Cash Management System, the Debtor can readily identify checks, wire transfer requests, ACH transfers, electronic funds transfers, and other payment requests as relating to authorized payments pursuant to this Motion or another order of this Court.

73.     Therefore, the Debtor respectfully requests that the Court authorize all applicable financial institutions, including the Cash Management Banks, to receive, process, honor, and pay any and all checks, drafts, wire transfer requests, ACH transfers, electronic funds transfers, and other payment requests in respect of the relief requested in this Motion. Any such financial institution may rely on the representations of the Debtor as to which checks, drafts, transfers, or payment requests are authorized to be paid in accordance with this Motion or any order of the Court, without any duty of further inquiry and without liability for following the Debtor's instructions.

**THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED**

74.     The Debtor asserts that immediate relief is necessary to avoid immediate and irreparable harm. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, entry of the proposed Interim Order is integral to the Debtor's ability to successfully transition into chapter 11, and effectuate a successful reorganization. Specifically, the relief requested is necessary to avoid a severe disruption of the Debtor's operations and negotiations with key stakeholders at this critical juncture

and, in turn, to preserve and maximize the value of the Debtor's estate for the benefit of all stakeholders. Importantly, upon entry of the Interim Order, the Debtor will be able to access the remainder of the funds under the Amended Keepwell Agreement and use the proceeds in accordance with the Budget. Accordingly, the Debtor submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully requests that the Court approve the relief requested in this Motion.

## REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

75.     The Debtor requests a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtor's ongoing operations and value-maximization process. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## RESERVATION OF RIGHTS

76.     Nothing contained herein or any action taken pursuant to the relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Debtor or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim or other obligation; (d) a waiver of the Debtor or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's

32

estate.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtor or any party in interest's rights to subsequently dispute such claim.

## NOTICE

77.    Notice of this Motion has been provided by email, facsimile, or first-class mail to: (a) the Office of the United States Trustee for the District of Delaware; (b) the United States Attorney's Office for the District of Delaware; (c) the firms listed on the Debtor's list of the top twenty (20) law firms with the most significant representations of Represented Litigation Claimants; (d) counsel to the prepetition representative for future talc and asbestos claims; (e) the Internal Revenue Service; (f) counsel to the Non-Debtor Affiliates (including those party to the Intercompany Transactions and the Amended Keepwell Agreement); (g) the Cash Management Banks; (h) the attorneys general of the states in which the Debtor does business; and (i) all parties entitled to notice pursuant to Local Rules 2002-1(b) and 9013-1(m).  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtor respectfully requests entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and granting such other relief as is just and proper.

Dated: August 2, 2026
Wilmington, Delaware

/s/ *Jason S. Levin*

| | |
|---|---|
| **MORRIS JAMES LLP** | **SIDLEY AUSTIN LLP** |
| Eric J. Monzo (DE Bar No. 5214) | Thomas R. Califano (*pro hac vice* pending) |
| Jason S. Levin (DE Bar No. 6434) | William E. Curtin (*pro hac vice* pending) |
| Samantha L. Rodriguez (DE Bar No. 7524) | Anne G. Wallice (*pro hac vice* pending) |
| 3205 Avenue North Boulevard, Suite 100 | 787 Seventh Avenue |
| Wilmington, Delaware 19803 | New York, New York 10019 |
| Telephone: (302) 888-6800 | Telephone: (212) 839-5300 |
| Facsimile: (302) 571-1750 | Facsimile: (212) 839-5599 |
| E-mail: emonzo@morrisjames.com | Email: tom.califano@sidley.com |
| jlevin@morrisjames.com | wcurtin@sidley.com |
| srodriguez@morrisjames.com | anne.wallice@sidley.com |

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

*Proposed Co-Counsel to the Debtor and Debtor in Possession*