**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| VI-JON, LLC,[1] | Case No. 26-11216 (MFW) |
| Debtor. | |

**DECLARATION OF MACKENZIE SHEA IN SUPPORT OF
THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Mackenzie Shea, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer ("CRO") of Vi-Jon, LLC, the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor") and a Managing Director at Berkeley Research Group, LLC ("BRG").  I am over the age of 18 and authorized to submit this declaration (this "Declaration") on behalf of the Debtor.

2.      I have served as CRO of the Debtor since May 14, 2026.  I have substantial financial, legal and operational experience in the restructuring context, and my practice at BRG is focused on strategic alternative and restructuring advisory projects for distressed companies.  I have served as a chief restructuring officer, independent director and interim executive at other distressed companies, including Bedford Systems, LLC d/b/a Drinkworks, Disruptive Products, Inc., Tastemakers, LLC, and CSCEC Holding Company, Inc.  During my tenure at BRG, I, and my firm, have been involved in other chapter 11 cases and out-of-court restructurings involving mass tort claims.  Prior to joining BRG, I was lead transaction counsel and associate general counsel at a global investment firm, where I structured, negotiated, documented, operated, and

---

[1]     The Debtor in this chapter 11 case is Vi-Jon, LLC.  The last four digits of the Debtor's federal tax identification number are 8002.  The Debtor's service address is 8800 Page Ave., St. Louis, MO 63114.

executed hundreds of millions of dollars of transactions across multiple sectors. Prior to that, I was a partner at a global law firm practicing in bankruptcy and restructuring. I began my career in restructuring 20 years ago as a law clerk to the Honorable Joel Rosenthal of the United States Bankruptcy Court for the District of Massachusetts. I am a Fellow in the American College of Bankruptcy, regularly speak at industry conferences, including for the Turnaround Management Association, American Bankruptcy Institute, and International Women's Insolvency & Restructuring Confederation, and hold a Juris Doctorate from the Suffolk University Law School and a Bachelor of Arts from Assumption University.

3.      In my capacity as CRO of the Debtor, I am familiar with the facts and circumstances set forth herein, which, except as otherwise noted, are based on my actual knowledge as well as information and advice provided to me by the Debtor's management and professionals. In addition, my statements herein are based, in whole or in part, upon my review of documents regarding the Debtor's operations and financial condition and my discussions with other members of the Debtor's management team and professionals on whom I have relied. I am generally familiar with the Debtor's business, financial condition, litigation history, day-to-day operations, and the circumstances leading to the commencement of this chapter 11 case (the "Chapter 11 Case"). I believe, to the best of my knowledge, that the facts and circumstances set forth herein are true and correct. References to bankruptcy, the chapter 11 process, and related legal matters are based on my understanding of such in reliance on the explanation provided by counsel to the Debtor. If called upon to testify, I would testify competently to the facts set forth herein.

4.      The primary purpose of this Chapter 11 Case is to address and comprehensively resolve the Talc-Related Claims asserted against the Debtor by implementing the global settlement embodied in the Restructuring Support Agreement. The Debtor vigorously disputes all talc-related

2

liabilities and maintains that its talc products were safe; however, as described in further detail below, the unexpected and unforeseen massive increase in Talc-Related Claims that began in 2024 and the expenses associated with defending and settling talc-related litigation, coupled with recent adverse verdicts, have overwhelmed the Debtor.  The costs associated with continuing to litigate and settle the Talc-Related Claims are not sustainable to the Debtor's continuing operations.

5.    Prior to the Petition Date (as defined below), I worked with the Debtor and its advisors to negotiate a global settlement between the Debtor and certain of its Non-Debtor Affiliates, the Ad Hoc Plaintiffs' Group, and the Prepetition FCR (each as defined below, the "Supporting Parties") whereby, among other things, the Supporting Parties have agreed to support a chapter 11 plan incorporating a global resolution of talc-related claims (the "Talc-Related Claims") against the Debtor, its Non-Debtor Affiliates, and each of their Related Parties (as defined in the Restructuring Support Agreement).  The terms of the settlement and related chapter 11 plan, which are set forth in the Restructuring Support Agreement (attached hereto as **Exhibit C**), include the establishment of a § 524(g) trust, funded by a guaranteed $25 million contribution by certain Non-Debtor Affiliates and additional consideration (including insurance rights), and the channeling of all current and future Talc-Related Claims to the § 524(g) trust—which will be governed by trust distribution procedures.

6.    After entering into the Restructuring Support Agreement, the Debtor determined that it was in the best interest of its estate and all stakeholders to file this Chapter 11 Case to implement the settlement and chapter 11 plan contemplated by the Restructuring Support Agreement.  Therefore, on August 2, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court") to expeditiously

consummate the chapter 11 plan contemplated by the Restructuring Support Agreement. This Chapter 11 Case is supported by counsel representing over 80% of holders of Talc-Related Claims—whose vote is necessary to confirm the § 524(g) plan—and the Non-Debtor Affiliates—whose contributions will fund the § 524(g) trust. Accordingly, I believe that this Chapter 11 Case and the creation of a § 524(g) trust for the benefit of holders of Talc-Related Claims, as contemplated by the Restructuring Support Agreement, represents the most efficient and expeditious means for the Debtor to manage its liabilities in a centralized process that assures equitable treatment to all current and future claimants.

7.    I submit this Declaration for the purpose of apprising the Court and other parties in interest of the Debtor's history, its capital structure and debt, and the circumstances surrounding the alleged talc-related liabilities that led to the commencement of this Chapter 11 Case, as well as to support the Debtor's chapter 11 petition and the other motions and applications that the Debtor has filed with the Court (the "First Day Pleadings").

8.    This Declaration is organized into four sections. Part I provides background information on the Debtor's corporate history, operations and assets, as well as a general overview of the Debtor's Epsom salt and body powder business. Part II outlines the Debtor's capital structure and other debt obligations. Part III describes the circumstances leading to the filing of this Chapter 11 Case. Part IV summarizes the Debtor's primary objectives in this Chapter 11 Case and provides insight into immediate next steps.

## PART I: COMPANY AND OPERATIONS

**I.    The Debtor's History.**

9.    The Debtor sells private-label dry bath products consisting of Epsom salts and body powder to major retailers across the United States and has serviced major customers such as Amazon, Dollar General, Kroger, TopCo, and Walgreens (collectively, the "Customers"). The

Debtor leverages shared-services and co-manufacturing agreements with its non-Debtor affiliates (the "Non-Debtor Affiliates") for sourcing, manufacturing, packaging, testing, quality control, and distribution of its products.  The Debtor owns one non-operational manufacturing plant in St. Louis, Missouri (the "Etzel Property").  An organizational chart of the Debtor and its Non-Debtor Affiliates is attached hereto as **Exhibit A** and set forth below.

10.    Historically, the Debtor began its operations in 1908 as the Peroxide Specialty Company ("PSC").  By 1933, PSC had expanded its operations and rebranded as Vi-Jon Laboratories Inc. ("Vi-Jon Laboratories"), and founded a successful line of cosmetics.  By 1944, the company had over 70 employees and its sales exceeded $1.1 million (approximately $20.6 million in 2026 dollars).

11.    In the 1960s, retail stores such as the F.W. Woolworth Company began stocking their own private brand products, and Vi-Jon Laboratories capitalized on the opportunity to become the manufacturer of such private-label cosmetic and personal care products.  Over the next decade, Vi-Jon Laboratories switched its focus to production for a variety of retail chains, and instead of producing one "Vi-Jon" labeled product, Vi-Jon Laboratories produced private-label products.

12.    Vi-Jon Laboratories continued to grow and scale, and, in 2006, a controlling interest in the company was obtained by Berkshire Partners LLC ("Berkshire").  Following this acquisition, in July 2006, Vi-Jon Laboratories merged with Cumberland Swan Holdings, Inc. ("Cumberland Swan"), a Tennessee-based private brand manufacturer, to become Vi-Jon, Inc, a subsidiary of VJCS Holdings, Inc. ("VJCS Holdings").  This acquisition allowed the business to

double in size, and, in the following years, Vi-Jon, Inc. was able to grow to five manufacturing and distribution centers in St. Louis, Missouri and Smyrna, Tennessee.[2]

13.    In 2020, Berkshire consummated a series of transactions that ultimately ended in the sale of the company to the Vi-Jon Employee Stock Ownership Plan (the "ESOP," and the related transactions, the "ESOP Transactions").    Following the consummation of the ESOP Transactions, VJCS Holdings became Vi-Jon Holding, Inc. ("Vi-Jon Holding"), a 100% employee-owned entity, while Vi-Jon, Inc. became Vi-Jon, LLC, which remained a subsidiary of Vi-Jon Holding and is the Debtor in this Chapter 11 Case.  The shift to an employee-owned entity did not materially affect the company's business operations.    Today, the Debtor's ultimate corporate parent is still owned by the ESOP.

### A.    The 2023 Restructuring Transaction.

14.    In 2023, the Vi-Jon Holding enterprise, with the help of its former counsel, began exploring a strategic internal reorganization (the "2023 Restructuring Transaction") to (a) better align its organizational structure with each of their product lines, which included (i) private brand liquid fill household and personal care products, (ii) private brand dry bath products, and (iii) branded products such as Germ-X, a leading brand of hand sanitizer and (b) begin to manage the mounting alleged talc-related liabilities faced by Vi-Jon, LLC, which are described in Part III, section I below.

15.    As part of the 2023 Restructuring Transaction, the parent company of the enterprise, Vi-Jon Holding, was renamed Emprise Group, Inc. ("Emprise").  The Debtor's affiliate,

---

[2]    Cumberland Swan's talc liability dates back to its 1999 purchase of certain assets and business from Perrigo Co. As part of Vi-Jon Laboratories' merger with Cumberland Swan, Vi-Jon Laboratories became responsible for Cumberland Swan's talc liabilities.  Accordingly, the Debtor's association with talc liabilities arising from Cumberland Swan products relates to the period between August 1999 and when the Debtor discontinued the production and sale of talc products in 2016.

Vivos Holdings, LLC ("Vivos") was formed in June 2023, and its subsidiaries became the home of the liquid and branded product lines.  More specifically, on December 3, 2023, the Debtor and Vivos entered into a Contribution Agreement (the "Contribution Agreement"), pursuant to which the Debtor transferred to Vivos its assets and liabilities not related to its dry goods business.  Vivos in turn distributed certain of the assets to its subsidiaries.  Vi-Jon, LLC, which had already existed as a subsidiary of Vi-Jon Holding, continued to maintain its pre-existing private brand dry goods lines of business.  Organizational charts of the pre- and post-2023 Restructuring Transaction structure are attached as **Exhibit B** hereto.

