## Exhibit C

**Restructuring Support Agreement**

*Execution Version*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EXECUTION DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF THE DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY RESTRUCTURING TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS, IN EACH CASE, SUBJECT TO THE TERMS HEREOF.**

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, together with all exhibits, annexes, and schedules hereto, this "Agreement") is made and entered into as of July 30, 2026 (the "Execution Date"), by and among:

(i)     Vi-Jon, LLC (the "Company");

(ii)    Emprise Group, Inc. ("Emprise") and Emprise HPC, LLC ("Emprise HPC" and together with Emprise, the "Emprise Supporting Parties");

(iii)   The Honorable Shelley C. Chapman (Ret.), solely in her capacity as prepetition or court-appointed (as applicable) legal representative for the purpose of protecting the rights of persons that might assert talc-related demands (as defined in the Bankruptcy Code) against the Company or the Non-Debtor Affiliates[1] (the "Future Claimants' Representative"); and

---

[1]     "Non-Debtor Affiliates" means Emprise Group, Inc.; Emprise HPC, LLC; VH Investment Group, LLC; VH Finance, LLC; Vivos Holdings, LLC; Nice-Pak Products, LLC; INSPR Labs, LLC; UpLift Brands, LLC; Nice-Pak International Limited; Nice-Pak Deutschland GmbH; Emprise Group Charitable Foundation; and any other current or former affiliates of Emprise other than the Company and all former affiliates and predecessors of the Company, and their respective successors and assigns.

(iv)    the undersigned law firms representing holders of talc-related claims against the Company, the Non-Debtor Affiliates, and/or their Related Parties[2] (such claims, the "Talc Personal Injury Claims," and such law firms, collectively, the "Talc Claimants' Representatives," and, together with the Emprise Supporting Parties and the Future Claimants' Representative, the "Supporting Parties").

Each of the entities described in sub-clauses (i) through (iv) of the preceding paragraph is referred to herein as a "Party" and collectively as the "Parties." Upon execution of a Joinder Agreement (as defined below) and delivery of a joinder to this Agreement substantially in the form attached hereto as **Exhibit A** (the "Joinder Agreement") to the Company, additional law firms representing holders of Talc Personal Injury Claims shall be considered a "Party" to this Agreement and a "Talc Claimants' Representative" for all purposes under this Agreement.

## RECITALS

**WHEREAS**, the Company and the Supporting Parties have in good faith and at arm's length negotiated certain restructuring transactions with respect to the Company, the resolution of Talc Personal Injury Claims, and the implementation of a global settlement, on the terms set forth in the term sheet attached as **Exhibit B** hereto (together with any exhibits and appendices annexed thereto, the "Restructuring Term Sheet,"[3] and such transactions, as described in the Restructuring Term Sheet, the "Restructuring Transactions");

**WHEREAS**, the Restructuring Transactions include, among other things, (i) the commencement of a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court," and the case commenced, the "Chapter 11 Case"), (ii) providing the Emprise Effective Date Cash Contribution, (iii) confirmation and consummation of a chapter 11 plan acceptable to the Parties (the "Plan") incorporating the Global Settlement, the Sale Transaction, and the other terms of the Restructuring Term Sheet, (iv) establishment of the Talc Personal Injury Trust and issuance of a channeling injunction pursuant to section 524(g) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"), and (v) entry into the Amended Keepwell Agreement and the related Cash Management Orders, in each case, on the terms set forth in the Restructuring Term Sheet;

**WHEREAS**, certain of the Emprise Supporting Parties have agreed to (i) enter into the Amended Keepwell Agreement, (ii) acquire certain assets of the Company, and (iii) otherwise support the transactions contemplated by the Restructuring Term Sheet;

---

[2]    "Related Parties" means, with respect to a party, each party's respective current and former officers, directors (or similar), shareholders, lenders, employees, professionals (including, but not limited to, attorneys, financial advisors, and investment bankers), agents, and consultants, and the assignees, predecessors, and successors of any of the foregoing.

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Restructuring Term Sheet.

**WHEREAS**, Talc Claimants' Representatives represent at least 75% of holders (by number) of Talc Personal Injury Claims against the Company and support the Restructuring Transactions contemplated by the Restructuring Term Sheet; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement, and as will be fully documented under the Definitive Documents (as defined herein).

**NOW, THEREFORE**, in consideration of the covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound by this Agreement pursuant to its terms, agrees as follows:

*AGREEMENT*

1.      <u>Interpretation</u>.  For the purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be duly amended, restated, supplemented, or otherwise modified from time to time with the agreement of the Parties; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(d)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(e)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety, including all exhibits, annexes, and schedules attached hereto, rather than to any particular portion of this Agreement unless a specific section or paragraph is specified;

(f)      each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules, as though fully incorporated herein;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

3

(h)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company laws; and

(i)    the use of "include" or "including" is without limitation, whether stated or not.

2.    <u>Affirmative Commitments of the Company</u>.  Except as set forth in Section 4, the Company agrees to:

(a)    support and use commercially reasonable efforts to take all steps necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement and the Restructuring Term Sheet and to address any legal or structural impediment that arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions in accordance with this Agreement and the Restructuring Term Sheet;

(b)    use commercially reasonable efforts to comply with the milestones set forth in the Restructuring Term Sheet (the "<u>Milestones</u>"), which may be extended at any time with the prior written approval of Emprise (email from counsel to Emprise being sufficient);

(c)    use commercially reasonable efforts to (i) obtain any and all required Bankruptcy Court, regulatory, and/or third-party approvals for the Restructuring Transactions and (ii), subject to any limitations in this Agreement, seek additional support for the Restructuring Transactions from holders of Talc Personal Injury Claims and other material stakeholders;

(d)    cooperate with the Supporting Parties to implement the Restructuring Transactions;

(e)    negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents (as defined below) and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement and the Restructuring Term Sheet;

(f)    keep the Supporting Parties reasonably informed of any events or occurrences that may be material to the effectuation and consummation of the Restructuring Transactions;

(g)    (i) notify the Supporting Parties promptly (and in any event within three (3) business days) of the Company's receipt of any bona fide written proposal or offer from or on behalf of any of the Company's or the Emprise Supporting Parties' current or former customers or retailers with respect to any settlement with, or relief for, any such customers or retailers in the Chapter 11 Case related to Talc Personal Injury Claims, which notice shall include the material terms thereof and the identity of the person or group of persons involved, and, contemporaneously with such notice, furnish counsel to the Supporting Parties copies of any such written proposal or offer and (ii) include counsel to the Talc Claimants' Representatives or the Official Committee of Unsecured Creditors (as the case may be) on any communications with any such customers or retailers with respect to any such potential settlement or relief in the Chapter 11 Case; *provided*, that, nothing in this Section 2(g) shall prohibit the Company or the Emprise Supporting Parties from negotiating, entering into, or performing commercial arrangements or accommodations with any customer or retailer including with respect to indemnification or contribution claims asserted by any such customer or retailer, so long as no such arrangement or accommodation (A) effects a

4

settlement of, or provides for any release or channeling of, any Talc Personal Injury Claim, or (B) extends the automatic stay to, or otherwise enjoins any Talc Personal Injury Claim against, any such customer or retailer without the consent of the Talc Claimants' Representatives or the Official Committee of Unsecured Creditors (as the case may be) and the pre-petition Future Claimants' Representative or the Official Future Claimants' Representative (as the case may be); *provided*, *further,* that any information shared with or furnished pursuant to this paragraph (except for the fact that any proposal or offer of any settlement with, or relief for, any customers or retailers in the Chapter 11 Case related to Talc Personal Injury Claims was made or received) shall be provided on a "professional eyes only" basis unless otherwise agreed by the Parties in writing subject to any protective order entered in the Chapter 11 Case;

(h)    so long as the Chapter 11 Case is pending and an Acceptable Plan has not been confirmed, at a time no later than 5:00 p.m. on Thursday of each calendar week, commencing on the second such date following the Petition Date, the Company shall deliver to the Supporting Parties a Budget Variance Report and respond to reasonable requests or questions from the Supporting Parties concerning such Budget Variance Report;

(i)    use commercially reasonable efforts to oppose any person or entity from taking any actions contemplated in Section 3, including by objecting to any motion seeking any of the relief described in Section 3(d) or Section 3(e) that does not have the consent of the Talc Claimants' Representatives or the Official Committee of Unsecured Creditors (as the case may be) and the pre-petition Future Claimants' Representative or the Official Future Claimants' Representative (as the case may be);

(j)    subject to the provisions of the Bankruptcy Code and the Company's exercise of its fiduciary duties in its business judgment, comply in all material respects with its obligations under all material contracts; *provided*, however, that the Company shall not be obligated to pay any prepetition amounts on account of any material contracts;[4] and

(k)    furnish to the Supporting Parties (A) at least two (2) business days in advance to the extent reasonably practicable all material pleadings and/or filings in the Chapter 11 Case related to (i) this Agreement and (ii) the Acceptable Plan (including any channeling injunction, personal injury trust, releases, settlement agreements pursuant thereto), other than the Material Documents; (B) at least five (5) business days in advance to the extent reasonably practicable the Material Documents;[5] and (C) (i) as soon as available, and in any event within two (2) business days after the preparation or issuance thereof, all operating reports provided to the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (ii) promptly after filing thereof, copies of all pleadings, motions, applications, briefs, memoranda, financial information and other papers and documents filed by the Company in the Chapter 11 Case; and (iii) promptly

---

[4]    On the Effective Date, the Reorganized Debtor shall assume and assign to the Non-Debtor Affiliates (or their designees) all executory contracts of the Debtor that are material to the operation of the Debtor's business and designated by Emprise for assumption and assignment, unless otherwise rejected pursuant to the Plan or other order of the Bankruptcy Court. Emprise shall pay all cure amounts, if any, required in connection with such assumption and assignment in accordance with the Budget and to-be-negotiated assumption and assignment procedures.

