**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>VI-JON, LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11216 (MFW) |

**AMENDED CHAPTER 11 PLAN OF REORGANIZATION**
**OF VI-JON, LLC**

Dated: September 30, 2026

**SIDLEY AUSTIN LLP**
Thomas R. Califano (admitted *pro hac vice*)
William E. Curtin (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
E-mail: tom.califano@sidley.com
wcurtin@sidley.com
anne.wallice@sidley.com

*Co-Counsel to the Debtor*
*and Debtor in Possession*

**MORRIS JAMES LLP**
Eric J. Monzo (DE Bar No. 5214)
Jason S. Levin (DE Bar No. 6434)
Samantha L. Rodriguez (DE Bar No. 7524)
3205 Avenue North Boulevard, Suite 100
Wilmington, Delaware 19803
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
jlevin@morrisjames.com
srodriguez@morrisjames.com

*Co-Counsel to the Debtor*
*and Debtor in Possession*

[1] The Debtor in this Chapter 11 Case is Vi-Jon, LLC. The last four digits of the Debtor's federal tax identification number are 8002. The Debtor's service address is 8800 Page Ave., St. Louis, MO 63114.

# TABLE OF CONTENTS


ARTICLE I. DEFINITIONS AND RULES OF INTERPRETATION ........ 1

A. Definitions ........ 1

B. Rules of Interpretation ........ 22

C. Computation of Time ........ 22

D. Reference to Monetary Figures ........ 23

E. Controlling Document ........ 23

ARTICLE II. GENERAL ADMINISTRATIVE EXPENSE CLAIMS, SHARED SERVICES CLAIMS, PROFESSIONAL CLAIMS, AND PRIORITY TAX CLAIMS ........ 23

A. General Administrative Expense Claims; Shared Services Claims ........ 23

B. Professional Claims ........ 24

1. Final Fee Applications and Payment of Professional Claims ........ 24

2. Professional Claim Reserve Account ........ 25

3. Post-Confirmation Date Fees and Expenses ........ 25

C. Priority Tax Claims ........ 26

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........ 26

A. Classification of Claims and Interests ........ 26

B. Treatment of Claims and Interests ........ 27

1. Class 1 – Other Secured Claims ........ 27

2. Class 2 – Other Priority Claims ........ 28

3. Class 3 – General Unsecured Claims ........ 28

4. Class 4 – Talc Personal Injury Claims ........ 28

5. Class 5 – Intercompany Claims ........ 29

6. Class 6 – Section 510(b) Claims ........ 29

7. Class 7 – Existing Equity Interests ........ 30

C. Special Provision Governing Unimpaired and Reinstated Claims ........ 30

D. Elimination of Vacant Classes ........ 30

E. Acceptance or Rejection of the Plan ........ 30

1. Acceptance or Rejection of the Plan ........ 30

2. Voting Classes and Class Acceptance Requirements ........ 30

3. Issuance of the Talc Personal Injury Channeling Injunction Pursuant to Section 524(g) of the Bankruptcy Code ........ 31

F. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ........ 31

G. Subordination of Claims ........ 31

H. Insurance .......... 31
ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .......... 32
A. Settlement of Claims and Interests .......... 32
B. Establishment and Contributions to the Talc Personal Injury Trust .......... 32
1. Timing of Effective Date Transactions .......... 32
2. Emprise Effective Date Cash Trust Contribution .......... 33
3. Vi-Jon Promissory Note and Pledge and Security Agreement .......... 33
4. Assigned Causes of Action .......... 33
5. Debtor's Rights in Talc Insurance Policies .......... 34
6. Non-Debtor Affiliates' Rights under Talc Insurance Policies .......... 34
7. Real Estate Transaction .......... 34
8. Settlement Fee Obligation .......... 34
C. Transfer of the Transferred Assets and Sale of the Etzel Property .......... 35
1. Transfer of the Transferred Assets to Non-Debtor Affiliate(s) .......... 35
2. Sale of the Etzel Property .......... 35
D. Talc Personal Injury Trust .......... 35
1. Creation of the Talc Personal Injury Trust .......... 35
2. Purpose of the Talc Personal Injury Trust .......... 35
3. Talc Personal Injury Trust Assets .......... 36
4. Appointment of Talc Personal Injury Trustee .......... 36
5. Delaware Trustee .......... 37
6. Appointment of Post-Effective Date Future Claimants' Representative .......... 37
7. Appointment of Talc Personal Injury Trust Advisory Committee Members .......... 37
8. Transfer of Claims and Demands to the Talc Personal Injury Trust .......... 37
9. Transfer of Rights and Defenses Related to Talc Personal Injury Claims .......... 38
10. Talc Personal Injury Claimant Release .......... 38
11. Talc Personal Injury Claims Asserted Against the Reorganized Debtor Post-Effective Date in Violation of the Talc Personal Injury Channeling Injunction .......... 39
12. Consideration for Talc Personal Injury Channeling Injunction .......... 39
13. Termination of Emprise Contribution .......... 39
14. Institution and Maintenance of Legal and Other Proceedings .......... 39
15. Talc Personal Injury Trust Expenses .......... 39
E. Cooperation; Privilege; Access to Books and Records .......... 40
F. Emprise Effective Date Cash Debtor Contribution .......... 40

G. Unsecured Creditors Committee and Future Claimants' Representative Professional Fees ........ 40
H. Effectuating Documents; Further Transactions ........ 40
I. Corporate Action ........ 40
J. Exemption from Certain Taxes and Fees ........ 41
K. Preservation of Causes of Action ........ 42
L. Insurance Provisions ........ 42
M. Sources of Consideration for Plan Distributions ........ 42
N. Closing the Chapter 11 Case ........ 43
ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 43
A. General Treatment ........ 43
B. Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired Leases ........ 44
C. Claims Arising from Rejection of Executory Contracts and Unexpired Leases ........ 45
D. Indemnification Obligations ........ 45
ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS OTHER THAN FOR TALC PERSONAL INJURY CLAIMS AND TALC PERSONAL INJURY TRUST EXPENSES ........ 45
A. Distributions Generally ........ 45
B. Record Date for Holders of Claims ........ 46
C. Timing of Distributions ........ 46
D. Post-Petition Interest on Claims ........ 46
E. Delivery of Distributions ........ 46
1. Delivery of Distributions in General ........ 46
2. Cash Distributions ........ 47
3. Setoff and Recoupment ........ 47
F. Compliance with Tax Requirements ........ 47
G. Claims Paid or Payable by Third Parties ........ 48
1. Claims Paid by Third Parties ........ 48
2. Claims Payable by Third Parties ........ 48
3. Applicability of Insurance Contracts ........ 48

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS OTHER THAN TALC PERSONAL INJURY CLAIMS AND PROFESSIONAL CLAIMS ..... 49

A. Disputed Claims Other than Talc Personal Injury Claims and Professional Claims ..... 49

1. Allowance of Claims ..... 49
2. Claim Administration Responsibilities ..... 49
3. Time to File Objections to Claims ..... 49

B. Payments and Distributions With Respect to Disputed Claims; Claims Filed After Applicable Bar Date(s) ..... 49

C. Resolution of Talc Personal Injury Claims ..... 50

D. Resolution of General Administrative Expense Claims ..... 50

E. Resolution of Professional Claims ..... 50

F. Adjustment to Claims Without Objection ..... 50

G. No Transfers of Claims After Effective Date ..... 51

H. No Distributions Pending Allowance ..... 51

I. Distributions After Allowance ..... 51

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ..... 51

A. Discharge of Debtor and Reorganized Debtor ..... 51

B. Reorganized Debtor Discharge Injunction ..... 52

C. Talc Personal Injury Channeling Injunction ..... 52

1. Terms ..... 52
2. District Court Affirmance of Talc Personal Injury Channeling Injunction ..... 53
3. Reservations ..... 53

D. Insurance Entity Injunction ..... 54

1. Purpose ..... 54
2. Terms Regarding Claims Against Talc Insurers ..... 54
3. Reservations ..... 55

E. Exculpation and Section 1125(e) Protection ..... 55

F. Releases by Debtor and Estate, Third-Party Release, and Related Injunction ..... 56

1. Debtor Release of Non-Debtor Affiliates and Their Related Parties ..... 56
2. Debtor Releases of Other Released Parties ..... 57
3. Third-Party Release ..... 57
4. Injunction Enforcing Releases ..... 58
5. Preservation of Assigned Causes of Action ..... 58

G. Certain Waivers ..... 58
H. Disallowed Claims ..... 59
ARTICLE IX. CONFIRMATION ORDER REQUIREMENTS AND CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ..... 60
A. Confirmation Order Requirements ..... 60
B. Conditions Precedent to the Effective Date ..... 66
C. Waiver of Conditions ..... 67
D. Failure to Achieve the Effective Date ..... 67
ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN ..... 68
A. Modification and Amendments ..... 68
B. Effect of Confirmation on Modifications ..... 68
C. Revocation or Withdrawal of Plan ..... 69
ARTICLE XI. RETENTION OF JURISDICTION ..... 69
A. Retention of Jurisdiction ..... 69
B. Consent to Jurisdiction ..... 71
ARTICLE XII. MISCELLANEOUS PROVISIONS ..... 71
A. Immediate Binding Effect ..... 71
B. Dissolution of the Unsecured Creditors Committee ..... 72
1. Automatic Dissolution ..... 72
2. Survival for Limited Purposes ..... 72
3. Dissolution and Succession ..... 73
C. Additional Documents ..... 73
D. Payment of United States Trustee Quarterly Fees ..... 73
E. Reservation of Rights ..... 74
F. Successors and Assigns ..... 74
G. Notices ..... 74
H. Term of Injunctions or Stays ..... 75
I. Entire Agreement ..... 76
J. Exhibits and Annexes ..... 76
K. Non-Severability of Plan Provisions ..... 76
L. Governing Law ..... 76
M. Waiver or Estoppel ..... 77

# EXHIBITS

**Exhibit A** Talc Personal Injury Trust Distribution Procedures

## INTRODUCTION

Vi-Jon, LLC, as debtor and debtor in possession (the "Debtor"), together with the other Plan Proponents, propose this joint chapter 11 plan, including the exhibits hereto, as supplemented by the Plan Supplement (as may be amended or modified from time to time, the "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtor. Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtor's history, business, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, and certain related matters.[2]

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY.

Nothing in the Plan or the other Plan Documents constitutes an admission by the Debtor as to the existence, merits, or amount of the Debtor's actual present or future liability on account of any Claim or Demand (including in connection with or related to a Talc Personal Injury Claim), except to the extent that such liability is specifically provided for in this Plan or the other Plan Documents in accordance with the Confirmation Order and, in all cases, subject to the occurrence of the Effective Date.

## ARTICLE I.
## DEFINITIONS AND RULES OF INTERPRETATION

### A. Definitions

Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth below:

1. "2020 ESOP Transaction" means the series of transactions consummated in 2020 pursuant to which certain shareholders of VJCS Holdings, Inc. sold their equity interests in VJCS Holdings, Inc. to the Vi-Jon Employee Stock Ownership Trust, making Vi-Jon a 100% employee owned company.

2. "2023 Transaction" means, collectively, the transactions consummated on or before December 3, 2023, and December 28, 2023, by and among the Debtor, Emprise (f/k/a Vi-Jon Holdings, Inc.), and/or certain of their respective Affiliates, together with the agreements, instruments, and other documents entered into in connection therewith and the transactions contemplated thereby.

3. "Administrative Expense Claim" means any right to payment constituting a cost or expense of administration of the Chapter 11 Case incurred on or after the Petition Date prior to the occurrence of the Effective Date that is allowable under section 327, 328, 330, or 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2) or 507(b) of the Bankruptcy Code that has not already been paid, including: (a) any actual and necessary post-petition costs and expenses of preserving the Estate and operating the Debtor's business; (b) the Professional Claims;

[2] Capitalized terms used but not defined in this Introduction shall have the meanings set forth in Article I hereof.

(c) the Shared Services Claims; and (d) all fees and charges assessed against the Estate pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

4. "Administrative Expense Claims Bar Date" means the deadline to File a request for payment of an Administrative Expense Claim, which: (a) with respect to General Administrative Expense Claims, shall be thirty (30) days after the Effective Date; and (b) with respect to Professional Claims, shall be forty-five (45) days after the Effective Date, unless otherwise ordered by the Court.

5. "Affiliate(s)" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person or Entity that is not the Debtor but is an Affiliate of the Debtor, the term "Affiliate" shall apply to such Person or Entity as if the Person or Entity were the Debtor.

6. "Allowed" means, when used with respect to any Claim or Interest (other than a Talc Personal Injury Claim), such Claim or Interest: that (a) is listed in the Schedules, which may be amended by the Debtor, as neither disputed, contingent, nor unliquidated and with respect to which no claim objection or contrary or superseding Proof of Claim has been Filed, and that has not been paid pursuant to an order of this Court or otherwise satisfied prior to the Effective Date; (b) is evidenced by a Proof of Claim Filed on or before the applicable Bar Date for which no objection has been Filed on or before the Claim Objection Deadline; (c) is not the subject of an objection to allowance that was Filed on or before the Claim Objection Deadline that has not been settled, waived, withdrawn, or denied pursuant to a Final Order; or (d) is expressly allowed (i) pursuant to a Final Order, (ii) pursuant to an agreement between the Holder of such Claim or Interest and the Debtor, or (iii) pursuant to the terms of this Plan; *provided* that, notwithstanding the foregoing, the Allowed amount of any such Claim shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, to the extent applicable. "Allow" and "Allowance" shall have correlative meanings.

7. "Amended Keepwell Agreement" means that certain Amended and Restated Limited Contribution Agreement, dated July 30, 2026, by and between Emprise HPC (as defined below) and the Debtor.

8. "Assigned Causes of Action" means any and all of the causes of action, claims, demands, legal and equitable remedies, defenses, counterclaims, and suits that are owned, held by, assertable by or are otherwise property of the Estate, and that may be asserted by or on behalf of, the Debtor or its Estate that are not settled, released, waived, abandoned, or otherwise finally resolved under the Plan (or separate order of the Bankruptcy Court) as of the Effective Date that: (1) relate to or arise out of the Talc Insurance Policies to the fullest extent that such rights are related to coverage for Talc Personal Injury Claims; (2) relate to or arise out of any Talc Personal Injury Claim; (3) relate to or arise out of the 2020 ESOP Transaction, but solely against the Excluded Parties; (4) constitute or relate to any preference causes of action arising under chapter 5 of the Bankruptcy Code, including section 547 thereof, that remain property of the Debtor or its Estate and have not been settled, released, waived, abandoned, or otherwise finally resolved as of the Effective Date in all cases regardless of whether or not (i) asserted, (ii) direct or derivative, (iii) known or unknown, (iv) arising under tort, contract, or other, (v) partially or wholly accruing, (vi) existing in law, equity, by statute or regulation, or otherwise, and (vii) viable, expired or barred, including without limitation whenever and wherever such causes of action arise and

without regard to the laws of any jurisdiction that are applicable. The Assigned Causes of Action described in clauses (1)–(4) hereof include, without limitation, claims for extracontractual relief, including but not limited to claims for exemplary, punitive, or multiple damages, as well as claims for bad faith, unfair, or deceptive trade practices, or breach of the implied covenant of good faith and fair dealing (either in existence as of the Effective Date or arising subsequent to the Effective Date), in each case, solely to the extent such theories of liability relate to the causes of action in clauses (1)–(4) hereof; *provided, however*, that Assigned Causes of Action shall not include any Causes of Action (A) against any customer of the Debtor or Non-Debtor Affiliates under chapter 5 of the Bankruptcy Code, (B) against any customer of the Debtor or Non-Debtor Affiliates under any contract, purchase order or the like, or (C) to collect accounts owing to the Debtor or Non-Debtor Affiliates.

9. "Available Cash" means the aggregate sum of, as applicable, all Cash or Cash equivalents of the Debtor, including the Emprise Effective Date Cash Debtor Contribution, less the amount of cash (i) necessary to pay Allowed General Administrative Expense Claims, Allowed Professional Claims, Allowed Priority Tax Claims (if any), Allowed Other Secured Claims (if any), and Allowed Other Priority Claims (if any) in accordance with and to the extent required under the Plan, (ii) payment of all statutory fees payable under section 1930 of chapter 123 of title 28 of the United States Code, and (iii) funding and maintenance of any reserves required under the Plan, any agreement contemplated by the terms hereof or applicable law, without duplication; provided, that Available Cash shall not include Talc Personal Injury Trust Proceeds.

10. "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing that are made retroactive to the Petition Date, as the same may exist on any relevant date to the extent applicable to the Chapter 11 Case.

11. "Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Case.

12. "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code, 28 U.S.C. § 2075, and the general, local, and chambers rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Case, as in effect on the Petition Date, together with any and all amendments and modifications thereto that are subsequently made applicable to the Chapter 11 Case.

13. "Bar Date" means, (a) with respect to any Entity that is not a Governmental Unit, September 29, 2026, and (b) with respect to a Governmental Unit, January 29, 2027, each of which were the dates set by the Bar Date Order as the date by which certain Proofs of Claim must be Filed, (c) with respect to General Administrative Expense Claims and Professional Claims, the Administrative Expense Claims Bar Date, and (d) with respect to Claims arising from the rejection of an Executory Contract or Unexpired Lease, the Rejection Damages Bar Date.

14. "Bar Date Order" means an order entered by the Bankruptcy Court setting the Bar Dates as requested in the *Debtor's Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Other than with Respect to Direct Talc Claims, (II) Establishing Amended*

*Schedules Bar Date and Rejection Damages Bar Date, and (III) Approving Form and Manner of Notice Thereof* [Docket No. 26].

15. "Bill of Sale" means the bill of sale, included in the Plan Supplement, evidencing the transfer of the Transferred Assets to the applicable Non-Debtor Affiliates.

16. "Business Day" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

17. "Carve-Out Accounts" means the two segregated accounts maintained by Omni Agent Solutions, Inc. at East West Bank ending in 7868 and 8211, which are maintained for the benefit of the Professionals retained by (i) the Debtor, (ii) the Unsecured Creditors Committee, and (iii) the Future Claimants' Representative, respectively, in each case in accordance with the Cash Management Order and any interim compensation order or fee order entered in the Chapter 11 Case, and for the payment of fees required to be paid to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a).

18. "Cash" means the legal tender of the United States of America.

19. "Cash Management Order" means the final order entered by the Bankruptcy Court approving the Debtor's Cash Management Motion [Docket No. 128].

20. "Cause of Action" means any action, Claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, obligation, liability, loss, suit, debt, damage, remedy, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. Cause of Action includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claim under any state or foreign law, including any fraudulent transfer or similar claim.

21. "Chapter 11 Case" means the case filed by the Debtor under chapter 11 of the Bankruptcy Code as case number 26-11216 pending in the Bankruptcy Court.

22. "Claim" has the meaning assigned to that term in section 101(5) of the Bankruptcy Code.

23. "Claim Objection Deadline" means the deadline for Filing an objection to any Claim, which deadline shall be one-hundred eighty (180) days after the Effective Date, subject to any extensions approved by an order of the Court; *provided*, that the Claim Objection Deadline shall not apply to any Claims Filed after the applicable Bar Date.

24. "Claims and Balloting Agent" means Omni Agent Solutions, Inc., the notice, claims, and solicitation agent retained by the Debtor in this Chapter 11 Case.

25. "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

26. "Class" means a category of Claims or Interests pursuant to sections 1122(a) and 1123(a) of the Bankruptcy Code.

27. "CM/ECF" means the Court's Case Management and Electronic Case Filing system.

28. "Co-Manufacturing Agreement" means that certain Co-Manufacturing and Supply Agreement by and between Nice-Pak Products, LLC (as successor by merger to CP2) and the Debtor, as amended.

29. "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Case.

30. "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of this Chapter 11 Case.

31. "Confirmation Hearing" means the hearing(s) before the Bankruptcy Court and/or District Court pursuant to section 1128 of the Bankruptcy Code to consider Confirmation of the Plan.

32. "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code, which shall be affirmed and/or entered by the District Court on or after the Confirmation Date in the District Court Order pursuant to Article VIII.C.2.

33. "Consummation" means the occurrence of the Effective Date.

34. "Cooperation Agreement" means the cooperation agreement substantially in the form included in the Plan Supplement, entered into as of the Effective Date, pursuant to which the Reorganized Debtor will maintain, share, transfer, or otherwise make available to the Talc Personal Injury Trust (or facilitate the transfer or availability to the Talc Personal Injury Trust of) documents, information, and related privileges that may relate to litigation of Talc Personal Injury Claims, the Assigned Causes of Action, and the Insurance Assignment, including the Debtor's business records and correspondence related to talc products and associated talc activities, which shall be in form and substance reasonably acceptable to the Debtor, the Non-Debtor Affiliates, the Unsecured Creditors Committee and the Future Claimants' Representative.

35. "CP2" means Consumer Product Partners, LLC.

36. "Cure" means payment of all amounts required to cure any monetary defaults under any Executory Contracts or Unexpired Leases (or such lesser amount as may be agreed upon by

the parties to the Executory Contract or Unexpired Lease) that are to be assumed and assigned by the Debtor pursuant to section 365 or 1123 of the Bankruptcy Code.