16.     As the Contribution Agreement provided that the Debtor was to retain all liabilities related to the dry goods business, including alleged talc-related liabilities, on December 28, 2023, the Debtor's immediate parent, Emprise HPC, LLC (f/k/a Intermediary HoldCo, LLC) ("Emprise HPC") and the Debtor entered into a Limited Contribution Agreement (the "Keepwell Agreement").  Pursuant to the Keepwell Agreement, Emprise HPC agreed, subject to certain conditions being met, to make equity contributions to the Debtor upon receipt of a qualifying capital call, in an amount determined by projected liquidity shortfalls, up to $25 million (the "Keepwell Obligations").  The Keepwell Agreement was intended to provide a source of funding for the Debtor's anticipated talc-related liabilities as it continued to operate the dry goods business and was sized based upon a third party consultant's forecast of talc-related liabilities, as described below.

17.     In connection with the 2023 Restructuring Transaction, the Debtor also entered into various intercompany agreements with Emprise, Vivos, and certain of the Debtor's other Non-Debtor Affiliates.  The intercompany agreements include two administrative services agreements and a co-manufacturing agreement, each as set out in further detail below:

- On December 3, 2023, the Debtor entered into a Co-Manufacturing and Supply Agreement with CPP (as predecessor-in-interest to Nice-Pak),[3] as amended on December 28, 2023, further amended on August 13, 2025, and further amended on June 9, 2026 (as amended, the "Co-Manufacturing Agreement").   Under the Co-Manufacturing Agreement, Nice-Pak purchases certain finished goods and raw materials, from which it manufactures or otherwise manages certain Epsom salt, personal care powder products, and other dry goods products for the Debtor before delivering such products to Nice-Pak's warehouse.  Nice-Pak also assists with sales, customers, and related services (the "SG&A Costs") and, upon request, also assists the Debtor in developing additional product lines.  In exchange for the services provided by Nice-Pak, the Debtor currently pays Nice-Pak (a) an annual fee of $400,000 for the SG&A Costs, which is reviewed and updated periodically, (b) certain variable overhead, fixed overhead, and distribution expenses based on a proportional number of units sold, (c) raw materials, components, direct labor, and freight costs, and (d) a 12.5% contract manufacturing fee on the product cost of Epsom salt products.

- On December 3, 2023, the Debtor entered into an Administrative Services Agreement with Vivos, as amended on December 28, 2023, further amended on August 13, 2025, and further amended on June 9, 2026 (as amended, the "Vivos Administrative Services Agreement").  Pursuant to the Vivos Administrative Services Agreement, Vivos provides certain shared services to the Debtor including (a) general management, (b) human resources, (c) finance and accounting, (d) order processing, (e) information technology, (f) utility services, (g) legal and regulatory compliance, and (h) ancillary services for the Debtor.  In exchange for the services provided by Vivos, the Debtor currently pays Vivos an annual fee of $572,000, which fee is annually renegotiated by Vivos and the Debtor based on the expected costs of such services and the Debtor's relative proportion of expected net sales across the Debtor's and Non-Debtor Affiliates' product lines.

- On December 3, 2023, the Debtor entered into an Administrative Services Agreement with Emprise, as amended on December 28, 2023 (as amended, the "Emprise Administrative Services Agreement" and together with the Vivos Administrative Services Agreement, the "Administrative Services Agreements" and, together with the Co-Manufacturing Agreement, the "Shared Services Agreements").   Emprise   maintains   certain   risk-management,   insurance, employee-benefit, consolidated-tax and related services for the Debtor.  The Debtor does not pay Emprise for these services.  Instead, Vivos makes the payments related to these services, including payments to third-party benefits providers, tax

---

[3]   In August 2025, Vivos, the parent entity of Consumer Product Partners, LLC ("CPP") acquired Nice-Pak Products, LLC ("Nice-Pak").  Subsequently, in November 2025, Vivos initiated a process to integrate certain of its subsidiary entities, including CPP, into the U.S. operations of Nice-Pak. On January 1, 2026, the integrated subsidiaries began operating as a unified business under the Nice-Pak brand name.  This acquisition and internal restructuring are unrelated to the Debtor and are referenced solely for completeness of understanding with respect to the Debtor's corporate organizational chart.

payments, and related costs, and such amounts are charged by Vivos to the Debtor at cost and reconciled through the intercompany reconciliation process.

## II.    The Debtor's Operations.

18.    Following the 2023 Restructuring Transaction, the Debtor has continued to operate its private brand dry goods business.  The Debtor's product offerings are primarily focused on Epsom salts and body powders, although it continues to develop additional product offerings.[4] The Debtor leverages the shared services and co-manufacturing agreements described in paragraph 17 above for the sourcing, manufacturing, packaging, and distribution of its dry goods products.

19.    The Debtor sells primarily to large retailers and has a concentrated customer base; in 2024 and 2025, the Debtor's two largest customers accounted for nearly 50% of the Debtor's net sales.  The vast majority of the Debtor's customers also maintain commercial relationships with certain of its other Non-Debtor Affiliates for other unrelated products.

20.    The Debtor had total annual net sales of approximately $26 million in 2025 and expects sales of approximately $21 million in 2026 due to the loss of a significant portion of body powder sales, as described in further detail below.  The Debtor generated approximately $700,000 in 2025 for EBITDA, adjusted for litigation costs, settlements, and other one-time costs.  The Debtor expects approximately $300,000 of Adjusted EBITDA in 2026, primarily driven by lower sales.  The Debtor's 2026 plan also contemplates the growth of higher-margin Epsom salt product offerings, leading to improved gross margin as compared to 2025.

---

[4]    As of the Petition Date, the Debtor is developing new products and capabilities, including fragranced foot soak, saline laxative, and lawn & garden plant-food products.

### A.   Epsom Salt.

21.   The Debtor's Epsom salt products are its most profitable product line, representing approximately 65% of the Debtor's total annual net sales in 2024–2025.  In light of this, the Debtor plans to continue to expand its Epsom salt business and, as part of this strategy, is currently pursuing additional customers and considering broadening its Epsom salt product offerings.

22.   The Debtor sells its Epsom products directly to its retail customers, but it relies on its Non-Debtor Affiliate Nice-Pak to manufacture and package the product.  Pursuant to the Co-Manufacturing Agreement, Nice-Pak procures raw, bulk magnesium sulfate and then converts the magnesium sulfate into finished Epsom salt goods.  In exchange, Nice-Pak charges the Debtor per-unit costs, including selling, general, and administrative expenses, as well as a 12.5% co-manufacturing fee on Epsom salt products.

23.   Once Nice-Pak has manufactured and packaged the product, the finished product is shipped to Nice-Pak's distribution center, at which point title transfers to the Debtor.  The Debtor then sells such products to its customers and Nice-Pak manages the shipments of product to the customer.  The Debtor incurs a pass-through freight charge based on the weight of the product.

### B.   Body Powder.

24.   The Debtor generated approximately $2.4 million in quarterly net sales from the sale of body powder over 2024–2025.  However, in October 2025, the Debtor lost a significant portion of its body powder sales, resulting in an anticipated reduction of approximately $1.7 million per quarter in sales from its body powder line.  This lost business had previously accounted for approximately 28.4% and 22.6% of the Debtor's annual net sales in 2024 and 2025, respectively.  As a result, net sales of the Debtor's body powder products declined from approximately $2.1 million in the first quarter of 2025 to approximately $662,000 in the first

quarter of 2026.  Accordingly, in 2026, the Debtor's body powder revenue is projected to be under $1 million per quarter.

25.     As with its Epsom salt products, the Debtor sells body powder products directly to its retail customers but relies on Nice-Pak to support procurement and logistics.  Nice-Pak sources fully finished and packaged goods from a third-party supplier on behalf of the Debtor, which are then shipped to a Nice-Pak distribution center.  Upon receipt at the distribution center, title transfers to the Debtor.  Nice-Pak then coordinates outbound shipments of the product to the Debtor's customers, and the Debtor incurs pass-through freight charges based on the weight of the product.  Nice-Pak charges the Debtor per-unit costs, including selling, general, and administrative expenses for the body powder products.   However, Nice-Pak does not charge any co-manufacturing fees with respect to the body powder products because the body powder products are procured in finished form from third-party manufacturers.

## PART II: PREPETITION CAPITAL STRUCTURE

### I.     Secured Obligations.

26.     The Debtor does not have any secured debt.[5]  The Debtor does not contemplate obtaining any postpetition financing and instead intends to fund its operations and this Chapter 11 Case through a combination of cash on hand, cash receipts, and equity funding from its affiliates, as discussed in further detail below.

27.     Vivos and certain of the other Non-Debtor Affiliates are party to an (a) Amended and Restated Credit Agreement, dated August 13, 2025, by and among Vivos and certain of its subsidiaries, VH Finance, LLC ("VH Finance"), and Bank of America, N.A., (the "RCF

---

[5]     The Debtor is party to an Intercompany Advance Agreement (as defined below), pursuant to which Emprise advanced certain funds to the Debtor in exchange for a security interest in the proceeds of the sale of the Etzel Property.  As of the Petition Date, Emprise's security interest remains unperfected.

11

Agreement"), (b) Credit and Guaranty Agreement, dated as of August 13, 2025, by and among Vivos and certain of its subsidiaries, VH Finance, Loan Admin Co LLC, and certain lenders (as set forth thereto) (the "1L Credit Agreement"), and (c) Second Lien Credit and Guaranty Agreement, dated as of August 13, 2025, by and among Vivos and certain of its subsidiaries, VH Finance, TCW Asset Management Company LLC, and certain lenders (as set forth thereto) (the "2L Credit Agreement," and together with the RCF Agreement and the 1L Credit Agreement, the "Vivos Loan Documents").