[5]    "Material Documents" means the Definitive Documents, any motion or complaint seeking any extension of the automatic stay, and any motion to approve any settlement.

after sending thereof, copies of all written reports given by the Company to any official or unofficial creditors' committee in the Chapter 11 Case; provided that, with respect to clause (C), any operating report, pleading, motion, application, financial information, or other paper or document delivered to counsel to a Supporting Party through the Court's CM/ECF system shall satisfy the Company's delivery obligations under clause (C) with respect thereto.

3.   Negative Commitments of the Company.   Except as set forth in Section 4, the Company agrees not to, directly or indirectly:

(a)   take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in this Agreement or the Restructuring Term Sheet;

(b)   file any motion, pleading, or Definitive Document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Restructuring Term Sheet;

(c)   other than in the ordinary course of business or as contemplated by this Agreement, the Restructuring Term Sheet, the Budget, the Amended Keepwell Agreement, the Sale Transaction, or any Alternative Transaction permitted under the Restructuring Term Sheet, engage in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness, or other similar transaction;

(d)   except with the consent of the Talc Claimants' Representatives or the Official Committee of Unsecured Creditors (as the case may be) (such consent not to be unreasonably withheld, conditioned, or delayed) and the pre-petition Future Claimants' Representative or the Official Future Claimants' Representative (as the case may be), (i) enter into any settlement in the Chapter 11 Case with, nor support any relief in the Chapter 11 Case for, any of their respective customers or retailers, including any attempt to extend the automatic stay or otherwise enjoin any Talc Personal Injury Claims against any such entity in the Chapter 11 Case, (ii) solicit or make any proposal or offer to any of the Company's or the Emprise Supporting Parties' current or former customers or retailers with respect to any settlement with, or relief for, any such customers or retailers in the Chapter 11 Case related to Talc Personal Injury Claims, or (iii) seek to remove, or support any request by any entity to remove, any Talc Personal Injury Claims against any such entity to the United States District Court for the District of Delaware or any other federal court; *provided*, that nothing in this Section 3(d) shall prohibit the Company or the Emprise Supporting Parties from negotiating, entering into, or performing commercial arrangements or accommodations with any customer or retailer including with respect to indemnification or contribution claims asserted by any such customer or retailer, so long as no such arrangement or accommodation (A) effects a settlement of, or provides for any release or channeling of, any Talc Personal Injury Claim, or (B) extends the automatic stay to, or otherwise enjoins any Talc Personal Injury Claim against, any such customer or retailer without the consent of the Talc Claimants' Representatives or the Official Committee of Unsecured Creditors (as the case may be) and the pre-petition Future Claimants' Representative or the Official Future Claimants' Representative (as the case may be); or

6

(e)      except with the consent of Emprise (solely with respect to any such adversary proceeding commenced prior to the Effective Date), the Talc Claimants' Representatives or the Official Committee of Unsecured Creditors (as the case may be) (not to be unreasonably withheld) and the pre-petition Future Claimants' Representative or the Official Future Claimants' Representative (as the case may be), commence an adversary proceeding in the Bankruptcy Court seeking a declaratory judgment with respect to coverage disputes between the Company and its insurers.

4.      Additional Provisions Regarding Company Commitments.

(a)      Nothing in this Agreement shall prohibit the Company (or the Emprise Supporting Parties, as applicable) from (i) negotiating with existing creditors, (ii) complying with applicable legal, regulatory, or licensing requirements related to the ongoing operation of its business, or (iii) pursuing or preparing for the Chapter 11 Case, in the case of this clause (iii), to the extent in accordance with Sections 2 and 3 of this Agreement and the Restructuring Term Sheet.

(b)      Notwithstanding anything to the contrary in this Agreement or the Restructuring Term Sheet, (a) the Company and its board of managers, and the special committee thereof, shall be permitted to take (or permitted to refrain from taking) any action with respect to the Restructuring Transactions if such board of managers, or special committee thereof, determines, in good faith and based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with its fiduciary duties under applicable law (such determination, a "Fiduciary Out"), and may take such action or refrain from taking such action without incurring any liability to any other Party to this Agreement; and (b) to the extent that such fiduciary obligations require the Company or its board of managers, or special committee thereof, to terminate the Company's obligations under this Agreement, the Company may terminate this Agreement and any agreement related hereto without liability. Before exercising its Fiduciary Out, the Company shall comply with any applicable notice, consultation, or other requirements set forth in the Restructuring Term Sheet or any other applicable Definitive Document. Nothing in this section shall impede or abridge any Party's termination rights under this Agreement.

(c)      *Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall prohibit the Company from: (i) enforcing any right, remedy, condition, consent, or approval requirement under this Agreement or any Definitive Documents; (ii) asserting or raising any objection not prohibited under or inconsistent with this Agreement in connection with the Chapter 11 Case; (iii) taking any action that is required by applicable law or declining to take any action which is prohibited by applicable law; (iv) retaining the benefit of any applicable legal professional privilege; (v) making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like; (vi) taking any action that is not inconsistent with this Agreement; or (vii) consulting with other parties in the Chapter 11 Case.*

5.      Affirmative Commitments of the Supporting Parties.  Each Supporting Party agrees to:

(a)    support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', creditors', committee, client, or other process requiring voting, consent, support, recommendation, or approval to which it is legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(b)    cooperate with the Company and the other Supporting Parties to implement the Restructuring Transactions;

(c)    negotiate in good faith and, to the extent it is contemplated to become a party thereto, use commercially reasonable efforts to execute and deliver the applicable Definitive Documents;

(d)    support and use commercially reasonable efforts to cooperate with and assist the Company in obtaining additional support for the Restructuring Transactions from the Company's other stakeholders;

(e)    cooperate with and assist the Company in opposing any party, person, or entity taking actions that are inconsistent or may interfere with this Agreement, the Restructuring Term Sheet, or the Restructuring Transactions, including, if requested by the Company, by timely filing a joinder to any formal objection, to any motion, application, or other pleading filed with the Bankruptcy Court or any other court seeking relief that is (A) materially inconsistent with this Agreement or the Restructuring Term Sheet, or (B) otherwise materially inconsistent with, or reasonably expected to prevent, interfere with, delay, or impede the implementation or consummation of the Plan or the Restructuring Transactions;

(f)    use commercially reasonable efforts to oppose any person or entity from taking any actions contemplated in Section 6; and

(g)    promptly notify counsel to the Company upon becoming aware of a material breach of this Agreement or the Restructuring Term Sheet by any Supporting Party.

6.    <u>Negative Commitments of the Supporting Parties</u>.  Each Supporting Party agrees not to, directly or indirectly:

(a)    take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions, including:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, including the solicitation of acceptances, confirmation, affirmation, consummation, or implementation of the Plan, including, without limitation, support any request to terminate the Company's exclusive period to file or solicit a plan of reorganization;

(ii)    solicit approval or acceptance of, encourage, propose, file, support, or participate in the formulation of or vote for, any restructuring, merger, workout, or plan of reorganization for the Company other than the Plan, other than as set forth herein, without the consent of the Company;

8

(iii)    take any actions (including filing any motion, pleading, or other documents with the Bankruptcy Court or any other court, including any modifications or amendments thereto, or initiating or causing to be initiated on its behalf any litigation or proceeding), or fail to take any actions, where such taking or failing to take actions would be, in either case, (A) materially inconsistent with this Agreement or the Restructuring Term Sheet or (B) otherwise materially inconsistent with, or reasonably expected to prevent, interfere with, delay, or impede the implementation or consummation of the Plan or the Restructuring Transactions or the Company's commencement and prosecution of the adversary proceeding(s) to extend the automatic stay described in the Restructuring Term Sheet;

(iv)    exercise, or direct any other person or entity to exercise, any right or remedy for the enforcement, collection, or recovery of any claims, rights or interests in a manner that is inconsistent with this Agreement, the Restructuring Term Sheet, or the Definitive Documents;

(v)    seek to lift the automatic stay to permit Talc Personal Injury Claims to go forward against the Company without prior written consent of the Company (such consent not to be unreasonably withheld, conditioned, or delayed);

(vi)    commence, continue, or support any litigation against the Company or any of the Emprise Supporting Parties with respect to the Talc Personal Injury Claims without prior written consent of the Company or the Emprise Supporting Party subject to such litigation (such consent not to be unreasonably withheld, conditioned, or delayed);

(vii)    (A) object to, delay, impede, or take any other action to interfere with the Company's ownership and possession of its assets, wherever located in a manner that is inconsistent with this Agreement, the Restructuring Term Sheet, or the Definitive Documents without prior written consent of the Company (such consent not to be unreasonably withheld, conditioned, or delayed) or order of the Court (other than an order sought in contravention of clause (B) hereof); or (B) seek entry of an order approving any of the foregoing;

(viii)    except with the consent of the Talc Claimants' Representatives or the Official Committee of Unsecured Creditors (as the case may be) (such consent not to be unreasonably withheld, conditioned, or delayed) and the pre-petition Future Claimants' Representative or the Official Future Claimants' Representative (as the case may be), enter into any settlement with, nor support any relief for, any of the Company's or the Emprise Supporting Parties' current or former customers or retailers of the type described in Section 3(d); subject to the proviso set forth in Section 3(d); or

(b)    encourage any person or entity to undertake any action prohibited by this Section 6.