37. "Cure Notice" means one or more notices (and any supplements, modifications, or amendments thereto) collectively listing the potential Executory Contracts and Unexpired Leases to be Assumed in connection with the Plan and related Cure amounts.

38. "D&O Liability Insurance Policies" means all insurance policies that have been issued (or provide coverage) at any time to or for the benefit of the Debtor (or any of its predecessors) for directors', managers', and officers' liability (including any "tail policy" or run-off coverage) and all agreements, documents, or instruments relating thereto.

39. "Debtor" means Vi-Jon, LLC, a Delaware limited liability company.

40. "Delaware Trustee" means the Entity appointed in accordance with Article IV.D.5 to serve as the "Delaware Trustee" in accordance with the terms of the Plan and the Talc Personal Injury Trust Agreement.

41. "Demand" means any demand for payment, present or future, against the Debtor or any other Protected Party that: (a) was not a Claim prior to the Effective Date; and (b) arises out of the same or similar conduct or events that gave rise to Talc Personal Injury Claims and is based on, arises from, or is attributable to personal injury or wrongful death allegedly caused by talc or asbestos. All Demands shall be channeled to and resolved by the Talc Personal Injury Trust pursuant to the terms of the Talc Personal Injury Trust Documents.

42. "Direct Talc Personal Injury Claim" means a Talc Personal Injury Claim that is not an Indirect Talc Personal Injury Claim.

43. "Disallowed" means, when used with respect to a Claim against the Debtor, other than a Talc Personal Injury Claim, a Claim that is denied, dismissed, expunged, overruled, or disallowed in whole or in part (but solely to the extent of the disallowance) by Final Order or under the Plan.

44. "Disbursing Agent" means, as applicable, the Debtor, the Reorganized Debtor, the Talc Personal Injury Trustee, or such other Entity designated by the Debtor, the Reorganized Debtor, or Talc Personal Injury Trustee to hold and disburse the applicable Plan Distributions to Holders of Allowed Claims, Allowed Interests, or other eligible Entities pursuant to the terms of this Plan.

45. "Disclosure Statement" means the disclosure statement for this Plan, filed contemporaneously herewith and incorporated herein by reference (as such may be amended, modified, or supplemented from time to time hereafter), including all exhibits and schedules thereto.

46. "Disclosure Statement Order" means one or more orders of the Bankruptcy Court approving the Disclosure Statement as providing "adequate information" for solicitation purposes within the meaning of section 1125(a) of the Bankruptcy Code and establishing certain dates, deadlines, and procedures related to Confirmation of the Plan.

47. "Disputed" means, with respect to any Claim or Interest or any portion thereof, other than Talc Personal Injury Claims, that is neither Allowed nor Disallowed in accordance with the terms of this Plan or other Final Order of the Bankruptcy Court. For the purposes of this Plan, a Claim shall be considered a Disputed Claim in its entirety if: (a) the amount or classification of the Claim specified in a relevant Proof of Claim exceeds the amount or classification of any corresponding Claim scheduled in the Schedules; (b) any corresponding Claim scheduled by the Debtor has been scheduled as zero, disputed, contingent, unliquidated, or unknown; (c) no corresponding Claim has been scheduled by the Debtor in its Schedules (or portion thereof); or (d) for which a timely objection to such Claim has been Filed, which objection has not been withdrawn or determined pursuant to a Final Order.

48. "Distribution Date" means the date or dates determined by the applicable Disbursing Agent, upon which date or dates such Disbursing Agent shall make Plan Distributions in accordance with the terms of this Plan.

49. "Distribution Record Date" means the record date for purposes of making Plan Distributions under this Plan, which date shall be the Effective Date.

50. "District Court" means the United States District Court for the District of Delaware.

51. "District Court Order" means the order entered by the District Court affirming the Confirmation Order and the Talc Personal Injury Channeling Injunction.

52. "Effective Date" means the Business Day selected by the Debtor as of which all conditions precedent to the occurrence of the Effective Date have been satisfied or waived.

53. "Emprise" means Emprise Group, Inc.

54. "Emprise Administrative Services Agreement" means that certain Administrative Services Agreement, dated December 3, 2023, by and among Emprise and the Debtor, as amended.

55. "Emprise Effective Date Cash Debtor Contribution" means a $7,000,000 contribution by Emprise to the Debtor on the Effective Date, as further described in Article IV.F.

56. "Emprise Effective Date Cash Trust Contribution" means a $25,000,000 contribution by Emprise to the Talc Personal Injury Trust on the Effective Date, as further described in Article IV.B.2.

57. "Emprise HPC" means Emprise HPC, LLC (f/k/a Intermediary HoldCo, LLC).

58. "Encumbrance" means, with respect to any property (whether real or personal, tangible, or intangible), any mortgage, Lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such property, including, without limitation, any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction, to secure payment of a debt or performance of an obligation.

59. "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

60. "ESOP Litigation" means the putative class action case that is captioned Laidig, *et al.* v. GreatBanc Trust Company, *et al.*, No. 1:22-cv-1296, currently pending in the United States District Court for the Northern District of Illinois.

61. "Estate" means the estate created with respect to the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

62. "Etzel Property" means the real property located at (a) 6300 Etzel Avenue, St. Louis, MO 63133, (b) 6283 Bartmer Avenue, St. Louis, MO 63133, (c) 6306 Spencer Avenue, St. Louis, MO 63133, (d) 6306 Suburban Avenue, St. Louis, MO 63133, (e) 6324 Spencer Avenue, St. Louis, MO 63133, (f) 6326 Spencer Avenue, St. Louis, MO 63133, (g) 6328 Spencer Avenue, St. Louis, MO 63133, (h) 6328 Suburban Avenue, St. Louis, MO 63133, (i) 6330 Spencer Avenue, St. Louis, MO 63133, (j) 6332 Spencer Avenue, St. Louis, MO 63133, (k) 6335 Suburban Avenue, St. Louis, MO 63133, (l) 6337 Suburban Avenue, St. Louis, MO 63133, (m) 6339 Suburban Avenue, St. Louis, MO 63133, and (n) 6341 Suburban Avenue, St. Louis, MO 63133, which is owned by the Debtor.

63. "Excluded Assets" means the Debtor's assets that are not included in the Transferred Assets which are listed on the Excluded Assets Schedule, including all rights, title, and interest in certain intellectual property, which will be licensed by the Reorganized Debtor to one or more Non-Debtor Affiliates pursuant to the License Agreement.

64. "Excluded Assets Schedule" means the schedule identifying the Debtor's assets that are not included in the Transferred Assets, as set forth in the Plan Supplement.

65. "Excluded Parties" shall only include (a) Berkshire Partners LLC, Berkshire Fund VI Limited Partnership, Berkshire Investors LLC, and Berkshire Investors III LLC, and (b) John G. Brunner and any Person or Entity related to or who is an Affiliate of John G. Brunner. For the avoidance of doubt, the Debtor and Non-Debtor Affiliates are not Excluded Parties.

66. "Exculpated Parties" means, collectively, and in each case solely in its capacity as such, (a) the Debtor; (b) the members of the Debtor's board of managers, including the members of the special committee thereof, the Debtor's officers, and the Debtor's chief restructuring officer, in each case who served in such capacity at any time between the Petition Date and the Effective Date; (c) the Unsecured Creditors Committee and each of its members, solely in their capacity as such; (d) the Future Claimants' Representative, solely in such capacity; (e) the professionals and other advisors retained or engaged in connection with any Restructuring Transaction or this Chapter 11 Case by the Debtor, the Unsecured Creditors Committee, or the Future Claimants' Representative, including, without limitation, financial advisors, attorneys, accountants, investment bankers, and consultants, and each partner, member, manager, officer, employee, agent, or other representative of any such professional or advisor providing services in connection with any Restructuring Transaction or this Chapter 11 Case at any time from the Petition Date through the Effective Date; and (f) solely as to conduct found by a court of competent jurisdiction to have been undertaken while acting as a fiduciary of the Estate, the employee of the Debtor or other individuals providing similar services to the Debtor (other than Persons otherwise included in this definition), and counsel to the individual members of the Unsecured Creditors Committee, each solely in their capacities as such; *provided*, however, that the Court is not determining the

fiduciary status of any such employee, individual, or counsel. Nothing herein shall shift the burden of any such employee, individual, or counsel to establish that such Person was a fiduciary of the Estate during the period between the Petition Date and the Effective Date.

67. "Executory Contract" means a contract to which the Debtor is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

68. "Existing Equity Interests" means the membership interests of the Debtor.

69. "Federal Judgment Rate" means the federal judgment rate in effect as of the Petition Date.

70. "File," "Filed," or "Filing" means file, filed, or filing with the Bankruptcy Court (or, as applicable, the District Court) or its authorized designee in this Chapter 11 Case.

71. "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, which has not been reversed, vacated, stayed, modified, or amended, and as to (a) which the time to appeal, petition for certiorari, or motion for a new trial, reargument or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing is pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing has been sought, such order or judgment shall have been affirmed or otherwise disposed of by the highest court to which such order was appealed, or certiorari, a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, or such appeal, petition for certiorari or motion for a new trial, reargument or rehearing shall have otherwise been dismissed with or without prejudice, and the time to take any further appeal, petition for certiorari or motion for a new trial, reargument or rehearing shall have expired; *provided*, however, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment.

72. "Future Claimants' Representative" means The Honorable Shelley C. Chapman (Ret.) (or any Bankruptcy Court-appointed successor), in her capacity as the legal representative for all Future Demand Holders pursuant to sections 105(a) and 524(g) of the Bankruptcy Code.

73. "Future Demand Holder" means an Entity that holds or might subsequently hold a Demand.

74. "General Administrative Expense Claim(s)" means an Administrative Expense Claim other than a Professional Claim or a Shared Services Claim.

75. "General Unsecured Claim(s)" means an unsecured claim, including any deficiency Claim under section 506(a) of the Bankruptcy Code on account of an Other Secured Claim, that is not entitled to priority under the Bankruptcy Code and that is not an Intercompany Claim or a Talc Personal Injury Claim.

76. "Global Settlement" has the meaning set forth in the Restructuring Term Sheet.

77. “Governmental Unit” has the meaning set forth in section 101(27) of the Bankruptcy Code.

78. “GUC Recovery Pool” means a $100,000 amount set aside by the Debtor from Available Cash on the Effective Date for Pro Rata distribution to Holders of Allowed General Unsecured Claims.

79. “Holder” means an Entity holding a Claim or an Interest, as applicable.

80. “Impaired” means, with respect to a Claim, Interest, or Class of Claims or Interests, “impaired” within the meaning of section 1124 of the Bankruptcy Code.

81. “Indirect Talc Personal Injury Claim” means any cross-claim, contribution, claim, subrogation claim, reimbursement claim, indemnity claim, guaranty claim, or other similar indirect Claim, Demand, or Cause of Action to the extent based on, arising out of, or attributable to a Talc Personal Injury Claim, and arising in any jurisdiction around the world against the Debtor or any other Protected Party, whether or not such claim, Demand, or Cause of Action is or has been reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, and whether in the nature of, on account of, or sounding in tort, or under contract or implied by law (as governed by the applicable non-bankruptcy law), statutory right, warranty, guaranty, contribution, joint liability, joint and several liability, subrogation, reimbursement, or indemnity, or any other theory of law, equity, or admiralty, whether based on statute, treaty, regulation, restatement or common law, whether or not diagnosable or manifested before the Effective Date, caused or allegedly caused, in whole or in part, directly or indirectly (a) by talc or asbestos-containing products manufactured, supplied, distributed, handled, stored, or sold by the Debtor, or (b) by services, actions, or operations provided, completed, or taken by the Debtor with respect to talc or asbestos-containing products. An Indirect Talc Personal Injury Claim shall not include any claim for or otherwise relating to death, injury, or damages caused by talc or a product or material containing talc that is asserted by or on behalf of an injured individual by such individual’s estate, legal counsel, relative, assignee, or other representative, or by an individual who claims injury or damages as a result of the injury or death of another individual (including, without limitation, any claim for loss of consortium, loss of companionship, services and society, or wrongful death), regardless of whether such claim seeks compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable, or other relief whatsoever, including pursuant to a settlement, judgment, or verdict.

82. “Insurance Assignment” means the assignment and transfer to the Talc Personal Injury Trust of Talc Personal Injury Insurance Assets pursuant to Article IV.B.5.

83. “Insurance Contracts” means all insurance policies, including the D&O Liability Insurance Policies, that have been issued (or provide coverage) at any time to or for the benefit of the Debtor (or any of its predecessors), and all agreements, documents, or instruments relating thereto.

84. "Insurance Entity Injunction" means the injunction set forth in Article VIII.D of this Plan.

85. "Insurer" means any company or other entity that issued an Insurance Contract and includes any third-party administrator of or for any Insurance Contract, along with any predecessors, successors, and/or Affiliates thereof.

86. "Intercompany Advance Claim" means all Claims held by Emprise on account of that certain Intercompany Advance Agreement, effective as of September 5, 2024, by and between Emprise and the Debtor, as amended by a First Amendment to Intercompany Advance Agreement, dated as of September 5, 2025 (and as further amended, modified, or supplemented).

87. "Intercompany Claim(s)" means any and all Claims against the Debtor by any Non-Debtor Affiliate, including any Intercompany Promissory Note Claims and Intercompany Advance Claims, but not including any Shared Services Claims.

88. "Intercompany Promissory Note Claim" means all Claims held by Vivos and VH Finance, LLC on account of that certain Intercompany Promissory Note, dated as of December 3, 2023, by and among the Debtor, Vivos, and VH Finance, LLC (as amended, modified, or supplemented), pursuant to which each of the parties thereto acts as both borrower and lender to each other party with respect to intercompany advances, and the outstanding principal balance reflects the aggregate amount of advances outstanding from time to time.

89. "Interest(s)" means (a) any equity security (as defined in section 101(16) of the Bankruptcy Code) in the Debtor that existed immediately prior to the Petition Date, including all units, shares, common stock, preferred stock, membership interests, and other instruments evidencing any fixed or contingent ownership in the Debtor or any rights to purchase or demand the issuance of any of the foregoing (including options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, or convertible, exercisable, or exchangeable securities); or (b) any other agreement, arrangement, or commitment of any character relating to, or whose value is related to, any of the foregoing.

90. "License Agreement" means the License Agreement, included in the Plan Supplement, between the Reorganized Debtor and certain Non-Debtor Affiliates, pursuant to which the Reorganized Debtor will license the use of intellectual property to the Non-Debtor Affiliates, in form and substance reasonably acceptable to the Debtor and the Non-Debtor Affiliates.

91. "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

92. "List of Managers and Officers of the Reorganized Debtor" means the list identifying the individuals selected by Emprise HPC, in its sole discretion, to serve as the managers and officers of the Reorganized Debtor on the Effective Date, as set forth in the Plan Supplement.

93. "Members of the Talc Personal Injury Trust Advisory Committee" means the number and identity of the individuals nominated by the Unsecured Creditors Committee to serve as the initial members of the Talc Personal Injury Trust Advisory Committee, as set forth in the Plan Supplement.

94. "Name of Talc Personal Injury Trustee" means the name of the individual nominated by the Unsecured Creditors Committee and the Future Claimants' Representative to serve as the initial Talc Personal Injury Trustee, as set forth in the Plan Supplement.

95. "Non-Debtor Affiliates" means Emprise and any of its current or former Affiliates (other than the Debtor, the Excluded Parties, and any Affiliates and predecessors of the Debtor that are not current Affiliates of Emprise), and their respective successors and assigns, including but not limited to the Entities listed on the Schedule of Non-Debtor Affiliates.

96. "Other Priority Claim(s)" means a Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

97. "Other Secured Claim(s)" means any Secured Claim against the Debtor where, pursuant to section 506(a) of the Bankruptcy Code, the Secured Claim is secured by a valid, perfected, and enforceable Lien that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law in or upon any right, title, or interest of the Debtor in and to property of the Estate, to the extent of the value of the Debtor's interest in such property as of the relevant determination date; *provided*, that an Other Secured Claim shall not include Secured Tax Claims.

98. "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

99. "Petition Date" means August 2, 2026, which is the date the Debtor filed a voluntary petition in the Court for relief under chapter 11 of the Bankruptcy Code.

100. "Plan" has the meaning set forth in the introductory paragraph above.

101. "Plan Distribution" means payment(s) or distribution(s) to Holders of Allowed Claims, Holders of Allowed Interests, or other eligible Entities under this Plan.

102. "Plan Documents" means, collectively, (a) the Plan, (b) the Disclosure Statement, (c) the Talc Personal Injury Trust Documents, (d) the Confirmation Order, (e) the District Court Order, and (f) any other document necessary to implement the Plan.

103. "Plan Objection Deadline" means the date set by the Court in the Disclosure Statement Order as the deadline for any Person(s) to File an objection to Confirmation of this Plan.

104. "Plan Proponents" means, collectively, the Debtor, the Unsecured Creditors Committee, and the Future Claimants' Representative.

105. "Plan Supplement" means those documents and forms of documents, agreements, schedules, and exhibits to this Plan, which shall be Filed by the Debtor no later than seven (7) days prior to the Plan Objection Deadline, or such later date as may be approved by the Court, including, without limitation, (a) the Cooperation Agreement; (b) the Name of Talc Personal Injury Trustee; (c) the Members of the Talc Personal Injury Trust Advisory Committee; (d) the Reorganized Debtor Organizational Documents; (e) the List of Managers and Officers of the Reorganized Debtor; (f) the Vi-Jon Promissory Note; (g) the Pledge and Security Agreement; (h) the Settlement Fee Letter Agreement; (i) the Transferred Assets Schedule; (j) the Excluded Assets Schedule; (k)

the Schedule of Assigned Executory Contracts and Unexpired Leases; (l) the Schedule of Assumed Executory Contracts and Unexpired Leases; (m) the License Agreement; (n) the Bill of Sale; (o) the Schedule of Excluded Policies; (p) the Talc Personal Injury Trust Agreement; (q) the form of Talc Personal Injury Claimant Release; (r) the Schedule of Non-Debtor Affiliates; and (s) the financial projections described in the Disclosure Statement. The Debtor shall have the right to amend the documents contained in the Plan Supplement through and including the Effective Date in accordance with the terms of the Plan (and subject to the consent, approval and consultation rights set forth herein).

106. "Pledge and Security Agreement" means the Non-Recourse Pledge and Security Agreement, in substantially the form included in the Plan Supplement, to be dated as of the Effective Date, by and among Emprise HPC, as sole member of the Reorganized Debtor, and the Talc Personal Injury Trust.

107. "Post-Effective Date Future Claimants' Representative" means, subject to approval of the Bankruptcy Court, on and after the Effective Date, The Honorable Shelley C. Chapman (Ret.), in her capacity as the post-Effective Date legal representative for all Future Demand Holders, or any successor thereto appointed pursuant to the Talc Personal Injury Trust Agreement.

108. "Priority Tax Claim(s)" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

109. "Privilege" means any attorney-client privilege, work-product protection, or other privilege or protection of immunity (i) held by any or all of the Debtor, the Debtor's Estate, or the Reorganized Debtor, (ii) held by the board of managers or any special committee of the board of managers of the Debtor or the Reorganized Debtor, and (iii) attaching to any documents, communications, or thing (whether written or oral), including all electronic information relating to any Talc Insurance Policies, insurance rights, or Causes of Action.

110. "Pro Rata" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

111. "Professional" means an Entity either (a) employed pursuant to a Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code to be compensated for services rendered prior to or on the Effective Date in accordance with sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code, as applicable; or (b) awarded compensation and reimbursement by the Court pursuant to section 503(b)(4) of the Bankruptcy Code. Professionals includes the Debtor's, Unsecured Creditors Committee's and the Future Claimants' Representative's retained professionals.

112. "Professional Claim(s)" means a Claim by a Professional or by the Future Claimants' Representative seeking an award by the Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 329, 330, 331, 363, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

113. "Professional Claim Reserve Account" means one or more segregated reserve accounts, which may be the Carve-Out Accounts, funded by or on behalf of the Debtor in an aggregate amount equal to the Professional Claim Reserve Amount solely for the purpose of paying Allowed but unpaid Professional Claims.

114. "Professional Claim Reserve Amount" means the aggregate amount of unpaid and estimated Professional Claims incurred before and as of the Effective Date.

115. "Proof of Claim" means a written proof of claim Filed with the Bankruptcy Court or submitted to the Claims and Balloting Agent pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rule 3001 or 3002 and in accordance with any procedures approved by the Court against the Debtor (including the Bar Date Order).

116. "Protected Party" means (a) the Debtor; (b) the Reorganized Debtor; (c) the Non-Debtor Affiliates; and (d) any Related Party of any of the foregoing, solely in their capacity as such. Notwithstanding the foregoing, no Excluded Party shall be a Protected Party.

117. "Real Estate Transaction" means the sale of the Etzel Property consummated during the Chapter 11 Case pursuant to section 363 of the Bankruptcy Code or under the Plan pursuant to section 1123(a)(5)(D) of the Bankruptcy Code.