## II.     Trade Debt.

28.     The Debtor does not contract directly with vendors in connection with the manufacturing and sale of its dry goods products.  Through the Shared Services Agreements, the Debtor pays its Non-Debtor Affiliates as contractually required and, in turn, any third party vendors are contracted with and paid by Vivos, Emprise, or Nice-Pak, as applicable. Any amounts due and owing between the Debtor and its Non-Debtor Affiliates are reconciled pursuant to the intercompany reconciliation process.  As of the Petition Date, the Debtor does not have any accrued outstanding third-party trade accounts payable.[6]

29.     As explained in further detail in Part III, section F below, the Debtor is party to certain Customer Indemnification Agreements (as defined below), pursuant to which the Debtor must defend, indemnify, and hold harmless the relevant Customers from claims, liabilities, losses and costs arising from any product sold by the Debtor to such Customers.

## III.     Intercompany Indebtedness.

30.     The Debtor is a party to an Intercompany Promissory Note, dated as of December 3, 2023, by and among the Debtor, Vivos, and VH Finance (the "Intercompany Promissory Note

---

[6]   The Debtor is responsible for security and utility expenses for the Etzel Property, which are paid by Vivos and reimbursed to Vivos by the Debtor.  However, as of the Petition Date, no such expenses are outstanding.

Parties," and such Note, the "Intercompany Promissory Note"), pursuant to which each of the Intercompany Promissory Note Parties acts as both borrower and lender to each other Intercompany Promissory Note Party with respect to intercompany advances, and the outstanding principal balance reflects the aggregate amount of advances outstanding from time to time. As of July 25, 2026, the balance owing by the Debtor pursuant to the Intercompany Promissory Note is $1,460,000.

31.     The Debtor is also party to an Intercompany Advance Agreement, effective as of September 5, 2024, by and between Emprise and the Debtor, as amended by a First Amendment to Intercompany Advance Agreement, dated as of September 5, 2025 (collectively, the "Intercompany Advance Agreement"), under which Emprise advanced $675,000 to the Debtor. Repayment of the advance is required upon the earlier of (a) the closing of the sale of the Etzel Property and (b) September 5, 2026 (the "Outside Date"), unless further extended by agreement of the parties. The advance is secured by, and repayable from, the proceeds of the sale of the Etzel Property, though Emprise's security interest in the property sale proceeds has never been perfected.

32.     With respect to the Shared Services Agreements, prior to the Petition Date, the Debtor and its advisors undertook an evaluation of all intercompany reconciliations occurring after the 2023 Restructuring Transaction. This evaluation showed that the Debtor and its Non-Debtor Affiliates conducted intercompany reconciliation monthly and remitted cash payments from time to time to settle intercompany balances. In particular, because Vivos collects and holds cash receivables for the Debtor's products on behalf of the Debtor, Vivos uses the intercompany reconciliation process to offset the cash it holds for the Debtor from the contractual obligations owed by the Debtor to its Non-Debtor Affiliates pursuant to the Shared Services Agreements. Accordingly, any payments made by Vivos to the Debtor pursuant to the intercompany

reconciliation process are simply a remittance of funds that already comprise part of the Debtor's estate, while reconciliation payments that flow from the Debtor to its Non-Debtor Affiliates are made to resolve any outstanding amounts owed by the Debtor under the Shared Services Agreements, net of any cash amounts held by Vivos on the Debtor's behalf. Any amounts currently owed by the Debtor with respect to the intercompany reconciliation process are, in the aggregate, reflected in the net $1,460,000 owed by Vi-Jon under the Intercompany Promissory Note.

**IV.    Other Outstanding Unsecured Debt.**

33.    In addition to the ongoing talc-related litigation, as of the Petition Date, the following outstanding unsecured obligations have been asserted against the Debtor: (a) settlements and judgments relating to the ongoing litigation of Talc-Related Claims, including aggregate liabilities of approximately $20 million related to litigation judgments (including the *Heyer* and *Ludwig* judgments, as explained in further detail below); (b) certain retailer indemnification claims (including disputed, contingent, and/or unliquidated retailer indemnification claims) in an aggregate amount of approximately $15 million; and (c) other unsecured claims, comprised of non-restructuring professional fees, in an aggregate amount of approximately $2 million.[7]

**V.    Equity Holders and Subsidiaries.**

34.    The Debtor is a wholly-owned and privately held subsidiary of Emprise HPC, which in turn is a wholly-owned and privately held subsidiary of Emprise. The Debtor does not have any subsidiaries.

---

[7]    The Debtor reserves all rights in connection with any asserted unsecured obligations.

## PART III: EVENTS LEADING TO THIS CHAPTER 11 CASE

**I.   Shifting Market Dynamics and Customer Losses.**

35.   As described previously herein, the Debtor has faced an overall decline in customer demand with respect to its body powder business, largely due to the Debtor's loss of a key customer in October 2025.  Though the Debtor hopes to mitigate this impact over time by focusing on its more profitable Epsom salt business, this loss has contributed to near-term liquidity constraints.

**II.   Unexpected and Unforeseeable Increases in Litigation Costs.**

**A.   Overview of Talc-Related Claims**

36.   Historically, plaintiffs have generally asserted two types of Talc-Related Claims against the Debtor: (1) claims alleging ovarian cancer arising as a result of talc exposure (the "OC Claims") and (2) claims alleging respiratory cancers or other asbestos-related diseases arising as a result of exposure to contaminated talc (the "Mesothelioma and Lung Cancer Claims").  As of the Petition Date, there are no alleged OC Claims and 367 alleged Mesothelioma and Lung Cancer Claims pending against the Debtor.

37.   *OC Claims.*  Though there are currently no pending OC Claims against the Debtor, plaintiffs who have historically asserted OC Claims against the Debtor generally allege that they developed ovarian cancer or other gynecological diseases as a result of their use of the Debtor's talc products for feminine hygiene purposes.

38.   *Mesothelioma and Lung Cancer Claims.*  Plaintiffs asserting Mesothelioma and Lung Cancer Claims generally allege that they have developed non-ovarian cancer personal injuries based on contaminated talc exposure.  A minority of plaintiffs asserting Mesothelioma and Lung Cancer Claims against the Debtor have alleged, in addition to exposure to the Debtor's talc products, work-related asbestos exposure through either the plaintiff's own work history and/or the work history of the plaintiff's family.

39.     The Debtor believes that its talc was safe, that the OC Claims and Mesothelioma and Lung Cancer Claims are without medical or scientific merit, and that exposure to the Debtor's talc products has not caused any personal injuries.  During the time where the Debtor manufactured and sold talc products, the Debtor received certificates of analysis ("Certificates of Analysis") from its raw talc suppliers for each batch of talc purchased.  These Certificates of Analysis indicated that no asbestos was detected in any of the talc purchased by the Debtor.

**B.     NERA Liability Forecasts**

40.     In connection with the evaluation of the potential scope of the Debtor's retained liabilities and the sizing of the Keepwell Agreement, prior to the consummation of the 2023 Restructuring Transaction, the Debtor retained NERA Economic Consulting ("NERA") to prepare a liability forecast with respect to the Debtor's exposure to talc-related litigation.  NERA is a global economic consulting firm with over 60 years of experience, including with respect to economic analyses regarding the forecasting of damages and future losses in the mass torts and product liability litigation contexts.  Pursuant to its retention, NERA prepared a series of liability forecasts between June 2020 and June 2023, culminating with the 2023 Liability Forecast, which was used to size the Keepwell Agreement.  In connection with the filing of this Chapter 11 Case, NERA prepared a further updated liability forecast in May 2026 (each, a "Liability Forecast" and collectively, the "Liability Forecasts").

41.     As part of NERA's evaluations, NERA analyzed the Debtor's historical talc business and calculated the Debtor's potential talc-related liabilities beginning in 1963 and through the time that the Debtor permanently discontinued the production and sale of talc products in 2016.[8] For most of the period in which the Debtor was engaged in the sale of talc products, the

---

[8]     In addition, the Debtor temporarily discontinued the sale of talc from 1995 through August 1999.

Debtor had relatively minimal sales. The Debtor's talc sales peaked in 2003, with approximately 20 million units of talc products sold.[9] From there, the Debtor saw a steady year-over-year decline in talc sales until the Debtor ultimately discontinued the sale of talc in 2016.

42.     In addition to surveying the Debtor's historical talc operations, the Liability Forecasts estimated the Debtor's future litigation costs with respect to the retained talc liabilities. As explained in further detail in Part III, section I.C herein, just prior to the 2023 Restructuring Transaction, NERA updated their Liability Forecast to assist the Debtor in determining the scope and projected cost of the retained liabilities associated with the dry-goods business based on the Debtor's prior experience with Talc-Related Claims and various then-current market trends. The 2023 Liability Forecast analyzed the Talc-Related Claims filed against the Debtor based upon the filing and dismissal rates and average settlement amounts of such claims in 2023. Based on the available data, NERA believed that the Debtor would experience a steady state with respect to future filing and dismissal rates and settlement amounts. Based on their analysis, NERA calculated the projected aggregate nominal cost of defending against the Talc-Related Claims, as well as the net present value of such costs. These calculations were then used to size the Keepwell Obligations.

43.     However, notwithstanding these projections, there was a drastic and unforeseen increase in the number of claims filed against the Debtor in the years following the receipt of the 2023 Liability Forecast and the consummation of the 2023 Restructuring Transaction. For instance, as explained in further detail in Part III, section I.C herein, claims filed against the Debtor increased by approximately 400% since 2023, driven largely by plaintiffs' counsel adding the

---

[9]   Based on historical sales data, the Debtor's average market share for talc products between 1975–2015 was 13.2%.

Debtor to pre-existing cases in which the Debtor was not initially named.  At the same time, the average costs of settlement have increased substantially compared to those reflected in the 2023 Liability Forecast, while dismissal rates have decreased substantially.   This drastic and unanticipated increase in litigation volume and settlement costs is the primary driver of the Debtor's Chapter 11 Case.

44.    Since the 2023 Restructuring Transaction, the Debtor has faced a myriad of financial challenges including shifting market dynamics and customer losses.  However, the greatest catalyst for the Debtor's current strained liquidity position and the need to commence this Chapter 11 Case was the unexpected and unforeseen increase in Talc-Related Claims that began in 2024.