(c)    Notwithstanding anything to the contrary in this Agreement, any holders of Talc Personal Injury Claims may take reasonable steps to perpetuate the testimony of any person subject to this Agreement who is not expected to survive the duration of this Agreement or who otherwise is expected to be unable to provide testimony if it is not perpetuated during the duration of this Agreement. Notice shall be provided to the Company and Emprise by notifying counsel for the Company and Emprise of the perpetuation of such testimony. The Company and Emprise shall

have the right to object to the notice on any grounds it would have had if it was a party to the underlying proceeding and not subject to the terms of the automatic stay, and the Company and Emprise may raise any such objections with the Bankruptcy Court. The use of such testimony in any appropriate jurisdiction shall be subject to the applicable procedural and evidentiary rules of such jurisdiction. All parties reserve and do not waive any and all objections with respect to such testimony.

7. <u>Additional Affirmative Commitments of the Talc Claimants' Representatives</u>. In addition to and without limiting the commitments detailed in Sections 5 and 6 of this Agreement, the Talc Claimants' Representatives agree to:

(a)     support the Plan, including the channeling injunction;

(b)     recommend that the holders of Talc Personal Injury Claims against the Company vote in favor of the Plan and not opt out of (or, if an opt-in release is used, opt into) the third-party releases contemplated by the Plan and otherwise use commercially reasonable efforts to secure an affirmative vote on the Plan by holders of Talc Personal Injury Claims and Plan confirmation;

(c)     cause the Official Committee of Unsecured Creditors to provide, for inclusion with the Disclosure Statement (as defined below) or in the Company's solicitation packages, a letter recommending that all holders of Talc Personal Injury Claims vote in favor of the Plan and not opt out of (or, if an opt-in release is used, opt into) the third-party releases contemplated by the Plan;

(d)     if the Talc Claimants' Representatives become aware or are notified that they cease to represent, or may not represent, at least 75% of holders (by number) of Talc Personal Injury Claims against the Company, promptly (and in any event within two (2) business days) inform the other Parties and use commercially reasonable efforts to encourage and facilitate such additional representation of, or joinder to this Agreement by, holders of Talc Personal Injury Claims against the Company as may be necessary to meet or maintain such 75% threshold (*provided* that such efforts shall not require the Talc Claimants' Representatives to incur material expenses);

(e)     to the extent holders of Talc Personal Injury Claims against the Company have granted the Talc Claimants' Representatives or the law firm representing such holder a specific power of attorney granting authority to vote on a bankruptcy plan on their behalf, exercise such power of attorney to vote in favor of the Plan and not opt out of (or, if applicable, opt into) the third-party releases contemplated by the Plan; and

(f)     seek to have one or more of their respective clients with a Talc Personal Injury Claim(s) against the Company be appointed to any official committee representing holders of Talc Personal Injury Claims in the Chapter 11 Case (following such appointment, and in the case that the majority of members are individual holding Talc Personal Injury Claims, the "<u>Official Committee of Unsecured Creditors</u>"); and

(g)     Notwithstanding anything to the contrary in this Agreement or the Restructuring Term Sheet, (i) each of the Official Committee of Unsecured Creditors and the Official Future Claimants' Representative shall be permitted to take (or refrain from taking) any action with respect to the Restructuring Transactions if such Party determines, in good faith, that taking such action, or refraining from taking such action, as applicable, is required to comply with its fiduciary

10

duties under applicable law or rules of professional conduct, and may take such action or refrain from taking such action without incurring any liability to any other Party to this Agreement; and (ii) to the extent that such fiduciary obligations require the Official Committee of Unsecured Creditors or the Official Future Claimants' Representative to terminate its obligations under this Agreement, such Party may terminate this Agreement as to itself and any agreement related hereto without liability; *provided* that such Party shall comply with any applicable notice, consultation, or other requirements set forth in the Restructuring Term Sheet or any other applicable Definitive Document. Nothing in this Section shall impede or abridge any Party's termination rights under this Agreement.

8.    <u>Additional Affirmative Commitments of the Future Claimants' Representative</u>.  In addition to and without limiting the commitments detailed in Sections 5 and 6 of this Agreement, the Future Claimants' Representative agrees to:

(a)    support the Plan, including the channeling injunction and the Talc Personal Injury Trust contemplated thereby; and

(b)    seek to be appointed to an official position representing future holders of Talc Personal Injury Claims in the Chapter 11 Case (following such appointment, the "<u>Official Future Claimants' Representative</u>").

9.    <u>Definitive Documents</u>.   The definitive documents governing the Restructuring Transactions shall include this Agreement and each of the following (the "<u>Definitive Documents</u>"):

(a)    the Restructuring Term Sheet (and all exhibits thereto);

(b)    the Plan (and all exhibits thereto);

(c)    the related disclosure statement with respect to the Plan and all exhibits thereto (the "<u>Disclosure Statement</u>");

(d)    all documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, other than the Disclosure Statement (the "<u>Solicitation Materials</u>"); and

(e)    the Confirmation Order, any and all Plan supplements, the Trust Agreement, the TDP, and any other documents necessary to implement the Plan, the Global Settlement, the § 524(g) channeling injunction, or the Talc Personal Injury Trust, including the cooperation agreement described in the Restructuring Term Sheet.

The Definitive Documents remain subject to negotiation and completion.  The Restructuring Term Sheet sets forth the Parties' respective consent and consultation rights, and the Party that will draft certain of the Definitive Documents in the first instance.

10.    <u>Confidentiality</u>.  No Party shall, directly or indirectly, without the prior written consent of the other applicable Parties, disclose this Agreement, the Restructuring Transactions, the terms or contents hereof, the fact that the Parties are engaged in discussions or negotiations with respect to the Restructuring Transactions, or any other information or documentation relating

11

to this Agreement or the Restructuring Transactions, to any third party (*provided*, that if this Agreement is referenced in a Definitive Document, that shall constitute the consent of the Parties).

11.     Notwithstanding the foregoing, each Party hereto may disclose this Agreement and the Restructuring Transactions and related information (i) to its existing lenders or creditors; (ii) to its officers, employees, members, managers, partners, directors, clients, or other principals, as applicable; (iii) to its financial, legal, tax, and other professional advisors who are assisting with the evaluation of the Restructuring Transactions, *provided* that such Party shall cause all such persons, entities, and advisors to be bound by confidentiality obligations no less restrictive than those set forth herein and shall be responsible to the other Parties for any breach of this Section by any such person, entity, or advisor; (iv) to the extent required by applicable law, rule, or regulation or pursuant to a request by a governmental or regulatory authority, upon the reasonable advice of legal counsel, *provided* that the disclosing party shall, to the extent practicable and not prohibited by applicable law, give the other applicable Parties prompt prior notice of any such required disclosure; (v) to other holders of Talc Personal Injury Claims (or their counsel) in an effort to garner additional support for the Restructuring Transactions from holders of Talc Personal Injury Claims, *provided* that such holders (and their counsel) shall agree to be bound by a non-disclosure agreement in form and substance similar to the confidentiality agreement(s) entered into by the Talc Claimants' Representatives; (vi) to the Company's customers, *provided* that such customers (and their counsel) shall agree to be bound by a customary confidentiality agreement; and (vii) in any filing required in the Chapter 11 Case.

The terms of any confidentiality agreement by and among the parties to this Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such confidentiality agreements.

12.     <u>Termination</u>.

(a)     *Supporting Party Termination Rights*. Any Supporting Party may terminate this Agreement as to itself by written notice and exercise all remedies available under applicable law and any applicable Definitive Document, upon the occurrence of any of the following, *provided* that a Party shall not be entitled to terminate under this section to the extent such occurrence was caused by such Party's own acts or omissions, including any breach of this Agreement:

(i)     a material breach by any other Party of its obligations, representations, warranties, or covenants set forth in this Agreement that remains uncured for three (3) business days after written notice;

(ii)     the execution or filing of any Definitive Document, or the entry of any order (if applicable), that is materially inconsistent with this Agreement or the Restructuring Term Sheet;

(iii)     failure of the Company to proceed with the Restructuring Transactions in a manner that is materially consistent with this Agreement or the Restructuring Term Sheet that remains uncured for three (3) business days after written notice;

(iv)    the Company proposes, supports, or enters into an Alternative Restructuring Proposal, except to the extent permitted by this Agreement, the Restructuring Term Sheet, or the Fiduciary Out;

(v)    the Company fails to comply with the Milestones (as such Milestones may be amended, extended, or waived in accordance with this Agreement);

(vi)    the Company exercises a Fiduciary Out pursuant to Section 4(b) of this Agreement;

(vii)    solely with respect to the Talc Claimants' Representatives, the majority of the members of the Official Committee of Unsecured Creditors are not individuals holding Talc Personal Injury Claims; provided, however, that such circumstances shall not constitute a termination event if within 10 days of the appointment of the Official Committee of Unsecured Creditors, the Company seeks recognition of an ad hoc committee comprising the Talc Claimants' Representatives and permission from the Court to pay all reasonable and necessary professional fees of such ad hoc committee as administrative claims;

(viii)    solely with respect to the Emprise Supporting Parties, any of the Talc Claimants' Representatives terminates its obligations under this Agreement;

(ix)    if the Emprise Supporting Parties reasonably determine in good faith, and in consultation with the Talc Claimants' Representatives, that the Company no longer has sufficient support of holders of Talc Personal Injury Claims to ensure confirmation of the Plan (including the § 524(g) channeling injunction); or

(x)    solely with respect to the Emprise Supporting Parties, the Talc Claimants' Representatives cease to collectively represent at least 75% of holders (by number) of Talc Personal Injury Claims against the Company, and such representation is not restored within a reasonable time (not to exceed fifteen (15) days) after the earlier of the date on which the Talc Claimants' Representatives inform the other Parties thereof and the date on which the Emprise Supporting Parties otherwise become aware thereof.