118. "Reinstated" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

119. "Rejection Damages Bar Date" means, unless otherwise ordered by the Bankruptcy Court, the later of (a) September 29, 2026 and (b) 11:59 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the later of (i) service of an order approving the rejection of any Executory Contract or Unexpired Lease of the Debtor and (ii) the effective date of a rejection of any Executory Contract or Unexpired Lease of the Debtor pursuant to operation of any order of the Bankruptcy Court, in each case as set forth in the Bar Date Order.

120. "Related Parties" means, with respect to any Person, such Person's (a) predecessors, successors, permitted assigns, equity holders, subsidiaries, and Affiliates; (b) current and former officers, directors, and managers, principals, members, employees, professionals, financial advisors, attorneys, accountants, investment bankers, agents, consultants, experts, and other professionals; (c) respective heirs, executors, and estates, in each case solely in their capacity as such; (d) lender or other provider of a loan or other financial transaction, solely in their capacity as such; and (e) the assignees, predecessors, and successors of any of the foregoing.

121. "Release" means the release given by the Releasing Parties to the Released Parties as set forth in Article VIII.F.1–3 hereof.

122. "Released Party" and, collectively, the "Released Parties" means each of the following, in each case in their capacity as such (unless such Entity is an Excluded Party): (a) the Debtor; (b) the Reorganized Debtor; (c) the Non-Debtor Affiliates; (d) the Unsecured Creditors Committee and its members, solely in their capacity as such; (e) the Future Claimants' Representative; and (f) to the fullest extent permitted by applicable law, with respect to each of the

foregoing entities in clauses (a) through (e), such Entities' Related Parties, in each case, solely in their capacity as such.

123. "Releasing Parties" means, collectively, the following, in each case in their capacity as such unless noted otherwise: (a) the Debtor; (b) the Reorganized Debtor; (c) the Non-Debtor Affiliates; (d) the Unsecured Creditors Committee and its members, solely in their capacity as such; (e) the Future Claimants' Representative; (f) all Holders of Claims or Interests that elect to opt into the Third-Party Release; and (g) each Related Party of each Entity in clause (a) through clause (f) solely to the extent such Related Parties may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through clause (f).

124. "Reorganized Debtor" means the Debtor as reorganized pursuant to the Confirmation Order on or after the Effective Date.

125. "Reorganized Debtor Interests" means the Interests of Reorganized Debtor to be issued on the Effective Date.

126. "Reorganized Debtor Organizational Documents" means the amended and restated organizational documents for the Reorganized Debtor as of the Effective Date, which shall be included in the Plan Supplement.

127. "Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of July 30, 2026, by and among the Debtor, Emprise, Emprise HPC, the Future Claimants' Representative, and the Talc Claimants' Representatives (as defined therein) [Docket No. 8-3].

128. "Restructuring Term Sheet" means the restructuring term sheet attached as Exhibit B to the Restructuring Support Agreement.

129. "Restructuring Transaction" means each action by the Reorganized Debtor necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation, certificates of incorporation, operating agreements, by-laws, or other documents containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law; (b) the execution, delivery, and funding of the Amended Keepwell Agreement and other loans to support the Non-Debtor Affiliates' and Debtor's liquidity throughout the Chapter 11 Case, the Emprise Effective Date Cash Debtor Contribution, and the Emprise Effective Date Cash Trust Contribution; (c) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan; (d) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (e) the execution and delivery of the applicable documents and instruments included in the Plan Supplement; and (f) all other actions the Debtor or the Reorganized Debtor determines to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

130. "Retained Causes of Action" means any and all causes of action, claims, demands, legal and equitable remedies, defenses, counterclaims, and suits that are owned, held by, assertable by or are otherwise property of the Estate, and that may be asserted on behalf of, the Debtor or its Estate, that are both (i) not settled, released, waived, abandoned, or otherwise finally resolved under the Plan (or separate order of the Bankruptcy Court) as of the Effective Date and (ii) not Assigned Causes of Action.

131. "Schedule(s)" means the schedule of assets and liabilities and statements of financial affairs, as such may be further amended, modified, or supplemented from time to time by the Debtor at any point prior to the Effective Date and Filed by the Debtor with the Court pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007.

132. "Schedule of Assigned Executory Contracts and Unexpired Leases" means a schedule of Executory Contracts and Unexpired Leases to be assumed and assigned by the Debtor to the applicable Non-Debtor Affiliates (or their designees) pursuant to the Plan, included in the Plan Supplement, in form and substance acceptable to the Debtor and Non-Debtor Affiliates and, in each case, as such schedule may be amended, modified, or supplemented from time to time at the direction of the applicable Non-Debtor Affiliates (or their designees) in accordance with Article V.A.

133. "Schedule of Assumed Executory Contracts and Unexpired Leases" means a schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtor pursuant to the Plan, included in the Plan Supplement, as such schedule may be amended, modified, or supplemented from time to time.

134. "Schedule of Excluded Policies" means a schedule of insurance policies that are excluded from the definition of Talc Insurance Policies under clause (b) of the proviso in that definition, which may only be modified with the consent of the Unsecured Creditors Committee and the Future Claimants' Representative, or by the Talc Personal Injury Trust Advisory Committee and Post-Effective Date Future Claimants' Representative, as applicable (which such consent shall not be unreasonably withheld).

135. "Schedule of Non-Debtor Affiliates" means the schedule identifying the Non-Debtor Affiliates, which shall be included in the Plan Supplement.

136. "Section 510(b) Claim(s)" means any Claim(s) against the Debtor that is subject to subordination pursuant to section 510(b) of the Bankruptcy Code, including all Claims relating to the ESOP Litigation and Claims for contribution, subrogation, reimbursement, indemnity, guaranty, or other similar indirect Claims against the Debtor relating to the ESOP Litigation.

137. "Section 1125(e) Protected Parties" means: (a) the Debtor; (b) the Reorganized Debtor; (c) the Non-Debtor Affiliates; (d) the Unsecured Creditors Committee and its members, solely in their capacity as such; (e) the Future Claimants' Representative; (f) The Honorable Shelley C. Chapman (Ret.), solely in her capacity as the prepetition future claimants' representative under the Restructuring Support Agreement; (g) the ad hoc committee of talc personal injury claimants that served as the predecessor to the Unsecured Creditors Committee prior to the Petition Date and its members, solely in their respective capacities as such; (h) the

lenders providing the funding of the Amended Keepwell Agreement and other loans to support the Non-Debtor Affiliates' and Debtor's liquidity throughout the Chapter 11 Case, the Emprise Effective Date Cash Debtor Contribution, and the Emprise Effective Date Cash Trust Contribution, solely in their capacity as participants in the Solicitation and in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entity's directors, managers, members of any other governing body, officers, and professionals, in each case solely in their capacity as such. Notwithstanding the foregoing, no Excluded Party shall be a Section 1125(e) Protected Party.

138. "Secured Claim(s)" means a Claim or any portion thereof: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, to the extent of the value of the creditor's interest in the Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code; (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff as determined pursuant to section 506(a) of the Bankruptcy Code; or (c) Allowed as secured pursuant to the Plan or any Final Order as a secured Claim.

139. "Secured Tax Claim(s)" means any Secured Claim that, absent its Secured Claim status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

140. "Settlement Fee" means Emprise's obligation to the Talc Personal Injury Trust that is described in Article IV.B.8 and set forth in the Settlement Fee Letter Agreement.

141. "Settlement Fee Letter Agreement" means the letter agreement between Emprise and the Talc Personal Injury Trust, included in the Plan Supplement, obligating Emprise to pay the Settlement Fee, on the terms and conditions thereof and as set forth herein and otherwise in form and substance acceptable to Emprise, the Unsecured Creditors Committee, and the Future Claimants' Representative.

142. "Shared Services Agreements" means, collectively, (i) the Vivos Administrative Services Agreement (as defined below), (ii) the Emprise Administrative Services Agreement, and (iii) the Co-Manufacturing Agreement.

143. "Shared Services Claims" means any Claim arising under or relating to the Shared Services Agreements, but solely for goods or services provided on or after the Petition Date. All Claims arising under or relating to the Shared Services Agreements for goods or services provided prior to the Petition Date shall be deemed Intercompany Promissory Note Claims.

144. "Solicitation" means the solicitation of votes on the Plan.

145. "Talc Insurance Policy" means any known or unknown commercial general liability or products liability insurance policy in effect at any time on or before the Effective Date that provides, or may potentially provide, coverage to the Debtor for Talc Personal Injury Claims or Claims related to Talc Personal Injury Claims; *provided* that (a) any type of policy other than commercial general liability or products liability policies (including, without limitation, director

and officer liability policies, property and casualty policies, and crime insurance policies), or (b) policies issued in or after 2016 that contain valid talc claims exclusions (i.e., the policies listed on the Schedule of Excluded Policies) shall not constitute Talc Insurance Policies for any purposes hereunder.

146. "Talc Insurer" means any insurer that issued a Talc Insurance Policy.

147. "Talc Personal Injury Channeling Injunction" means the injunction provided for in Article VIII.C of this Plan, the Confirmation Order, and the District Court Order.

148. "Talc Personal Injury Claim" means any Claim or Demand against the Debtor or any other Protected Party, whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease or alleged disease process, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries or harms (whether physical, emotional, or otherwise and whether or not diagnosable or manifested before the Effective Date), whether or not such right, Claim, remedy, liability or Demand is reduced to judgment, settled, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal basis for such right, Claim, remedy, liability or Demand are known or unknown, suspected or unsuspected, under any theory of law, equity, admiralty, or otherwise, directly or indirectly arising out of or relating to the alleged presence of or exposure to talc, asbestos, or talc-containing or asbestos-containing products in connection with, arising out of, relating to, or resulting from the alleged pre-Effective Date acts, contacts, or omissions of the Debtor (or Vi-Jon, Inc.) or any other Entity or Person for whose conduct the Debtor has liability or is alleged to have liability by reason of the conduct of business or transaction of the Debtor (or Vi-Jon, Inc.) with such Entity or Person. With respect to Protected Parties, the term "Talc Personal Injury Claim" encompasses any claim against a Protected Party (other than the Debtor) only if and to the extent the Protected Party is alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on the Debtor to the extent such alleged liability of such Protected Party arises by reason of (i) ownership of a financial interest in the Debtor, a past or present affiliate of the Debtor, or a predecessor in interest of the Debtor, (ii) involvement in the management of the Debtor or a predecessor in interest of the Debtor, or service as an officer, director, manager, or employee of the Debtor or a related party (as defined in Section 524(g)(4)(A)(iii) of the Bankruptcy Code), (iii) provision of insurance to or for the benefit of the Debtor or a related party (as defined in Section 524(g)(4)(A)(iii) of the Bankruptcy Code), or (iv) involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the Debtor or a related party (as defined in Section 524(g)(4)(A)(iii) of the Bankruptcy Code), including but not limited to (A) involvement in providing financing (debt or equity), or advice to an Entity involved in such a transaction; or (B) acquiring or selling a financial interest in an Entity as part of such a transaction.

Talc Personal Injury Claims include any such Claims or Demands against the Debtor or any Protected Party directly or indirectly arising out of or relating to: (a) any products previously processed, manufactured, purchased, sold, and/or distributed by the Debtor (or Vi-Jon, Inc.) or by any other Entity or Person for whose conduct the Debtor (or Vi-Jon, Inc.) has liability or is alleged to have liability; (b) any materials present at any premises owned, leased, occupied, or operated by the Debtor (or Vi-Jon, Inc.) or for which the Debtor has, or is alleged to have, liability; (c) any talc or asbestos or talc-containing or asbestos-containing product sold by the Debtor (or Vi-Jon,

Inc.) or (d) any indemnification obligation of the Debtor and Non-Debtor Affiliates, and their respective Related Parties, related to any talc or asbestos or talc-containing or asbestos-containing product sold by the Debtor (or Vi-Jon, Inc.).

Talc Personal Injury Claims include all such Claims or Demands, whether: (i) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation, aiding and abetting, or any other theory of law, equity or admiralty, whether brought, threatened, or pursued (including but not limited to in any United States Federal, state, or territorial court or court or other proceeding anywhere in the world); (ii) seeking compensatory, special, economic, non-economic, punitive, exemplary, or administrative damages, or any other costs, fees, penalties, injunctive or similar relief, or any other measure of damages; (iii) seeking any legal, equitable or other relief of any kind whatsoever, including in the nature of alter ego, veil piercing, successor, or vicarious liability, mere continuation, contribution, fraudulent transfer, fraudulent conveyance, conspiracy, or aiding and abetting, and including, for the avoidance of doubt, any Claims or Demands arising out of or relating to the presence of or exposure to talc, asbestos, talc-containing or asbestos-containing products assertable against the Debtor (or Vi-Jon, Inc.) or any other Protected Party; or (iv) held by claimants residing within the United States or its territories or in any non-US jurisdiction.

Talc Personal Injury Claims also include any such Claims that have been settled, resolved, or are subject to resolution pursuant to any agreement, or any such Claims that are based on a judgment or verdict. Talc Personal Injury Claims include, without limitation: (1) all claims, rights, debts, obligations, remedies, or liabilities for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; and (2) Indirect Talc Personal Injury Claims.

Talc Personal Injury Claims do not include (a) any Claim by any present or former employee of a predecessor or Affiliate of the Debtor for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer; or (b) any environmental liabilities or obligations arising out of or based upon federal or state environmental laws or regulations, environmental orders, consent decrees, and other similar requirements.

149. "Talc Personal Injury Claimant Release" means a release of a claimant's Talc Personal Injury Claims against the Debtor and the other Protected Parties consistent with the Plan, which shall be in substantially the form included in the Plan Supplement, which may only be modified with the consent of the Unsecured Creditors Committee and the Future Claimants' Representative, or by the Talc Personal Injury Trust Advisory Committee and Post-Effective Date Future Claimants' Representative, as applicable; *provided*, however, any material modifications that affect either the applicability of section 524(g) and section 105 of the Bankruptcy Code to the Plan, the Confirmation Order and District Court Order, or the Talc Personal Injury Trust, or the efficacy or enforceability of the Talc Personal Injury Channeling Injunction or any other injunction, release, or other protection issued or granted in connection with the Plan to the Protected Parties, must be reasonably acceptable to the Debtor (or the Reorganized Debtor, as applicable) and Emprise.

150. "Talc Personal Injury Insurance Assets" means all of the rights, claims, benefits, or causes of action that the Debtor or Reorganized Debtor has, or may have in the future, with respect to the Talc Insurance Policies, including all rights to coverage and receipt of proceeds under the Talc Insurance Policies, together with all rights to insurance coverage and insurance proceeds under any settlement agreements with respect to any Talc Insurance Policies, as well as the right, on behalf of the Debtor, to compromise with or grant a full release to one or more of the Talc Insurers of any such insurance rights, whether under any such policy or settlement agreement.

151. "Talc Personal Injury Trust" means the Talc Personal Injury Trust established on the Effective Date pursuant to Article IV.D.1 hereof and the Talc Personal Injury Trust Agreement, which trust shall constitute a "qualified settlement fund" under section 468B of the Internal Revenue Code.

152. "Talc Personal Injury Trust Advisory Committee" means the advisory committee established pursuant to the terms of the Plan and the Talc Personal Injury Trust Agreement, the initial members of which are identified in the Members of the Talc Personal Injury Trust Advisory Committee.

153. "Talc Personal Injury Trust Agreement" means the agreement, to be dated as of the Effective Date, by and among the Reorganized Debtor, the Talc Personal Injury Trustee, the Future Claimants' Representative, and the Talc Personal Injury Trust Advisory Committee, governing the creation and the terms of the Talc Personal Injury Trust, which shall be substantially in the form included in the Plan Supplement, which shall be in form and substance reasonably acceptable to the Plan Proponents and Emprise. Any changes to the Talc Personal Injury Trust Agreement made on or after the Effective Date shall be made pursuant to the provisions set forth in the Talc Personal Injury Trust Agreement.

154. "Talc Personal Injury Trust Assets" means, collectively: (a) the Emprise Effective Date Cash Trust Contribution, (b) the Vi-Jon Promissory Note and the related Pledge and Security Agreement, (c) the Assigned Causes of Action, (d) the Talc Personal Injury Insurance Assets, (e) the rights of Non-Debtor Affiliates under and related to the Talc Insurance Policies, (f) the net proceeds of the Real Estate Transaction or the Etzel Property (as the case may be), (g) the right to the Settlement Fee, and (h) all proceeds of the foregoing.

155. "Talc Personal Injury Trust Distribution Procedures" means the trust distribution procedures for the Talc Personal Injury Trust substantially in the form attached hereto as **Exhibit A**, which shall be in form and substance reasonably acceptable to the Plan Proponents and Emprise. Any changes to the Talc Personal Injury Trust Distribution Procedures made on or after the Effective Date shall be made pursuant to the provisions set forth in the Talc Personal Injury Trust Distribution Procedures.

156. "Talc Personal Injury Trust Documents" means, collectively: (a) the Talc Personal Injury Trust Agreement and any exhibits thereto; (b) the Talc Personal Injury Trust Distribution Procedures and any exhibits thereto; (c) the Cooperation Agreement and any exhibits thereto; and (d) any other agreements, instruments and documents governing the establishment and administration of the Talc Personal Injury Trust, which shall be materially consistent with the terms of the Plan, the Talc Personal Injury Trust Agreement, the Talc Personal Injury Trust

Distribution Procedures, and the Cooperation Agreement, as the same may be amended or modified from time to time, in accordance with the terms thereof.

157. "Talc Personal Injury Trust Expenses" means any of the liabilities, costs, or expenses incurred by or on behalf of the Talc Personal Injury Trust (other than liabilities to Holders of Talc Personal Injury Claims in respect of such Claims or Demands), Talc Personal Injury Trustee, Talc Personal Injury Trust Advisory Committee, and the Post-Effective Date Future Claimants' Representative, in carrying out the terms of the Talc Personal Injury Trust Agreement, including the reasonable fees and expenses of their respective Professionals and advisors.

158. "Talc Personal Injury Trust Proceeds" means proceeds of the Talc Personal Injury Trust.

159. "Talc Personal Injury Trustee" means the individual set forth in the Talc Personal Injury Trust Agreement, identified in the Plan Supplement, and appointed pursuant to the Confirmation Order to serve as the trustee for the Talc Personal Injury Trust in accordance with the terms of the Plan and the Talc Personal Injury Trust Agreement, and any successor trustee thereto appointed in accordance with the Talc Personal Injury Trust Agreement.

160. "Third-Party Release" means the consensual releases of the Released Parties by the Releasing Parties provided for in Article VIII.F.3.

161. "Transferred Assets" means a material set of the Debtor's assets that are listed on the Transferred Assets Schedule, which will be transferred to the applicable Non-Debtor Affiliate on or after the Effective Date.

162. "Transferred Assets Schedule" means the schedule setting forth the assets of the Debtor to be transferred to the applicable Non-Debtor Affiliates pursuant to Article IV.C.1 and the applicable transferee of each such asset, as set forth in the Plan Supplement.

163. "U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

164. "Unexpired Lease" means a lease to which the Debtor is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

165. "Unimpaired" means a Class of Claims or Interests that is not Impaired.

166. "Unsecured Creditors Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Case [Docket No. 81], as such committee may be reconstituted from time to time, and its members (solely in their respective capacities as such).

167. "Vi-Jon Promissory Note" means a promissory note issued by the Reorganized Debtor to the Talc Personal Injury Trust in the original principal amount of $1,000,000 substantially in the form included in the Plan Supplement, as further described in Article IV.B.3.

168. "Vivos" means Vivos Holdings, LLC.

169. "Vivos Administrative Services Agreement" means that certain Administrative Services Agreement, dated December 3, 2023, by and among Vivos and the Debtor, as amended.

170. "Voting Classes" means Classes 3 and 4.

## B. Rules of Interpretation

Unless otherwise specified: (1) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural; (2) any reference to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document, schedule, exhibit, or annex, shall mean that document, schedule, exhibit, or annex, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) all article references in the Plan are to the respective Articles of the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof; (6) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular Article, paragraph, or clause contained herein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively; (7) the words "include" and "including," and variations thereof, are not limiting; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (10) all references to docket numbers of documents Filed in this Chapter 11 Case are references to the docket numbers under the Court's CM/ECF system; (11) any immaterial effectuating provisions may be interpreted by the Debtor, the Reorganized Debtor, or Talc Personal Injury Trustee, as applicable, in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Court or any other Entity; (12) captions and headings to Articles are for convenience of reference only, are not intended to be a part of the Plan, and shall not limit, expand or otherwise affect the provisions hereof; and (13) any reference to an Entity's "subsidiaries" means its direct and indirect subsidiaries.

## C. Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. In the event that any payment, distribution, act, or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then such payment, distribution, act, or deadline shall be deemed to occur on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day, shall be deemed to have been completed or to have occurred as of the required date.

### D. Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

### E. Controlling Document

In the event of an inconsistency between the provisions of this Plan (excluding the Plan Supplement and any other exhibit to this Plan) and the Plan Supplement or any other exhibit to this Plan, the terms of the relevant document in the Plan Supplement or such exhibit shall control unless otherwise specified in such Plan Supplement document or exhibit. In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan (excluding the Plan Supplement), the provisions of the Plan Supplement, and the provisions of the Confirmation Order shall be construed in a manner such that the provisions of each are consistent with those of the others so as to effectuate the purposes of each to the extent reasonably possible; *provided*, however, that if there is determined to be any inconsistency between any provision of this Plan, including any provision of the Plan Supplement, and any provision of the Confirmation Order that cannot be reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan and the Plan Supplement, as applicable.