**C.    Increase in Projected Talc-Related Claims Following the 2023 Restructuring Transaction**

45.    NERA's 2023 Liability Forecast concluded that the Debtor had *de minimis* exposure to talc litigation related to ovarian and lung cancer claims, and that the Debtor's primary talc-related exposure arose from mesothelioma claims.  The 2023 Liability Forecast estimated the Debtor's exposure using two filing-rate scenarios.   First, based on filing trends for non-occupational mesothelioma claims against the Debtor between January 2022 and May 2023, NERA estimated the nominal value of the talc and asbestos-related litigation at $102 million, with a net present value of $14 million.[10]  Second, based on the broader historical filing data of all non-occupational mesothelioma claims filed against the Debtor since 2017, NERA also calculated a more conservative estimate of litigation costs.  Under this second approach, NERA estimated the nominal value of the litigation at $59 million, with a net present value of $9 million.  NERA

---

[10]    NERA's net present value calculation assumed an annual discount of 12.5%.

estimated, as of June 2023, that the combined net present value of the Debtor's projected liabilities and defense costs ranged from approximately $16–33 million under the second scenario to approximately $25–54 million under the first scenario.

46.     Based on NERA's 2023 Liability Forecast, Emprise HPC and the Debtor entered into the Keepwell Agreement as part of the 2023 Restructuring Transaction, pursuant to which Emprise HPC provided the Debtor with a total funding commitment of up to $25 million.

47.     Realizing recently that its actual experience with Talc-Related Claims following the 2023 Restructuring Transaction was far in excess of what was predicted in the 2023 Liability Forecast, the Debtor requested that NERA prepare the 2026 Liability Forecast in connection with the filing of this Chapter 11 Case to analyze the Debtor's actual claims experience following the 2023 Restructuring Transaction, revise projections, and explain the reasons for the delta between the 2023 Liability Forecast and the Debtor's actual experience.  NERA's 2026 Liability Forecast revised the estimated nominal value of the litigation to $720 million, with a net present value of $159 million.  The increase was driven by three principal developments: a substantial increase in Talc-Related Claims asserted against the Debtor, lower dismissal rates of claims filed against the Debtor, and an increase in average settlement amounts.  Notably, since the 2023 Liability Forecast, 28 law firms have filed Talc-Related Claims against the Debtor for the first time.  Together, these three developments caused the Debtor's projected Talc-Related Claims to unforeseeably increase substantially above the amounts forecasted by NERA in 2023 and used to size the Keepwell Agreement in connection with the 2023 Restructuring Transaction.

**D.     Heyer and Ludwig Verdicts**

48.     On May 15, 2026, in the case of *Heyer v. A.H. Bennett Co.*, No. 62-CV-25-5182 (Minn. Dist. Ct. Ramsey Cnty. 2025) ("*Heyer*"), the jury returned a verdict in the amount of $10.2 million, of which the jury apportioned 20% to the Debtor, subject to certain setoffs.

19

49.     On July 7, 2026, in the case of *Ludwig v. Sumitomo Corp. of Americas*, No. E187366/2025 (N.Y. Sup. Ct. 2025) ("*Ludwig*"), a judgment was entered against Vi-Jon in the amount of $16,750,487.00. While the Debtor continues to maintain that its historical talc products were safe and uncontaminated, the *Heyer* and *Ludwig* verdicts further underscore the litigation risk and costs facing the Debtor. Together with the substantial increase in Talc-Related Claims asserted against the Debtor since the 2023 Restructuring Transaction, the *Heyer* and *Ludwig* cases demonstrated that the Debtor cannot sustain the litigation costs of continuous trials in the long term.

**E.     Insurance Policies.**

50.     As explained above, the Debtor is currently named in 367 active litigation cases, 356 of which involve allegations of mesothelioma allegedly caused by exposure to the Debtor's historical talc products and 11 of which involve allegations of lung cancer allegedly caused by exposure to the Debtor's historical talc products. As of the Petition Date, none of the active litigation cases involve allegations of ovarian cancer allegedly caused by exposure to the Debtor's historical talc products.

51.     The Debtor has substantial historical insurance coverage that it believes is available to respond to the Talc-Related Claims. From 1965 through October 31, 2016[11] (other than a gap period from April 1, 1971 through May 19, 1977), the Debtor (or its predecessors) has purchased over $900 million of general liability, products liability, and umbrella insurance providing defense and indemnity coverage (the "Vi-Jon Policies").[12] The overwhelming majority of the Vi-Jon

---

[11]    The Debtor permanently discontinued the production and sale of talc products in 2016. The Debtor continued to purchase general liability, umbrella, and excess policies from November 1, 2016 through today; however, those policies contain explicit exclusions for products liability arising out of talc products.

[12]    A handful of the Policies—with aggregate limits of less than $20 million—were issued by insurers who are insolvent. Additionally, a few of the Policies covering general liability specifically exclude products liability coverage.

20

Policies are occurrence-based policies, meaning that they generally provide coverage for bodily injury or other covered events that "occur" (as defined by the policy and applicable law) during the policy period. The Debtor also has rights as successor by merger (following the July 2006 merger described in paragraph 12 hereof) under insurance policies purchased by Cumberland Swan from July 31, 1999, through July 31, 2006, that provide defense and indemnity coverage (the "Cumberland Swan Policies," and collectively with the Vi-Jon Policies, the "Policies").

52.     The aggregate limit of Policies from 1965 through October 31, 2016, issued by insurers who are currently solvent is approximately $900 million.[13]  Certain Policies may be exhausted in whole or in part as a result of prior payments made by the insurers. Many of the general liability and umbrella Policies contain self-insured retentions. The Policies' self-insured retentions vary from $0 to $25,000, depending on the terms of the particular Policy.

53.     When a Talc-Related Claim is asserted against the Debtor, the Debtor timely tenders and notifies all insurers who issued Policies for policy years beginning with the date of first exposure ("DOFE") that is alleged by the plaintiff in the complaint asserting the Talc-Related Claim.[14]  After tendering the claim and notifying its insurers, Vi-Jon provides regular updates on the status of the Talc-Related Claims to these insurers.

54.     Despite the hundreds of millions of dollars in aggregate limits available under the Policies, the Debtor has been unable to manage its Talc-Related Claims solely through insurance coverage because certain insurers have asserted various alleged coverage defenses and other

---

[13]   Certain of the Policies were issued by insurers who are currently subject to insolvency proceedings of their own. Accordingly, the value of these Policies has been excluded from the aggregate Policy limit calculation.

[14]   Because the overwhelming majority of the Policies are occurrence-based policies, under the "progressive loss" theory that applies to bodily injury that takes time to develop (like mesothelioma, lung cancer, or ovarian cancer), the Debtor provides timely notice and updates to insurers that provided coverage from the DOFE and onward.

objections to providing defense and indemnity coverage to the Debtor, including based on asbestos exclusions, pollution exclusions, and other defenses.

55.    However, the Debtor has not yet pursued coverage litigation against its insurers to secure defense and indemnity coverage under the Policies.  Therefore, the Debtor has only been able to receive partial payment of defense and indemnity costs from its insurers, and the Debtor has incurred significant costs in connection with the Talc-Related Claims, resulting from defense costs and the obligations to pay certain settlements and/or judgments, as well as increased defense costs associated with the growing case count and the defense of certain Customers pursuant to the Debtor's Customer Indemnification Agreements (as defined below).  Accordingly, the Debtor's defense, settlement, and indemnity costs continue to grow, placing significant pressure on the Debtor's liquidity.

56.    The Debtor believes that the insurers' coverage defenses are not meritorious and that most or all of the Policies do provide defense and indemnity coverage for the Debtor's OC Claims and Mesothelioma and Lung Cancer Claims.  Accordingly, as discussed in further detail below, the Debtor intends to assign to the 524(g) trust established pursuant to its chapter 11 plan all rights to recover against the Policies and reserves all rights with respect to challenging the validity of the insurers' coverage defenses.

**F.    Customer Indemnification Agreements**

57.    The Debtor is party to certain indemnification agreements (the "Customer Indemnification Agreements") with certain of its Customers.  Though the exact terms of the Customer Indemnification Agreements vary from agreement to agreement, generally, the Customer Indemnification Agreements provide that the Debtor must defend, indemnify, and hold harmless the relevant Customers from any and all claims, liabilities, losses, and costs (including

22

with respect to attorneys' fees) arising, in whole or in part, from any products sold by the Debtor to the Customers.

58.     Customers have alleged indemnification claims ("Customer Indemnification Claims") against the Debtor both on a contractual basis, pursuant to the terms of the Customer Indemnification Agreements, and on a common law basis.  Depending on the nature of the Customer Indemnification Claim and the specific circumstances giving rise to such claim, the Debtor and the Customer will often cooperate on the defense of the claim.  In certain cases, the Debtor and the Customer will retain the same counsel with respect to such defense; in others, the Debtor and the Customer will retain separate counsel.

59.     In certain circumstances, the Debtor disputes that a Customer is entitled to indemnification and does not indemnify the Customer.

**G.     Prepetition Negotiations.**

60.     As a result of the increasing number of Talc-Related Claims, the Debtor retained Sidley Austin LLP ("Sidley") and Houlihan Lokey Capital, Inc. ("Houlihan") in late February 2026, and BRG in mid-May 2026 (together with Sidley and Houlihan, the "Restructuring Advisors") to assist the Debtor in evaluating a number of strategic options designed to address the Debtor's liquidity constraints.  Concurrently with its retention of BRG, I was retained as the Debtor's CRO.  In connection with the foregoing, the Debtor, its Restructuring and other Advisors, and I worked to assess the current Talc-Related Claims asserted against the Debtor and to analyze the Debtor's continuing litigation of the Talc-Related Claims in the tort system.

61.     At the same time, the Debtor explored, among other options, the viability of using bankruptcy to address the Talc-Related Claims by channeling the claims to one or more trusts created under section 524(g) of the Bankruptcy Code that would be structured to ensure fair and equitable treatment of present and future claimants.  In April 2026, the Debtor began exploratory

efforts regarding the implementation of a potential chapter 11 strategy if and when authorized by the Special Committee (as defined below). To that end, the Debtor entered into nondisclosure agreements with 8 plaintiffs' counsel, who subsequently, along with an additional plaintiffs' counsel that did not enter into a nondisclosure agreement, formed the ad hoc group (collectively, the "Ad Hoc Plaintiffs' Group") to facilitate negotiations regarding the possibility of a settlement and support for a prearranged chapter 11 filing. The Ad Hoc Plaintiffs' Group subsequently retained Caplin & Drysdale Chartered as legal counsel and Province, LLC as financial advisor to provide advice in connection with these negotiations. The Ad Hoc Plaintiffs' Group consists of plaintiffs holding more than 80% of all outstanding Talc-Related Claims against the Debtor as of the Petition Date.