(b)    *Company Termination Rights*. The Company may terminate this Agreement with respect to one or more of the Supporting Parties by written notice upon the occurrence of any of the following:

(i)    a material breach by any Supporting Party of its obligations, representations, warranties, or covenants set forth in this Agreement that remains uncured for three (3) business days after written notice;

(ii)    if the Company reasonably determines in good faith, and in consultation with the Talc Claimants' Representatives, that the Company no longer has sufficient support of holders of Talc Personal Injury Claims to ensure confirmation of the Plan;

(iii)    any of the Supporting Parties takes any action materially inconsistent with this Agreement or the Restructuring Term Sheet that remains uncured for three (3) business days after written notice;

(iv)    the Talc Claimants' Representatives cease to collectively represent at least 75% of holders (by number) of Talc Personal Injury Claims against the Company, and such representation is not restored within a reasonable time (not to exceed fifteen (15) days) after the earlier of the date on which the Talc Claimants' Representatives inform the other Parties thereof and the date on which the Company otherwise becomes aware thereof; or

(v)    the Company or its board of managers, or special committee thereof, after consulting with counsel, determines pursuant to Section 4(b) of this Agreement that continued performance of this Agreement is inconsistent with its fiduciary obligations to the Company's bankruptcy estate or other requirements under applicable law.

(c)    *All Party Termination*. This Agreement may be terminated by any or all Parties upon the occurrence of any of the following:

(i)    mutual written agreement of the Parties;

(ii)    entry of a final, non-appealable order that enjoins or materially impairs consummation of the Restructuring Transactions;

(iii)    the commencement of any voluntary or involuntary case or proceeding under the Bankruptcy Code or any other applicable insolvency law by or against the Company that is inconsistent in any material respect with this Agreement; *provided* that the Supporting Parties may not terminate this Agreement as a result of the commencement of the Chapter 11 Case or any involuntary case or proceeding unless such involuntary proceeding remains undismissed for a period of 60 days after the filing thereof; or

(iv)    if (A) The Company files a voluntary petition under chapter 7 of the Bankruptcy Code, (B) the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or (C) a chapter 11 trustee or examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code (but not an examiner appointed solely to review fees and expenses of professionals retained in the Chapter 11 Case) is appointed.

(d)    *Automatic Termination*. This Agreement shall terminate automatically without any further required action or notice immediately upon the earliest of (i) the Effective Date of the Plan and (ii) the date that is nine (9) months from the Execution Date of this Agreement, such date to be extended by the written agreement of the Parties.

(e)    *Limitation on Termination*. A Party may not terminate this Agreement if it is then in material breach of this Agreement.

(f)    *Effect of Termination*. Upon termination, this Agreement shall be of no further force and effect, and each Party shall be released from its obligations under this Agreement; *provided* that no such termination shall affect any rights or remedies arising from a prior breach.

Notwithstanding the foregoing, the following provisions shall survive any termination of this Agreement: Section 10 (*Confidentiality*), Section 14(a) (*Governing Law*), Section 14(b) (*Jurisdiction*), and this Section 12(f).

13.     Mutual Representations and Warranties.  Each of the Parties, severally and not jointly, represents and warrants to each other Party that the following statements are true, correct, and complete as of the date hereof, but, solely with respect to the Company, subject to any limitations or approvals arising from, or required by, the commencement of the Chapter 11 Case:

(a)     as to the Company and the Non-Debtor Affiliates, such Parties are validly existing and in good standing under the laws of the states of their respective organization;

(b)     as to the Talc Claimants' Representatives, based on the information provided by the Company, they collectively represent at least 75% of holders (by number) of Talc Personal Injury Claims against the Company, and each such representation is not joint or co-representation with any counsel or law firm that is not party to this Agreement under terms that would negatively impact the relevant firm from fulfilling any covenant under this Agreement;

(c)     this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(d)     except as expressly provided in this Agreement, it has all requisite organizational power and authority to enter into this Agreement and to carry out the Restructuring Transactions to which it is a party, and to perform its obligations under this Agreement, the Restructuring Term Sheet, and each of the Definitive Documents (as applicable);

(e)     the execution and delivery by it of this Agreement, and the performance of its obligations hereunder, have been duly authorized by all necessary organizational action on its part;

(f)     it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement;

(g)     it has been represented by legal counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement (including the Restructuring Transactions), has had the opportunity to review this Agreement with its legal counsel, and has not relied on any statements made by any other Party or its legal counsel as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement, the Restructuring Term Sheet, or each of the Definitive Documents (as applicable); and

(h)     the execution, delivery, and performance by such Party of this Agreement does not and will not (i) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, (ii) conflict with, result in a breach of, or constitute (with or without notice or lapse of time or both) a default under any material agreement to which it or any of its subsidiaries is a party, or (iii) violate any order, writ, injunction, decree, statute, rule, or regulation.

14.     Miscellaneous.

(a)     *Governing Law and Jury Trial Waiver*.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE

15

OF NEW YORK, WITHOUT REFERENCE TO CONFLICT OF LAWS PRINCIPLES. EACH PARTY HERETO HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE AGREEMENT, THE RESTRUCTURING TRANSACTIONS, OR ANY OTHER RELATED MATTER.

(b)     *Jurisdiction*.  If the Restructuring Transactions are consummated pursuant to the Chapter 11 Case, each Party hereto agrees that it (i) shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement; (ii) submits to the exclusive jurisdiction of the Bankruptcy Court; (iii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (iv) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

(c)     *Assignment*.  No Party may assign this Agreement without the prior written consent of the Company and the Supporting Parties. Any assignment in violation of the foregoing shall be void.

(d)     *Execution of Agreement*.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

(e)     *Amendments*. This Agreement may be amended only by mutual written amendment by the Company and each Supporting Party whose rights are adversely affected.

(f)     *Enforceability of Agreement*. Each Party agrees that the exercise of termination rights under this Agreement shall not be subject to the automatic stay to the extent permitted by law. If this Agreement is terminated, the Parties reserve all of their rights. This Agreement and all negotiations relating hereto shall be inadmissible except to enforce its terms, in accordance with Federal Rule of Evidence 408 and any applicable state or foreign evidentiary rules of similar effect.

(g)     *Entire Agreement*. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, whether written or oral, relating thereto, except as otherwise provided herein with respect to the Restructuring Term Sheet.

The Restructuring Term Sheet is incorporated by reference herein and forms an integral part of this Agreement; *provided* that in the event of any conflict or inconsistency between this Agreement and the Restructuring Term Sheet, the Restructuring Term Sheet shall govern and control.

(h)     *No Third-Party Beneficiaries*. Except as expressly set forth herein (including with respect to the Non-Debtor Affiliates and their Related Parties), this Agreement is intended solely for the benefit of the Parties and their permitted successors and assigns and shall not confer any rights or remedies upon any other person or entity.

16

(i)    *Specific Performance*. The Parties agree that irreparable harm would occur in the event of a breach of this Agreement and that the Parties shall be entitled to seek specific performance and other equitable relief, without the need to post a bond.

(j)    *Notices*. All notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed given if delivered by email, courier, or registered or certified mail to the addresses set forth on **Exhibit C** (or such other address as a Party may designate by written notice, including by execution of the Joinder Agreement). Notices delivered by email shall be effective when sent, so long as no bounce-back or similar error message is received by the sender; provided that, if sent outside of normal business hours, such notice shall be deemed given on the next business day. Notices delivered by courier or mail shall be effective upon receipt.

(k)    *Severability*. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

(l)    *Rules of Construction*. The Company and the Supporting Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

(m)    *Headings*. The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

(n)    *Effectiveness*. This Agreement shall become effective and binding (i) as to the Company, the Emprise Supporting Parties, the Talc Claimants' Representatives, and the Future Claimants' Representative, upon the Execution Date, and (ii) as to any additional law firm representing holders of Talc Personal Injury Claims that enters into a Joinder Agreement, upon the delivery to the Company of such executed and validly-completed Joinder Agreement.

*[Remainder of page intentionally left blank; signature pages follow]*

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement on the day and year first above written.

**VI-JON, LLC**

By: _____

Name:    MacKenzie Shea

Title:    Chief Restructuring Officer

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement on the day and year first above written.

**VI-JON, LLC**

By: _____

Name:   Mackenzie Shea

Title:    Chief Restructuring Officer

**EMPRISE GROUP, INC.**

By: _____

Name:   Gregory Billhartz

Title:    President and Chief Strategy Officer

**EMPRISE HPC, LLC**

By: _____

Name:   Gregory Billhartz

Title:    President

19

**TALC CLAIMANTS' REPRESENTATIVES**

DEAN OMAR BRANHAM SHIRLEY, LLP, on
behalf of its clients holding Talc Personal Injury
Claims against the Company

By:    _____

Name:   Trey Branham
       _____

Title:   Partner
       _____

**TALC CLAIMANTS' REPRESENTATIVES**

THE GORI LAW FIRM, on behalf of its clients
holding Talc Personal Injury Claims against the
Company

By: _Christopher Guinn_

Name: Christopher Guinn

Title: Attorney

21

22

**TALC CLAIMANTS' REPRESENTATIVES**

KARST & VON OISTE LLP, on behalf of its
clients holding Talc Personal Injury Claims against
the Company

By:   _____
          *Erik Karst*
          85157690C9C64FA...