## ARTICLE II. GENERAL ADMINISTRATIVE EXPENSE CLAIMS, SHARED SERVICES CLAIMS, PROFESSIONAL CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, General Administrative Expense Claims, Shared Services Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

### A. General Administrative Expense Claims; Shared Services Claims

Unless otherwise agreed to by the Holder of an Allowed General Administrative Expense Claim and the Debtor, each Holder of an Allowed General Administrative Expense Claim that is unpaid as of the Effective Date shall receive, on account and in full satisfaction of such Allowed General Administrative Expense Claim, Cash in an amount equal to the Allowed amount of such General Administrative Expense Claim, to be paid in accordance with the following: (1) if a General Administrative Expense Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed General Administrative Expense Claim is due or as soon as reasonably practicable thereafter); (2) if such General Administrative Expense Claim is not Allowed as of the Effective Date, no later than forty-five (45) days after the date on which an order allowing such General Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) at such time and upon such terms as may be agreed upon by such Holder and the Debtor; or (4) at such time and upon such terms as set forth in any other order of the Court.

Notwithstanding any prior Filing or Proof of Claim, parties seeking allowance and payment of General Administrative Expense Claims must File and serve a request for payment of such General Administrative Expense Claim on the Debtor no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date. The burden of proof for the allowance of General Administrative Expense Claims remains on the Holder of the General Administrative Expense Claims. **Holders of General Administrative Expense Claims that do not File and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such General Administrative Expense Claims against the Debtor, the Reorganized Debtor, or their respective property, and such General Administrative Expense Claims shall be deemed forever discharged and released as of the Effective Date. Any requests for payment of General Administrative Expense Claims that are not properly Filed and served by the Administrative Expense Claims Bar Date shall not appear on the Claims Register and shall be Disallowed automatically without the need for further action by the Debtor, or further order of the Court.**

Notwithstanding anything to the contrary in the Plan, in accordance with section 503(b)(1)(D) of the Bankruptcy Code and Local Rule 3002-1, a Governmental Unit shall not be required to File a request for payment of an Administrative Expense Claim on account of any tax liability described in section 503(b)(1)(B) or (C) of the Bankruptcy Code, and any such Administrative Expense Claim shall not be subject to the Administrative Expense Claims Bar Date. Any tax liabilities of the Debtor arising after the Petition Date shall be paid by the Debtor or the Reorganized Debtor, as applicable, in the ordinary course of business.

The Debtor may settle General Administrative Expense Claims without further Court approval. The Debtor may also choose to object to any General Administrative Expense Claim no later than sixty (60) days from the Administrative Expense Claims Bar Date, subject to extensions by the Court, agreement in writing of the parties, or on motion of a party in interest approved by the Court. Unless the Debtor or another party with standing, as applicable, objects to a timely Filed and properly served General Administrative Expense Claim, such General Administrative Expense Claim will be deemed Allowed in the amount requested. In the event that the Debtor objects to a General Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Court will determine whether such General Administrative Expense Claim should be Allowed and, if so, in what amount.

Unless a different treatment is otherwise agreed to between the Debtor and Emprise (which agreement may include waiver of such Shared Services Claims, in whole or in part), Shared Services Claims may be paid in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Shared Services Claim, pursuant to the Cash Management Order.

## B. Professional Claims

### 1. Final Fee Applications and Payment of Professional Claims

All Professionals seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date

under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall: (a) File, on or before the date that is forty-five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred; and (b) be paid in full, in Cash, from the Carve-Out Account maintained for the benefit of such Professional, or, if the amount in the applicable Carve-Out Account is not sufficient to pay such Claims, by the Reorganized Debtor, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or Allowing any such Professional Claim. Objections to Professional Claims must be Filed and served no later than twenty-one (21) days after the Filing of the Professional Claim.

**2. Professional Claim Reserve Account**

Professionals shall reasonably estimate their unpaid Professional Claim Reserve Amount and shall deliver such estimate to the Debtor no later than five (5) days before the Effective Date; *provided*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in this Chapter 11 Case or that a Professional can be paid in the ordinary course of business following the Effective Date. If a Professional does not provide an estimate, the Debtor may estimate the unpaid and unbilled fees and expenses of such Professional for purposes of determining the Professional Claim Reserve Amount.

No later than the Effective Date, the Debtor shall fund each Carve-Out Account comprising the Professional Claim Reserve Account with Cash in an amount equal to the aggregate Professional Claim Reserve Amount for the Professionals entitled to be paid from such account. The Professional Claim Reserve Account shall be maintained in trust for the Professionals. Such funds in the Professional Claim Reserve Account shall not constitute property of the Debtor, the Debtor's Estate, the Reorganized Debtor, the Talc Personal Injury Trustee, or the Talc Personal Injury Trust, except as otherwise expressly set forth in the last sentence of this paragraph. The amount of Professional Claims owing to the Professionals on and after the Confirmation Date shall be paid in Cash to such Professionals from funds held in the applicable Carve-Out Account, as soon as reasonably practicable after such Claims are Allowed by a Court order. When all Allowed Professional Claims have been paid in full, amounts remaining in the Professional Claim Reserve Account, if any, shall revert to the Reorganized Debtor.

**3. Post-Confirmation Date Fees and Expenses**

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtor or Reorganized Debtor, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash from Available Cash, the Professional Claim Reserve Account, or the applicable Carve-Out Accounts, as applicable, the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of this Plan incurred by the Debtor, Reorganized Debtor, or the Estate following the Confirmation Date (including, to the extent provided by the terms of Article IV.G and Article XII.B hereof, the Professionals of the Unsecured Creditors Committee and the Future Claimants' Representative). Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall

terminate, and the Debtor, Reorganized Debtor, and the Estate as applicable, may employ and pay any Professional (including, to the extent provided by the terms of Article IV.G and Article XII.B hereof, the Professionals of the Unsecured Creditors Committee and the Future Claimants' Representative) in the ordinary course of business without any further notice to or action, order, or approval of the Court.

The applicable Carve-Out Accounts comprising the Professional Claim Reserve Account shall be funded with sufficient funds to pay and satisfy any unpaid Professional Claims incurred (or fee and expenses estimated to be incurred) by the Debtor, the Future Claimants' Representative, the Unsecured Creditors Committee, and their respective professionals with respect to the matters set forth in Article XII.B.2, and such amounts shall be paid from the applicable Carve-Out Account or Available Cash as set forth in Article XII.B hereof. All reasonable and necessary post-Effective Date fees and expenses of the professionals retained by the Talc Personal Injury Trust Advisory Committee and the Post-Effective Date Future Claimants' Representative (except as provided in Article XII.B.2) shall be paid exclusively by the Talc Personal Injury Trust in accordance with the terms of the Talc Personal Injury Trust Agreement, and the Reorganized Debtor shall not be liable for any such fees and expenses.

### C. Priority Tax Claims

Except to the extent that a Priority Tax Claim has already been paid during this Chapter 11 Case or a Holder of an Allowed Priority Tax Claim and the Debtor or Reorganized Debtor, as applicable, agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, regular installment payments in Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five (5) years after the Petition Date and in a manner not less favorable than the most favored nonpriority unsecured claim provided for in the Plan; *provided*, that the Debtor and Reorganized Debtor reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A. Classification of Claims and Interests

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and Plan Distribution pursuant to sections 1122 and 1123(a) of the Bankruptcy Code. This Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class for purposes of distribution only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code and as described in Article II hereof, the Debtor has not classified General Administrative Expense Claims, Shared Services Claims, Professional Claims, and Priority Tax Claims.

The classification of Claims and Interests against the Debtor pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 | Talc Personal Injury Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B. Treatment of Claims and Interests**

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtor and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

**1. Class 1 – Other Secured Claims**

a. *Classification:* Class 1 consists of Other Secured Claims.

b. *Treatment*: On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Other Secured Claim, each Holder thereof shall receive, at the option of the Debtor or the Reorganized Debtor, as applicable:

(i) payment in full from Available Cash attributable to the Holder of such Allowed Other Secured Claim's collateral;

(ii) the return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim; or

(iii) such other treatment sufficient to render such Allowed Other Secured Claim as Unimpaired.

c. *Voting:* Class 1 is Unimpaired under the Plan. Holders of Claims in Class 1 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

**2. Class 2 – Other Priority Claims**

a. *Classification:* Class 2 consists of Other Priority Claims.

b. *Treatment*: On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Other Priority Claim, each Holder thereof shall receive payment or other treatment in accordance with the Bankruptcy Code in full satisfaction of such Claim.

c. *Voting*: Class 2 is Unimpaired under the Plan. Holders of Claims in Class 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

**3. Class 3 – General Unsecured Claims**

a. *Classification*: Class 3 consists of General Unsecured Claims.

b. *Treatment*: On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such General Unsecured Claim, each Holder thereof shall receive such Holder's Pro Rata share of the GUC Recovery Pool.

c. *Voting*: Class 3 is Impaired under the Plan. Holders of Claims in Class 3 are entitled to vote to accept or reject this Plan.

**4. Class 4 – Talc Personal Injury Claims**

a. *Classification*: Class 4 consists of Talc Personal Injury Claims.

b. *Treatment*: As of the Effective Date, liability for all Talc Personal Injury Claims shall automatically, and without further act, deed, or court

order, be permanently channeled solely and exclusively to and assumed by the Talc Personal Injury Trust in accordance with, and to the extent set forth in, Articles IV.D.8 and VIII.C below, the applicable Plan Documents, and the Confirmation Order. Each Talc Personal Injury Claim shall be resolved in accordance with the terms, provisions, and procedures of the Talc Personal Injury Trust Distribution Procedures. The Talc Personal Injury Trust shall be funded in accordance with the provisions of Article IV.B below. The sole recourse of the Holder of a Talc Personal Injury Claim shall be to the Talc Personal Injury Trust, and each such Holder shall have no right whatsoever at any time to assert its Talc Personal Injury Claim against any Protected Party and shall be enjoined pursuant to the Talc Personal Injury Channeling Injunction from filing any Talc Personal Injury Claims or Demands against any Protected Party. Indirect Talc Personal Injury Claims may be subject to disallowance by the Talc Personal Injury Trust pursuant to section 502(e) of the Bankruptcy Code and/or subordination under section 509(c) of the Bankruptcy Code.

c. *Voting*: Class 4 is Impaired under the Plan. Holders of Claims in Class 4 are entitled to vote to accept or reject this Plan.

**5. Class 5 – Intercompany Claims**

a. *Classification*: Class 5 consists of Intercompany Claims.

b. *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Intercompany Claim against the Debtor shall have such Claim cancelled, released, and extinguished without any distribution or compensation.

c. *Voting*: Class 5 is Impaired under the Plan. Holders of Claims in Class 5 are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.

**6. Class 6 – Section 510(b) Claims**

a. *Classification*: Class 6 consists of Section 510(b) Claims.

b. *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of each Section 510(b) Claim against the Debtor shall have such Claim cancelled, released, and extinguished without any distribution or compensation.

c. *Voting*: Class 6 is Impaired under the Plan. Holders of Claims in Class 6 are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.

### 7. Class 7 – Existing Equity Interests

a. *Classification*: Class 7 consists of Existing Equity Interests.

b. *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Existing Equity Interest shall be reinstated and reissued to Emprise HPC, without any distribution.

c. *Voting*: Class 7 is Impaired under the Plan. Holders of Interests in Class 7 are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.

## C. Special Provision Governing Unimpaired and Reinstated Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtor's or the Reorganized Debtor's rights in respect of any Unimpaired or Reinstated Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtor had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan.

## D. Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of any Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## E. Acceptance or Rejection of the Plan

### 1. Acceptance or Rejection of the Plan

With respect to the Debtor, if a Class contained Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject this Plan, this Plan shall be presumed accepted by the Holders of such Claims in such Class.

### 2. Voting Classes and Class Acceptance Requirements

Classes 3 and 4 are Impaired and entitled to vote to accept or reject this Plan. Acceptance of the Plan by Class 3 (General Unsecured Claims) shall be determined in accordance with section 1126 of the Bankruptcy Code, and acceptance of the Plan by Class 4 (Talc Personal Injury Claims) shall be determined in accordance with sections 524(g) and 1126 of the Bankruptcy Code.

#### 3. Issuance of the Talc Personal Injury Channeling Injunction Pursuant to Section 524(g) of the Bankruptcy Code

The Bankruptcy Court shall be asked to issue the Talc Personal Injury Channeling Injunction if the Plan has been accepted by at least two-thirds in amount of those Holders of Class 4 Claims actually voting on the Plan (such claims having been deemed to be temporarily allowed, for voting purposes only, in the amounts set forth in the Disclosure Statement Order), in accordance with section 1126(c) of the Bankruptcy Code, and 75% in number of those Holders of Class 4 Claims actually voting on the Plan, in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

### F. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to this Article III of the Plan. The Debtor hereby requests Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Class that is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. The Debtor reserves the right to request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Voting Class (other than Class 4) that votes to reject the Plan.

### G. Subordination of Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any statutory, contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtor or Reorganized Debtor (as applicable) reserves the right to re-classify any Allowed Claim or Allowed Interest in accordance with any statutory, contractual, legal, or equitable subordination relating thereto.

### H. Insurance

Other than with respect to Talc Personal Injury Claims (which shall be governed by the Talc Personal Injury Trust Documents), if any Claim is subject to coverage under an Insurance Contract, payments on account of such Claim will first be made from proceeds of such Insurance Contract, whether by the Debtor or Reorganized Debtor, as applicable, in accordance with the terms thereof, with the balance of such Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

The Insurance Contracts listed on the Schedule of Excluded Policies are not being assigned to the Talc Personal Injury Trust.

# ARTICLE IV.
# MEANS FOR IMPLEMENTATION OF THE PLAN

## A. Settlement of Claims and Interests

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and the applicable Bankruptcy Rules, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, effective upon the occurrence of the Effective Date. This Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to the applicable Bankruptcy Rules, and the entry of the Confirmation Order shall constitute the Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and the applicable Bankruptcy Rules, as well as a finding by the Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtor and its estate. Subject to Article VII hereof, all Plan Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

## B. Establishment and Contributions to the Talc Personal Injury Trust

### 1. Timing of Effective Date Transactions

On the Effective Date, the following transactions, each of which is described below, shall be deemed for all purposes to have occurred simultaneously and in consideration of reasonable, fair, and adequate value being exchanged, including the Talc Personal Injury Channeling Injunction:

1. establishment of the Talc Personal Injury Trust (see Article IV.D.1);

2. making of the Emprise Effective Date Cash Trust Contribution to the Talc Personal Injury Trust;

3. making of the Emprise Effective Date Cash Debtor Contribution to the Debtor;

4. issuance of the Vi-Jon Promissory Note and the Pledge and Security Agreement to the Talc Personal Injury Trust;

5. assignment of the Assigned Causes of Action to the Talc Personal Injury Trust;

6. assignment of the Debtor's rights, claims, benefits, and Causes of Action that the Debtor or the Reorganized Debtor has, or may have in the future, with respect to the Talc Insurance Policies to the Talc Personal Injury Trust;

7. contribution by the Non-Debtor Affiliates of their respective rights under and related to the Talc Insurance Policies to the Talc Personal Injury Trust;

8. contribution of the proceeds of the Real Estate Transaction, net of broker's commissions and other reasonable and documented costs of sale, or the Etzel Property (as the case may be), to the Talc Personal Injury Trust;

9. incurrence by Emprise of the Settlement Fee obligation pursuant to the Settlement Fee Letter Agreement;

10. the vesting of the Talc Personal Injury Trust Assets in the Talc Personal Injury Trust, as more fully described in Article IV.D; and

11. the channeling of all Talc Personal Injury Claims to the Talc Personal Injury Trust, as more fully described in Article VIII.C.

**2. Emprise Effective Date Cash Trust Contribution**

On the Effective Date, Emprise will indefeasibly contribute to the Talc Personal Injury Trust the Emprise Effective Date Cash Trust Contribution. The Emprise Effective Date Cash Trust Contribution is a guaranteed contribution of $25,000,000 to the Talc Personal Injury Trust and shall not be reduced on account of any Professional Claims or other obligations.

**3. Vi-Jon Promissory Note and Pledge and Security Agreement**

On the Effective Date, (a) the Reorganized Debtor shall issue and deliver the Vi-Jon Promissory Note to the Talc Personal Injury Trust and (b) Emprise HPC shall execute and deliver the Pledge and Security Agreement to the Talc Personal Injury Trust.

The Vi-Jon Promissory Note shall have a maturity date of twelve (12) months following the Effective Date, shall be non-interest bearing, shall be prepayable at any time without prepayment premium or penalty, and shall be secured by a first-priority lien on 50.1% of the equity interests in the Reorganized Debtor pursuant to the Vi-Jon Promissory Note and Pledge and Security Agreement. The Confirmation Order will provide that the Talc Personal Injury Trust's first-priority lien on such equity interests shall be automatically perfected as of the Effective Date. The Vi-Jon Promissory Note shall otherwise be non-recourse with respect to Emprise HPC.

In the event that the Reorganized Debtor fails to pay the Vi-Jon Promissory Note in full on or before the maturity date, the Talc Personal Injury Trust may, upon written notice to Emprise HPC and the Reorganized Debtor, foreclose on the lien. Upon payment of the Vi-Jon Promissory Note in full on or before the maturity date thereunder, the first-priority lien in favor of the Talc Personal Injury Trust shall immediately and automatically terminate without further court order.

**4. Assigned Causes of Action**

On the Effective Date, the Debtor will be deemed to have transferred the Assigned Causes of Action (excluding, for the avoidance of doubt, any Retained Causes of Action) to the Talc Personal Injury Trust. The Talc Personal Injury Trust shall not have any rights in, control over, or right to proceeds from, any Retained Causes of Action, which shall be deemed to be vested in the Reorganized Debtor on the Effective Date unless otherwise released pursuant to this Plan, the

Confirmation Order, or a valid release signed by the Debtor or the Reorganized Debtor (with the approval of the Court, to the extent required).

**5. Debtor's Rights in Talc Insurance Policies**

On the Effective Date, the Debtor will be deemed to assign all of the Debtor's rights, claims, benefits, and Causes of Action that the Debtor or the Reorganized Debtor has, or may have in the future, with respect to the Talc Insurance Policies to the Talc Personal Injury Trust.

From and after the Effective Date, the Talc Personal Injury Trustee, on behalf of the Talc Personal Injury Trust and with the consent of the Talc Personal Injury Trust Advisory Committee and Post-Effective Date Future Claimants' Representative as set forth in the Talc Personal Injury Trust Agreement, will have the sole right and authority, to assert, prosecute and/or settle any coverage claims under the Talc Insurance Policies. To facilitate such settlements, the Talc Personal Injury Trustee may request that the Bankruptcy Court retain jurisdiction to approve such settlements under section 363(b), (f), and (m) of the Bankruptcy Code and enter injunctive relief pursuant to section 105 of the Bankruptcy Code.

**6. Non-Debtor Affiliates' Rights under Talc Insurance Policies**

On the Effective Date, the Non-Debtor Affiliates shall be deemed to contribute their respective rights under and related to the Talc Insurance Policies to the Talc Personal Injury Trust.

**7. Real Estate Transaction**

On the Effective Date, the Debtor will contribute the proceeds of the Real Estate Transaction (*see* Article IV.C.2), net of broker's commissions and other reasonable and documented costs of sale, to the Talc Personal Injury Trust. If the Real Estate Transaction is not consummated under section 363 of the Bankruptcy Code during the Chapter 11 Case, then the Debtor shall sell the Etzel Property in accordance with Article IV.C.2 and contribute the net proceeds of such sale to the Talc Personal Injury Trust. If Emprise, the Unsecured Creditors Committee, or the Future Claimants' Representative does not consent to such sale, or the Debtor is unable to find a purchaser for the Etzel Property, then the Debtor shall instead contribute the Etzel Property to the Talc Personal Injury Trust.

**8. Settlement Fee Obligation**

On the Effective Date, Emprise shall deliver the Settlement Fee Letter Agreement, which obligates Emprise to pay to the Talc Personal Injury Trust a settlement fee payable by Emprise only upon a sale or merger of Emprise at an enterprise value at or above $1 billion, equal to 50% of the first $40 million of gross consideration above $1 billion of such sale or merger transaction. The Talc Personal Injury Trust shall have consultation rights regarding computation of the Settlement Fee, including receiving sufficient information to assess the enterprise value calculation. Nothing herein shall affect the Talc Personal Injury Trust's rights under applicable law to dispute the Settlement Fee, and the Bankruptcy Court shall have jurisdiction over any such dispute. All parties' rights under the Settlement Fee Letter Agreement are fully reserved.