62.     In addition, in June 2026, the Debtor engaged The Honorable Shelley C. Chapman (Ret.) of Willkie Farr & Gallagher LLP ("Willkie") as the prepetition future claimants' representative (the "Prepetition FCR") to represent the interests of individuals who may in the future assert Talc-Related Claims against the Debtor. The Prepetition FCR retained Willkie as counsel.[15]

63.     As part of its discussions with the Ad Hoc Plaintiffs' Group and the Prepetition FCR, the Debtor provided the Ad Hoc Plaintiffs' Group, the Prepetition FCR, and their respective advisors with access to a fulsome data room and responses to information requests.

64.     As a result of these negotiations, prior to the filing of this Chapter 11 Case, on July 30, 2026, the Debtor, Emprise, Emprise HPC, the Prepetition FCR, and the Ad Hoc Plaintiffs' Group entered into a restructuring support agreement (the "Restructuring Support Agreement").

---

[15]   The Debtor intends to seek the appointment of The Honorable Shelley C. Chapman (Ret.) as the future claimants' representative (the "FCR"). Given the knowledge of the Talc-Related Claims that The Honorable Shelley C. Chapman (Ret.) and her advisors have gained during the prepetition diligence process, the Debtor believes that her appointment will benefit the Debtor's creditors and estate.

The Restructuring Support Agreement attaches as Exhibit B thereto a plan term sheet (the "Plan Term Sheet").  The Restructuring Support Agreement and Plan Term Sheet were finalized after months of intensive negotiations by and among the Debtor, the Non-Debtor Affiliates, the Ad Hoc Plaintiffs' Group, and the Prepetition FCR.

65.    Under the Plan Term Sheet, the parties to the Restructuring Support Agreement have agreed to support a chapter 11 plan incorporating a global resolution of the Talc-Related Claims against the Debtor, the Non-Debtor Affiliates, and each of their Related Parties through the issuance of a channeling injunction under section 524(g) of the Bankruptcy Code.  The Plan Term Sheet also provides for the resolution of any and all estate causes of action against the Non-Debtor Affiliates and their Related Parties.

66.    Additionally, as part of the settlement, Emprise has agreed to fund a $25 million guaranteed contribution on the effective date of a confirmed chapter 11 plan (such plan, the "Plan" and such contribution, the "Emprise Effective Date Cash Trust Contribution") to fund a post-confirmation trust established under the Plan pursuant to section 524(g) of the Bankruptcy Code (the "Talc Personal Injury Trust").  In addition to the Emprise Effective Date Cash Trust Contribution, the Talc Personal Injury Trust will also be funded with a $1 million promissory note issued by the Reorganized Debtor, all Assigned Causes of Action (as defined in the Plan Term Sheet), any of the Debtor and Non-Debtor Affiliates' respective rights under and related to the Policies, the net proceeds of the sale of the Debtor's real estate (or the real estate itself, if a sale is not consummated during the Chapter 11 Case), and an  obligation to pay a settlement fee, payable by Emprise only upon a sale or merger of Emprise at an enterprise value at or above $1 billion, equal to 50% of the first $40 million of gross consideration above $1 billion of such sale or merger transaction.  In connection with the sale of the Debtor's real property, the Non-Debtor Affiliates

will waive any liens on the Debtor's real estate and the sale proceeds thereof.  The Non-Debtor Affiliates have also agreed to fund $7 million to the Debtor, which shall be used as exit financing in accordance with the Budget (as defined in the Plan Term Sheet).  In exchange, the Non-Debtor Affiliates will acquire a material set of the Debtor's assets pursuant to the terms of the Plan.  The Plan will also provide for the issuance of a channeling injunction prohibiting holders of Talc-Related Claims from asserting claims against the reorganized Debtor, the Non-Debtor Affiliates, or any of their related parties arising from the Debtor's sale of talc and talc products prior to its emergence from this Chapter 11 Case.

**III.    Exploration of Strategic Alternatives and the Commencement of this Chapter 11 Case.**

67.     Since recognizing the potential liquidity challenges related to its ongoing litigation, the Debtor has proactively pursued a broad range of potential strategic transactions to address its continuing liquidity needs, resulting in the Restructuring Support Agreement.

**A.     Appointment of the Special Committee.**

68.     On April 1, 2026, the Debtor's Board of Managers (the "Board") adopted the *Unanimous Written Consents of Vi-Jon, LLC*, (the "Unanimous Consents").  Attached as Exhibit A thereto was the *Charter of the Special Committee of the Board of Managers of Vi-Jon, LLC* (the "Special Committee Charter"), designating independent directors Michael Buenzow and Lloyd Palans as members of the Debtor's Special Committee (the "Special Committee").

69.     Mr. Buenzow is a Managing Member of TURN 180 LLC.  He has over 25 years of experience in operational turnarounds, interim leadership, business transformation, and financial restructuring, and has served as independent manager in other complex chapter 11 cases, including Norcold LLC.  Mr. Buenzow is also a Senior Managing Director and Head of C-Suite and Board Advisory at ZCGC; prior to joining ZCGC, he was Senior Managing Director and Vice Chairman

26

of Restructuring at FTI Consulting Inc.  Mr. Buenzow has a Bachelor of Business Administration from Niagara University and an MBA from the University of Notre Dame.

70.     Mr. Palans is a Principal at Palans Consulting LLC, prior to which he was a partner at a global law firm and an adjunct professor at the Washington University in St. Louis School of Law, where he taught chapter 11 reorganizations.  Mr. Palans has a Juris Doctorate from the University of Missouri-Columbia and a Bachelor of Science from Tulane University.

71.     The Special Committee Charter delegated to the Special Committee the exclusive authority to (a) review, evaluate, and propose strategic options with respect to potential transactions involving the Debtor, including, without limitation, any sale, financing, restructuring, or bankruptcy transactions and (b) review, evaluate, propose, and enter into settlement terms and conditions related to any potential claims or causes of action of or asserted against the Debtor, or to direct the prosecution or opposition of any such claims or causes of action.

**B.     Investigation Into Intercompany Matters.**

72.     As part of the Special Committee Charter, the Board delegated to the Special Committee the exclusive authority to review, negotiate, evaluate, propose, approve, and enter into settlement terms and conditions related to any potential claims or causes of action asserted by or against the Debtor (the "Claims"), including any such claims or causes of action related to the 2023 Restructuring Transaction (the "Intercompany Claims").  The Special Committee was also delegated, among other things, the exclusive authority to direct the prosecution of the Intercompany Claims and the opposition of any Claims related to the Intercompany Claims, including the litigation of such Claims or related Claims.

73.     Pursuant to the Special Committee Charter, the Special Committee is authorized, at the expense of the Debtor, to retain and employ any legal, financial, or other advisors to assist it in connection with its duties under the Special Committee Charter.  On April 16, 2026, the

Special Committee directed Jon Muenz, a litigation partner at Sidley, to, among other things, conduct an independent review of prior, potential, and existing Intercompany Claims, including potential claims related to the 2023 Restructuring Transaction (the "Investigation").

74.     In connection with the Investigation, the Special Committee has conducted extensive factual and legal analysis to determine whether the Debtor holds any potentially valuable and viable claims or causes of action against any of its equity holders, affiliates, directors, managers or officers, including any claims for alter ego, piercing the corporate veil, successor liability, actual fraudulent transfer, or constructive fraudulent transfer. At the Special Committee's direction, Mr. Muenz and his team sent diligence requests seeking information and documentation relevant to the Investigation, including, but not limited to, the books and records underlying the 2023 Restructuring Transaction and the emails of key employees related to the 2023 Restructuring Transaction. In connection with the Investigation, Mr. Muenz also interviewed certain key employees, including members of the Debtor's, Emprise's, and Vivos' management.

75.     As part of the Restructuring Support Agreement, and in exchange for the contributions made by the Non-Debtor Affiliates to (a) the Talc Personal Injury Trust and (b) the Debtor and this Chapter 11 Case through the provision of exit financing and the amendment of the Keepwell Agreement (as described in further detail below), the Debtor has agreed to release, pursuant to a confirmed Plan, any and all claims and causes of action arising out of the 2023 Restructuring Transaction, as well as any and all other estate claims and causes of action against the Non-Debtor Affiliates.

**C.      The Amended Keepwell Agreement.**

76.     On July 30, 2026, in connection with certain negotiations regarding the Plan, the Debtor and Emprise HPC executed an amendment to the Keepwell Agreement (as amended, the "Amended Keepwell Agreement"). The Amended Keepwell Agreement facilitates the Debtor's

ability to draw on the available Keepwell Obligations by removing certain conditions previously required to make a qualifying capital call under the Keepwell Agreement, including the requirements that (a) the Debtor's forecast for the four calendar quarters following the capital call indicate that, absent a capital infusion, the Debtor's available financial resources would not exceed its anticipated liabilities by more than $2 million and (b) if the capital call exceeded $2 million, Emprise HPC would have up to 45 business days to provide the requested amount.

77. As described in further detail in the Cash Management Motion (as defined below), the Debtor intends to use the outstanding Keepwell Obligations to fund the administration of this Chapter 11 Case. Accordingly, during the initial weeks of the case, Emprise HPC will fund to the Debtor the aggregate amount of the full undrawn capital commitment under the Amended Keepwell Agreement in accordance with the Budget. The Debtor's rights under the Amended Keepwell Agreement are a substantial asset of the Debtor as the Amended Keepwell Agreement (subject to the terms thereof) provides the Debtor with equity funding to satisfy incurred and anticipated expenses.

## PART IV: CHAPTER 11 FILING AND NEXT STEPS

78. The Debtor's immediate post-petition objective is to maintain a business-as-usual atmosphere during the early stage of the Chapter 11 Case, with as little disruption to the Debtor's operations as possible. I believe that, if the Court grants the relief requested in each of the First Day Pleadings, this objective will be met. Moreover, if the relief requested in the First Day Pleadings is not granted, I believe the Debtor would suffer immediate and irreparable harm, putting the Debtor's operations and stakeholders at substantial risk.