Name:  Erik Karst
      _____

Title:  Mr.
     _____

**TALC CLAIMANTS' REPRESENTATIVES**

MAUNE RAICHLE HARTLEY FRENCH &
MUDD, LLC, on behalf of its clients holding Talc
Personal Injury Claims against the Company

By:     _Clay Thompson_____

Name:   Clay Thompson
        _____

Title:  Partner
        _____

**TALC CLAIMANTS' REPRESENTATIVES**

MEIROWITZ & WASSERBERG, LLP, on behalf
of its clients holding Talc Personal Injury Claims
against the Company

By: _Justine Delaney_____

Name: Justine Delaney_____

Title: Attorney_____

**TALC CLAIMANTS' REPRESENTATIVES**

SIMON GREENSTONE PANATIER, PC, on behalf of its clients holding Talc Personal Injury Claims against the Company

By: _Leah Kagan_____

Name: Leah Kagan

Title: Shareholder

25

**TALC CLAIMANTS' REPRESENTATIVES**

SIMMONS HANLY CONROY LLP, on behalf of
its clients holding Talc Personal Injury Claims
against the Company

By: _____

Name: Lisa Busch
_____

Title: Partner
_____

26

**TALC CLAIMANTS' REPRESENTATIVES**

SWMW LAW, on behalf of its clients holding Talc
Personal Injury Claims against the Company

By: _Lauren Williams_____

Name: _Lauren Williams_____

Title: _Member_____

**THE HON. SHELLEY C. CHAPMAN (RET.), IN HER
CAPACITY AS FUTURE CLAIMANTS' REPRESENTATIVE**

By: _Shelley C. Chapman_____

Name: The Honorable Shelley C. Chapman, in her
capacity as legal representative for future claimants

28

**Exhibit A**

**Joinder Agreement**

This JOINDER AGREEMENT (this "Joinder Agreement") to the Restructuring Support Agreement, dated as of July 30, 2026 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Agreement"), between the Company, the Emprise Supporting Parties, the Talc Claimants' Representatives, and the Future Claimants' Representative, each as defined in the Agreement, is executed and delivered by _____ (the "Joining Party") as of [●], 2026.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.      Agreement to be Bound. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **Annex I** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof).

2.      Effectiveness. Upon (i) delivery of a signature page for this Joinder Agreement and (ii) written acknowledgement by the Company, the Joining Party shall hereafter be deemed to be a "Party" and a "Talc Claimants' Representative" for all purposes under the Agreement.

3.      Covenants; Representations and Warranties. Without limiting the foregoing, the Joining Party hereby affirms its obligations, covenants, representations, and warranties under the Agreement, including its commitments as a Supporting Party set forth in Sections 5 and 6 of the Agreement, its commitments as a Talc Claimants' Representative set forth in Section 7 of the Agreement, and its representations and warranties set forth in Section 13 of the Agreement, to each other Party to the Agreement.

4.      Notices.  For the purposes of providing notice pursuant to Section 14(j) of the Agreement, the Joining Party shall have the following addresses:

> **[Joining Party]**
> [●]
> Attention: [●]
> Email: [●]

5.      Governing Law and Jury Trial Waiver.  This Joinder Agreement shall be governed by and construed in accordance with the laws of the state of New York, without reference to conflict of laws principles.  Each party hereto hereby waives its respective rights to a jury trial in any action or proceeding arising out of or relating to this Joinder Agreement, the Agreement, the Restructuring Transactions, or any other related matter.

*[Remainder of page intentionally left blank; signature pages follow]*

**JOINING PARTY,** on behalf of its clients holding
Talc Personal Injury Claims against the Company:

_____

By:      _____

Name:    _____

Title:     _____

Date:     _____

**Annex I**

**Restructuring Support Agreement**

**<u>Exhibit B</u>**

**Restructuring Term Sheet**

**THIS PLAN TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS PLAN TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## *PLAN TERM SHEET*

### INTRODUCTION

This Plan Term Sheet describes the principal terms of the proposed chapter 11 plan of Vi-Jon, LLC ("Vi-Jon" or the "Debtor") which will file a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 2, 2026 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court" and the Debtor's case therein, the "Bankruptcy Case"). The regulatory, corporate, tax, accounting, and other legal and financial matters related to the restructuring transactions set forth herein have not been fully evaluated, and any such evaluation may affect the terms and structure of any such restructuring transactions. This Plan Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Plan Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

This Plan Term Sheet does not include a description of all of the terms, conditions, and other provisions that will be contained in the definitive documents governing the restructuring transactions, which remain subject to negotiation and finalization. The Plan (as defined below) will not contain any material terms or conditions that are inconsistent in any material respect with this Plan Term Sheet. This Plan Term Sheet incorporates the rules of construction as set forth in section 102 of the Bankruptcy Code.

| GENERAL PROVISIONS | |
|---|---|
| **Overview and Means of Implementation** | The Parties agree to the material terms set forth herein and the transactions set forth herein, which are intended to deliver complete finality to Vi-Jon, Emprise, and the other Non-Debtor Affiliates and each of their Related Parties (each as defined below). |
| | The restructuring transaction will be consummated through the confirmation and consummation of a chapter 11 plan which shall have terms consistent with this Plan Term Sheet (as amended, modified, or supplemented, the "Plan"),[1] and such Plan shall incorporate the terms of a global settlement agreement (the "Global Settlement") by and among Vi-Jon, Vi-Jon's parent, Emprise Group, Inc. ("Emprise"), Emprise's non-debtor affiliates, (collectively with Emprise, the "Non-Debtor Affiliates")[2], the Talc |

---

[1]   For the avoidance of doubt, the Plan, the Global Settlement, and any and all Plan supplements, exhibits, appendices, or attachments must be (i) consistent with this Plan Term Sheet, and (ii) in form and substance acceptable to the Parties (as defined herein).

[2]   For purposes of this Plan Term Sheet, the Non-Debtor Affiliates include: Emprise Group, Inc.; Emprise HPC, LLC; VH Investment Group, LLC; VH Finance, LLC; Vivos Holdings, LLC; Nice-Pak Products, LLC; INSPR Labs, LLC; UpLift Brands, LLC; Nice-Pak International Limited; Nice-Pak Deutschland GmbH; Emprise Group

| | |
|---|---|
| **GENERAL PROVISIONS** | |
| | Claimants' Representatives (defined below), and the Future Claimants' Representative (defined below) (collectively, the "Parties").<br><br>On the Effective Date (as used herein, the "Effective Date" means the date on which all conditions precedent to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof, including that the confirmation order entered by the Bankruptcy Court (the "Confirmation Order") has become Final),[3] the Plan, which shall incorporate the terms of the Global Settlement, (a) shall effectuate a global resolution of all talc-related claims against the Debtor, the Non-Debtor Affiliates and each of their Related Parties[4] (to the fullest extent available under applicable law), through the issuance of a channeling injunction pursuant to section 524(g) of the Bankruptcy Code that directs such claims exclusively to a trust, and (b) shall resolve any and all estate causes of action against the Non-Debtor Affiliates and their Related Parties.<br><br>The releases, injunctions, and other protections necessary to deliver complete finality to the Non-Debtor Affiliates and their Related Parties shall include (i) general releases from the Debtor in favor of the Non-Debtor Affiliates and their Related Parties, (ii) indemnity from the Talc Personal Injury Trust in favor of the Non-Debtor Affiliates and their Related Parties to indemnify, and hold harmless the Non-Debtor Affiliates and their Related Parties from and against any Talc Personal Injury Claims, and (iii) a prohibition on any Talc Personal Injury Trust distribution (payment) to an individual holding a Talc Personal Injury Claim (such individual, a "Claimant") against the Debtor absent the Trust's receipt from that Claimant of a written general release in a form acceptable to the Non-Debtor Affiliates and each of their respective Related Parties, providing for the Claimant's release of the Non-Debtor Affiliates and their Related Parties under the Plan and the Global Settlement embodied therein. The releases, injunctions, and other protections in the Plan granted to the Non-Debtor Affiliates and their Related Parties shall be in exchange for the monetary contribution in the amount set forth herein and the other non-monetary contributions described herein provided by the Non-Debtor Affiliates and their Related Parties.<br><br><br>The Plan will channel, pursuant to section 524(g) of the Bankruptcy Code, all direct and indirect talc-related claims or demands (the "Talc Personal Injury Claims") against the Debtor, the Non-Debtor Affiliates and their Related Parties to a post-confirmation trust (the "Talc Personal Injury |

---

Charitable Foundation; and any other current or former affiliates of Emprise other than the Debtor and all former affiliates and predecessors of the Debtor, and their respective successors and assigns.

[3] The Confirmation Order shall become "Final" when the time to appeal or seek review, rehearing, or writ of certiorari with respect to such order has expired without any appeal having been taken, and no stay with respect to such order is then in effect.

[4] "Related Parties" shall include at the least each party's respective current and former officers, directors (or similar), shareholders, lenders, employees, professionals (including, but not limited to, attorneys, financial advisors, and investment bankers), agents, and consultants, and the assignees, predecessors, and successors of any of the foregoing.

| **GENERAL PROVISIONS** |
| --- |

Trust"). The Plan shall provide for the establishment of the Talc Personal Injury Trust in accordance with section 524(g) of the Bankruptcy Code. The Talc Personal Injury Trust shall assume all direct and indirect talc-related liabilities of the Debtor, the Non-Debtor Affiliates, and their Related Parties pursuant to section 524(g) of the Bankruptcy Code and shall be funded as described below. The Talc Personal Injury Trust shall be governed by trust distribution procedures (the "TDP").