## C. Transfer of the Transferred Assets and Sale of the Etzel Property

### 1. Transfer of the Transferred Assets to Non-Debtor Affiliate(s)

On or after the Effective Date, the Debtor shall transfer the Transferred Assets to the applicable Non-Debtor Affiliates indicated on the Transferred Assets Schedule pursuant to the Bill of Sale. The transfer of the Transferred Assets shall be in exchange for the Emprise Effective Date Cash Debtor Contribution and the Emprise Effective Date Cash Trust Contribution, and will be on an "as is, where is" basis and shall be free and clear of all claims, liens and interests to the fullest extent permitted by the Bankruptcy Code. The Transferred Assets shall not include any Excluded Assets or Talc Personal Injury Trust Assets.

In connection with the transfer of the Transferred Assets to the Non-Debtor Affiliates, the Reorganized Debtor and certain Non-Debtor Affiliates will enter into the License Agreement, pursuant to which the Reorganized Debtor will license the use of intellectual property to the Non-Debtor Affiliates.

### 2. Sale of the Etzel Property

In the event that the Real Estate Transaction does not occur under section 363 of the Bankruptcy Code during the Chapter 11 Case, on or after the Effective Date, the Debtor shall sell the Etzel Property to a purchaser on terms and conditions that are acceptable to Emprise, the Unsecured Creditors Committee, and the Future Claimants' Representative. Any sale of the Etzel Property pursuant to the Real Estate Transaction shall be on an "as is, where is" basis, shall be free and clear of all Claims, Liens, and Interests to the fullest extent permitted by the Bankruptcy Code, and shall be exempt under section 1146(a) of the Bankruptcy Code from any state, city, or other municipal transfer taxes, mortgage recording taxes, and any other stamp or similar tax. In the event that any of Emprise, the Unsecured Creditors Committee, or the Future Claimants' Representative do not consent to the sale of the Etzel Property to the purchaser selected by the Debtor, or the Debtor is unable to find a purchaser for the Etzel Property, then the Debtor shall contribute the Etzel Property to the Talc Personal Injury Trust on the Effective Date.

## D. Talc Personal Injury Trust

### 1. Creation of the Talc Personal Injury Trust

On the Effective Date, the Talc Personal Injury Trust shall be established in accordance with the Plan Documents, the Talc Personal Injury Trust Documents, and section 524(g) of the Bankruptcy Code and managed pursuant to the terms and conditions of the Talc Personal Injury Trust Documents. The Talc Personal Injury Trust shall be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under section 468B of the Internal Revenue Code. On the Effective Date, the Cooperation Agreement shall become effective and the Debtor's talc and asbestos-related records shall be treated in accordance therewith.

### 2. Purpose of the Talc Personal Injury Trust

The purpose of the Talc Personal Injury Trust shall be to assume all liabilities and responsibility for all Talc Personal Injury Claims, and, among other things, to: (a) direct the

processing, liquidation, and payment of all compensable Talc Personal Injury Claims in accordance with this Plan, the Talc Personal Injury Trust Agreement, the Talc Personal Injury Trust Distribution Procedures, and the Confirmation Order; (b) preserve, hold, manage, and maximize the assets of the Talc Personal Injury Trust for use in paying and satisfying Talc Personal Injury Claims; and (c) qualify at all times as a qualified settlement fund. The Talc Personal Injury Trust shall use the Talc Personal Injury Trust's assets and income to resolve Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Agreement and the Talc Personal Injury Trust Distribution Procedures in such a way that Holders of Talc Personal Injury Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such Claims, and shall otherwise comply in all respects with the requirements of a trust established pursuant to sections 105(a) and 524(g)(2)(B) of the Bankruptcy Code.

### 3. Talc Personal Injury Trust Assets

On the Effective Date, all right, title, and interest in and to the Talc Personal Injury Trust Assets, and any proceeds thereof, will be transferred to, and vested in, the Talc Personal Injury Trust, free and clear of all Claims, Demands, Interests, Encumbrances, and other interests of any Entity, without any further action of the Bankruptcy Court or any Entity, but subject to the remaining provisions of this Article IV.D, including the transfer and channeling of Talc Personal Injury Claims provided in Article IV.D.8 below.

Upon the occurrence and during the continuation of a default under the Vi-Jon Promissory Note, the Talc Personal Injury Trust shall have the right to demand in writing to the Reorganized Debtor that the Reorganized Debtor transfer to the Talc Personal Injury Trust ownership of 50.1% of the equity interests in the Reorganized Debtor. Within twenty (20) days of the Reorganized Debtor's receipt of any such written demand, the Reorganized Debtor shall transfer to the Talc Personal Injury Trust ownership of 50.1% of the equity interests in the Reorganized Debtor. In connection with any such transfer, the Reorganized Debtor Organizational Documents may be amended as necessary or appropriate to reflect the ownership of the Reorganized Debtor and any resulting changes in governance or economic rights. The rights granted under this Article IV.D.3 shall remain valid and enforceable until the earlier of the date on which (i) all obligations under the Vi-Jon Promissory Note have been fully paid or have otherwise been fully discharged and (ii) the Talc Personal Injury Trust exercises any remedy under the Vi-Jon Promissory Note.

### 4. Appointment of Talc Personal Injury Trustee

The individual nominated by the Unsecured Creditors Committee and the Future Claimants' Representative to serve as the initial Talc Personal Injury Trustee is identified in the Name of Talc Personal Injury Trustee. On the Effective Date, such individual (or a successor designated by the Unsecured Creditors Committee and the Future Claimants' Representative in a Plan Supplement Filed prior to the Effective Date) shall be appointed as the Talc Personal Injury Trustee pursuant to the Plan, the Confirmation Order, and the Talc Personal Injury Trust Agreement, and all costs and expenses of the Talc Personal Injury Trustee shall be paid by the Talc Personal Injury Trust. All subsequent Talc Personal Injury Trustees shall be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement. For purposes of performing the duties and fulfilling the obligations under the Talc Personal Injury Trust Agreement

and the Plan, the Talc Personal Injury Trustee shall be deemed to be a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

**5. Delaware Trustee**

The name of the initial Delaware Trustee will be set forth in the Plan Supplement and will be appointed as such pursuant to the Confirmation Order. All subsequent Delaware Trustees shall be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement.

**6. Appointment of Post-Effective Date Future Claimants' Representative**

Subject to approval in the Confirmation Order, on the Effective Date the Honorable Shelley C. Chapman (Ret.) shall be appointed, pursuant to the Plan, the Confirmation Order, and the Talc Personal Injury Trust Agreement, as the Post-Effective Date Future Claimants' Representative (all costs and expenses of the Post-Effective Date Future Claimants' Representative shall be paid by the Talc Personal Injury Trust). The Post-Effective Date Future Claimants' Representative shall have the functions, duties, and rights provided in, and shall serve in accordance with, the Talc Personal Injury Trust Agreement. Successor Post-Effective Date Future Claimants' Representatives shall be appointed as provided in, and pursuant to, the terms of the Talc Personal Injury Trust Agreement.

**7. Appointment of Talc Personal Injury Trust Advisory Committee Members**

The Talc Personal Injury Trust Advisory Committee shall be established pursuant to the Talc Personal Injury Trust Agreement. The number and identity of those nominated by the Unsecured Creditors Committee to serve as the initial members of the Talc Personal Injury Trust Advisory Committee shall be identified in the Plan Supplement. The Confirmation Order shall constitute an order of the Bankruptcy Court appointing the initial members of the Talc Personal Injury Trust Advisory Committee. The Talc Personal Injury Trust Advisory Committee shall have the functions, duties, and rights provided in, and shall serve in accordance with, the Talc Personal Injury Trust Agreement, and all costs and expenses of the Talc Personal Injury Trust Advisory Committee shall be paid by the Talc Personal Injury Trust as set forth in the Talc Personal Injury Trust Agreement. Successor members of the Talc Personal Injury Trust Advisory Committee will be appointed as provided in the Talc Personal Injury Trust Agreement.

**8. Transfer of Claims and Demands to the Talc Personal Injury Trust**

In consideration for the property transferred to the Talc Personal Injury Trust and pursuant to Section 524(g) of the Bankruptcy Code, notwithstanding the free-and-clear provision of Article IV.D.3 above, on the Effective Date, all liabilities, obligations, and responsibilities relating to all present and future Talc Personal Injury Claims, including, without limitation, Demands, shall be transferred and channeled to the Talc Personal Injury Trust and shall be satisfied solely by the assets held by the Talc Personal Injury Trust. The Talc Personal Injury Trust shall have no liability for any Claims and Demands other than Talc Personal Injury Claims and Talc Personal Injury Trust Expenses, and no Claims other than Talc Personal Injury Claims and Talc Personal Injury Trust Expenses shall be transferred and channeled to and assumed or incurred by the Talc Personal Injury Trust.

**9. Transfer of Rights and Defenses Related to Talc Personal Injury Claims**

With the exception of those claims and Causes of Action released by the Debtor pursuant to Article VIII of the Plan, on the Effective Date all Assigned Causes of Action relating to Talc Personal Injury Claims shall be transferred and assigned to the Talc Personal Injury Trust. In accordance with section 1123(b) of the Bankruptcy Code, the Talc Personal Injury Trust shall retain and may enforce such claims, defenses, rights, and Causes of Action and shall retain and may enforce all defenses and counterclaims to all Claims or Demands asserted against the Talc Personal Injury Trust, including, but not limited to, setoff, recoupment, and any rights under section 502(d) and 502(e) of the Bankruptcy Code; *provided*, however, that no such claims, defenses, Causes of Action, or counterclaims may be asserted against any Protected Party. The Talc Personal Injury Trust shall be deemed to be the appointed representative of the Debtor and the Reorganized Debtor for purposes of evaluating, defending against, litigating and/or resolving Talc Personal Injury Claims and may pursue, litigate, compromise, and settle any rights, claims, or Causes of Action transferred to it, as appropriate. Nothing contained in the Talc Personal Injury Channeling Injunction shall be deemed a waiver of any claim, right, remedy, or cause of action that the Debtor had immediately before the Effective Date, on behalf of the Estate or of itself, in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law against any Person in connection with or arising out of a Talc Personal Injury Claim.

The Talc Personal Injury Trust shall have the right to enforce the Plan and any of the other Plan Documents (including, but not limited to, the Cooperation Agreement) according to their respective terms, including the right to receive the Talc Personal Injury Trust Assets as provided in the Plan; *provided*, however, (a) the Talc Personal Injury Trust shall have no other rights against the Reorganized Debtor or the Protected Parties except to enforce the Plan and any of the other Plan Documents; (b) the Assigned Causes of Action and the Talc Personal Injury Insurance Assets shall not include any claims fully and finally released, compromised, or settled pursuant to the Plan; and (c) the Assigned Causes of Action do not include any rights of the Debtor, the Reorganized Debtor, or the other Protected Parties arising under the Talc Personal Injury Channeling Injunction or any of the other injunctions, releases, or the discharge granted under the Plan and the Confirmation Order, which rights are fully preserved for the Debtor, the Reorganized Debtor, or the other Protected Parties, respectively.

**10. Talc Personal Injury Claimant Release**

In connection with the resolution of Talc Personal Injury Claims, the Talc Personal Injury Trust Distribution Procedures shall provide that all Holders of Talc Personal Injury Claims shall execute a Talc Personal Injury Claimant Release as a precondition to receiving payment on account of their Talc Personal Injury Claims from the Talc Personal Injury Trust. The Talc Personal Injury Claimant Release shall be substantially in the form included in the Plan Supplement, and neither it nor the Talc Personal Injury Trust Distribution Procedures shall be materially amended or modified after the Effective Date in any way that impairs: (a) the releases and injunctions contained in this Plan or in the Talc Personal Injury Claimant Release; or (b) the Talc Personal Injury Trust's "qualified settlement fund" status under section 468B of the Internal Revenue Code.

**11. Talc Personal Injury Claims Asserted Against the Reorganized Debtor Post-Effective Date in Violation of the Talc Personal Injury Channeling Injunction**

The Talc Personal Injury Trust shall protect, defend, indemnify and hold harmless each Protected Party from and against any Talc Personal Injury Claim; *provided*, however, that the sole and exclusive remedies for the Talc Personal Injury Trust's failure to satisfy the indemnification, defense, and hold harmless obligations under this Section shall be the right of the Protected Parties to seek reimbursement from the Talc Personal Injury Trust of expenses incurred as a result of such failure and/or assert money damage claims against the Talc Personal Injury Trust; and *provided*, further, that the obligations of the Talc Personal Injury Trust in this Article IV.D.11 shall not exceed the value of the assets of the Talc Personal Injury Trust.

**12. Consideration for Talc Personal Injury Channeling Injunction**

The assignment, transfer, and conveyance of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust on the Effective Date supports the imposition of the Talc Personal Injury Channeling Injunction in favor of all of the Protected Parties as of the Effective Date.

**13. Termination of Emprise Contribution**

Notwithstanding any other provision of the Plan, the obligations of the Non-Debtor Affiliates to support the Plan and make the Emprise Effective Date Cash Trust Contribution, the Emprise Effective Date Cash Debtor Contribution, and all other contributions, agreements, and accommodations of the Non-Debtor Affiliates hereunder shall terminate if an event entitling Emprise and Emprise HPC to terminate the Restructuring Support Agreement occurs prior to the Effective Date and Emprise and Emprise HPC have exercised such right under the Restructuring Support Agreement, unless Emprise and Emprise HPC agree otherwise in writing.

**14. Institution and Maintenance of Legal and Other Proceedings**

From and after the Effective Date, the Talc Personal Injury Trust shall be empowered and entitled, and have standing, in its sole and absolute discretion and at its own expense, to pursue, compromise, or settle all legal actions and other proceedings related to any asset, liability, or responsibility of the Talc Personal Injury Trust that is not released pursuant to the Plan.

**15. Talc Personal Injury Trust Expenses**

The Talc Personal Injury Trust shall pay all Talc Personal Injury Trust Expenses from the Talc Personal Injury Trust Assets. None of the Plan Proponents, the Debtor's Estate, the Reorganized Debtor, or any other Protected Party shall have any obligation to pay any Talc Personal Injury Trust Expenses or any other liabilities of the Talc Personal Injury Trust. The Talc Personal Injury Trust shall promptly pay all Talc Personal Injury Trust Expenses incurred by the Reorganized Debtor for any and all liabilities, costs, or expenses as a result of taking any action on behalf of, and at the direction of, the Talc Personal Injury Trust.

### E. Cooperation; Privilege; Access to Books and Records

On the Effective Date, the Reorganized Debtor and the Talc Personal Injury Trustee shall enter into the Cooperation Agreement, pursuant to which the documents, information, and related Privileges of the Debtor and the Reorganized Debtor that are reasonably necessary to investigate, prosecute, compromise, or settle the Talc Personal Injury Insurance Assets and the Assigned Causes of Action shall be transferred, assigned, or otherwise made available (or, with respect to any of the foregoing in the possession, custody, or control of any other Person, the transfer or availability of which shall be facilitated) to the Talc Personal Injury Trust, without waiver or destruction of any such Privilege, on the terms and subject to the limitations set forth in the Cooperation Agreement.

### F. Emprise Effective Date Cash Debtor Contribution

On the Effective Date, Emprise shall indefeasibly contribute to the Debtor the Emprise Effective Date Cash Debtor Contribution, which shall be used to pay or reserve for General Administrative Expense Claims, the GUC Recovery Pool, and Professional Claims against the Debtor.

### G. Unsecured Creditors Committee and Future Claimants' Representative Professional Fees

The Debtor shall, on or prior to the Effective Date, pay (or reserve for in the applicable Carve-Out Account with respect to the applicable Professional Claim Reserve Amount) the accrued and unpaid reasonable and documented fees and expenses incurred prior to the Effective Date by the Unsecured Creditors Committee and the Future Claimants' Representative and their respective professionals.

### H. Effectuating Documents; Further Transactions

On and after the Confirmation Date, the Debtor shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to implement the provisions of the Plan, including, without limitation, the creation of the Talc Personal Injury Trust and the preparations for the transfer of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust.

On the Effective Date, the Reorganized Debtor Organizational Documents shall be effective, and the managers and officers of the Reorganized Debtor, as identified in the List of Managers and Officers of the Reorganized Debtor shall be appointed and installed.

### I. Corporate Action

Upon the Effective Date, in accordance with Section 303 of the General Corporation Law of the State of Delaware, as applicable, all actions contemplated by or necessary to effectuate the Plan shall be deemed authorized and approved in all respects, including: (1) assumption, assumption and assignment, and/or rejection (as the case may be) of Executory Contracts; (2) the effectiveness of the Reorganized Debtor Organizational Documents and appointment and

installation of the managers and officers of the Reorganized Debtor, as identified in the List of Managers and Officers of the Reorganized Debtor; (3) establishment of the Talc Personal Injury Trust and execution and entry into the Talc Personal Injury Trust Documents; (4) contribution of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust; (5) transfer of the Transferred Assets to the applicable Non-Debtor Affiliates; (6) consummation of the Real Estate Transaction or contribution of the Etzel Property to the Talc Personal Injury Trust (as the case may be); (7) implementation of the Restructuring Transactions contemplated by the Plan (including by way of (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law, (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the Plan and having other terms to which the applicable parties agree, and (c) the filing of appropriate certificates of formation and memoranda and articles of association and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law); and (8) all other actions contemplated by the Plan (whether occurring before, on, or after the Effective Date). Except as expressly provided in this Article IV.I, all matters provided for in the Plan involving the organizational structure of the Reorganized Debtor, and any organizational action required by the Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the manager(s), members, directors, or officers of the Debtor or the Reorganized Debtor.

Except as otherwise provided in the Plan, the Plan Supplement, or the Confirmation Order, on the Effective Date, all property of the Estate and any property acquired or otherwise retained by the Debtor pursuant to the Plan, except for the Professional Claim Reserve Account, shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, and other encumbrances.

### J. Exemption from Certain Taxes and Fees

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any issuance, direct or indirect transfer, or exchange of any security or other property pursuant hereto, as well as any sale transactions consummated by the Debtor in accordance with the Plan on and after the Confirmation Date through and including the Effective Date, including the transfer of the Transferred Assets to the applicable Non-Debtor Affiliates pursuant to Article IV.C.1 and the Bill of Sale and the Real Estate Transaction pursuant to Article IV.C.2, shall not be subject to any stamp, document recording, conveyance fee, deed stamp, real estate, transfer, sales or use, mortgage recording, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to: (1) the creation of any mortgage, deed of trust, lien, or other security interest; (2) the making, assumption, or assignment of any lease or sublease; (3) any Restructuring Transaction; (4) the issuance, renewal, modification, or securing of indebtedness; (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including (a) any merger agreements, (b) agreements of consolidation, restructuring,

disposition, liquidation or dissolution, (c) deeds, (d) bills of sale, or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

**K. Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released or assigned to the Talc Personal Injury Trust, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action in its favor, whether arising before or after the Petition Date, and the Reorganized Debtor's rights to commence, prosecute or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Retained Causes of Action, as appropriate, in accordance with the best interest of the Reorganized Debtor. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Retained Cause of Action against them as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Retained Causes of Action. The Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Retained Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Retained Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation of the Plan.

Further, all Holders of Talc Personal Injury Claims shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action in their favor, whether arising before or after the Petition Date, to the extent not released and/or channeled hereunder or under the Talc Personal Injury Claimant Release.

**L. Insurance Provisions**

Other than the permissibility of the Insurance Assignment as provided for herein, or as otherwise provided in the Bankruptcy Code, applicable law, or the findings made by the Bankruptcy Court in the Confirmation Order, nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Contract, or the rights or obligations of the parties under the Insurance Contracts (to the extent such rights and obligations are otherwise available), which shall be determined pursuant to applicable law.

Nothing in this Article IV.L is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Entity.

**M. Sources of Consideration for Plan Distributions**

Except as otherwise provided in the Plan or the Confirmation Order, and subject to the provisions of the Plan concerning the Professional Claim Reserve Account, (a) the Debtor shall fund Plan Distributions on account of Administrative Expense Claims, Priority Tax Claims, Other

Secured Claims, Other Priority Claims, and General Unsecured Claims (in each case, to the extent Allowed) with Available Cash (if any) and the Emprise Effective Date Cash Debtor Contribution; and (b) the Talc Personal Injury Trust shall fund Plan Distributions on account of Talc Personal Injury Claims with the Talc Personal Injury Trust Assets (including the Emprise Effective Date Cash Trust Contribution and the Talc Personal Injury Insurance Assets).

### N. Closing the Chapter 11 Case

The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case (which, for the avoidance of doubt, may be deemed to have occurred on the Effective Date), File a motion with the Bankruptcy Court pursuant to Bankruptcy Rule 3022 and Local Rule 3022-2 and a proposed form of any applicable order necessary to close the Chapter 11 Case. Furthermore, the Claims and Balloting Agent is authorized to destroy all paper/hardcopy records related to this matter two (2) years after the Effective Date has occurred.

## ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. General Treatment

On the Effective Date, the Debtor will assume the Executory Contracts and Unexpired Leases that are listed on the Schedule of Assumed Executory Contracts and Unexpired Leases, and assume and assign to the applicable Non-Debtor Affiliates (or designees) the Executory Contracts and Unexpired Leases of the Debtor that are listed on the Schedule of Assigned Executory Contracts and Unexpired Leases. Prior to the Effective Date, the Debtor has served the counterparties to such Executory Contracts and Unexpired Leases with Cure Notices with respect to the Executory Contracts and Unexpired Leases. The fact that any contract or lease is identified on a Cure Notice shall not constitute or be construed to constitute an admission that such contract or lease is an Executory Contract or Unexpired Lease within the meaning of section 365 of the Bankruptcy Code or that the Debtor or any successor in interest to the Debtor (including the Reorganized Debtor) has any liability thereunder.