## FIRST DAY MOTIONS

79. Contemporaneously herewith, the Debtor has filed a number of pleadings (the "First Day Pleadings") seeking relief intended to stabilize the Debtor's business operations,

facilitate the efficient administration of the Debtor's Chapter 11 Case, and execute a swift and smooth restructuring.  I have reviewed each of the First Day Pleadings and believe that the factual support set forth in each of the First Day Pleadings is correct and accurate to the best of my knowledge, information, and belief.  The First Day Pleadings include the following:

### Administrative and Procedural Motions

- "Claims Agent Retention Application": *Debtor's Section 156(c) Application for Retention and Appointment of Omni Agent Solutions, Inc. as Claims and Noticing Agent*

- "Creditor Matrix Motion": *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Redact Certain Personally Identifiable Information from the Creditor Matrix and Other Documents, (B) List Addresses of Represented Litigation Claimants' Counsel in the Creditor Matrix and Other Filings in Lieu of Represented Litigation Claimants' Addresses and Serve Represented Litigation Claimants at Such Addresses and (C) List the Twenty Law Firms Representing the Largest Number of Represented Litigation Claimants Instead of the Twenty Largest Unsecured Creditors, (II) Approving Notice of Commencement Procedures, and (III) Granting Related Relief*

### Operational Motions

- "Cash Management Motion": *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Use of its Existing Cash Management System, Bank Accounts, and Business Forms and (B) Pay Certain Obligations Related Thereto, (II) Authorizing Postpetition Intercompany Transactions, (III) Approving the Amended Keepwell Agreement, (IV) Extending the Time Period to Comply or Waiving Certain Requirements of Section 345(b) of the Bankruptcy Code, and (V) Granting Related Relief*

- "Employee Wage Motion": *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtor to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefit Programs and (II) Granting Related Relief*

- "Shared Services Agreement Motion": *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Continue Operating Under the Shared Services Agreements and (II) Granting Related Relief*

80.   I have consulted with the Debtor's management and the Debtor's advisors regarding the relief requested in the First Day Pleadings and understand each of the First Day

30

Pleadings and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Pleadings are true and accurate.  Where applicable, a brief summary of the facts supporting the First Day Pleadings is set forth below.  To the extent any First Day Pleadings contain additional facts, those facts are incorporated herein by reference. Capitalized terms used but not otherwise defined in this section of the Declaration shall have the meanings ascribed to such terms in the relevant First Day Pleadings.

81.    The First Day Pleadings seek authority to, among other things, ensure the continuation of the Debtor's cash management system, and maintain the Debtor's operations in the ordinary course of business.  I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  However, I believe, based on conversations with the Debtor and the Debtor's advisors, that the Debtor urgently needs the relief requested in the operational motions to continue operations uninterrupted during its Chapter 11 Case, and that failure to grant the relief requested in any of the First Day Pleadings may result in immediate and irreparable harm to the Debtor, its business, and its estate.  Accordingly, I believe and am advised that emergency consideration of such motions is warranted.

82.    I further believe that the relief requested in the First Day Pleadings is necessary, in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will allow the Debtor to operate with minimal disruption and maximize value preservation during the pendency of this Chapter 11 Case.  Accordingly, I believe that (a) the relief requested in each motion is critical, (b) unless the relief is granted, the Debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate which is disproportionate to the amount of

31

the claim sought to be satisfied, and (c) there is no practical or legal alternative by which the Debtor can deal with the claimants sought to be paid or the relief sought other than by payment of the claim or via the requested relief.

83.     Accordingly, for the reasons set forth herein and in each respective First Day Pleading, I believe that the Court should grant the relief requested in each of the First Day Pleadings.

## I.     Administrative and Procedural Motions

### A.     Claims Agent Retention Application

84.     Pursuant to the Claims Agent Retention Application, the Debtor seeks entry of an order appointing Omni Agent Solutions, Inc. ("Omni") as the claims and noticing agent for the Debtor in its Chapter 11 Case to assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in this Chapter 11 Case, pursuant to the provisions of the Engagement Agreement (as defined in the Claims Agent Retention Application).

85.     Although the Debtor has not yet filed its schedules of assets and liabilities and statement of financial affairs, it anticipates that there will be several hundred entities to be noticed, particularly in connection with the Debtor's ongoing talc litigation, and that many of these parties will file claims.   In view of the number of anticipated parties, the Debtor submits that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtor and/or the Office of the Clerk of the Bankruptcy Court of, the administrative burden of noticing and administering claims and is in the best interests of the Debtor's estate and its creditors.  Accordingly, I believe the Claims Agent Retention Application should be granted.

**B.      Creditor Matrix Motion**

86.     Pursuant to the Creditor Matrix Motion, the Debtor seeks entry of an order (a) authorizing the Debtor to (i) redact personally identifiable information for individual creditors and (ii) file a list of the 20 law firms with the most significant representations of parties pursuing talc and/or asbestos claims against the Debtor based on the volume of claims or other related factors (a "Top Plaintiffs' Counsel List") in lieu of a list of creditors that hold the 20 largest unsecured claims against the Debtor; (b) approving certain notice procedures for creditors (collectively, the "Represented Litigation Claimants") who are claimants in talc or asbestos-related personal injury lawsuits or other proceedings involving the Debtor and are represented by counsel; (c) approving the form and manner of the notice of commencement (the "Notice of Commencement") for this Chapter 11 Case; and (d) granting related relief.

87.     I believe it is appropriate for the Court to approve the use of the Top Plaintiffs' Counsel List in lieu of a list of creditors that hold the 20 largest unsecured claims against the Debtor because (without admission of the Debtor as to the viability of any such claims), if any of these talc or asbestos-related claims were liquidated in the amounts asserted, they would constitute the largest unsecured claims against the Debtor.

88.     I further believe it is appropriate to approve the modified notice procedures for the Represented Litigation Claimants to provide notices directly to their counsel, given that such procedures would provide for more efficient and effective service of notices in this Chapter 11 Case.

89.     I further believe it is appropriate for the Court to approve the redaction of personally identifiable information for individuals listed on the Debtor's creditor matrix ("Creditor Matrix"), including the home and email addresses of any individual, including the Debtor's employee and any of the Debtor's individual creditors, because such information can be used to perpetrate

33

identity theft or to locate survivors of domestic violence, harassment, or stalking. The Debtor proposes to provide an unredacted version of the Creditor Matrix, the schedules of assets and liabilities, and the statement of financial affairs to the Court, the U.S. Trustee, and to any official committee of unsecured creditors appointed in this Chapter 11 Case, which I believe is sufficient to satisfy the rules and requirements of the Bankruptcy Code. Accordingly, I believe the Creditor Matrix Motion should be granted.

## II.      Operational Motions

### A.      Cash Management Motion

90.      Pursuant to the Debtor's Cash Management Motion, the Debtor seeks entry of an order (a) authorizing, but not directing, the Debtor to (i) continue to use its existing cash management system, bank accounts, and business forms and (ii) pay certain obligations related thereto; (b) authorizing, but not directing, the Debtor to continue postpetition Intercompany Transactions; (c) approving the Amended Keepwell Agreement and authorizing, but not directing, the Debtor to perform thereunder, including by making capital calls, receiving funding, and using proceeds in accordance with the Budget; (d) extending the time period to comply or waiving certain requirements under section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines; and (e) granting related relief.

91.      The Debtor's bank accounts are maintained at Bank of America, N.A. and East West Bank. The Debtor's Cash Management System (as defined in the Cash Management Motion) consists of four bank accounts: two operating accounts, a receivables account, and an inactive account with a zero balance (the "Bank Accounts"). The Debtor estimates that, as of the Petition Date, it has approximately $1,650,000 in cash on hand. The Debtor incurs periodic service charges and other fees related to the Cash Management System (collectively, the "Bank Fees"). The Debtor pays the Cash Management Banks an aggregate of approximately $2,100 per month in

34

Bank Fees, which are generally due and payable monthly.  As of the Petition Date, the Debtor does not believe it owes any prepetition, unpaid Bank Fees, and estimates that $2,250 will become due and payable within thirty (30) days of the Petition Date.

92.     As of the Petition Date, all the Bank Accounts are maintained at financial institutions that have executed a uniform depository agreement with and are designated as authorized depositories (each, an "Authorized Depository") by the U.S. Trustee pursuant to the U.S. Trustee Guidelines.  *See* USTP Region 3 Authorized Depository Institutions, Feb. 1, 2026 (available at https://www.justice.gov/ust/ust-regions-r03/page/file/1582216/dl) at 2, 4 (listing Bank of America and East West Bank).  Each Cash Management Bank at which the Bank Accounts are held is a highly rated, FDIC-insured bank that is subject to supervision by the applicable federal and state regulators.

93.     Additionally, Omni maintains two segregated accounts at East West Bank that are not part of the Debtor's Cash Management System (the "Carve-Out Accounts").  Pursuant to the Amended Keepwell Agreement and the Budget, the Carve-Out Accounts will receive certain amounts upon entry of the Interim Cash Management Order and on a weekly basis thereafter (the "Carve-Out Amounts") that are earmarked and set aside for the benefit of the professionals retained by the Debtor, the official committee of unsecured creditors, and the FCR (collectively, the "Retained Professionals"), as well as for fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a).  Once set aside, the Carve-Out Amounts will not be deposited into or commingled with any of the Debtor's Bank Accounts.  As described in the Amended Keepwell Agreement, the Carve-Out Amounts shall be held and disbursed solely to Retained Professionals in accordance with the Interim Cash Management Order, the Final Cash Management Order, and any interim compensation order or fee order entered in this Chapter 11

35

Case, as well as on account of fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a).

94.     The smooth operation of the Debtor's business requires the continuation of the Cash Management System.  As a practical matter, it would be expensive, burdensome, and unnecessarily disruptive to require the Debtor to adopt a new cash management system during this Chapter 11 Case.  The Cash Management System allows the Debtor to collect, transfer, and disburse funds, pay its financial obligations, obtain accurate account balances and other financial data, ensure cash availability and liquidity, reconcile intercompany balances, and facilitate cash monitoring, forecasting, and reporting.  The Debtor also relies on the Cash Management System to conduct Intercompany Transactions with certain Non-Debtor Affiliates in the ordinary course of business, including on account of (a) customer receipts collected by Non-Debtor Affiliates that include amounts attributable to the Debtor's goods; (b) shared-services fees, direct costs, service fees, taxes, utilities, insurance, employee benefits, manufacturing costs, logistics costs, freight costs, raw-materials, overhead, and other expenses paid or administered by Non-Debtor Affiliates and reimbursed by the Debtor; and (c) reimbursements and settlement payments among the Debtor and the Non-Debtor Affiliates.