The Talc Personal Injury Trust will be funded on the Effective Date by the "Trust Assets," which shall comprise:

1) $25 million guaranteed contribution from Emprise and/or its affiliates (the "Emprise Effective Date Cash Trust Contribution"), (which shall not be reduced on account of professional fees or other obligations) in exchange for releases of any and all claims and causes of action that the Debtor may hold against the Non-Debtor Affiliates or any of their Related Parties, including any and all claims and causes of action arising out of the transactions consummated on or about December 28, 2023, by and among the Debtor, Emprise and/or certain of their respective affiliates, together with all agreements, instruments, and other documents entered into in connection therewith and all transactions contemplated thereby (collectively, the "2023 Transaction") and any and all other estate claims and causes of action and protection under a channeling injunction under section 524(g) of the Bankruptcy Code as set forth in the Plan acceptable to the Parties;

2) the $1 million Debtor Promissory Note (as defined below);

3) the Assigned Causes of Action (as defined below);

4) assignment of the Debtor's rights, claims, benefits, or causes of action that the Debtor or the Reorganized Debtor[5] has, or may have in the future, with respect to any applicable talc insurance policies (the "Talc Insurance Policies");[6]

5) a contribution by Emprise and the other Non-Debtor Affiliates of their respective rights under and related to the Talc Insurance Policies;

6) a contribution of the proceeds of the Real Estate Transaction (as defined below), net of broker's commissions and other reasonable and documented costs of sale, it being understood that the Parties intend the Real Estate Transaction to qualify for the exemption from stamp, transfer, and similar taxes under section 1146(a) of the

---

[5]   "Reorganized Debtor" means the Debtor as it exists after the Effective Date.

[6]   "Talc Insurance Policies" shall mean any known or unknown commercial general liability or products liability insurance policy in effect at any time on or before the Effective Date that provides, or may potentially provide, coverage to the Debtor for Talc Personal Injury Claims or Claims related to Talc Personal Injury Claims; *provided* that any type of policy other than commercial general liability or products liability policies (including, without limitation, any director and officer liability policies, property and casualty policies and crime insurance policies) shall not constitute Talc Insurance Policies for any purposes under the Plan.

3

| | |
|---|---|
| **GENERAL PROVISIONS** | |
| | Bankruptcy Code, and a waiver by the Non-Debtor Affiliates of any liens on the Debtor's real property or on the sale proceeds; and |
| | 7)  an obligation to pay a $20 million settlement fee (the "Settlement Fee") payable by Emprise only upon a sale or merger of Emprise at an enterprise value at or above $1 billion, equal to 50% of the first $40 million of gross consideration above $1 billion of such sale or merger transaction.  The Talc Personal Injury Trust shall have consultation rights regarding computation of the Settlement Fee, including receiving sufficient information to assess the enterprise value calculation. |
| | The Plan must receive acceptance by at least 75% in number of the Talc Personal Injury Claimants. |
| | The Plan and ballots soliciting votes on the Plan shall contain an "opt out" (or, if an "opt out release" is not permitted by the Bankruptcy Court, an "opt in") with respect to releases of all talc-related claims and causes of action against the Non-Debtor Affiliates and their Related Parties.  All Consenting Talc Personal Injury Claimants will agree to vote in favor of the Plan and to not opt out of (or, if an "opt in" is used, to opt into) such third party releases. |
| **Settlement of Estate Causes of Action** | Any settlement of estate causes of action against the Non-Debtor Affiliates or any of their Related Parties pursuant to the Global Settlement (the "Estate Claims Settlement") shall be incorporated into the Plan. The Plan shall be deemed a motion to approve the Estate Claims Settlement pursuant to the Bankruptcy Code and the Bankruptcy Rules, and the entry of an order confirming the Plan shall constitute the Bankruptcy Court's approval of the Estate Claims Settlement under section 1123 of the Bankruptcy Code and the applicable Bankruptcy Rules. |
| **Sale Transaction** | The transfer of a material set of the Debtor's assets (to be listed or scheduled on a Plan Supplement) consummated under the Plan pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to: Emprise HPC, LLC, another Non-Debtor Affiliate or their designee in exchange for the monetary contributions in the amount set forth herein and the other non-monetary contributions described herein provided by the Non-Debtor Affiliates and their Related Parties. |

| GENERAL PROVISIONS | |
|---|---|
| **Real Estate Transaction** | The sale of the Debtor's real property consummated during the Chapter 11 Case pursuant to section 363 of the Bankruptcy Code or under the Plan pursuant to section 1123(a)(5)(D) of the Bankruptcy Code as approved by the Court.  The Talc Claimants' Representatives or Official Committee of Unsecured Creditors (as the case may be), the pre-petition Future Claimants' Representative or the Future Claimants' Representative (as the case may be), and Emprise shall have consent rights in connection with any Real Estate Transaction.  The Debtor shall use all commercially reasonable efforts to consummate the Real Estate Transaction.  If the Real Estate Transaction is not consummated or if requisite consent is withheld then, at the election of the Talc Claimants' Representatives or Official Committee of Unsecured Creditors (as the case may be), the Debtor shall contribute the real property to the Talc Personal Injury Trust. |
| **Plan Proponents** | The Plan will be proposed by the Debtor, with the support of Emprise.  The Official Committee of Unsecured Creditors and the Future Claimants' Representative shall each be a plan proponent.  The law firms representing holders of Talc Personal Injury Claims who have agreed to this Plan Term Sheet (the "Talc Claimants' Representatives") shall agree to support the Plan and recommend that their respective clients holding claims against the Debtor agree to vote in favor of the Plan and to not opt out of (or, if an "opt in" is used, to opt into) the third-party releases, and, to the extent such clients have granted the Talc Claimants' Representatives or the law firm representing such holder a specific power of attorney granting authority to vote on a bankruptcy plan on their behalf, the Talc Claimants' Representatives or the law firm representing such holder shall exercise such power of attorney to vote in favor of the Plan and to not opt out of (or, if an "opt in" is used, to opt into) the third-party releases.  The Plan shall be consistent in all material respects with the terms of this Plan Term Sheet. |
| **Tax Considerations** | Subject to the terms of this Plan Term Sheet, the Debtor, Emprise, the Talc Claimants' Representatives, and the Future Claimants' Representative will cooperate in good faith and will use commercially reasonable efforts to structure and implement the transactions contemplated in the Plan in a tax-efficient and cost-effective manner reasonably acceptable to the Debtor and Emprise. |
| **Plan Contribution** | To fund the administration of the Bankruptcy Case and to implement the Plan and the settlements embodied therein, on the Effective Date, Emprise and/or its affiliates shall contribute $32 million (the "Emprise Effective Date Cash Contribution"), $25 million of which shall fund the Emprise Effective Date Cash Trust Contribution, and the remaining $7 million to be funded and used in accordance with the Budget. |

| **GENERAL PROVISIONS** | |
|---|---|
| **Automatic Stay Extension** | On or after the Petition Date, the Debtor may file, and the Talc Claimants' Representatives and the pre-petition Future Claimants' Representative will not oppose, an adversary proceeding seeking a preliminary injunction (and corresponding TRO) extending the automatic stay to the Non-Debtor Affiliates and each of their respective Related Parties, and enjoining the assertion, commencement, continuation, or prosecution of any Talc Personal Injury Claim against the Non-Debtor Affiliates and each of their respective Related Parties in any jurisdiction pending the Effective Date, in each case consistent in scope with the channeling injunction described herein, applicable law, this Plan Term Sheet, and Restructuring Support Agreement. |
| | Except with the consent of the Talc Claimants' Representatives, Official Committee of Unsecured Creditors, or Talc Personal Injury Trust (as the case may be) and the pre-petition Future Claimants' Representative or the Future Claimants' Representative (as the case may be) (in each case, such consent not to be unreasonably withheld, conditioned, or delayed), neither the Debtor nor Emprise will (a) enter into any settlement in the Bankruptcy Case with, nor support any relief in the Bankruptcy Case for any of their respective customers or retailers, including any attempt to extend the automatic stay or otherwise enjoin any Talc Personal Injury Claims against any such entity or (b) seek to remove, or support any request by any entity to remove, any Talc Personal Injury Claims against any such entity to the U.S. District Court for the District of Delaware or any other federal court. Notwithstanding the foregoing, nothing herein shall prohibit the Debtor, Emprise, or any other Non-Debtor Affiliate from negotiating, entering into, or performing commercial arrangements or accommodations with any customer or retailer, including with respect to indemnification or contribution claims asserted by any such customer or retailer; provided that no such arrangement or accommodation (A) effects a settlement of, or provides for any release or channeling of, any Talc Personal Injury Claim against any such customer or retailer, or (B) extends the automatic stay to, or otherwise enjoins any Talc Personal Injury Claim against, any such customer or retailer, without the consent of the Talc Claimants' Representatives or the Official Committee of Unsecured Creditors (as the case may be) and the pre-petition Future Claimants' Representative or the Future Claimants' Representative (as the case may be). |
| **Allocation** | The Talc Personal Injury Trust shall be allocated in accordance with the TDP, which shall be drafted in the first instance by the Talc Claimants' Representatives or Official Committee of Unsecured Creditors (as the case may be), in consultation with the Future Claimants Representative, and which shall be reasonably acceptable to the Debtor and Emprise. |