At any time prior to the Effective Date, each applicable Non-Debtor Affiliate (or its designee) may, by written notice to the Debtor, remove any Executory Contract or Unexpired Lease from the Schedule of Assigned Executory Contracts and Unexpired Leases, and the Debtor shall amend such Schedule accordingly and provide any notice to the applicable counterparty required by the Bankruptcy Court. In addition, with respect to any Executory Contract or Unexpired Lease that is subject to a dispute regarding the applicable Cure, adequate assurance of future performance, or any other matter pertaining to the proposed assumption and assignment thereof, the applicable Non-Debtor Affiliate (or its designee) may remove such Executory Contract or Unexpired Lease from the Schedule of Assigned Executory Contracts and Unexpired Leases at any time through and including seven (7) Business Days after entry of a Final Order resolving such dispute. Any Executory Contract or Unexpired Lease so removed shall not be assumed and assigned to such Non-Debtor Affiliate (or designee) and, unless the Debtor or Reorganized Debtor elects to assume such Executory Contract or Unexpired Lease, shall be deemed rejected by the Debtor as of the Effective Date; *provided* that the applicable Non-Debtor Affiliate (or designee)

shall not acquire any rights or assume any liabilities thereunder, and Emprise shall have no obligation to pay any Cure with respect thereto.

Any monetary defaults under each such Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment by Emprise of the applicable Cure in Cash on the Effective Date, or on such other terms as the parties to any such Executory Contract or Unexpired Lease and the Debtor, Emprise, or the applicable Non-Debtor Affiliate, may otherwise agree; *provided* that, in the event of a dispute that remains pending as of the Effective Date regarding: (a) the existence or amount of the applicable Cure; (b) the ability of the applicable Non-Debtor Affiliates (or designees) to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed and assigned; or (c) any other matter pertaining to such assumption and assignment, the payments required by section 365(b)(1) of the Bankruptcy Code shall, if the applicable Executory Contract or Unexpired Lease has not been removed from the Schedule of Assigned Executory Contracts and Unexpired Leases in accordance with the foregoing paragraph, be made following entry of a Final Order or orders resolving such dispute and approving the applicable assumption and assignment.

Except for the Executory Contracts and Unexpired Leases of the Debtor that are listed on the Schedule of Assigned Executory Contracts and Unexpired Leases or Schedule of Assumed Executory Contracts and Unexpired Leases or as otherwise provided herein, as of the Effective Date, the Debtor shall be deemed to have rejected any and all other Executory Contracts and Unexpired Leases to which the Debtor is a party, except for: (a) any Executory Contracts or Unexpired Leases previously rejected, assumed, or assumed and assigned pursuant to a Final Order entered on the Effective Date that become fixed on or before the Effective Date; or (b) any Executory Contract or Unexpired Lease subject to a motion to reject, assume, or assume and assign pending as of the Effective Date.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, assumptions, and assumptions and assignments, as the case may be, pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, and payment of any Cure amounts relating thereto, shall result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

### B. Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired Leases

Except as otherwise set forth herein, rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtor under such contracts or leases, to the extent such obligations continue under the terms of such contracts or leases or under applicable law. The Debtor expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to

provide, warranties or continued performance from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases, to the extent afforded by applicable law.

### C. Claims Arising from Rejection of Executory Contracts and Unexpired Leases

Any Claim arising from the rejection of an Executory Contract or Unexpired Lease shall be classified and treated as a General Unsecured Claim against the Debtor unless such Claim otherwise falls within the definition of a Talc Personal Injury Claim or Indirect Talc Personal Injury Claim, in which case such Claim shall be treated in accordance with the applicable provisions of this Plan.

### D. Indemnification Obligations

For purposes of this Plan, the obligations of the Debtor and other Protected Parties to indemnify and reimburse Persons who are or were managers or officers of the Debtor prior to or following the Petition Date against and for any obligations as provided in the Debtor's organizational documents, bylaws, applicable state law, or other agreement, or any combination of the foregoing, shall, except as otherwise set forth in this paragraph, survive confirmation of this Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Petition Date, *provided* no such obligation is a Talc Personal Injury Claim. Obligations, to the extent owed by the Debtor under the Debtor's organizational documents, bylaws, applicable state law, or other agreement, or any combination of the foregoing, shall be deemed assumed by the Reorganized Debtor on the Effective Date solely to the extent necessary to preserve, recover, and have access to insurance proceeds under the D&O Liability Insurance Policies; *provided*, that such assumption shall not create, enlarge, accelerate, or revive any right of payment or recovery against the Reorganized Debtor or its assets, and any recovery on account of such assumed obligations shall be limited solely to, and payable exclusively from, available proceeds of the D&O Liability Insurance Policies. To the extent not satisfied from proceeds of the D&O Liability Insurance Policies, any such indemnification or reimbursement obligations, to the extent owed by the Debtor, shall not constitute obligations of the Reorganized Debtor and shall be treated as General Unsecured Claims against the Debtor to the extent Allowed, and shall be subject to the Talc Personal Injury Channeling Injunction to the extent they constitute Talc Personal Injury Claims.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS OTHER THAN FOR TALC PERSONAL INJURY CLAIMS AND TALC PERSONAL INJURY TRUST EXPENSES

### A. Distributions Generally

Other than with respect to payments to be made on account of Talc Personal Injury Claims and Talc Personal Injury Trust Expenses from the Talc Personal Injury Trust, the Reorganized Debtor shall make all distributions required to be made under the Plan as provided under this Article VI. All distributions to be made by the Talc Personal Injury Trust shall be made in accordance with the terms of the Talc Personal Injury Trust Agreement and the Talc Personal Injury Trust Distribution Procedures.

### B. Record Date for Holders of Claims

Except as otherwise provided in a Final Order, the transferees of Claims that are transferred pursuant to Rule 3001 of the Bankruptcy Rules on or prior to the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

### C. Timing of Distributions

Except as otherwise provided herein, any Plan Distributions to be made hereunder on account of Allowed Claims (other than Talc Personal Injury Claims and any claims previously paid or otherwise satisfied) shall be made (1) on the Effective Date or as soon thereafter as is practicable for Claims that are Allowed as of the Effective Date or (2) within thirty (30) days of the date on which a Claim becomes Allowed if such Claim becomes Allowed after the Effective Date.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on, or as soon as reasonably practicable after, the next succeeding Business Day, but shall be deemed to have been completed as of the required date, and no interest shall accrue or be payable on any such payment on the basis that such payment was not actually made on the required date.

### D. Post-Petition Interest on Claims

Except as otherwise provided in this Plan, the Plan Documents or the Confirmation Order, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the Plan Distributions provided for herein, regardless of whether such Plan Distributions are delivered on or at any time after the Effective Date.

### E. Delivery of Distributions

#### 1. Delivery of Distributions in General

All Plan Distributions to any Holder of an Allowed Claim shall be made at the address of such Holder as set forth on (a) any Schedules Filed with the Bankruptcy Court, (b) a Proof of Claim Filed by or on behalf of such Holder in the Chapter 11 Case, or (c) the books and records of the Debtor, unless the Debtor or the Reorganized Debtor, as applicable, have been notified in writing of a change of address.

Other than with respect to Talc Personal Injury Claims, whose distributions shall be made in accordance with the terms of the Talc Personal Injury Trust Agreement and the Talc Personal Injury Trust Distribution Procedures, if any Holder's Plan Distribution is returned as undeliverable, then no further Plan Distributions to such Holder shall be made unless and until the Reorganized Debtor is notified of such Holder's then-current address, at which time any missed Plan Distribution shall be made to such Holder without interest. A Cash distribution that is not claimed by the expiration of three (3) months from the date that such distribution was made—along with any further distributions withheld under this Section—shall be deemed unclaimed

property under section 347(b) of the Bankruptcy Code and shall revest in the Reorganized Debtor, and the Claim of any Holder to such Plan Distributions or any further Plan Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require the Debtor or Reorganized Debtor to attempt to locate any Holder of an Allowed Claim.

### 2. Cash Distributions

At the option of the Debtor or Reorganized Debtor, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in any applicable agreement. Other than with respect to Talc Personal Injury Claims, whose distributions shall be made in accordance with the terms of the Talc Personal Injury Trust Agreement and the Talc Personal Injury Trust Distribution Procedures, checks issued by the Reorganized Debtor in respect of Plan Distributions on Allowed Claims shall be null and void if not presented for payment within ninety (90) days after the date of issuance thereof. Requests for reissuance of any check shall be made in writing to the Reorganized Debtor by the Holder of the Allowed Claim to whom such check originally was issued on or before the expiration of the ninety (90) day period following the date of issuance of such check. All funds held on account of a check voided in accordance with this Article VI.E.2 shall be returned to the Reorganized Debtor, and the Claim of any Holder to such Plan Distributions shall be discharged and forever barred.

### 3. Setoff and Recoupment

The Debtor or Reorganized Debtor (or the Talc Personal Injury Trust to the extent it pertains to a Talc Personal Injury Claim) may, but shall not be required to, set off and/or recoup against any Claim (for purposes of determining the Allowed amount of such Claim on which a Plan Distribution shall be made), any claims of any nature whatsoever that the Debtor or the Reorganized Debtor (or the Talc Personal Injury Trust to the extent it pertains to a Talc Personal Injury Claim) may have against the Holder of such Claim, and the failure to do so shall not constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Talc Personal Injury Trust, of any such claims that the Debtor, Reorganized Debtor, or Talc Personal Injury Trust may have against the Holder of such Claim; *provided* that, until the earlier of the Chapter 11 Case being closed or dismissed, the Debtor or the Reorganized Debtor (or the Talc Personal Injury Trust, as applicable) shall give the Holder of such Allowed Claim no less than fourteen (14) days' written notice of the proposed setoff or recoupment; *provided*, *further* that if the Holder of such Allowed Claim objects to the proposed setoff or recoupment within such fourteen (14) day period, such setoff or recoupment may not be effectuated without prior approval of the Bankruptcy Court.

## F. Compliance with Tax Requirements

In connection with this Plan, to the extent applicable, the applicable Disbursing Agent and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Plan Distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate

such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The applicable Disbursing Agent reserves the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

### G. Claims Paid or Payable by Third Parties

#### 1. Claims Paid by Third Parties

The Debtor or the Reorganized Debtor, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from a party that is not the Debtor or Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Plan Distribution to the Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan. The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

#### 2. Claims Payable by Third Parties

Other than with respect to Talc Personal Injury Claims (which shall be governed by the Talc Personal Injury Trust Documents), no Plan Distributions shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's Insurance Contracts until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract. To the extent that one or more of the Debtor's Insurers agrees to pay in full or in part such Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Court.

#### 3. Applicability of Insurance Contracts

Except as otherwise provided in this Plan, payments to Holders of Claims covered by Insurance Contracts shall be in accordance with the provisions of the applicable Insurance Contract and this Plan. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including Insurers under any Insurance Contract, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

# ARTICLE VII.
# PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS OTHER THAN TALC PERSONAL INJURY CLAIMS AND PROFESSIONAL CLAIMS

All Disputed Claims asserted against the Debtor other than Talc Personal Injury Claims and Professional Claims shall be subject to the provisions of this Article VII.

## A. Disputed Claims Other than Talc Personal Injury Claims and Professional Claims

### 1. Allowance of Claims

Other than with respect to Talc Personal Injury Claims (which are subject to the Talc Personal Injury Trust Documents), after the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses that the Debtor had with respect to any Claim or Interest.

### 2. Claim Administration Responsibilities

Other than with respect to Talc Personal Injury Claims (which are subject to the Talc Personal Injury Trust Documents), after the Effective Date, the Reorganized Debtor shall have the sole authority to: (a) File, withdraw, or litigate to judgment, objections to such Claims or Interests; (b) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court with respect to such Claims and Interests.

### 3. Time to File Objections to Claims

Other than with respect to Talc Personal Injury Claims (which are subject to the Talc Personal Injury Trust Documents), and except as otherwise provided herein, any objections to Claims shall be Filed on or before the Claim Objection Deadline (as such date may be extended upon presentment of an order to the Bankruptcy Court by the Debtor or Reorganized Debtor).

## B. Payments and Distributions With Respect to Disputed Claims; Claims Filed After Applicable Bar Date(s)

Notwithstanding any other provision hereof, no payments or Plan Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

Holders of Claims, other than Direct Talc Personal Injury Claims, that were required to file proofs of claim and/or serve requests for payment of such Claims prior to any applicable Bar Date(s), and that did not File and serve such a request by such applicable Bar Date(s), including the Bar Date(s) with respect to Administrative Expense Claims and Professional Claims, shall be forever barred, estopped and enjoined from asserting such Claims against the Debtor or its property

(unless such Claim has been otherwise permitted to be Filed as a late claim by the Bankruptcy Court).

### C. Resolution of Talc Personal Injury Claims

All Talc Personal Injury Claims shall be resolved by the Talc Personal Injury Trust in accordance with Article III.B.4 of the Plan, pursuant to the Talc Personal Injury Trust Agreement and the Talc Personal Injury Trust Distribution Procedures. Only the Talc Personal Injury Trust will have the right to review and resolve Talc Personal Injury Claims. All Talc Personal Injury Claims must be submitted solely and exclusively to the Talc Personal Injury Trust for resolution which shall be all in accordance with the Talc Personal Injury Trust Agreement and the Talc Personal Injury Trust Distribution Procedures.

Except as otherwise set forth in this Plan, after the Effective Date, the Reorganized Debtor or Talc Personal Injury Trustee, on behalf of the Talc Personal Injury Trust, as applicable, shall have and retain any and all rights and defenses the Debtor had with respect to any Claim immediately before the Effective Date, including the Causes of Action retained pursuant to Article IV.K hereof. Except as specifically provided in this Plan or an order entered by the Court in this Chapter 11 Case, any Claim, other than a Talc Personal Injury Claim, shall become an Allowed Claim only to the extent such Claim is deemed Allowed in accordance with this Plan.

### D. Resolution of General Administrative Expense Claims

General Administrative Expense Claims shall be resolved in accordance with Article II.A of this Plan. After the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had prior to the Effective Date with respect to any General Administrative Expense Claim that has not become Allowed, including the authority to object to, prosecute any pending objection to, litigate, settle, or otherwise compromise such Claim.

### E. Resolution of Professional Claims

Professional Claims shall be determined and, if Allowed, paid from the Professional Claim Reserve Account in accordance with Article II.B.

### F. Adjustment to Claims Without Objection

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtor without such Reorganized Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Court.

Except as provided herein or otherwise agreed to by the Reorganized Debtor in its sole discretion, any and all Claims subject to the Bar Date, but evidenced by Proofs of Claims Filed only after the applicable Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Court, and Holders of such Claims may

not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely-Filed by a Final Order.

### G. No Transfers of Claims After Effective Date

After the Effective Date, no Holder of a Claim may sell, transfer, encumber, pledge or assign all or any part of its Claim unless such Holder and the applicable counterparty acknowledge in writing that any Plan Distribution on account of such Claim shall be paid or distributed by the Disbursing Agent to the Holder of such Claim on the Distribution Date. Any purported sale, transfer, encumbrance, pledge or assignment by a Holder of a Claim in violation of this Article VII.G shall be null and void.

### H. No Distributions Pending Allowance

Other than with respect to Talc Personal Injury Claims (which are subject to the Talc Personal Injury Trust Documents), if any portion of a Claim is a Disputed Claim, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided* that if only the Allowed amount of an otherwise valid Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

### I. Distributions After Allowance

Other than with respect to Talc Personal Injury Claims (which are subject to the Talc Personal Injury Trust Documents), to the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim, satisfying the Allowed amount in full, in accordance with the provisions of this Plan. As soon as reasonably practicable after the date that the order or judgment of the Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the Plan Distribution to which such Holder is entitled under this Plan as of the Effective Date.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A. Discharge of Debtor and Reorganized Debtor

Except as specifically provided in the Plan or in the Confirmation Order, pursuant to sections 524 and 1141(d)(1)(A) of the Bankruptcy Code, confirmation of the Plan shall discharge the Debtor and Reorganized Debtor on the Effective Date from any and all Claims and Demands of any nature whatsoever, including, without limitation, all Claims, Demands, and liabilities that arose before the Confirmation Date and all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code whether or not: (1) a Proof of Claim based on such Claim was Filed under section 501 of the Bankruptcy Code, or such Claim was listed on the Debtor's Schedules; (2) such Claim is or was Allowed under section 502 of the Bankruptcy Code; or (3) the Holder of such Claim has voted on or accepted the Plan. Except as otherwise specifically provided for in the Plan, Confirmation Order, or District Court Order, as of the Effective Date, the rights provided in the Plan to Holders of Claims, Demands and Interests shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims (including, without limitation, Talc

Personal Injury Claims) and Demands against, Liens on, and Interests in the Debtor, the Reorganized Debtor and all of their respective assets and properties.

### B. Reorganized Debtor Discharge Injunction

Except as specifically provided in this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Demands against the Debtor are permanently enjoined, on and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property with respect to such Claim or Demand; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property with respect to such Claim or Demand; (3) creating, perfecting, or enforcing any Encumbrance of any kind against the Debtor, the Reorganized Debtor, or their respective property with respect to such Claim or Demand; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to the Debtor or against the property or interests in property of the Debtor, with respect to such Claim or Demand; and/or (5) commencing or continuing any action, in any manner and in any place in the world, against the Debtor, the Reorganized Debtor, or their respective property that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order. The foregoing injunction shall extend to the successors of the Debtor, including, without limitation, the Reorganized Debtor, and their respective properties and interests in property. The discharge provided in this Article VIII shall void any judgment obtained against the Debtor at any time to the extent that such judgment relates to a discharged Claim or Demand.

### C. Talc Personal Injury Channeling Injunction

#### 1. Terms

Pursuant to sections 524(g) and 105(a) of the Bankruptcy Code, and to the fullest extent permitted thereby, from and after the Effective Date, the sole recourse of any Holder of a Talc Personal Injury Claim on account of such Talc Personal Injury Claim shall be to the Talc Personal Injury Trust pursuant to this Article VIII.C.1 of the Plan and the other Plan Documents, including the Talc Personal Injury Trust Distribution Procedures, and such Holder shall have no right whatsoever at any time to assert its Talc Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party. On and after the Effective Date, all present and future Holders of Talc Personal Injury Claims shall be permanently, forever, and completely stayed, restrained, prohibited, barred, and enjoined from taking any of the following actions, whether directly or indirectly, derivatively, by way of indemnity, contribution, subrogation, aiding and abetting, or otherwise, for the purpose of, directly, indirectly, derivatively, by way of indemnity, contribution, subrogation, aiding and abetting, or otherwise collecting, recovering, or receiving payment of, on, or with respect to any Talc Personal Injury Claim other than from the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Agreement and the Talc Personal Injury Trust Distribution Procedures:

(a) commencing, conducting, or continuing in any manner, directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction

around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

(b) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

(c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

(d) setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

(e) proceeding in any manner in any place with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Talc Personal Injury Trust, except in conformity and compliance with the Talc Personal Injury Trust Agreement and the Talc Personal Injury Trust Distribution Procedures.

**2. District Court Affirmance of Talc Personal Injury Channeling Injunction**

Following entry of the Confirmation Order by the Bankruptcy Court, the Debtor shall seek entry of the District Court Order affirming the Confirmation Order, including affirmance of the Talc Personal Injury Channeling Injunction in accordance with section 524(g) of the Bankruptcy Code.

**3. Reservations**

The Talc Personal Injury Channeling Injunction shall not stay, restrain, bar, or enjoin:

(a) the rights of Holders of Talc Personal Injury Claims to assert Talc Personal Injury Claims against the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents (including the Talc Personal Injury Trust Distribution Procedures);

(b) the rights of the Talc Personal Injury Trust to assert any claims with respect to the Talc Insurance Policies from and after the Effective Date;

(c) the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Talc Personal Injury Trust Expenses against the Talc Personal Injury Trust;

(d) the rights of Holders of Talc Personal Injury Claims to assert any claims against anyone other than a Protected Party, in their capacity as such; and

(e) the Talc Personal Injury Trust from enforcing its rights explicitly provided to it under this Plan and the Talc Personal Injury Trust Documents.

Notwithstanding the foregoing reservations, nothing in this Article VIII.C.3 shall permit any Entity or Person to assert, directly or indirectly, any indemnification, contribution, subrogation, reimbursement, or other similar claim or Cause of Action against any Protected Party to the extent such claim or Cause of Action is an Indirect Talc Personal Injury Claim, and all such claims and Causes of Action shall be and remain subject to the Talc Personal Injury Channeling Injunction and shall be channeled exclusively to the Talc Personal Injury Trust, and may be subordinated or Disallowed pursuant to the terms of this Plan.