95.     In addition to limited customer payments directly collected by the Debtor on account of sales of its products, certain customer receipts for joint customers or consolidated invoices are collected into Vivos' accounts, and the Debtor-attributable portion is identified through stock-keeping unit ("SKU") level and profit-center information and reconciled through the intercompany reconciliation process that occurs from time to time, including through netting against amounts the Debtor owes to the applicable Non-Debtor Affiliates and, to the extent the reconciliation results in a net amount receivable by the Debtor, cash remittance to the Debtor.

96.     Historically, the Debtor and its Non-Debtor Affiliates closed their books based on a 5-4-4 retail calendar, an accounting calendar commonly used by retailers that divides each fiscal quarter into three fiscal periods of five weeks, four weeks, and four weeks, respectively, resulting in 13-week quarters and generally a 52-week fiscal year.  As part of that process, the Debtor and its Non-Debtor Affiliates would process, identify, and reconcile customer receipts, shared-services charges, affiliate-paid costs, manufacturing costs, logistics costs, taxes, utilities, insurance, employee benefits, inventory movements, cash-management-related obligations, and other amounts attributable to the Debtor or the Non-Debtor Affiliates.  While this reconciliation allowed the Debtor and the Non-Debtor Affiliates to record activity, identify and correct discrepancies, and maintain accurate intercompany balances, cash settlement generally occurred only in connection with true-ups, which occurred from time to time, and most recently in December 2025.

97.     As of the Petition Date, the Debtor implemented an updated intercompany reconciliation process.  Under the updated process, postpetition activity will be reconciled and settled more frequently through weekly cash remittances rather than being settled from time to time.  At the close of each week, the Debtor and its Non-Debtor Affiliates will reconcile postpetition customer receipts, shared-services charges, affiliate-paid costs, direct costs, reimbursements, and other Intercompany Transactions.  The weekly reconciliation will be completed by the following Thursday, and the resulting net balance will be settled by cash remittance on the following Friday.  If the net balance is payable by the Debtor, the Debtor will remit payment to the applicable Non-Debtor Affiliate.  If the net balance is a Debtor receivable, the applicable Non-Debtor Affiliate will remit payment to the Debtor.  Following each month-end close, the Debtor and its Non-Debtor Affiliates will perform a final monthly reconciliation, and any discrepancies identified between the weekly reconciliations and the month-end close process

will be settled at that time.  These procedures are intended to protect the Debtor's estate by ensuring that postpetition estate cash is transferred efficiently and expeditiously after the parties identify the Debtor-attributable activity, calculate the net amount payable or receivable, and maintain records sufficient to trace each Intercompany Transaction.  Any intercompany balance outstanding as of the Petition Date will be frozen and excluded from the postpetition reconciliation and settlement process.

98.    In addition to authority to maintain its existing Cash Management System, the Cash Management Motion also seeks approval of the Amended Keepwell Agreement pursuant to section 363(b) of the Bankruptcy Code.  I believe that entry into the Amended Keepwell Agreement is supported by a sound business justification, as the Amended Keepwell Agreement is intended to provide a source of funding for the Debtor's continued operations during the pendency of this Chapter 11 Case.  Accordingly, I believe that the relief requested in the Cash Management Motion is necessary to avoid disruption to the Debtor's business and is in the best interests of the Debtor's estate, its creditors, and other parties in interest.

**B.    Employee Wage Motion**

99.    Pursuant to the Employee Wage Motion, the Debtor requests entry of interim and final orders (a) authorizing, but not directing, the Debtor to pay prepetition wages, salaries, other compensation, independent contractor obligations, and reimbursable expenses, and continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto, including, where applicable, by remitting or reimbursing amounts to Vivos or Emprise pursuant to the Administrative Services Agreements, and (b) granting related relief.

100.    **Workforce.**  As of the Petition Date, the Debtor employs one full-time salaried employee (the "Employee") and one independent contractor (the "Independent Contractor").

101.    The Employee performs a variety of functions critical to the preservation of value and the administration of the Debtor's estate.  Specifically, the Employee is the Vice President and General Manager of the Debtor.  The Employee is responsible for overseeing the Debtor's profit-and-loss performance, developing strategies to drive growth and identify market opportunities, coordinating manufacturing optimization between the Debtor and its Non-Debtor Affiliates, supporting sales and digital marketing initiatives, advancing brand development, managing projects, analyzing business data, and conducting market research.

102.    The Independent Contractor's role is limited and specifically tailored to support the Debtor's defense and administration of Talc-Related Claims and litigation.  The Independent Contractor assists the Debtor and its counsel with matters requiring institutional knowledge of the Debtor's historical products, operations, and records, including responding to discovery, preparing for and assisting with depositions, coordinating factual information needed for witness testimony, reviewing case-related materials, and otherwise supporting the Debtor's counsel.  The Independent Contractor's services are necessary during this Chapter 11 Case because the Independent Contractor's institutional knowledge is critical to helping the Debtor manage the Talc-Related Claims, preserve estate resources, and evaluate potential settlements of such claims.

103.    **Compensation.**  The Debtor pays the Employee directly every two weeks and pays the Independent Contractor directly every month (the "Key Personnel Compensation").

104.    The Debtor does not owe any prepetition amounts on account of Key Personnel Compensation but anticipates that, as of the Petition Date, certain Key Personnel Compensation owed to its Employee and Independent Contractor will become due and owing within the first thirty (30) days after the Petition Date (the "Interim Period") and thereafter during the pendency of this chapter 11 case.  Out of an abundance of caution, the Debtor seeks authority to pay any

accrued but unpaid Key Personnel Compensation and to continue paying the Key Personnel Compensation on a postpetition basis in the ordinary course of business and consistent with past practices.

105.   **Reimbursable Expenses.**  The Debtor also reimburses the Employee and, to the extent applicable, the Independent Contractor for certain pre-approved expenses incurred on behalf of the Debtor within the scope of their employment and engagement (the "Reimbursable Expenses").  Reimbursable Expenses include, among other expenses, business travel-related expenses such as air travel, lodging, car rental, and meal allowances, and reasonable business-related expenses.  The Employee and Independent Contractor generally pay for their own Reimbursable Expenses up front (*i.e.*, not via a company credit card) and then apply for reimbursement of such expenses by submitting an expense report for review.  Pursuant to the Vivos Administrative Services Agreement, Vivos reviews the expense reports and approves charges that constitute allowable Reimbursable Expenses incurred on behalf of the Debtor.  Following Vivos' review and approval, the Debtor remits payment to the Employee through Paycom or, to the extent applicable, the Independent Contractor.

106.   During the three-month period before the Petition Date, the Debtor incurred a monthly average of approximately $2,000 on account of Reimbursable Expenses.  Due to the timing of when Reimbursable Expenses are submitted, it is difficult for the Debtor to precisely estimate the Reimbursable Expenses outstanding as of the Petition Date.  Based on historical practice, however, the Debtor estimates that as of the Petition Date, it owes approximately $2,000 of Reimbursable Expenses.

107.   **Benefits.**  Pursuant to the Administrative Services Agreements, Emprise provides or administers health benefits, ESOP-related benefits, and other employee-related benefit

40

programs for the Employee (collectively, the "Employee Benefits" and, together with the Key Personnel Compensation, the "Employee Obligations"), while Vivos pays the applicable third-party benefit providers and plan administrators (collectively, the "Benefit Providers") on the Debtor's behalf. Vivos charges the Debtor a fee equal to 21% of the Employee's gross payroll for Employee Benefits and related administrative costs (the "Gross Payroll Fee"). The Gross Payroll Fee constitutes a direct cost under the Vivos Administrative Services Agreement and is not included in, or covered by, the fixed annual fee charged to the Debtor thereunder.

108. The Employee Benefits include medical and prescription drug coverage, dental coverage, vision coverage, HSA and flexible spending account options, life and accidental death and dismemberment insurance, short-term and long-term disability coverage, voluntary critical illness and accident coverage, a 401(k) plan, ESOP participation, paid leave, telemedicine and virtual counseling, employee assistance programs, travel assistance, severance obligations, and other wellness and ancillary benefit programs.

109. **ESOP.** Emprise also maintains an Employee Stock Ownership Plan (the "ESOP"), a tax-qualified employee stock ownership plan established for the benefit of eligible employees and their beneficiaries. The ESOP is available to eligible employees of Emprise and its subsidiaries, including the Debtor. The Employee is eligible to participate in the ESOP. The ESOP is intended to assist eligible employees with saving for retirement and to more closely align their financial interests with the success of Emprise and its affiliates, including the Debtor. The assets of the ESOP are held in the Emprise Employee Stock Ownership Trust (the "ESOP Trust"), which holds stock and other assets for the exclusive benefit of ESOP participants and their beneficiaries. To the extent applicable to the Employee, the Debtor may be required to reimburse or otherwise satisfy Debtor-attributable obligations arising from the Employee's participation in

41

the ESOP and ESOP Trust, including contributions, administrative expenses, trust expenses, and any payments or distributions to or for the benefit of ESOP participants and beneficiaries, in each case in accordance with the ESOP, the ESOP Trust, and applicable law (collectively, the "ESOP Obligations").  Any ESOP Obligations owed by the Debtor will be administered as part of the Employee Benefits and reconciled with Vivos or Emprise, as applicable, through the intercompany reconciliation process.  The Debtor does not expect to incur any ESOP Obligations on account of the Employee during the pendency of this Chapter 11 Case, and no such amounts are earned and unpaid as of the Petition Date.

110.    **Withholding Obligations.**  In the ordinary course of business, the Debtor incurs obligations on account of Payroll Deductions and Payroll Taxes (each as defined in the Employee Wage Motion and collectively, the "Withholding Obligations").  The Withholding Obligations are administered on the Debtor's behalf by Vivos pursuant to the Administrative Services Agreements, including the processing, withholding, and reconciliation of such amounts.  Remittances of such amounts are administered through Paycom.  The Debtor does not owe any prepetition amounts on account of Withholding Obligations but Withholding Obligations will continue to come due and must be remitted during the Interim Period and thereafter during the pendency of this chapter 11 case.  The Debtor submits that, with the exception of the Employer Payroll Taxes (as defined in the Employee Wage Motion), the Withholding Obligations generally are not property of the estate and are held in trust until deposited with the various applicable third-party recipients.  Out of an abundance of caution, the Debtor respectfully requests that the Court authorize the Debtor to continue to honor its Withholding Obligations and to pay any prepetition amounts owed with respect thereto in the ordinary course of business.