| OTHER MATERIAL PROVISIONS | |
|---|---|
| **Plan Treatment of Talc Personal Injury Claims** | As of the Effective Date, all Talc Personal Injury Claims shall automatically and, without further act, deed, or court order, be channeled exclusively to the Talc Personal Injury Trust, and all of the Debtor's, the Non-Debtor Affiliates', each of their Related Parties' liability for such claims shall be incurred in full and assumed by the Talc Personal Injury Trust to the fullest extent permissible under section 524(g) of the Bankruptcy Code.  Each holder of an allowed Talc Personal Injury Claim shall be entitled to receive compensation from the Talc Personal Injury Trust in accordance with the Plan and TDP.  Pursuant to the Plan, the sole recourse of any holder of a Talc Personal Injury Claim on account of its Talc Personal Injury Claim shall be to the Talc Personal Injury Trust. |
| | The Debtor shall not seek a bar date for any direct Talc Personal Injury Claims without the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Talc Claimants' Representatives or Official Committee of Unsecured Creditors (as the case may be) and the pre-petition Future Claimants' Representative or the Future Claimants' Representative (as the case may be). |
| **Channeling Injunction** | The Plan shall include a channeling injunction (in form and substance acceptable to the Non-Debtor Affiliates), issued pursuant to section 524(g) of the Bankruptcy Code, which shall permanently enjoin the assertion of talc-related claims against the Debtor, the Non-Debtor Affiliates, and each of their respective Related Parties in any jurisdiction and channel such claims exclusively to the Talc Personal Injury Trust.  As of the Effective Date, the Talc Personal Injury Trust will be the sole avenue for Talc Personal Injury Claimants to recover, and no claims may be asserted against the Debtor, the Reorganized Debtor, the Non-Debtor Affiliates, and any of the foregoing's Related Parties, and all present and future holders of Talc Personal Injury Claims shall be permanently enjoined and forever stayed, restrained, barred, and enjoined from taking any actions for the purpose of directly, indirectly, or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Talc Personal Injury Claim other than from the Talc Personal Injury Trust pursuant to the Trust Agreement and the TDP. |
| **Debtor Promissory Note** | The Reorganized Debtor (subject to further discussion) shall issue a promissory note to the Talc Personal Injury Trust on the Effective Date in the stated principal amount of $1,000,000 (the "Debtor Promissory Note"), which will have a maturity date of six (6) months following the Effective Date.  The Debtor Promissory Note will be non-interest bearing and will be prepayable at any time without prepayment premium or penalty. |
| | The Debtor Promissory Note will be secured by a non-recourse first-priority lien on 50.1% of the equity interests in the Reorganized Debtor granted to the Talc Personal Injury Trust pursuant to a customary pledge agreement (the "Pledge").  The Pledge and lien will terminate upon the payment in full of the Debtor Promissory Note.  In the event the Reorganized Debtor defaults on the Debtor Promissory Note, the Talc Personal Injury Trust may, upon written notice to the Reorganized Debtor, foreclose on the Pledge. |

7

| **OTHER MATERIAL PROVISIONS** | |
|---|---|
| **Insurance Rights** | The Plan shall provide for the assignment of the Debtor's rights, claims, benefits, or causes of action that the Debtor or the Reorganized Debtor has, or may have in the future, with respect to any Talc Insurance Policies to the Talc Personal Injury Trust.  The Talc Personal Injury Trust shall have the right to pursue recoveries under such applicable policies, and the channeling injunction shall be structured to preserve and maximize the value of such insurance rights. |
| | An adversary proceeding seeking a declaratory judgment with respect to coverage disputes between the Debtor and its insurers shall not be commenced absent the reasonable consent of Emprise (solely with respect to any such adversary proceeding commenced prior to the Effective Date) and the Talc Claimants' Representatives, Official Committee of Unsecured Creditors, or Talc Personal Injury Trust (as the case may be) and the pre-petition Future Claimants' Representative, the Future Claimants' Representative, or the post-confirmation Future Claimants' Representative (as the case may be). |
| **Assigned Causes of Action** | The Plan shall provide for the assignment of any and all causes of action held or that may be asserted by the Debtor or its estate that are not settled, released, waived, abandoned, or otherwise finally resolved under the Plan (or by separate order of the Bankruptcy Court) as of the Effective Date that: (1) relate to or arise out of the Talc Insurance Policies to the fullest extent that such rights are related to coverage for Talc Personal Injury Claims; (2) relate to or arise out of any Talc Personal Injury Claim; (3) relate to or arise out of the series of transactions consummated in 2020 pursuant to which certain shareholders of Vi-Jon sold their equity interests in Vi-Jon to the Vi-Jon Employee Stock Ownership Plan, making Vi-Jon a 100% employee-owned company (the "2020 ESOP Transaction"), but solely against the Excluded Parties (as defined below); (4) constitute or relate to any preference causes of action arising under chapter 5 of the Bankruptcy Code, including section 547 thereof, that remain property of the Debtor or its estate and have not been settled, released, waived, abandoned, or otherwise finally resolved as of the Effective Date (the "Assigned Causes of Action"). |
| | "Excluded Parties" shall only include (a) Berkshire Partners LLC, Berkshire Fund VI Limited Partnership, Berkshire Investors LLC, and Berkshire Investors III LLC, and (b) Brunner-family related entities and individuals. |

8

| **OTHER MATERIAL PROVISIONS** | |
|---|---|
| **Cooperation Agreement** | The Debtor and the Talc Claimants' Representatives or Official Committee of Unsecured Creditors (as the case may be), and the pre-petition Future Claimants' Representative or the Future Claimants' Representative (as the case may be), shall agree to a cooperation agreement to be entered into as of the Effective Date, under which the Reorganized Debtor will maintain, share, transfer, or otherwise make available to the Talc Personal Injury Trust all documents, information, and related privileges that may relate to litigation of Talc Personal Injury Claims, the Assigned Causes of Action and the Insurance Assignment, including the Debtor's business records and correspondence related to talc products and associated talc activities, which shall be in form and substance reasonably acceptable to the Debtor, the Non-Debtor Affiliates (including Emprise), the Official Committee of Unsecured Creditors, and the Future Claimants' Representative. |
| **Releases/Exculpation** | In light of the funding provided by the Non-Debtor Affiliates, including the Emprise Effective Date Cash Contribution and the financing from the Amended Keepwell Agreement, and the contribution of the Non-Debtor Affiliates' respective rights under and related to the Talc Insurance Policies, and the consent to the Debtor's contribution of the Talc Insurance Policies as set forth herein, which would not be available to the Debtor (or Holders of Talc Personal Injury Claims) without the releases and the Global Settlement embodied in the Plan, the Debtor has agreed to fully and finally release the Non-Debtor Affiliates and their Related Parties. |
| | To the maximum extent permitted by law, the Plan will include (1) a Debtor release of all claims the Debtor holds against the Non-Debtor Affiliates and each of their respective Related Parties, as necessary to implement the Global Settlement; (2) customary release and exculpation provisions with respect to the Debtor, the Non-Debtor Affiliates, and each of their respective Related Parties, the Talc Claimants' Representatives (individually and in their role as members of any ad hoc committee or representatives of any member of any official committee), any ad hoc or official committee representing holders of Talc Personal Injury Claims, and pre- or post-petition Future Claimants' Representative (as applicable), and their respective representatives in connection with, among other things, this Plan Term Sheet, the implementation thereof, and the Bankruptcy Case; and (3) execution by claimants of a customary release of claims as a precondition to receiving payment or otherwise recovering from the Talc Personal Injury Trust. The Plan will not release the Debtor's claims or causes of action against the Excluded Parties that relate to or arise out of the 2020 ESOP Transaction. |
| **Official Committee of Unsecured Creditors** | Each of the Talc Claimants' Representatives shall seek to have one or more of their respective clients holding claims against the Debtor to be appointed to the official committee representing unsecured creditors, including holders of Talc Personal Injury Claims (the "Official Committee of Unsecured Creditors"). |

9

| **OTHER MATERIAL PROVISIONS** | |
|---|---|
| **Future Claimants' Representative** | The Debtor has engaged The Hon. Shelley C. Chapman (Ret.) as pre-petition Future Claimants' Representative and shall seek Bankruptcy Court approval to appoint Judge Chapman as the Official Future Claimants' Representative. |
| | The Parties will cooperate in good faith with the Future Claimants' Representative and use commercially reasonable efforts to gain the Future Claimants' Representative's support for the transactions contemplated herein. |
| **Assumption of Executory Contracts** | On the Effective Date, the Reorganized Debtor shall assume and assign to the Non-Debtor Affiliates (or their designees) all executory contracts of the Debtor that are material to the operation of the Debtor's business and designated by Emprise for assumption and assignment, unless otherwise rejected pursuant to the Plan or other order of the Bankruptcy Court.  Emprise shall pay all cure amounts required in connection with such assumption and assignment in accordance with the Budget and to-be-negotiated assumption and assignment procedures. |
| **Treatment of Amended Keepwell Agreement** | Prior to the Petition Date, Emprise HPC and the Debtor will amend the Limited Contribution Agreement, dated December 28, 2023, by and between Emprise HPC, LLC and the Debtor (as amended, the "Amended Keepwell Agreement") to provide that Emprise HPC will promptly make advances in the aggregate amount of the full undrawn capital commitments under the Amended Keepwell Agreement in accordance with a budget, including a cash-flow forecast setting forth all projected cash receipts and cash disbursements on a weekly basis (the "Budget"). |
| | The Debtor will subsequently provide Emprise HPC with an updated budget at the times subject to the Budget Variance Report (as defined below) to be negotiated.  As part of its First Day Motions, the Debtor will file a cash management motion (a "Cash Management Motion") which shall include a request for approval of the Amended Keepwell Agreement in interim and final orders approving the Debtor's use of its cash management system (a "Cash Management Order"); *provided* that such a request shall only be included in the final order if not otherwise approved on a final basis in the interim order. |
| **Preservation of Rights; Fiduciary Duties** | If the Plan is not confirmed or the Effective Date fails to occur for any reason, the rights, remedies, claims, and defenses of all parties hereto and of any other creditors and interest holders of the Debtor are fully preserved. |
| | The Debtor, Official Committee of Unsecured Creditors, and the Official Future Claimants' Representative each reserve their respective rights to take, or refrain from taking, any action to the extent consistent with their respective fiduciary duties. |