**D. Insurance Entity Injunction**

**1. Purpose**

In order to protect the Talc Personal Injury Trust and to preserve the Talc Personal Injury Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court, the Bankruptcy Court shall issue the injunction set forth in this Article VIII.D (the "Insurance Entity Injunction"); *provided*, however, that the Insurance Entity Injunction is not issued for the benefit of any Talc Insurer, and no Talc Insurer is a third-party beneficiary of the Insurance Entity Injunction.

**2. Terms Regarding Claims Against Talc Insurers**

Subject to the provisions of Article VIII.C and VIII.D of the Plan, all Entities (including any Entity that holds or asserts rights as an additional insured under any Talc Insurance Policy) that have held or asserted, that hold or assert, or that may in the future hold or assert any claim, demand, or Cause of Action (including any Talc Personal Injury Claim or any claim or demand for or respecting any Talc Personal Injury Trust Expenses) against any Talc Insurer based upon, attributable to, arising out of, or in any way connected with any such Talc Personal Injury Claim, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or Cause of Action, including, without limitation:

(a) commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or Cause of Action against any Talc Insurer, or against the property of any Talc Insurer;

(b) enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Talc Insurer, or against the property of any Talc Insurer, with respect to any such claim, demand, or Cause of Action;

(c) creating, perfecting, or enforcing in any manner, directly or indirectly, any Encumbrance against any Talc Insurer, or the property of any Talc Insurer, with respect to any such claim, demand, or Cause of Action; and

(d) except as otherwise specifically provided in this Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Talc Insurer, or against the property of any Talc Insurer, with respect to any such claim, demand, or Cause of Action.

Notwithstanding the foregoing, (a) the Insurance Entity Injunction shall not impair in any way any actions brought by the Talc Personal Injury Trust against any Talc Insurer, and (b) the Talc Personal Injury Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the Insurance Entity Injunction with respect to any Talc Insurer upon express written notice to such Talc Insurer.

**3. Reservations**

Notwithstanding anything to the contrary above, the Insurance Entity Injunction shall not enjoin:

(a) the rights of Entities to the treatment accorded them under this Plan, as applicable, including the rights of Holders of Talc Personal Injury Claims to assert such Claims in accordance with the Talc Personal Injury Trust Distribution Procedures;

(b) the rights of Entities to assert any claim, debt, obligation, Cause of Action, or liability for payment of Talc Personal Injury Trust Expenses against the Talc Personal Injury Trust;

(c) the rights of the Talc Personal Injury Trust to prosecute any action based on or arising from the Talc Insurance Policies;

(d) the rights of the Talc Personal Injury Trust to assert any claim, debt, obligation, Cause of Action, or liability for payment against a Talc Insurer based on or arising from the Talc Insurance Policies or Talc Personal Injury Insurance Assets; and

(e) the rights of any Talc Insurer to assert any claim, debt, obligation, Cause of Action, or liability for payment against any other Talc Insurer.

Nothing in this Article VIII.D shall affect any insurance coverage or rights of the Reorganized Debtor and the Non-Debtor Affiliates, and their respective Related Parties that are not assigned or contributed to the Talc Personal Injury Trust pursuant to the Plan.

**E. Exculpation and Section 1125(e) Protection**

None of the Exculpated Parties shall have or incur any liability to any Entity for any act or omission taken or to be taken on or after the Petition Date through and including the Effective Date in connection with, related to, or arising out of: (1) this Chapter 11 Case; (2) the negotiation,

formulation, and preparation of this Plan and the other Plan Documents, and any of the terms and/or settlements and compromises reflected in this Plan and the other Plan Documents; (3) the pursuit of Confirmation of this Plan; (4) the Consummation of this Plan, or administration of this Plan or the property to be distributed under this Plan or the Talc Personal Injury Trust Distribution Procedures; or (5) the releases and injunctions contained in this Plan, except for any liability that results from such Entity's criminal acts, actual fraud, willful misconduct, or gross negligence as determined by a Final Order; and, in all respects, the Debtor, the Reorganized Debtor, and each of the other Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities in and under this Chapter 11 Case, this Plan, and the Plan Documents.

Each of the Section 1125(e) Protected Parties shall be deemed to have acted in good faith under section 1125(e) of the Bankruptcy Code in connection with the solicitation and/or participation in this Plan. Each of the Section 1125(e) Protected Parties shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.

## F. Releases by Debtor and Estate, Third-Party Release, and Related Injunction

### 1. Debtor Release of Non-Debtor Affiliates and Their Related Parties

Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, the Reorganized Debtor, and any Entity seeking to exercise the rights of the Estate, in each case whether individually or collectively, including, without limitation, any successor to the Debtor or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, shall, and shall be deemed to, irrevocably, completely, and forever release, waive, and discharge unconditionally each Non-Debtor Affiliate and each of its respective Related Parties from any and all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action, and liabilities which the Debtor, its Estate, or the Reorganized Debtor is entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, whether direct, indirect, or derivative, based upon, attributable to, or arising out of, in whole or in part, any act or omission, transaction, event, occurrence, or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date), including, without limitation, any and all Claims and Causes of Action arising out of or relating to the 2023 Transaction, and any other estate Claims and Causes of Action against the Non-Debtor Affiliates or their Related Parties; *provided*, however, that the foregoing release shall not release or impair (a) any rights under this Plan, the Plan Documents, and the contracts, instruments, releases, and other agreements or documents delivered or to be delivered under or in connection with this Plan, (b) any Assigned Causes of Action against the Excluded Parties that relate to or arise out of the 2020 ESOP Transaction, which shall be assigned to the Talc Personal Injury Trust, or (c) any direct Causes of Action that Holders of Talc Personal Injury Claims have against the Non-Debtor Affiliates or any Entity other than the Debtor.

**2. Debtor Releases of Other Released Parties**

Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, the Reorganized Debtor, and any Entity seeking to exercise the rights of the Estate, in each case whether individually or collectively, including, without limitation, any successor to the Debtor or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, shall, and shall be deemed to, irrevocably, completely, and forever release, waive, and discharge unconditionally the Released Parties (other than the Non-Debtor Affiliates and their Related Parties, which are the subject of Article VIII.F.1 above) from any and all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action, and liabilities which the Debtor, its Estate, or the Reorganized Debtor is entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, whether direct, indirect, or derivative, based upon, attributable to, or arising out of, in whole or in part, any act or omission, transaction, event, occurrence, or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date), other than the rights under this Plan, the Plan Documents, and the contracts, instruments, releases, and other agreements or documents delivered or to be delivered under or in connection with this Plan; *provided*, however, that nothing contained in this Article VIII.F.2 shall operate as a release of any liability arising from a criminal act, actual fraud, or willful misconduct as determined by a Final Order.

**3. Third-Party Release**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party shall be deemed to irrevocably and forever release, waive, and discharge all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action, losses, and liabilities whatsoever against the Released Parties, including the Non-Debtor Affiliates and their respective Related Parties, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, based in whole or in part upon any act, omission, event, transaction, occurrence, or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in any way relating to or connected with the Debtor, the Estate, the 2023 Transaction, the Restructuring Support Agreement, the Restructuring Transactions, this Chapter 11 Case, this Plan (including the subject matter of, or the transactions or events giving rise to, any Claim or Interest treated under this Plan), the Plan Documents, the Reorganized Debtor, or any related agreements, instruments, and other documents created or entered into before or during this Chapter 11 Case or the negotiation, formulation, preparation, solicitation, Confirmation, Consummation, administration, or implementation thereof, including, without limitation, all talc-related Claims and Causes of Action against the Non-Debtor Affiliates and their respective Related Parties; *provided*, however, that the foregoing release shall not operate to release or impair (a) any rights under this Plan, the Plan Documents, and the contracts, instruments, releases, and other agreements or documents delivered or to be delivered under or in connection with this Plan, (b) any Claim or Cause of Action arising from a criminal act, actual fraud, or willful misconduct of a Released Party as determined by a Final Order; or (c) any Assigned Causes of Action against the Excluded Parties that relate to or arise out of the 2020 ESOP Transaction, which shall be assigned to the Talc Personal Injury Trust. For the

avoidance of doubt, nothing in this Article VIII.F.3 shall alter or diminish the requirement that a Holder of a Talc Personal Injury Claim execute a Talc Personal Injury Claimant Release as a condition to receiving a distribution or otherwise recovering from the Talc Personal Injury Trust, as provided in this Plan and the Talc Personal Injury Trust Documents.

**4. Injunction Enforcing Releases**

Except as provided in this Plan or the Confirmation Order, the Debtor, the Reorganized Debtor, any Entity seeking to exercise the rights of the Estate, and each Releasing Party, in each case solely to the extent bound by a release set forth in this Article VIII.F, are permanently enjoined from taking any of the following actions on account of or based upon any and all Claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action, and liabilities released pursuant to this Article VIII.F: (a) commencing or continuing any action or other proceeding against any applicable Released Party or its property; (b) enforcing, attaching, collecting, or recovering any judgment, award, decree, or order against any applicable Released Party or its property; (c) creating, perfecting, or enforcing any Encumbrance against any applicable Released Party or its property; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to any applicable Released Party or against its property; and (e) commencing or continuing any action, in any manner and in any place in the world, against any applicable Released Party that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.

**5. Preservation of Assigned Causes of Action**

Notwithstanding anything to the contrary in this Article VIII.F, except to the extent expressly released pursuant to Article VIII.F.1 as part of the settlement embodied in the Restructuring Support Agreement and this Plan, nothing in this Article VIII.F shall release, waive, discharge, or otherwise impair any Assigned Cause of Action, and all Assigned Causes of Action shall remain preserved for transfer to and enforcement by the Talc Personal Injury Trust in accordance with this Plan and the Talc Personal Injury Trust Documents. For the avoidance of doubt, the Assigned Causes of Action that relate to or arise out of the 2020 ESOP Transaction against the Excluded Parties are expressly preserved and are not released by this Plan, and any preference Causes of Action arising under chapter 5 of the Bankruptcy Code, including section 547 thereof, that constitute Assigned Causes of Action shall remain preserved except to the extent expressly released pursuant to Article VIII.F.1.

**G. Certain Waivers**

Although the Debtor does not believe that California law is applicable to the Plan, nevertheless, in an abundance of caution, the Debtor hereby affirms that it understands and waives the effect of section 1542 of the California Civil Code to the extent that such section is applicable to the Debtor or the Debtor's Estate. Section 1542 of the California Civil Code provides:

> **§ 1542. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY**

**AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

**THE DEBTOR AGREES TO ASSUME THE RISK OF ANY AND ALL UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS WHICH ARE RELEASED BY THE PLAN AND THE DEBTOR HEREBY WAIVES AND RELEASES ALL RIGHTS AND BENEFITS WHICH THE DEBTOR OR DEBTOR'S ESTATE MIGHT OTHERWISE HAVE UNDER THE AFOREMENTIONED SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH REGARD TO THE RELEASE OF SUCH UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS. TO THE EXTENT (IF ANY) ANY OTHER LAWS SIMILAR TO SECTION 1542 OF THE CALIFORNIA CIVIL CODE MAY BE APPLICABLE, THE DEBTOR HEREBY WAIVES AND RELEASES ANY BENEFIT, RIGHT OR DEFENSE WHICH THE DEBTOR OR DEBTOR'S ESTATE MIGHT OTHERWISE HAVE UNDER ANY SUCH LAW WITH REGARD TO THE RELEASE OF UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.**

The foregoing waiver of the effects of section 1542 of the California Civil Code shall not alter, modify or otherwise impact the treatment, releases, and/or channeling injunction with respect to Talc Personal Injury Claims and shall not affect or alter the requirement that all Holders of Talc Personal Injury Claims (whether present, future, known or unknown) must execute a Talc Personal Injury Claimant Release as a precondition to receiving payment on account of their Talc Personal Injury Claims from the Talc Personal Injury Trust.

### H. Disallowed Claims

The Confirmation Order, except as otherwise provided therein or herein, shall constitute an order: (1) disallowing all Claims (other than Talc Personal Injury Claims) to the extent such Claims are not allowable under any provision of section 502 of the Bankruptcy Code, including, without limitation, time-barred Claims and Claims for unmatured interest; and (2) disallowing or subordinating, as the case may be, any Claims, or portions of Claims, for penalties or non-compensatory damages. On and after the Effective Date, the Debtor and its Estate shall be fully and finally discharged from any liability or obligation on a Disallowed Claim, and any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

## ARTICLE IX.
## CONFIRMATION ORDER REQUIREMENTS AND CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

### A. Confirmation Order Requirements

The following are requirements to the substance and form of the Confirmation Order that are, among other things, designed to ensure that the injunctions, releases, and discharges set forth in Article VIII shall be effective, binding, and enforceable and that must be satisfied unless waived in accordance with Article IX.C below:

1. The Confirmation Order shall be acceptable in form and substance to the Debtor, Emprise, the Unsecured Creditors Committee, and the Future Claimants' Representative, in each case to the extent required by and subject to the applicable consent, approval, and consultation rights set forth in the Restructuring Support Agreement and the Restructuring Term Sheet.

2. The Confirmation Order shall, among other things:

    (a) order that the Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

    (b) provide that, except with respect to obligations specifically preserved in the Plan, the Debtor is discharged effective on the Effective Date (in accordance with the Plan) from any Talc Personal Injury Claims and Demands, and the Debtor's liability in respect thereof, whether reduced to judgment or contingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, or known or unknown, suspected or unsuspected, that arose from any agreement of the Debtor entered into or obligation of the Debtor incurred before the Effective Date, or from any conduct of the Debtor prior to the Effective Date, whether such liability accrued before or after the Petition Date, is extinguished completely;

    (c) authorize the implementation of the Plan in accordance with its terms;

    (d) acknowledge it is to be affirmed by the District Court Order;

    (e) approve and provide for the issuance of the Talc Personal Injury Channeling Injunction, subject to appropriate findings that Class 4 voted in the requisite numbers and amounts in favor of the Plan as required by sections 524(g), 1126, and 1129 of the Bankruptcy Code;

    (f) provide that Emprise HPC shall receive the Reorganized Debtor Interests as of the Effective Date, subject to the Pledge and Security Agreement securing the obligations under the Vi-Jon Promissory Note;

(g) provide that the Reorganized Debtor shall deliver the Vi-Jon Promissory Note to the Talc Personal Injury Trust and Emprise HPC shall deliver the Pledge and Security Agreement to the Talc Personal Injury Trust;

(h) provide that all transfers of assets of the Debtor contemplated under the Plan shall be free and clear of all Claims and Encumbrances against or on such assets except as otherwise provided under the Plan;

(i) provide that the issuance, transfer, or exchange of any security, or the making or delivery of any instrument of transfer, under the Plan are free and clear of taxes to the extent provided for under section 1146(a) of the Bankruptcy Code;

(j) provide that: (i) the Insurance Assignment is authorized and permissible notwithstanding any terms of the Talc Insurance Policies or provisions of applicable law that may be argued to prohibit the Insurance Assignment; and (ii) the Bankruptcy Code authorizes the assignment of the Talc Personal Injury Insurance Assets to the Talc Personal Injury Trust pursuant to Article IV.B.5, and from and after the Insurance Assignment, no Talc Insurer may assert under any Talc Insurance Policy (x) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (y) any defense that the assignment of the Talc Personal Injury Insurance Assets to the Talc Personal Injury Trust pursuant to Article IV.B.5, or any other action contemplated by Article IV, is prohibited by any Talc Insurance Policy;

(k) except as otherwise provided in the Plan or Confirmation Order, provide that the assets vesting or revesting in the Reorganized Debtor shall be free and clear of all Claims and Encumbrances;

(l) provide that any transfers effected or entered into, or to be effected or entered into, under the Plan (including the Real Estate Transaction) shall be and are exempt under section 1146(a) of the Bankruptcy Code from any state, city, or other municipal transfer taxes, mortgage recording taxes, and any other stamp or similar tax;

(m) provide that the transfers of property by the Debtor to the Reorganized Debtor: (i) are or will be legal, valid, and effective transfers of property; (ii) vest or will vest the Reorganized Debtor with good title to such property; (iii) do not and will not constitute avoidable transfers under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law; and (iv) do not and will not subject the Reorganized Debtor to any liability by reason of such transfer under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, any laws affecting or effecting successor or transferee liability;

(n) provide that all Executory Contracts and Unexpired Leases assumed or assumed and assigned by the Debtor during the Chapter 11 Case or under

the Plan shall remain in full force and effect for the benefit of the Reorganized Debtor or any assignee thereof notwithstanding any provision in such contract or lease, including those provisions described in sections 365(b)(2) and 365(f) of the Bankruptcy Code, that prohibits such assignment or transfer or that enables or requires termination of such contract or lease;

(o) provide that any applicable Cure shall be paid or otherwise satisfied on the Effective Date, with Emprise paying or otherwise satisfying any applicable Cure with respect to Executory Contracts and Unexpired Leases that are assumed and assigned to the Non-Debtor Affiliates (or their designees), and that the Reorganized Debtor, with respect to Executory Contracts and Unexpired Leases assumed by the Debtor, and the applicable Non-Debtor Affiliates (or their designees), with respect to Executory Contracts and Unexpired Leases assumed and assigned to them, have provided adequate assurance of future performance;

(p) require, as a condition to receiving any distributions of any kind from the Talc Personal Injury Trust, that each Holder of a Talc Personal Injury Claim execute the Talc Personal Injury Claimant Release;

(q) include one or more forms of notices that the Talc Personal Injury Trust and/or Protected Parties may utilize in connection with any alleged violation of the Talc Personal Injury Channeling Injunction; and

(r) approve in all respects the other settlements, transactions, and agreements to be effected pursuant to the Plan, including, without limitation, the Talc Personal Injury Trust Agreement, the Talc Personal Injury Trust Distribution Procedures, the other Talc Personal Injury Trust Documents, and the releases herein of the Released Parties, including the Non-Debtor Affiliates and their Related Parties.

3. In addition to the foregoing, the Confirmation Order shall contain the following findings of fact and conclusions of law, among others:

(a) the Plan complies with all applicable provisions of the Bankruptcy Code, including, without limitation, those requiring that the Plan be proposed in good faith and that the Confirmation Order not be procured by fraud;

(b) the Plan and its acceptance otherwise comply with sections 524(g) and 1126 of the Bankruptcy Code, and confirmation of the Plan is in the best interests of all creditors;

(c) the Plan does not provide for the liquidation of all or substantially all of the property of the Debtor, the Reorganized Debtor will operate as an ongoing business and continue in business as a separate entity, and confirmation of the Plan is not likely to be followed by the liquidation of the Reorganized Debtor or the need for further financial reorganization;

(d) as of the Petition Date, the Debtor had been named as a defendant in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, talc or talc-containing products and/or asbestos or asbestos-containing products;

(e) upon the Effective Date, the Talc Personal Injury Trust shall assume, to the fullest extent permissible under section 524(g) of the Bankruptcy Code and as provided in the Plan and other Plan Documents, the liabilities with respect to all Talc Personal Injury Claims that are channeled to the Talc Personal Injury Trust;

(f) the Talc Personal Injury Trust is to be funded by contribution of the Talc Personal Injury Trust Assets, including the Emprise Effective Date Cash Trust Contribution;

(g) Emprise HPC will on the Effective Date own one hundred percent (100%) of the Reorganized Debtor Interests and all rights to receive distributions on account of such Reorganized Debtor Interests, subject to the pledge of 50.1% of such Reorganized Debtor Interests to the Talc Personal Injury Trust pursuant to the Pledge and Security Agreement securing the obligations under the Vi-Jon Promissory Note;

(h) the transfer of the Transferred Assets to the applicable Non-Debtor Affiliates (or their designees) pursuant to Article IV.C.1 of the Plan and the Bill of Sale and, to the extent consummated pursuant to the Plan and other Plan Documents, the sale of the Etzel Property pursuant to Article IV.C.2 of the Plan are legal, valid, and effective transfers, vest the applicable Non-Debtor Affiliate, designee, or purchaser, as applicable, with good title to the assets transferred to it, and, pursuant to sections 1123 and 1141(c) of the Bankruptcy Code and to the fullest extent permitted thereby, transfer such assets free and clear of all Claims, Liens, Encumbrances, Interests, and other interests in or against such assets, except as otherwise expressly provided in the Plan or the Confirmation Order;

(i) neither the transfer of the Transferred Assets to the applicable Non-Debtor Affiliates (or their designees) pursuant to Article IV.C.1 of the Plan nor, to the extent consummated pursuant to the Plan, the sale of the Etzel Property pursuant to Article IV.C.2 of the Plan shall, solely by reason of such transfer or sale, cause any such Non-Debtor Affiliate, designee, or purchaser to be deemed a successor to the Debtor or the Estate under any theory of law or equity or subject any such Non-Debtor Affiliate, designee, or purchaser to successor or transferee liability of any kind or character for any Claim, Demand, liability, or obligation of the Debtor or the Estate arising from or relating to any act, omission, conduct, event, circumstance, operation, or ownership of such assets occurring or existing prior to the applicable transfer or sale, except for any liabilities or obligations expressly assumed

by such Non-Debtor Affiliate, designee, or purchaser under the Plan, the Bill of Sale, or any other applicable Plan Document; *provided* that any Holder of a Talc Personal Injury Claim or Demand that seeks to impose successor or transferee liability upon a Protected Party shall remain subject to the Talc Personal Injury Channeling Injunction;