111.    **Payroll Processing.** Vivos also manages the Debtor's payroll-processing function, including coordination with Paycom, as part of the administrative services provided under the Administrative Services Agreements.    Any Debtor-attributable amounts related to payroll processing are captured in the Administrative Fees under the Administrative Services Agreements and are not separately billed to the Debtor as standalone payroll-processing fees.    The Debtor separately pays the Payroll Processing Fees to Paycom.

112.    The Debtor estimates that, as of the Petition Date, it does not owe any prepetition amounts on account of Payroll Processing Fees in connection with the Key Personnel Compensation and Employee Benefits.    The Debtor seeks authority to continue to pay or honor the Employee Obligations, together with the Withholding Obligations, Payroll Processing Fees, and Reimbursable Expenses (each as defined in the Employee Wage Motion) that will come due and owing during the pendency of this Chapter 11 Case in the ordinary course of business on a postpetition basis, consistent with past practices.

113.    The Debtor estimates that, in the aggregate across all of the foregoing categories, (a) the obligations that may come due within approximately the first thirty (30) days following the Petition Date will not exceed $40,000 and (b) the total obligations that may come due during the pendency of this Chapter 11 Case will not exceed $150,000.    The relief sought for the Prepetition Employee Obligations reflects the priority amount cap.

114.    After the Petition Date, the reconciliation of the Gross Payroll fee, Withholding Obligations, payroll, payroll processing, reimbursable expenses, and other related employee costs will be reconciled pursuant to the postpetition intercompany reconciliation process.

115.    In short, continued employment and satisfaction of obligations owed to both the Employee and Independent Contractor are critical for the Debtor.    Without the continued,

uninterrupted services of the Employee and Independent Contractor (and by extension, without the relief requested by the Employee Wage Motion), the Debtor simply could not operate its business or preserve value for the benefit of the stakeholders.

### C.      Shared Services Agreement Motion

116.     Pursuant to the Shared Services Agreement Motion, the Debtor seeks entry of an order (a) authorizing, but not directing, the Debtor to (i) continue operating under the Shared Services Agreements and (ii) pay amounts arising under the Shared Services Agreements in accordance with the reconciliation procedures in an aggregate amount of no more than $2,000,000 during the Interim Period, and pre-petition amounts solely to the extent such amounts relate to employee wages, employee benefits, or the Workers' Compensation Program; and (b) granting related relief.

117.     Following the 2023 Restructuring Transaction, the Debtor entered into contractual manufacturing and support relationships necessary to operate its business.  The services governed by these contractual relationships include procuring or purchasing raw materials, manufacturing products, paying certain taxes and utilities, arranging employee benefit programs, and maintaining the insurance policies that cover the Debtor.  The Debtor relies on Vivos, Emprise, and Nice-Pak to provide these and other services under the Shared Services Agreements, including services related to the sourcing, production, packaging, logistics, sale, and distribution of the Debtor's products.

118.     **Vivos Administrative Services Agreement.**  Pursuant to the Vivos Administrative Services Agreement, Vivos provides or administers a variety of operational and administrative services key to the Debtor's operations, including:

   a) <u>Management Services</u>: providing comprehensive managerial services, including, but not limited to, administrative supervision, business guidance, operational coordination, strategic planning support, and assistance with everyday business operations;

b) <u>Human Resources</u>: managing personnel-related matters, payroll administration and payroll processing management, ensuring compliance with employment laws and regulations;

c) <u>Finance and Accounting</u>: providing financial management and oversight, budget preparation and monitoring, comprehensive reporting, bookkeeping, payroll processing, and tax management services;

d) <u>Order Processing</u>: administering order processing functions, including preparing invoices for Debtor and Non-Debtor Affiliate products on a consolidated basis and collecting payments on behalf of such orders;

e) <u>Information Technology</u>: managing networks, hardware and support, software maintenance, data security and integrity measures, and other technical support as required;

f) <u>Etzel Services</u>: coordinating and paying for certain utilities, insurance, and taxes at the Etzel Property; and

g) <u>Legal & Regulatory Compliance</u>: assisting in analysis and compliance with applicable laws and regulatory standards.

119.    In exchange for the services provided by Vivos, the Debtor and Vivos negotiated a fee of approximately $572,000 for Vivos' services in 2026, which fee is annually renegotiated by Vivos and the Debtor based on the expected costs of such services and the Debtor's relative proportion of expected net sales across the Debtor's and Non-Debtor Affiliates' product lines (the "<u>Vivos Administrative Fee</u>").  The Vivos Administrative Fee is not subject to reconciliation based on the actual costs of such services.  As of the Petition Date, the Debtor estimates that approximately $286,000 is outstanding and payable pursuant to the Vivos Administrative Services Agreement, which is incorporated into the balance under the Intercompany Promissory Note.

120.    The Debtor also reimburses Vivos for any direct costs Vivos incurs on the Debtor's behalf including, but not limited to, insurance, taxes, utilities (including at the Etzel Property), employee health benefits, and vendor payments.  Property insurance across the business enterprise is paid on an aggregated basis across properties and constitutes (with respect to the Etzel property) part of the fixed overhead charge under the Co-Manufacturing Agreement but is maintained by

Emprise and paid for by Vivos. The Debtor estimates that the Etzel Property comprises approximately $5,000–5,500 of annual premiums.

121. The payment of actual Taxes and Fees to the Taxing Authorities on the Debtor's behalf is also treated as a direct cost. Sales and use taxes and real and personal property taxes, if any, are generally administered and paid by Vivos on the Debtor's behalf, while consolidated income, franchise, margin, or similar taxes are generally administered by Emprise, but ultimately paid by Vivos. Because Emprise is ultimately owned by a trust pursuant to an employee stock ownership plan, Emprise and its affiliates (including the Debtor) operate on a pass-through basis for federal income tax purposes and do not directly incur federal income taxes. Similar treatment is afforded under the vast majority of state income tax regimes, with minimal exceptions. The Debtor incurs *de minimis* franchise, margin, excise taxes, and LLC fees at the state level in an annual amount of approximately $7,000, and such amounts are paid by Vivos and reconciled pursuant to the intercompany reconciliation process. Property taxes on the Etzel Property in 2025 were $17,095.34 and the Company anticipates a similar annual cost for 2026. The Company is charged approximately $1,500 per month by Vivos on account of the property taxes on the Etzel Property.

122. **Emprise Administrative Services Agreement.** Pursuant to the Emprise Administrative Services Agreement, Emprise provides or administers a variety of key services that support the Debtor's operations, including:

a) Corporate Governance and Secretarial Services: providing services related to corporate governance, such as ensuring compliance with corporate laws and regulations, maintaining corporate records, arranging board meetings, and other secretarial tasks;

b) Risk Management: identifying potential risks, developing risk mitigation strategies, and managing, and binding the Debtor's insurance policies;

c) Employee Benefits: maintaining and administering the Debtor's employee benefits programs; and

d) Tax Support: providing consolidated tax support, coordination of tax filings and related costs, and other enterprise-level support services.

123.    The Debtor is not charged an annual fee by Emprise for these services and, as of the Petition Date, the Debtor does not believe any amounts are outstanding and payable pursuant to the Emprise Administrative Services Agreement.  Instead, Vivos pays the amounts associated with these services, and such amounts are reconciled through the intercompany reconciliation process. The Insurance Program is charged to the Debtor at cost, while the Workers' Compensation Program and the employee benefit program, and their related administrative costs, are charged to the Debtor as a fee equal to 21% of the Employee's gross payroll.

124.    **Co-Manufacturing Agreement.**  The Co-Manufacturing Agreement provides for the operational framework through which Nice-Pak supports the Debtor's dry goods business. Nice-Pak provides sourcing, production, manufacturing, packaging, warehousing, logistics, customer service, and sales support for certain Epsom salt, body powder products, and other dry goods products.

125.    Under the Co-Manufacturing Agreement, Nice-Pak charges the Debtor an annual fee of $400,000 for sales, customer service, sales support, research and development, and related services.  Similar to the Vivos Administrative Fee, this amount is renegotiated annually by the Debtor and Nice-Pak on an arm's-length basis.

126.    Nice-Pak also charges the Debtor for certain direct costs associated with sourcing, production and manufacturing, direct labor, and order processing, including, but not limited to procuring raw materials, pallets used for shipping, in-warehouse overhead costs, and the freight costs of shipping.  Included in these direct costs are certain variable, fixed overhead, and distribution costs charged based on a proportional number of units sold: (a) variable overhead equal to $0.115 per unit, (b) fixed overhead equal to $0.082 per unit (applicable to Epsom salt

products only), and (c) distribution equal to $0.043 per unit.   A portion of the fixed overhead costs are attributable to certain of the policies included in the Insurance Program.

127.   Finally, in addition to the SG&A Costs and the direct costs of production and distribution, the Debtor also pays a contract manufacturing fee of 12.5% of the product cost of Epsom salt products.  All charges accrued between the Debtor and Nice-Pak are settled through the intercompany reconciliation process.

128.   The Shared Services Agreements are critical to the success of the Debtor's business and, particularly, to the Debtor's smooth transition into chapter 11.  The Debtor has historically outsourced these functions and continuing to do so, with service providers with whom the Debtor has an established relationship and systems already in place for the provision of such services, is in the best interest of the Debtor's estate and creditors.  Vivos, Emprise, and Nice-Pak provide economic and operational benefits by allowing the Debtor to use existing enterprise systems and affiliate expertise rather than duplicating procurement, manufacturing, logistics, customer-service, finance, accounting, tax, insurance, benefit, utility, and administrative infrastructure.   Any disruption to the Debtor's arrangements under the Shared Services Agreements could severely disrupt the Debtor's operations and cause irreparable harm to the Debtor's business.  Accordingly, I believe that the Debtor's continued performance under the Shared Services Agreements, including the authority to reconcile and pay amounts arising postpetition in the ordinary course and the authority, but not direction, to pay prepetition amounts related thereto, in the Debtor's discretion, is necessary to avoid disruption to the Debtor's business and is in the best interests of the Debtor's estate, its creditors, and other parties in interest.

[*Remainder of page left intentionally blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  August 2, 2026                          */s/ Mackenzie Shea*
                                                Mackenzie Shea
                                                Chief Restructuring Officer
                                                Vi-Jon, LLC