| **OTHER MATERIAL PROVISIONS** | |
|---|---|
| **Cost Efficiency** | Each party hereto acknowledges and agrees that the transactions contemplated by this Plan Term Sheet will not be feasible or in the best interests of such parties or the holders of the Talc Personal Injury Claims unless the negotiation, documentation, solicitation, and Chapter 11 processes contemplated herein are undertaken on a cost-efficient basis. Accordingly, the Debtor, Emprise, and the Talc Claimants' Representatives (including as a representative of a member of any official committee appointed in the Bankruptcy Case, as applicable) agree to act in a commercially reasonable manner (including with respect to retention of professionals, negotiation, documentation, and any litigation) so as to minimize the costs incurred by the Debtor and thereby maximize recoveries to Holders of Talc Personal Injury Claims, in all events subject to such parties' exercise of their fiduciary duties, and it being understood that a solicitation process similar to the protections in Miyoshi America shall be considered to be commercially reasonable. |
| **Professional Fees** | The professionals of the Company, the Official Committee of Unsecured Creditors, and the Future Claimants' Representative shall each be subject to a budget and an agreed-upon aggregate cap on fees to be incurred and allowed during the Chapter 11 Case, which is reflected in the Budget as may be amended from time to time with the consent of Emprise. Prior to the Petition Date, the Debtor shall be required to satisfy any outstanding reasonable retainer requests from professionals related to this Term Sheet. |
| **Solicitation Documents and Voting** | Following this Plan Term Sheet becoming effective, the parties shall expeditiously negotiate in good faith as to the form and substance of the Plan, Disclosure Statement, Voting and Solicitation Procedures, Trust Agreement, and TDP (collectively, the "Solicitation Documentation"), which shall each be consistent with this Plan Term Sheet. <br><br> Initial drafts of the Plan, Disclosure Statement, and the Voting and Solicitation Procedures shall be prepared and circulated by the Debtor. <br><br> Initial drafts of the Trust Agreement and TDP shall be prepared and circulated by the Talc Claimants' Representatives or Official Committee of Unsecured Creditors (as the case may be), in consultation with the pre-petition Future Claimants' Representative or the Future Claimants' Representative (as the case may be). |
| **First Day Motions** | The Debtor shall prepare customary first-day motions for filing substantially contemporaneously with the filing of its voluntary Chapter 11 petition. The Talc Claimants' Representatives and the pre-petition Future Claimants' Representative shall have consultation rights in connection with the first-day motions. |
| **Effectiveness** | This Plan Term Sheet shall not be effective and binding against any party hereto until Talc Claimants Representatives certifying that they represent at least 75% of known, filed, and pending Talc Personal Injury Claims against the Debtor have executed this Plan Term Sheet. |

11

| **OTHER MATERIAL PROVISIONS** | |
|---|---|
| **Termination** | This Plan Term Sheet and any obligations and agreements thereunder shall terminate upon the Debtor's failure to file a Chapter 11 petition for reorganization by August 9, 2026, the Debtor's filing of a voluntary petition under chapter 7 of the Bankruptcy Code, or the dismissal or conversion of the Debtor's Chapter 11 case. |

| Plan Funding | |
|---|---|
| **Availability** | The Debtor will draw on undrawn capital commitments under the Amended Keepwell Agreement to fund the administration of the Bankruptcy Case (subject to entry of the interim Cash Management Order).  Monies available under the Amended Keepwell Agreement shall not be subject to repayment. |
| | Emprise HPC has further committed to provide funding as follows, in each case in accordance with the Budget: (i) the remaining undrawn capital commitments under the Amended Keepwell Agreement in an aggregate amount of approximately $8.1 million, to be funded following entry of the Interim Cash Management Order; and (ii) an aggregate amount of approximately $32 million to be funded on the Effective Date of the Acceptable Plan and the satisfaction or waiver of all applicable conditions precedent in the Acceptable Plan. |
| | Subject to the entry by the Bankruptcy Court of the Final Confirmation Order, in form and substance acceptable to Emprise and the Debtor and satisfaction by the Debtor of the conditions precedent to be negotiated between the Debtor and Emprise (including compliance with the Milestones (defined below)), Emprise shall contribute to the Debtor $7 million to fund the final costs of administration of the bankruptcy case in accordance with the budget and  $25 million to fund the Emprise Effective Date Cash Trust Contribution, in each case as part of, and not in addition to, the approximately $32 million referenced in the immediately preceding paragraph, subject to the terms and conditions of the Acceptable Plan. The funding of the Emprise Effective Date Cash Trust Contribution shall be a condition precedent to the occurrence of the Effective Date of the Acceptable Plan. |
| **Budget** | The Debtor and Emprise shall agree to an initial budget, including a cash-flow forecast setting forth all projected cash receipts and cash disbursements on a weekly basis (the "Initial Budget"). |
| | "Budget Variance Report" means a variance report to be delivered to Emprise, the Official Committee of Unsecured Creditors, and the Future Claimants' Representative on a weekly basis setting forth (i) the actual amount of non-operating expenditures of the Debtor (including all professional fees incurred related to or arising out of the Bankruptcy Case) compared to the projected amounts allocated for the same in the Budget, and (ii) an explanation, in reasonable detail, for any material variance from the Budget, certified by the chief restructuring officer of the Debtor. |
| **Milestones:** | The Debtor shall achieve the following milestones (the "Milestones"), each of which may be extended at any time only with the prior written approval of Emprise  (with email from counsel to Emprise being sufficient): |
| | **Keepwell Agreement:** |
| | <ul><li>No later than one (1) day after the Petition Date, the Debtor shall have filed the Cash Management Motion which shall include a request for approval of the Amended Keepwell Agreement on a final basis, which motion shall be in form and substance acceptable to Emprise.</li><li>No later than three (3) business days after the Petition Date, the interim Cash Management Order shall be entered by the Bankruptcy Court, which interim Cash Management Order shall be in form and substance acceptable to Emprise.</li></ul> |

13

| | |
|---|---|
| **Plan Funding** | |
| | • No later than thirty-five (35) days of the Petition Date, the Bankruptcy Court shall have entered the final Cash Management Order, which final Cash Management Order shall be in form and substance acceptable to Emprise in its sole and absolute discretion.<br><br>**Plan of Reorganization:**<br><br>• No later than thirty (30) days after the Petition Date, the Debtor shall have filed with the Bankruptcy Court an Acceptable Plan and disclosure statement in form and substance acceptable to Emprise.<br><br>• No later than seventy (70) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the disclosure statement in form and substance reasonably acceptable to Emprise.<br><br>• No later than seventy-five (75) days after the Petition Date, the Debtor shall have commenced solicitation on the Acceptable Plan.<br><br>• No later than one hundred ten (110) days after the Petition Date, the Bankruptcy Court shall have entered an order confirming the Acceptable Plan (including approval of the Sale Transaction) in form and substance reasonably acceptable to Emprise<br><br>• No later than one hundred twenty (120) days after the Petition Date, the Plan shall have been consummated. |
| **Acceptable Plan** | "Acceptable Plan" shall mean a plan of reorganization for the Bankruptcy Case, in form and substance acceptable to the Parties, materially consistent in all material respects with the Restructuring Term Sheet and the Restructuring Support Agreement, which incorporates the Global Settlement and the other terms of this Restructuring Term Sheet. |

14

**Exhibit C**

**Notice Information**

**Company**

Vi-Jon, LLC
Mackenzie Shea, Chief Restructuring Officer
c/o BRG
225 Franklin Street
Suite 3100
Boston, MA 02110
Attention: Mackenzie Shea, Chief Restructuring Officer
Email: MShea@thinkbrg.com


With a copy (which shall not constitute notice) to:

Sidley Austin LLP
787 Seventh Ave
New York, NY 10019
Attention: Thomas R. Califano, William E. Curtin, & Anne G. Wallice
Email:  tom.califano@sidley.com
        wcurtin@sidley.com
        anne.wallice@sidley.com


**Emprise Supporting Parties**

8800 Page Avenue
St. Louis, MO 63144
Attention: Greg Billhartz, President
Email: gbillhartz@emprisegroup.com

With a copy (which shall not constitute notice) to:

Bryan Cave Leighton Paisner LLP
One Metropolitan Square, 211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Attn.: Laurence Frazen and Bart Wall
Email:  larry.frazen@bclplaw.com
        bart.wall@bclplaw.com

-and-

161 N. Clark Street, Suite 4300
Chicago, Illinois 60601
Attn: Justin Winerman
Email: justin.winerman@bclplaw.com

**Talc Claimants' Representatives**

Kevin M. Davis
Caplin & Drysdale, Chartered
1200 New Hampshire Avenue NW
8th Floor
Washington, DC 20036

**Future Claimants' Representative**

Shelley C. Chapman
c/o Willkie Farr & Gallagher LLP
787 Seventh Ave
New York, NY 10019-6099
Email: schapman@willkie.com

With a copy (which shall not constitute notice) to:

Willkie Farr & Gallagher LLP
787 Seventh Ave
New York, NY 10019-6099
Attention: Jamie Eisen and Gabrielle Antonello
Email: jeisen@willkie.com and gantonello@willkie.com