(j) the Talc Personal Injury Trust is to use its assets and income to resolve Talc Personal Injury Claims and pay Talc Personal Injury Trust Expenses consistent with the terms of the Talc Personal Injury Trust Agreement and Talc Personal Injury Trust Distribution Procedures;

(k) the Debtor is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Talc Personal Injury Claims, and all such Demands are subject to the Talc Personal Injury Channeling Injunction;

(l) the actual amounts, numbers, and timing of Demands cannot be determined;

(m) pursuit of Demands outside the procedures prescribed by the Plan and the Talc Personal Injury Trust Distribution Procedures is likely to threaten the Plan's purpose to deal equitably with Talc Personal Injury Claims;

(n) the Plan separately classifies Talc Personal Injury Claims in Class 4, and at least two-thirds (2/3) in amount and seventy-five percent (75%) in number of the Holders in such Class that actually voted on the Plan have voted to accept the Plan;

(o) the Talc Personal Injury Trust will have the sole and exclusive authority as of the Effective Date to satisfy, settle, or defend against all Talc Personal Injury Claims;

(p) pursuant to: (i) the Talc Personal Injury Trust Distribution Procedures; (ii) court order; or (iii) otherwise, the Talc Personal Injury Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Talc Personal Injury Claims or other comparable mechanisms that provide reasonable assurance that the Talc Personal Injury Trust will value, and be in a financial position to pay, current and future Talc Personal Injury Claims in substantially the same manner regardless of the timing of the assertion of such Talc Personal Injury Claims;

(q) the Future Claimants' Representative was appointed by the Bankruptcy Court pursuant to sections 105 and 524(g) of the Bankruptcy Code as part of the proceedings leading to the issuance of the Talc Personal Injury Channeling Injunction for the purpose, among other things, of protecting the interests of Future Demand Holders;

(r) the Talc Personal Injury Channeling Injunction is to be implemented in accordance with the Plan and the Talc Personal Injury Trust;

(s) the Talc Personal Injury Channeling Injunction and the Insurance Entity Injunction are essential to the Plan and the Debtor's reorganization efforts;

(t) the terms of the Talc Personal Injury Channeling Injunction, the Insurance Entity Injunction, and the other injunctions contained in the Plan, including any provisions barring actions against third parties, are set forth in the Plan and the Disclosure Statement;

(u) the Talc Personal Injury Trust Assets and the contributions, agreements, and accommodations provided by the Non-Debtor Affiliates collectively constitute a sufficient basis upon which to provide the Protected Parties with the protections afforded to them under the Plan, the Plan Documents, and the Confirmation Order;

(v) in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by or on behalf of each Protected Party, the Talc Personal Injury Channeling Injunction and Insurance Entity Injunction are fair and equitable to all Holders of Talc Personal Injury Claims, including Demands;

(w) each Protected Party is identifiable from the terms of the Talc Personal Injury Channeling Injunction by name or as part of an identifiable group, and each Protected Party is or may be alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on the Debtor to the extent that such alleged liability arises by reason of one or more of the following: (i) such Protected Party's ownership of a financial interest in the Debtor, the Reorganized Debtor, any past or present Affiliate of the Debtor or the Reorganized Debtor, or any predecessor in interest thereof; (ii) such Protected Party's involvement in the management of the Debtor, the Reorganized Debtor, or any predecessor in interest thereof, or service as an officer, director, manager, or employee thereof; or (iii) such Protected Party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the Debtor, the Reorganized Debtor, any past or present Affiliate of the Debtor or the Reorganized Debtor, or any predecessor in interest thereof;

(x) any Indirect Talc Personal Injury Claim, including any claim for contribution, reimbursement, subrogation, or indemnification asserted against a Protected Party by any Entity or Person that has been, is, or may be a co-defendant in an action involving a Talc Personal Injury Claim, is subject to the Talc Personal Injury Channeling Injunction, may not be asserted against such Protected Party, and shall be channeled exclusively to the Talc Personal Injury Trust; and

(y) the releases provided to the Debtor and its Related Parties and to the Non-Debtor Affiliates and their Related Parties in exchange for the contributions, agreements, and accommodations provided in connection with the Global Settlement, including the Emprise Effective Date Cash Trust Contribution and the contribution of rights under and related to the Talc Insurance Policies, are essential to the Global Settlement of Talc Personal Injury Claims arising from the conduct or products of the Debtor reflected in the Plan.

**B. Conditions Precedent to the Effective Date**

The following are conditions precedent to occurrence of the Effective Date of the Plan that must be satisfied, unless waived in accordance with Article IX.C hereof, on or prior to the deadline for consummation of the Plan under the Restructuring Support Agreement, as such deadline may be extended in accordance therewith:

1. all conditions precedent to the Confirmation Date shall have been satisfied or waived and shall continue to be satisfied or waived, and the Confirmation Date shall have occurred on or before the applicable deadline under the Restructuring Support Agreement, as such deadline may be extended in accordance therewith;

2. the Restructuring Support Agreement shall remain binding, valid, and not terminated with respect to any of the parties thereto;

3. the Confirmation Order, in form and substance acceptable in accordance with Article IX.A, shall have been entered by the Bankruptcy Court;

4. no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made or, if made, shall no longer remain pending;

5. no fact or circumstance shall exist that would prevent the Talc Personal Injury Channeling Injunction and Insurance Entity Injunction from coming into full force and effect immediately upon the occurrence of the Effective Date;

6. the Confirmation Order shall be a Final Order;

7. the Emprise Effective Date Cash Trust Contribution and the Emprise Effective Date Cash Debtor Contribution shall have been funded or shall be funded contemporaneously with the occurrence of the Effective Date;

8. no fact or circumstance shall prevent the Talc Personal Injury Trust from being funded with the Talc Personal Injury Trust Assets, including the Emprise Effective Date Cash Trust Contribution, upon occurrence of the Effective Date;

9. the District Court shall have entered the District Court Order affirming the Confirmation Order, including affirmance of the Talc Personal Injury Channeling Injunction in accordance with section 524(g) of the Bankruptcy Code; and

10. all Plan Documents shall have been executed and delivered, and all other actions, documents, and agreements necessary to implement those provisions of the Plan to be effectuated on or prior to the Effective Date, in form and substance satisfactory to the Plan Proponents and Emprise to the extent required by and subject to the applicable consent, approval, and consultation rights set forth in the Restructuring Support Agreement and the Restructuring Term Sheet, shall have been effected or executed and delivered.

**C. Waiver of Conditions**

To the fullest extent permitted by law, and subject to the Restructuring Support Agreement and the Restructuring Term Sheet, any of the requirements or conditions precedent set forth in Articles IX.A and IX.B above may be waived or modified, in whole or in part, by mutual consent of the Plan Proponents and Emprise, to the extent each such party is entitled to a consent right with respect to such waiver or modification under the Restructuring Support Agreement and the Restructuring Term Sheet. Any such consent may be evidenced by confirmatory email from counsel and shall be subject to any standard applicable to such consent under the Restructuring Support Agreement and the Restructuring Term Sheet. Any such waiver or modification may be effected at any time without leave or order of the Bankruptcy Court or the District Court, and without any other formal action.

**D. Failure to Achieve the Effective Date**

If each of the conditions to the Effective Date is not met or duly waived in accordance with Article IX.C, then upon motion by the Debtor with consent of the other Plan Proponents and notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court. If (1) the Plan Proponents jointly revoke or withdraw the Plan, (2) the Confirmation Order is vacated, (3) the Plan is otherwise not confirmed by a Final Order, or (4) the Plan is confirmed and does not become effective for any other reason, then the rights of all parties in interest in the Chapter 11 Case are and shall be reserved in full. In any such event, the Plan shall become null and void in all respects; any settlement or compromise embodied in the Plan, any assumption or assumption and assignment of Executory Contracts or Unexpired Leases effected by the Plan, funding commitments by the Non-Debtor Affiliates and their respective Related Parties, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and nothing contained in the Plan or the Confirmation Order, if previously entered, and no acts taken in preparation for Consummation of the Plan shall: (a) constitute or be deemed to constitute a waiver, release, or settlement of any Claims by or against, or any Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any Entity in any further proceedings involving the Debtor; or (c) constitute an admission of any sort by the Debtor or any other Entity.

# ARTICLE X.
# MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

## A. Modification and Amendments

Subject to the limitations contained herein and in the other Plan Documents, and except as otherwise ordered by the Court, the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules and with the consent of the other Plan Proponents, which consent shall not be unreasonably withheld, to alter, amend, or modify the Plan or any exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to entry of the Confirmation Order and may include such amended exhibits in the Plan, *provided* that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, without additional disclosure pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3019. A Holder of a Claim that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Court, if any, such Holder changes its previous acceptance or rejection, to the extent such Holder is required to be afforded the opportunity to do so under section 1127(d) of the Bankruptcy Code. Any such modification shall be in compliance with section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019(a).

To the extent permissible under section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019, following Confirmation, the Debtor or Reorganized Debtor, as applicable, may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan, so long as: (a) the interests of the Holders of Allowed Claims are not adversely affected thereby; (b) any such modifications are non-material; (c) the Unsecured Creditors Committee and the Future Claimants' Representative or, following the Effective Date, the Talc Personal Injury Trust Advisory Committee and the Post-Effective Date Future Claimants' Representative consent (which consent shall not be unreasonably withheld, conditioned, or delayed); (d) the Non-Debtor Affiliates consent (which consent shall not be unreasonably withheld, conditioned, or delayed); and (e) the United States Trustee does not object, unless such objection is overruled by the Bankruptcy Court. On and after the Effective Date, the authority to amend, modify, or supplement the Plan Documents, other than the Plan, will be as provided in such Plan Documents. After the Effective Date, any Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified or supplemented pursuant to this Article X.A. Any such modification shall be in compliance with section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019(b).

## B. Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the Solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019 or that any additional disclosure or re-solicitation performed was sufficient.

### C. Revocation or Withdrawal of Plan

The Debtor reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to File subsequent plans of reorganization. If the Debtor revokes or withdraws the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts and/or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Entity, (b) prejudice in any manner the rights of the Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

### A. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over all matters arising out of, or relating to, this Chapter 11 Case and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

A. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

B. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

C. resolve any matters related to: (1) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (2) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and assigned; and (3) any dispute regarding whether a contract is or was executory or expired;

D. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

E. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

F. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

G. enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with this Plan or the Disclosure Statement, except to the extent that a Plan Supplement document provides for exclusive jurisdiction and venue in another forum;

H. enter and enforce any order for the sale of property pursuant to sections 1123, or 1146(a) of the Bankruptcy Code;

I. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

J. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan;

K. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

L. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.G hereof;

M. enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

N. determine any other matters that may arise in connection with or relate to this Plan, the Plan Supplement, the Disclosure Statement, any order of the Court approving the sale of the Etzel Property, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan or the Disclosure Statement, except to the extent that any Plan Supplement document provides for exclusive jurisdiction and venue in another forum;

O. enter an order concluding or closing the Chapter 11 Case;

P. adjudicate any and all disputes arising from or relating to distributions under this Plan;

Q. consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

R. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

S. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan, if applicable, and the Plan Documents, except to the extent that any document provides for exclusive jurisdiction and venue in another forum;

T. hear and determine any dispute concerning, and enforce remedies upon, any default under this Plan;

U. hear and determine any dispute concerning the calculation or determination of the Settlement Fee, including any dispute concerning the enterprise value of Emprise or the amount of gross consideration used in calculating the Settlement Fee pursuant to Article IV.B.8 and the Settlement Fee Letter Agreement;

V. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

W. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under Article VIII hereof;

X. enforce all orders previously entered by the Court; and

Y. hear any other matter not inconsistent with the Bankruptcy Code.

If and to the extent that the Court is not permitted under applicable law to exercise jurisdiction over any of the matters specified above, references to the "Court" in this Article XI shall be deemed to refer to the District Court.

**B. Consent to Jurisdiction**

Upon default under the Plan, the Debtor, the Reorganized Debtor, the Talc Personal Injury Trust, the Talc Personal Injury Trustee, the Unsecured Creditors Committee, the Future Claimants' Representative, and the Protected Parties, respectively, consent to the jurisdiction of the Bankruptcy Court and the District Court, as applicable, and agree that it shall be the preferred forum for all proceedings relating to any such default.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

**A. Immediate Binding Effect**

Subject to Article IX.B hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including the documents and instruments contained in the Plan Supplement) shall be immediately

effective and enforceable and deemed binding upon the Debtor, any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Debtor.

### B. Dissolution of the Unsecured Creditors Committee

#### 1. Automatic Dissolution

Effective on the Effective Date, the Unsecured Creditors Committee shall be dissolved automatically, whereupon its members, professionals, and agents shall be released and discharged from any further authority, duties, obligations and responsibilities in the Chapter 11 Case and under the Bankruptcy Code. Effective on the Effective Date, the Future Claimants' Representative shall be discharged from her duties in such capacity, whereupon the Future Claimants' Representative and her professionals and agents shall be released and discharged from any further authority, duties, obligations and responsibilities in the Chapter 11 Case and under the Bankruptcy Code. On the Effective Date, the rights, duties, and responsibilities of the Future Claimants' Representative shall be assumed by the Post-Effective Date Future Claimants' Representative as set forth in Article IV.D.6.

#### 2. Survival for Limited Purposes

Notwithstanding the foregoing, the Unsecured Creditors Committee and the Future Claimants' Representative may, at their respective option and without taking any action or seeking or receiving any approval, continue in existence and have post-Effective Date standing and capacity to: (i) complete matters, if any, including litigation, appeals, or negotiations pending as of the Effective Date that are not released pursuant to the Plan; (ii) grant or withhold, in their sole discretion, any consent contemplated or required under the Plan; (iii) prosecute or defend any Professional Claims; (iv) appeal or oppose the appeal of any order entered in the Chapter 11 Case, including the Confirmation Order; (v) litigate any motions or other actions seeking enforcement or implementation of the provisions of the Plan or Confirmation Order; and (vi) prepare and prosecute applications for the payment of fees and reimbursement of expenses of their respective professionals. The Unsecured Creditors Committee's Professionals, and the Future Claimants' Representative and her Professionals shall be entitled to reasonable fees and reimbursement of expenses for services rendered after the Confirmation Date through and including the Effective Date, and following the Effective Date solely for those services arising from or connected with any matter authorized or described in this paragraph.

The Debtor shall pay or reserve for in the Professional Claim Reserve Account such reasonable fees and expenses incurred or projected to be incurred through the Effective Date, in accordance with the procedures set forth herein and in accordance with the Bankruptcy Code, Bankruptcy Rules, or orders relating to interim and final fee applications approved by the Bankruptcy Court during the Chapter 11 Case. All reasonable and necessary post-Effective Date fees and expenses of the Unsecured Creditors Committee, the Future Claimants' Representative, and their professionals, arising from or connected with any matter authorized or described in the preceding paragraph shall be paid from the Professional Claim Reserve Account.

### 3. Dissolution and Succession

Upon (i) the completion of all matters authorized and described in this section and (ii) the irrevocable and indefeasible payment in full of all Allowed Professional Claims of the Unsecured Creditors Committee, the Unsecured Creditors Committee shall be automatically dissolved, whereupon its members, retained professionals, and agents shall be released and discharged from all further authority, duties, responsibilities, liabilities, and obligations related to, or arising from, the Chapter 11 Case.

Upon (i) the completion of all matters authorized and described in this section and (ii) the irrevocable and indefeasible payment in full of all Allowed Professional Claims of the Future Claimants' Representative, the Future Claimants' Representative shall be automatically discharged, whereupon the Future Claimants' Representative and her professionals and agents shall be released and discharged from all further authority, duties, responsibilities, liabilities, and obligations related to, or arising from, the Chapter 11 Case.

In addition, effective as of the Unsecured Creditors Committee's dissolution, the Talc Personal Injury Trust Advisory Committee shall succeed to, and exclusively hold, the attorney-client privilege and any other Privilege held by the Unsecured Creditors Committee and shall enjoy the work product protections that were applicable or available to the Unsecured Creditors Committee before its dissolution. Upon the discharge of the Future Claimants' Representative, the Post-Effective Date Future Claimants' Representative shall succeed to, and exclusively hold, the attorney-client privilege and any other Privilege held by the Future Claimants' Representative and shall enjoy the work-product protections that were applicable or available to the Future Claimants' Representative before her discharge.

All reasonable and necessary post-Effective Date fees and expenses of the professionals retained by the Talc Personal Injury Trust Advisory Committee and the Post-Effective Date Future Claimants' Representative (except as provided in Article XII.B.2) shall be paid exclusively by the Talc Personal Injury Trust in accordance with the terms of the Talc Personal Injury Trust Agreement, and the Reorganized Debtor shall not be liable for any such fees and expenses. The parties shall attempt to resolve any dispute regarding the payment of such fees and expenses in good faith, and if they shall fail to resolve such dispute, they shall submit the dispute to the Bankruptcy Court for resolution.

## C. Additional Documents

On or before the Effective Date, the Debtor may File with the Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan. The Debtor, all Holders of Claims or Interests receiving Plan Distributions pursuant to this Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

## D. Payment of United States Trustee Quarterly Fees

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the United States

Code to the extent applicable ("Quarterly Fees"), prior to the Effective Date shall be paid by the Debtor on the Effective Date. After the Effective Date, the Debtor and the Reorganized Debtor shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. The Debtor shall File all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Reorganized Debtor shall File with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. The Debtor and the Reorganized Debtor shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of the Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to File any Administrative Expense Claim in the Chapter 11 Case and shall not be treated as providing any release under the Plan.

**E. Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

**F. Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of such Entity.

**G. Notices**

All notices, requests, and demands to or upon the Debtor to be effective shall be in writing (including by electronic email) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by electronic email, when received and telephonically confirmed, addressed as follows:

| Debtor | Counsel to the Debtor |
|---|---|
| Vi-Jon, LLC<br>Mackenzie Shea, Chief Restructuring Officer<br>c/o BRG<br>225 Franklin Street<br>Suite 3100<br>Boston, MA 02110<br>Attention: Mackenzie Shea<br>(MShea@thinkbrg.com) | Sidley Austin LLP<br>787 Seventh Ave<br>New York, NY 10019<br>Attention: Thomas Califano, William Curtin, Anne G. Wallice<br>(tom.califano@sidley.com;<br>wcurtin@sidley.com;<br>anne.wallice@sidley.com) |

| **U.S. Trustee** | **Counsel to the Non-Debtor Affiliates** |
|---|---|
| Office of the United States Trustee for the District of Delaware<br>844 King Street<br>Suite 2207<br>Wilmington, DE 19801<br>Attention: Jonathan W. Lipshie, Esq.<br>(jon.lipshie@usdoj.gov) | Bryan Cave Leighton Paisner, LLP<br>One Metropolitan Square, 211 North Broadway<br>Suite 3600<br>St. Louis, MO 63102<br>Attention: Laurence Frazen, Bart Wall, Katherine Spewak<br>(larry.frazen@bclplaw.com;<br>bart.wall@bclplaw.com;<br>katie.spewak@bclplaw.com)<br><br>and<br><br>161 N. Clark Street<br>Suite 4300<br>Chicago, IL 60601<br>Attention: Justin Winerman<br>(justin.winerman@bclplaw.com) |
| **Future Claimants' Representative and Counsel** | **Counsel to Unsecured Creditors Committee** |
| Hon. Shelley C. Chapman (Ret.)<br>c/o Willkie Farr & Gallagher LLP<br>787 Seventh Ave<br>New York, NY 10019<br>Attention: Hon. Shelley C. Chapman (Ret.), Jamie Eisen, Gabrielle Antonello<br>(schapman@willkie.com;<br>jeisen@willkie.com;<br>gantonello@willkie.com) | Caplin & Drysdale, Chartered<br>1200 New Hampshire Ave NW<br>8th Floor<br>Washington, DC 20036<br>Attention: Kevin M. Davis, Todd Phillips<br>(kdavis@capdale.com;<br>tphillips@capdale.com) |

After the Effective Date, the Debtor has the authority to send a notice to Entities stating that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtor is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

### H. Term of Injunctions or Stays

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in this Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### I. Entire Agreement

Except as otherwise indicated, this Plan (including, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### J. Exhibits and Annexes

All exhibits, annexes, and documents included in the Plan (including any Plan Supplement and the documents incorporated therein) are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits, annexes, and documents are Filed, copies of such exhibits, annexes, and documents shall be available upon written request to the Debtor's counsel at the address above or by downloading such exhibits, annexes, and documents from the Debtor's restructuring website at https://www.omniagentsolutions.com/vijon or the Court's website at https://www.deb.uscourts.gov/. To the extent any exhibit, annex, or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Court or otherwise specifically provided for in such exhibit, annex, or document, the non-exhibit, non-annex, or non-document portion of this Plan shall control.

### K. Non-Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the Debtor's consent; and (3) non-severable and mutually dependent.

### L. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters.

**M. Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtor or its counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Court prior to the Confirmation Date.

[*Remainder of Page Intentionally Left Blank*]

Dated: September 30, 2026

**VI-JON, LLC**

*/s/ Mackenzie Shea*
Name: Mackenzie Shea
Title: Chief Restructuring Officer